# EXHIBIT 54

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------X
PIERRE SANCHEZ,
PLAINTIFF,

-against- Case No. 2:17-CV-07335 (KAM) (LB)

NASSAU COUNTY, NASSAU COUNTY SHERIFF'S DEPARTMENT, CORRECTION OFFICER KEITH HOLLINGSHEAD, Shield # 2849, CORRECTION OFFICER ANDREW JAMES, Shield # 2797, SHERIFF MICHAEL SPOSATO, and CORRECTION OFFICER JOHN DOE 3,
DEFENDANTS.
------------------------------------------X
DATE: June 30, 2020
TIME: 10:10 A.M.

DEPOSITION of the Defendant, MICHAEL SPOSATO, taken by the Plaintiff, pursuant to a Notice and to the Federal Rules of Civil Procedure, held via videoconference at One West Street, Mineola, New York 11501, by Laura Anzelone, a Notary Public of the State of New York.

Page 2

A P P E A R A N C E S:

MORNINGSIDE HEIGHTS LEGAL SERVICES
Attorneys for the Plaintiff
435 West 116th Street - Room 831
New York, New York 10027
BY: CALEB WOODS, Certified Law Student Intern
BRETT MARY DIGNAM, ESQ.

COUNTY OF NASSAU
OFFICE OF THE COUNTY ATTORNEY
Attorneys for the Defendants
One West Street
Mineola, New York 11501
BY: JENNEAN R. ROGERS, ESQ.

ALSO PRESENT:
Kaivan Shroff
Daniela Weinstein

Page 3

F E D E R A L S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

* * * *

Page 4

M. SPOSATO

(Plaintiff's Exhibits 1 through 7 were marked for identification, as of this date by the Reporter.)

M I C H A E L S P O S A T O , called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY
MR. WOODS:

Q. Please state your name for the record.

A. Michael Sposato. One West Street, Mineola, New York 11501.

Q. Good morning, Mr. Sposato.

A. Good morning.

MS. ROGERS: For the record, former Sheriff Sposato has given the address of the Nassau County Attorney's Office. Thank you.

MR. WOODS: Before we begin, I will just run through the stipulations quickly.

It is stipulated and agreed that all objections except to the

Page 5

M. SPOSATO

form of the question or privilege are reserved until the time of trial. It is further stipulated and agreed by and between the attorneys for the respective parties hereto that the proof of the authority of the notary public of whom this deposition is taken is waived. It is further stipulated and agreed that the within deposition may be signed and sworn to before any notary public, and it is further stipulated and agreed that any defects in the notice are waived. It is stipulated and agreed by and between the attorneys for the respective parties hereto that the reading and signing of the within deposition by the witness is not waived.

Q. Good morning, Mr. Sposato and Ms. Rogers.

My name is Caleb Woods. I am a law student intern working under the supervision of Attorney Brett Dignam. We

Page 6

M. SPOSATO
represent Mr. Pierre Sanchez in this case.
I just want to go over a little bit of the baseline. You were just sworn in, and you are now under oath. Do you understand this?
A. Yes.
Q. If you do not understand a question, please let me know. I will try to do my best to rephrase it. Do you understand this?
A. I do.
Q. If you have answered the question, I am going to assume that you understood the question. Do you understand that?
A. I do.
Q. The court reporter can only transcribe one person speaking at a time. So, I would ask that you wait until I finish speaking to begin to answer a question, and I will extend you the same courtesy.
If you remember any additional information about a question that I have

Page 7

M. SPOSATO
asked you previously, you can supplement or correct your earlier answer. Just let me know. Do you understand?
A. I do.
Q. If you want to take break, that's perfectly fine, but you must answer the last question that I asked before we can take that break. Do you understand?
A. I do.
Q. You may hear your attorney make an objection from time to time. That's fine. Unless you are instructed not to answer the question, you still have to answer the question even if there is an objection. Do you understand?
A. I do.
Q. Do you have any questions about what I just went over?
A. No. I don't.
Q. Is there any reason that you wouldn't be able to give a full and truthful answer today?
A. No. There is not.
Q. Then we will begin.

Page 8

M. SPOSATO
I would like to introduce the first exhibit in the deposition, which has been marked as Plaintiff's Exhibit 1.
A. Okay.
Q. Are you familiar with this document?
A. Yes. I am familiar with it.
Q. What is the document for the record's sake?
A. This is the Pierre Sanchez lawsuit, plaintiff against the county and myself and other John Doe officers. It is the complaint.
Q. Do you understand that you have been named as a defendant in this civil action being brought by Mr. Sanchez?
A. I do.
Q. Do you remember Mr. Sanchez?
A. I do not.
Q. Have you ever spoken to Mr. Sanchez at all?
A. No. I have not.
Q. When did you first learn that this lawsuit had been filed?

Page 9

M. SPOSATO
A. I can't recall the exact date. Whenever the county attorney's office notified me that I was named in the case.
Q. Was this in 2018?
A. I can't recall a date.
Q. So, who told you about this lawsuit did you say?
A. The county attorney. I believe it was my attorney here that sent me the information.
Q. Are you familiar with the facts of this case?
A. I went over the complaint and some of the history of this complaint, so, yes.
Q. Have you ever been named as a defendant in another civil case?
A. Yes. I have.
Q. Do you remember any of the other named plaintiffs?
A. I don't recall names exactly, but I could get that for you.
Q. Do you remember any other named defendants that were alongside of you?

Page 10

M. SPOSATO
A. Normally, they have John Doe and a lot of them have unnamed correction officers that I did know, but I don't recall exactly the captions and all the cases.
Q. Have you been named as a defendant in any criminal proceeding?
A. No.
Q. Have you ever been deposed before?
A. I have.
Q. How many times would you say you have been deposed?
A. I want to say this is like my fourth deposition.
Q. When was the most recent deposition that you have given?
A. Approximately, I want to say either the beginning of this year or the end of last year. I don't recall. Maybe six months.
Q. What was the alleged conduct in the case there?
MS. ROGERS: The conduct of the

Page 11

M. SPOSATO
witness?
MR. WOODS: Correct.
MR. ROGERS: You may answer the question.
A. Can you repeat the question?
Q. What was the alleged conduct being discussed in the deposition for that case?
MS. ROGERS: His conduct, right?
MR. WOODS: Correct.
A. My conduct in all the cases has been as the overall manager of the sheriff's department.
Q. What did you testify about in that case?
A. I don't recall which case was the last case. I testified to whatever questions they asked and what my role was as the manager of the sheriff's department.
Q. Is this case still ongoing?
A. I believe one of them.
Is your question about the ones I have been deposed on before?

Page 12

M. SPOSATO
Q. Correct.
A. I believe one or possibly two are, but I am not positive of that.
Q. In addition to this case.
A. Yes.
Q. Did you prepare for this deposition in any way?
A. Yesterday I met with the county attorney to go over some stuff.
Q. For how long did you meet?
A. Approximately an hour, forty-five minutes.
Q. Did you review any documents at that meeting?
A. I did not.
Q. Did you review any documents before this deposition?
A. The only thing I reviewed was whatever I received, the initial complaint. I read that.
Q. Did you bring any documents with you?
A. No. I did not.
Q. Did you meet with any other

Page 13

M. SPOSATO
lawyer to prepare?
A. No.
Q. Did you meet with any other named defendants?
A. No. I have not.
Q. Have you been instructed on how to answer any question that might arise?
A. No. I have not.
Q. Do you have the documents that were sent to your lawyer and that have been marked as exhibits with you?
A. No.
MS. ROGERS: Yes. I have those documents.
THE WITNESS: I don't have them.
Q. I am going change gears here.
Are you married?
A. Yes. I am.
Q. For how long have you been married?
A. Since 2014.
Q. Where do you live?
MS. ROGERS: I am going to

Page 14

M. SPOSATO
object. He can give a very broad statement as to where he lives, such as the county, but aside from that, I am going to have to ask him not to answer that.
MR. WOODS: That's perfectly fine.
MS. ROGERS: You can answer.
A. Bayside, New York. Queens.
Q. How long have you lived there?
A. Approximately six years.
Q. So, around the same time you got married.
A. Yes.
Q. Are you from New York originally?
A. I am.
Q. A native New Yorker.
Did you graduate from high school?
A. I did.
Q. Which high school did you go to?
A. Hicksville High School.

Page 15

M. SPOSATO
Q. Where is that?
A. It is in Hicksville in Nassau County.
Q. Did you continue your education after high school?
A. I went to Nassau Community College.
Q. Did you earn a degree there?
A. I did not.
Q. What did you study?
A. Hotel restaurant management. I received about for forty-eight credits, and I didn't stay.
Q. For what reason did you not stay?
A. I wasn't interested to finish it.
Q. Did you enter into the workforce after that?
A. I worked for -- I am not sure if I went right to -- I worked for the Town of Oyster Bay I believe in 1992.
Q. What was your job with the Town of Oyster Bay?

Page 16

M. SPOSATO
A. I was an operator in a sewer district. It is like a water plant.
Q. What were your responsibilities in that role?
A. It was just basically, you know, a laborer slash operator of the pumping plant. I did that for two years.
Q. After those two years in 1994, what did you do?
A. In 1994, I was hired as a cook at the jail on May 27, 1994.
Q. What were your responsibilities in that job?
A. A cook is -- In Nassau, it is a unique title. It is a correctional center title. You basically supervise the inmates that are cooking inside the kitchen.
Q. So, how did you get selected for that job?
A. That was an appointment by the sheriff.
Q. How did you come into contact with the sheriff to be appointed?
A. I had known the sheriff. I had

Page 17

M. SPOSATO
known back then the county exec., and a there was a job opening. That's what I did, hotel and restaurant management, and there was an opening.
Q. So, you claim that there were interactions with detainees in that position.
A. They worked with us in the kitchen. Yes.
Q. Did you have to undergo any training to have that position?
A. Yes. I believe we went to a two or three-week course to understand some of the day-to-day stuff because you are supervising inmates, so we had to learn certain procedures, how to write reports. You know, it was a lot of the stuff that the jail had, policies and stuff like that to understand the workings of the jail.
Q. Who did you report to?
A. There were three kitchen supervisors.
Q. Did you have any policymaking input for your role in the kitchen?

M. SPOSATO

A. No. I didn't.

Q. How long did you remain at that specific role?

A. From May 27 of 1994 until -- I can't tell you the exact month in 2005. One kitchen supervisors retired, and then I became the kitchen supervisor.

Q. What are your responsibilities as the kitchen supervisor?

A. We basically decided the schedule for the cooks, what squad they worked on, what buildings they worked at. We met with nutritionist that had to go over the menu. We spoke to come some of the correctional staff because there had to be specific diets, specific religious us diets. There were a lot of things that went around for the kitchen. We also supplied food for the officers and staff. I had to decide what cooks would work in, as we called it, the mess hall where the officers ate. So, we had separate people. It was more of a scheduling role, and food ordering role, and basically stuff like



M. SPOSATO

that.

Q. Are there still interactions with detainees in that role?

A. Yes. Your office is actually in the kitchen. Basically, there are two kitchens. The supervisors, we rotated back and forth, but, yes, there was.

Q. Did you have to undergo any training specific to that position?

A. Just a brief supervisor training where a little higher level than the training to be the C.C. title cook to start, you know, more of a role as a supervisor how we would deal with the higher ranks in the jail and to oversee the reports that were coming to us from the cooks. It was just more of a management role.

Q. What sort of reports are coming to the kitchen supervisor from the cooks?

A. Basically, it was like I said, more menu items, what food to order, what stock we were low on. We had to -- Our length of stay changed often in the jail.



M. SPOSATO

Our length of stay was like forty or fifty days, so we always had to get new guys in there. It was just a lot of day-to-day operation reports.

Q. You said you were speaking to the higher ups. Who did you report to?

A. The kitchen had -- We had a captain, and then the captain went up to higher ranks in the jail.

Q. Did you have any policymaking input in the role as kitchen supervisor?

A. Policy, only as far as what the supervisor's role was as far as what time the inmates had to -- We personally did the escorts. There were no correction officers in the kitchen. So, the policies would be, like, you have to pick up the inmates at that specific time, drop them off, squad changes, you know, where I wanted people scheduled. It was basic management policies.

MS. ROGERS: Can we just take a quick five-minute break if that's okay.



M. SPOSATO

MR. WOODS: Sure.

(Whereupon, an off-the-record discussion was held.)

Q. You had mentioned that kitchen staff were picking up and dropping off the detainees. Are you saying that the kitchen staff were actually doing the movements without the help of corrections officers?

A. The title, as I explained, the title in the jail is a unique title for this county. It gives you the -- We had the authorization to have movements that we did as cooks because we were trained, and we didn't have to have a correction officer with us.

Q. You were just picking them up from the housing units and taking them to the kitchen itself?

A. The housing unit right to the kitchen.

Q. How long did you hold this position?

A. I was in that position from 1994 up until -- No. Strike that. In 2005

Page 22

M. SPOSATO
I was a kitchen supervisor, and also in 2005 I was promoted to chief of staff to the sheriff.
Q. Which sheriff was this?
A. This was Sheriff Reilly.
Q. Was this the same sheriff that you had known that got you into the kitchen originally?
A. No. That was another sheriff.
Q. Which sheriff was that?
A. That was Joe Jablonski.
Q. In 2005, you were given a promotion to chief of staff. Was there any training that came with that role?
A. I went to -- I don't recall what year I went to it. There was no specific training to be the chief of staff to the sheriff, but I went to a course in Harvard for local business leaders in government. It was like a three and-a-half week course. I'm not sure if I went in 2005 or in the beginning of 2006. It was a training course that the county sent me for leadership in management.

Page 23

M. SPOSATO
Q. To your knowledge, is that course routine for chiefs of staff to take?
A. I don't know the procedure for that course. There was law enforcement people, mayors, counsel people. It wasn't all just government. It was for law enforcement. There were people from around the world. I guess you sign up for the course. I don't recall exactly, but it wasn't specifically for a chief of staff.
Q. Do Nassau County chiefs of staff usually take some sort of course?
A. I can't recall what other chiefs of staff did. No.
Q. What are your responsibilities in the chief of staff role?
A. In my chief of staff role, I basically worked for the sheriff. Anything that the sheriff would need, I would do.
Q. What sorts of responsibilities would the sheriff normally task you with?
A. If he needed meetings with supervisors. It was just basic stuff. I was his chief of staff. I set up some

Page 24

M. SPOSATO
meetings for him. I would be in meetings with him. Whatever the sheriff needed done.
Q. Did you have any interactions with detainees in that position?
A. I mean, I would tour the jail. I would see them. I don't know as far as interactions with them personally, but I toured the jail often.
Q. Did you have any supervisory responsibilities in that role?
A. I worked directly for the sheriff. I had no line directly to any staff members.
Q. So, you only reported to the sheriff?
A. No one physically reported to me personally. I worked directly for the sheriff.
Q. Did you have any policymaking input in that role?
A. No.
Q. How long were you the sheriff's chief of staff?

Page 25

M. SPOSATO
A. I went in at some point in 2005, and then in 2006 he appointed me to undersheriff of the sheriff's department.
Q. Do you remember which month in 2006 you were appointed to be undersheriff?
A. I want to say February. I would be speculating, but I want to say February or March of 2006, but I can't recall the exact date.
Q. Who is the undersheriff at the time you were chief of staff?
A. When I was chief of staff, the undersheriff was Sidney Head.
Q. Why did Sidney Head vacate the position?
MS. ROGERS: Objection.
You may answer.
A. The sheriff appointed me undersheriff.
Q. As the undersheriff, what responsibilities were given to you?
A. The undersheriff is officially second in command of the sheriff's department. They would be acting as the

M. SPOSATO
sheriff in the sheriff's absence or if the sheriff was not available for emergency. Basically, I was the second in command.
Q. What sorts of tasks were you given outside of your second-in-command role?
A. Basically, everyone in our chain of different units, everyone would report directly to me, and I would report directly to the sheriff.
Q. When you say chain, can you explain what a chain is?
A. We have a table of organization which would show the sheriff and his staff and command positions, whether it would be the undersheriff, the deputy, deputy undersheriff, commissioners, captains, lieutenants. All the different positions in the sheriff's department would come up to a tree. That's the best way to describe it. They would all come up to the sheriff and undersheriff. We had multiple divisions in the sheriff's department.
Q. Is the deputy undersheriff and


M. SPOSATO
undersheriff the same role or are those two separate roles?
A. They are all separate roles.
Q. So, deputy undersheriff and undersheriff are not the same thing?
A. Undersheriff is a higher title. A deputy undersheriff and commissioner would have separate individual groups of people that would go to them, and then they would come up to me. They had different ranks, different titles.
Q. How long were you the undersheriff?
A. I was the undersheriff until officially in February of 2008 when Sheriff Reilly left. I became the acting sheriff.
Q. What was Sheriff Reilly's reason for leaving Nassau County?
A. I don't recall why he decided to leave.
Q. You were the acting sheriff in 2008 until what time?
A. I was the acting sheriff in 2008 until I was appointed sheriff in 2011.


M. SPOSATO
Q. In your capacity as acting sheriff, what were your responsibilities there?
A. I was the overall manager of the sheriffs.
Q. Let me back up quickly.
As undersheriff, did you have any supervisory role?
A. I was the undersheriff. I was the overall supervisor for everyone underneath me.
Q. Did you interact with detainees in that position?
A. The same as before. I toured the jail, so I saw them, but I'm not sure about interaction.
Q. Did you have any policymaking input as undersheriff?
A. I would put out -- I mean, there were sheriff's orders and undersheriff's orders. I can't recall what orders I specifically put out, but I was able to put out directives to the people, the responsibilities that were underneath


M. SPOSATO
me, the different divisions.
Q. So, the undersheriff orders, would you say those are internal documents?
A. Yes.
Q. Do corrections orders have to observe undersheriff's orders?
A. Yes.
When you say observe, can you give me the definition of observe?
Q. Do they have to adhere to the undersheriff's orders?
A. Yes.
Q. These corrections officers are the ones who are actually supervising the detainees, correct?
A. We have correction officers and then we have another rank of corporal in housing areas, but, yes, they supervise detainees.
Q. What sorts of topics were the undersheriff's orders pertaining to?
A. I can't tell you specific orders, but it could be anything from -- We had deputy sheriffs. We had -- You know,

M. SPOSATO
basically whatever directions I needed to put out. A lot of things happen in the sheriff's department. If there were changes, you know, there could be a visiting holiday schedule. It was the day-to-day operations in the sheriff's department. I would put out the directives.
Q. Are the undersheriff's directives and sheriff's directives, is there any overlap in the subject matter?
A. It depends. I mean, I could put out a directive, and the sheriff has the overall directives. I could amended some of them. We had different roles. The undersheriff wouldn't -- The undersheriff wouldn't put out an order and the sheriff override the order and you put out a new one. There would be discussions. There would be orders that I would put out, and there would be sheriff's orders. There were a lot of different orders that went out through captains and through different people.



M. SPOSATO
Q. How would you decide with the sheriff which orders were best to be given from the undersheriff and which were to be best to be given from the sheriff?
A. It depended on the situation. There were things that were not at his level. There were day-to-day things that I could put out. It was basically just the need of what I felt or he felt the need of the department was, and we would put out the orders.
Q. Would you say that the sheriff's orders concerned matters that had more weight in the jail?
A. It is an unanswerable question. We both put out orders that had weight. We wouldn't put out an order unless it was a specific responsibility in the sheriff's department. It wasn't, you know, who's order was more. We put out orders for different reasons.
Q. In 2008, you began working as the acting sheriff, correct?
A. Correct.



M. SPOSATO
Q. Does the acting sheriff have any difference in responsibilities to a sheriff?
A. The acting sheriff simply meant I am the sheriff. I wasn't confirmed by the legislature to be a permanent sheriff, but it is the same responsibility as the acting sheriff as the permanent sheriff.
Q. Did you undergo any training for the position of acting sheriff?
A. No.
Q. Did you report to anyone as acting sheriff?
A. As acting sheriff, we went to -- I went to -- I had a -- There are different times. I went to the deputy county executive for public safety, and we also had a chief county executive and county executive. I went to them all for different reasons.
Q. You had final policymaking input as acting sheriff.
A. Yes.
Q. In 2011, you became a full



M. SPOSATO
sheriff.
A. In 2011, the then county executive put me forward to the legislature for a vote. I had to be voted on by the legislature. They vote yes or no, and then you become the sheriff.
Q. So, this is not an elected position.
A. It is appointed by the county executive and the legislature.
Q. How long were you sheriff?
A. I was sheriff until the change of the administration at midnight on December 31 of 2017, so, January 1, 2018 I guess.
Q. On January 1, 2018, did you get a new job?
A. I took some time. I did some consulting, and pretty much that's it.
Q. What kind of consulting?
A. I did some consulting for I.T. staffing. I did some consulting for some court conferencing. I did some consulting for a family business. Pretty much that's

M. SPOSATO
it.
Q. Do you still hold this consulting job?
A. I hold one of them.
Q. What is your full title in that consulting position?
A. Just a consultant.
Q. I am going to change the background here a little bit.
Does the sheriff have an employment contract with the county?
A. The sheriff serves at the pleasure of the county. It is an appointment. Though you are approved by the legislature, the county executive can bring in a new sheriff at -- I am an at-will employee.
Q. So, any time the county executive decides, them can pose a new sheriff?
A. Yes.
Q. Do you stay in as sheriff until that new sheriff is voted on by the legislature or does the --



M. SPOSATO
A. It depends on the county executive. If they tell you that they are replacing you, they can replace you. They can ask you to stay. There is nothing that says you have to stay until there is a new sheriff. It is totally up to the county.
Q. Was there long deliberation when the legislature voted on you?
MS. ROGERS: Objection.
You may answer.
A. I was approved unanimously by both sides of the legislature. I don't know how long I was up there testifying, but it was a unanimous vote by both sides.
Q. So, the sheriff being fully at will to the county executive, how does the sheriff keep the job?
A. Well, one, you work hard. You have a budget to manage, a staff to manage. You have to run your department.
Q. Is the sheriff a government official in Nassau County?
A. I am a department head, so I would say yes.



M. SPOSATO
Q. And that department is the sheriff's office, correct?
A. Yes.
Q. What made you want to be the sheriff?
MS. ROGERS: Objection.
You may answer.
A. Like I said, I started off in the kitchen. I rose up. I liked the sheriff's department, the staff, and I just, you know, I kept moving. You always strive for higher, and that was the highest you could be. I kept managing my way, and I made it to the sheriff.
Q. What does the sheriff's day-to-day responsibility look like?
A. You would have to ask all the sheriff's specifically.
Me, personally, I was basically the overall manager. I had a lot of staff underneath me. I would meet with different levels of my staff. Some things might have happened that day. There might be a reason to have a specific meeting. Mostly, it was



M. SPOSATO
just management. I basically met with my team who basically did overseeing of different units. I was basically the overall manager of the sheriff's department.
I had a lot of different roles, you know, budgetary things, and legislative things, and jail things. I also held handled the civil enforcement division which was the deputy sheriff's side. So, there were a lot of roles.
Q. You said that if something happened, you might have to have a meeting with someone. What sorts of things triggered these meetings?
A. A lot of different things happened. We had emergencies. You know, if there was going to be a blizzard for three days, we had to close things. There were so many different reasons why we would have things that happened by the day in the jail. If something happened out of my --
My basic day was meeting with staff and going over things with them. Unless

Page 38

M. SPOSATO
something popped up that we had to have a specific meeting on, we did that. It was a lot of personnel things, a lot of budget things. It was an overall management role that I had.
Q. You said that you engaged in legislative actions. What sort of legislative actions were you engaging in?
A. Like I said, we had a budget to adhere to. There was a public safety committee. There were a lot of different committees.
As the sheriff, you handle things countywide. You handle things in different departments that we all have roles in. It was a lot more than just being the manager there. That's why you have staff because there are other things the sheriff has to do.
Q. Is the management of the jail a large part of the sheriff's job?
A. Yes.
Q. What portion of the budget was going to the management of the jail?

Page 39

M. SPOSATO
A. The sheriff's department had a budget. I would say ninety percent would be the correctional center and ten percent would be the civil enforcement division. Again, that's an approximate. I don't recall, but it was a much, much smaller division.
Q. Overall, the management of the jail seemed to be the lion's share of the budget and responsibility?
A. The day-to-day operations of both divisions. Plus, obviously, we had a budget. We had the civil enforcement side, the security side, and that was basically the overall operating of the jail.
Q. Is the sheriff position a political position at all?
MS. ROGERS: Objection.
What do you mean by that?
Q. Is there any non-administrative external force that you have to deal with that would impact your ability to keep the job?
A. You work for the county

Page 40

M. SPOSATO
executive. You keep your job and you work. I don't understand the question, but your job is -- You go into the job, and you do the best job you can knowing that the county executive can replace you. I don't know what you are asking, but my job was based on my performance.
Q. Which external groups would you interact with frequently as the sheriff?
A. We spoke often to the legislature, the police department, the district attorney's office, the medical center, the department of health, the department of mental health. It was a very broad. There was parole and probation. It was a very complex thing. It wasn't like an everyday interaction, but there were numerous, numerous groups. We had federal agencies. There were a lot of different people we interacted with.
Q. Were there any private groups that played an important role in your time as sheriff?
A. We had a lot of community

Page 41

M. SPOSATO
groups. I had meetings monthly with the community. We had a lot of clergy. If that's what you mean by those types of groups. We had a lot to do with the community because there were issues and different -- I met with whatever groups were looking to meet with me for whatever reasons.
Q. Did you have any interactions with employment groups during your time as sheriff?
A. Employment groups? Well, human resources the county, but employment groups other than H.R. and the county, no.
Q. Did you meet with any unions as your time as sheriff?
A. Yes.
Q. Were those substantial interactions with the unions during your time as sheriff?
A. I talked to the unions often.
Q. Did these external interactions make differences in the way you did your job as sheriff?

Page 42

M. SPOSATO

A. You have to listen. I met with a lot of groups. They had concerns. They had ideas. We would sit down, and we would talk with the unions and a lot of different things. Basically, that's why you meet with people. You try to resolve things. Some things I could help with. Some things I couldn't. That's basically the reason why I met with them.

Q. Based own your experience as sheriff, what are the basic elements of running a good jail?

A. Well, you know, our jails basically are care, custody, and control. That's really the main crux of it anywhere. I think to run a good jail you have to manage it. You have to make sure you know what your staff is doing the best you can with a large department, and a large budget, and try to put things in place that work, and, you know, you listen to people, and you try to do the best job you can do. It is a very big job.

Q. Would you say that every

Page 43

M. SPOSATO

facility could be run with that care, custody, and control mentality?

A. Well, I think jails basically, you know, we have custody, care, and control. That's the premiss. You have a lot of staff. You have a lot of employees. You have a lot of interaction with people, and that's the work you are tasked with.

Q. Is there anything that makes Nassau County's facility unique to other facilities?

A. Well, one, minus Rikers Island, we are now the largest in state county jails if you take away Rikers. Nassau has that unique title I told you about. We are the only county that has the correctional center cook title that is not supervised by corrections staff. Every county has their own policies, their own rules. I don't know if anyone does exactly the same things. It is not something that I could brief you on. I don't know if we are unique to -- I don't know what you mean by unique. That's pretty much how I would

Page 44

M. SPOSATO

answer that.

Q. So, if the same person ran every prison, would it be more or less the same from the correction officer prospective?

A. Well, you have to understand a couple of things. There is one of more thing about it. Nassau County and Rikers are the only two counties that have an appointed sheriff. Everywhere else in New York State they are elected. That would be another unique thing. I can't speak to how anyone else ran the jail. I can tell you how I ran it. I don't know how any other sheriff runs their facility.

Q. How often did you interact with the correction officers that were stationed in the housing units?

A. Only if I was touring with my -- We had multiple supervisors between a correction officer and me. When I would walk, I would say hello to the corrections officers, see how everything was going, but I didn't have an everyday interaction with

Page 45

M. SPOSATO

correction officers.

Q. Did you interact often with inmates or detainees?

A. Again, if I toured, you know, they are talking on the tier through their housing location, and they need this or that. I walked around. If someone asked me something, I would listen. I would talk to the supervisors there. I didn't go around every day doing that.

Q. How often would you say that you went on a tour?

A. I toured often. I toured definitely weekly if not biweekly. I had a multiple -- It is a very large place, our facility, with multiple units. I toured as frequently as I could.

Q. Do you control the policies that are followed by the correction officers in the Nassau County jail?

A. The policies that come out from myself and previous sheriffs over the years, you know, we have a lot of staff that do more of that. There are different

Page 46

M. SPOSATO
line supervisors. They are the ones that are basically the ones that are in the units. You have the building supervisors. People that have multiple units, they are the ones that are making sure that, you know, to the best of their ability, the officers are following the policies.
Q. Are they the ones who are creating these policies?
A. The policies have been created over numerous, numerous years from multiple sheriffs and undersheriffs and commissioners. Again, there is a lot, a lot of policies from the sheriff's office. The supervisors would be the ones that are making sure what needs to be done day to day is happening.
Q. Could you explain the commissioner role quickly?
A. Well, again, there wasn't always a commissioner. The commissioner is a title that basically ran the day-to-day operations, when we have had it, out of the corrections side.

Page 47

M. SPOSATO
Q. So, there is a commissioner underneath the sheriff that oversees exclusively the jail?
A. Again, the sheriff oversees the sheriff's department. If there is an undersheriff, he would also be overseeing it. The commissioner is a role that the sheriff can give any role to. In the past, the commissioner -- We have only had a couple of commissioners. The commissioners in the past would be focused on the correctional center.
Q. Did you appoint a commissioner during your time as sheriff?
A. I appointed -- I did appoint a commissioner at a point in my time. I don't know what year. I brought in somebody. Yes.
Q. Does the sheriff have ultimate control over the policies that are followed by the correction officers?
A. Again, as I stated, there are numerous policies from numerous sheriffs. The policies that have been out for years

Page 48

M. SPOSATO
and years, you know, the sheriffs, there might be sheriff's policies, but there are supervisors that go up -- We have a lot of ranks. They are the ones that make sure the policies are adhered to.
Q. They are the ones that are creating policies?
A. No. The policies would come from the sheriff, the commissioner, the undersheriff. They could come up and recommend that this needs to be changed or that needs to be changed, but they wouldn't personally put out orders without the knowledge of the sheriff or the undersheriff.
Q. In your capacity as sheriff, who do you work most closely with?
A. You would always work most closely with your administrative team. I did bring on a commissioner. I did not have a lot of staff. I reduced a lot of it. I had a department undersheriff. I had a lot of captains. I dealt mostly with captains, the department undersheriff, the

Page 49

M. SPOSATO
commissioner.
Q. You said that you reduced a lot of the administrative team. Which positions did you get rid of?
A. I didn't get rid of them. Over administrations, people changed and leave. I just didn't fill a lot of positions. I didn't get rid of anyone just, their positions were open and I didn't fill them. We had enough staff. Like I said, I had a commissioner. I had a department undersheriff. I had different people. I was there for a lot of years. Different years, we had different things. I managed it. I had what I felt I needed in my administrative team to run the jail.
Q. Did your administrative team keep you up to date with what was going on day to day in the facility?
A. Depending on what level. I wasn't briefly on every single thing that happened. It is too big. If an officer was hurt or if there was a major incident, you know, there were a million things that

M. SPOSATO
I would get briefed on. It was not like every single second. I would have meetings on stuff with the staff if something came up that I needed to know.
Q. Was the discovery of contraband something that you needed to know?
A. Depending on what the level. We had units that handled all this. If there was something found, you know, they wouldn't be briefing the sheriff. No.
Q. You said depending on which level. At which level did it become the sheriff's responsibility to know about it?
A. If they found something major and they wanted to lock down the facility or they thought it was unsafe. You know, I don't want to get too much in the security procedures, but there were certain things that I could authorize that they couldn't authorize without me. If there was something very serious that they needed to do right away, they needed my approval, they would reach out to me. If it was basic, I was not briefed on it.



M. SPOSATO
Q. Were you briefed on assaults?
A. Again, depending on what level. A lot of the assaults happen and we find out about them later. We are not notified right away. My team would get stats, the people underneath me, and if it rose to someone was assaulted, an inmate or officer, either one, and they had to be at the hospital that second or it was a major situation, I would be briefed. But, again, depending on -- I had staff underneath me that handled all that.
Q. How often did you, in your capacity as sheriff, create a policy?
A. I didn't create policies often. There were numerous sheriff's policies over a long time and commissioner's policies years ago. There would be times that we would modify a policy if something new happened or if there were new guidelines that came in from somewhere or we decided we wanted to make a change, but I didn't often put out new policies unless something new was happening from state guidance or



M. SPOSATO
something I felt we needed to do. It wasn't a regularity that I was putting out policies.
Q. Where was the state guidance coming from?
A. We have an oversight. It is the State Commission of Corrections. There would be different things whether it was visiting or -- There were a lot of different things that the state comes up with that sometimes we had to modify. That's when I would put out changes.
Q. How often did you have to put out these changes?
A. I can't tell you how often I even put out sheriff's orders or how often I put out a policy. A new policy would be very rare.
Q. If you wanted to put out a new policy, would it take time to get this policy implemented?
A. It depends on what the policy would be and if I was updating an old one or if there was something new. I can't



M. SPOSATO
give you a timeline on it. I wouldn't know what type of policy you are referring to if I was going to put out a policy.
Q. You mentioned that you have oversight from the State Commission of Correction. Do they take input to those that are closer to the facilities?
A. Can you repeat that and go a little further with it?
Q. Does the State Commission of Correction, when they are giving you guidance, do they listen to the people who are actually running these facilities to create that guidance for the rest of the state?
A. The State Commission of Correction is a state agency. They have the oversight of the jails, the police lockups, the state prisons. There is a lot of stuff they have. I don't know why their information comes from. If they are going to put out a new directive to us, I don't know who is involved in their conversations.

M. SPOSATO

Q. Were you ever involved in a conversation with the State Commission of Corrections?

A. Yes.

Q. What did you talk with the State Commission of Corrections about?

A. They would tour the facility. If there was something I needed guidance on or if there was something they needed guidance on. There were a lot of things. I don't have any specifics to tell you about my relationship and conversations with them, but we would speak if there was something we would need to speak about.

Q. Did the State Commission of Correction have input in correction officer training policies?

A. The only -- To my recollection, the only requirements the State Commission has is the basic training course for correction officers when they are hired. I don't believe they have any role in anything further than after you graduate the academy. Again, I don't believe they



M. SPOSATO

do, but I'm not sure.

Q. Did they circulate materials to each facility for that training specifically?

A. There is a guideline. There is our training manual that is part sheriff's department, what we personally need, and part mandates by the State Commission of Corrections. There are certain things that the state -- you have to pass certain things based on the state.

Q. Was the sheriff the one in Nassau County Correctional Center that was tasked with compiling these training materials and policies from the S.C.O.C. and other sources?

A. No. We always had a liaison from the S.C.O.C. who they dealt with on a regular basis. Me personally, no, but we had staff that did that. My training supervisor that handles training, different ones over the years, he would work with the liaison to the State Commission of Corrections. Basically, it was a



M. SPOSATO

guideline. I don't know how often that guideline changed. It might have not changed for years. I can't tell you that. I wasn't personally involved in the training guideline from the state for the academy.

Q. So, for the academy, are you the final decisionmaker for what gets put into the training policies?

A. No. I am not involved. We have a training unit. We have a lot of staff in training. We have a captain. They follow a guideline. They have a curriculum. When you get hired as a correction officer, it is eleven weeks or a thirteen-week course. They do firearms. They do report writing. There are a lot of different things that you have to do. It is a curriculum that they put forward.

Q. Do you have any input over that curriculum?

A. I don't get involved. If there is something that the training person needs, they might ask me a question, but



M. SPOSATO

once they are sworn in -- I wear them in. Once they are sworn in as correction officers, they go to the academy. Once they pass, I swear them in again, and they become correction officers. As far as the day-to-day training, it is all done by my training staff.

Q. You choose who is on the training staff?

A. No. I chose the supervisor of the training staff. All of our jobs are posted. I don't just -- There is a lot of people. We post the positions, and then I discuss it with different people, multiple people, and then we come up with who is going into these groups.

Q. Can the sheriff issue a directive that would change the type of training that is required?

A. There would be no reason for him to. There are things I could add. Depending on situations, there were times when I had them do some more mental health training. There are different things.

M. SPOSATO

Again, minus the state guideline coming out and minus something that I think needs attention, the training curriculum is done by the training staff.

Q. When they change the curriculum or their training policies, were you made aware of it?

A. I'm not sure they ever changed it, so I can't answer that. As long as they make the state mandates and they train the correction officers to obviously become a correction officer the best they can be -- You know, I am not engaged with every single thing they do every day unless they come to me, which would be a very rare situation where they are asking me what they are going to teach in the academy that day. There are too many people in the chain that they would go to so that would never get to me.

Q. So, you were never made aware of any changes to the training policy?

A. Again, it depends if there was a state guideline. If you are saying that



M. SPOSATO

this year's training they decided to cut it down to three weeks, they couldn't do that without me. Unless there was a change, and I don't know if there ever was a change, but if they were going to change something drastic, they would have to ask me for approval. I am not recalling that they would make any changes that didn't come from me or the state on their own.

Q. During your time as sheriff, you never made any changes to the training policies or materials that were given to the correction officers in the academy?

A. As I said, I was the sheriff and active sheriff and undersheriff for a lot of years. Can I sit here and tell you I never made a change? I can't. I can't tell you that. I don't recall it.

Again, depending on state guidance and state rules, you know, we had a training curriculum and we followed it. Unless things had to be yearly or whenever the state came out with new things that had to be done, that would be the only time my



M. SPOSATO

role would be involved.

Q. You said they wouldn't be able to, for example, reduce three weeks of training without your approval. Was there ever any reduction of training that they needed your approval for that you did approve?

A. Again, it was a lot of years. I don't recall if they came to me. My point to that was simply that they just can't say, you know, we are not going to train them, and we are going to cut out three weeks of training and not do all these required things without telling me. That wouldn't happen. I can't recall how many times they have come to me over thirteen years about asking to add or to delete something from the training. I can't tell you that.

Q. Did they ever ask you to add or delete something from the training?

A. I can't recall if they did.

Q. When you came into the sheriff's position, did you identify any



M. SPOSATO

major problems with the way that the jail was run?

A. I took time to assess it. I just didn't come in one day and say, these eighty-seven things are right or wrong. I looked at it, and I managed it the way I thought was right. I did what I thought was right, not the way people did it before or now. I tried to understand as much as I could about the sheriff's department and tried to manage it.

Q. What were some of the major problems that you identified during your initial assessment?

A. I wouldn't call them major problems. There are always things that I think could be done better. There are a lot of security things, and, you know, nothing to really discuss, but, again, I don't have any specifics to tell you. I just feel like you meet with the staff, and you try to do things in a more efficient way. That was my role. I tried to do things more efficiently, better, safer, and

M. SPOSATO

just try to manage.

Q. What security things were you referring to when you said that there were some security things?

A. No. I said I would look at security things. If there was something I felt needed to be changed, I would change it. I don't have any specific examples.

Q. Would these problems holdovers from the previous sheriff?

MS. ROGERS: Objection.

He never said there were any problems.

Q. Were there any things that you had identified that were holdovers from the previous sheriff?

A. I think every sheriff managed differently. I worked with the last sheriff. It wasn't about going out there and trying to find something that the last sheriff did or didn't do. I tried to look at the jail in the way I saw it, and how I ran it, and what staff I had, and what management people I had, and I tried to



M. SPOSATO

find the best way to do it most efficiently.

Q. What were the major things that you setout to come accomplish during your time as sheriff?

A. I mean, as sheriff, we tried to accomplish and efficiently run a safe sheriff's department. It is a large place with a lot of different groups, a lot of different union groups. It was basically a lot to do. I had to try to see things I felt that we could be doing better. I think every place, no matter what management you are in, government or non-government, banks, I think there is always a way to manage it and find ways to do things more efficiently, and that's what I did.

There was nothing I saw that was wrong. I just thought there could be things done my way differently. I had people focus on different things, but nothing I can say specifically.

Q. What was your idea of



M. SPOSATO

efficiency? What do you think of when you are saying efficiency?

A. We have a lot of different things we do. Obviously, we have overtime that we have to watch. We have a lot staff. We have a lot of shifts, a lot of units. I just tried to dissect ways to look into -- I tried to learn about every unit that we had. There were multiple, multiple units, and I tried to understand what it was that they did, what their role was, what staff did they have, did they need that staff, did they need more staff, could they do it a different way, different ways. I was more of a manager to try to be efficient and try to do things the best we could do it.

Q. When you are discussing efficiency, are you speaking in terms of use of resources as in the budget?

A. I mean budget and time. The budget was the budget. We had to make the budget. You couldn't always make it. There were certain things that you had to



M. SPOSATO

do. If I felt I needed more investigation done, I would add more people to a unit. If I felt I needed to get people to court faster, I would add buses.

Again, the day-to-day operations was very broad. I was trying to see ways to do that. That was the basis of my role for all those years. I went up through a lot of ranks, and that's what I tried to do.

Q. What was your efficiency oversight with regard to overtime as you had alluded to?

A. Again, overtime is something unique. Overtime happens for a lot of reasons. There are different shifts, different overlaps of shifts. There are people that are out hurt, out sick. There are a million reasons for overtime. I reduced overtime, and I did it through a lot of different security things. Again, management. There were things I thought we could do differently, and I did them, and we were able to save money that way.

M. SPOSATO

That's what I did.

Q. How did you go about reducing officer overtime?

A. It wasn't about -- How did I do it? I looked at every unit. I needed time. I came up through that ranks, but I never did that specific job, so I had to go in and understand each unit, what they did, where they went, how did they did it, and I came up with ways that I thought I could do it better, get the same job done efficiently or better with either a reduction of staff and utilize that staff in another place that needed staff or changed shifts. There was a lot of things in play. I can't really -- I did it over a lot, a lot of years. It took a lot of time. It didn't happen in one day. It took years for me to understand each unit, and that's what I did.

Q. Was the overtime wasteful in any way?

A. No. Wasteful would be the wrong word. There were positions that we



M. SPOSATO

had where I could combine the units. I was just more efficient. I was able to combine, and change shifts, and work different hours, and get the same job the right way, and have people spread out into other areas where we didn't have an abundance. I wouldn't call it wasteful, you know, people sitting around doing nothing. No. That wasn't the case. I did it more efficiently than we did it before.

Q. Did this change in overtime result in leaner staffing?

A. Our head count couldn't be reduced. I didn't reduce it. If you mean lay people off, no, I didn't reduce any staff. I moved staff around to locations where they were better fit in my personal opinion, and I changed shifts around so I could free up people to go handle other things. My staff never changed. I didn't have any correction officers leave. I had the same amount of staff working. I just did it in a different way.

Q. Did the number of officers on



M. SPOSATO

each shift change?

A. Again, we had -- A very, very brief analysis, we have a security division, and then we have multiple, multiple, multiple units. Staffing posts in security, housing areas couldn't change because we had to have what we had to have. Ancillary units would change. Again, I changed units to the staffing levels they need to have. If they had more, I put them into a unit where they needed people. The answer to your question is that some units were reduced and some units gained, but, again, there are things mandated and there are things that are not. The things that, you know, of course, I would always keep the mandated positions staffed. The not mandated would be people that I was able to change shift around and move them around to be more efficient and save some overtime. I always kept the mandates of the staff, the supervision of the inmates, because we had to have a certain amount of people in specific places.



M. SPOSATO

Q. Could you describe these ancillary units that you were moving around?

A. We have a lot of units. Do you want me to name the units that we have in the sheriff's department?

Q. If you can briefly tell us.

A. Well, it wasn't like I moved everybody. We have a transportation unit. We have a visiting unit. We have internal affairs. We have criminal investigations. We have a mailroom. We have a communications bureau. We have a rehab unit. We have a medical unit. We have -- I don't want to miss something. We have multiple, multiple units. There are a lot of other units where they all have people. There is a human resources unit. We have the visiting unit. We have a gang intelligence unit. We have a federal task force of people that work outside. We have a lot of different positions.

MR. WOODS: Off the record, please.

Page 70

M. SPOSATO
(Whereupon, an off-the-record discussion was held.)
Q. When you were discussing ancillary units, are the people that are staffed in the security posts also a part of these ancillary units?
A. All of the staff is correction officers. You are either assigned to security or you are assigned to an ancillary unit, if that is your question.
Q. There is no overlap between the two groups?
A. Well, the overlap would be if there was overtime and the ancillary units worked eight to four, and then there was security on four to twelve. If there was an overtime list, they could work in security. And, the same thing, vice versa, if visiting needed a correction officer because they were short, so there was overlapping, but not a steady post, but there was some overlapping.
Q. Did you, in addressing the inefficiencies of overtime, did that effect

Page 71

M. SPOSATO
the compensation of anyone that was working as a C.O.?
A. Can you make the question a little simpler for me and I will answer it for you.
Q. Okay.
So, you made overtime more efficient for the purpose of the facility. Did that affect the compensation of any of the correction officers?
A. When you say compensation, can you explain?
Q. Their paycheck, did they get less money in their paycheck due to the changes in overtime?
A. The correction officers salaries is what the salaries are. We averaged 1,100 or 1,200 officers at the time. Obviously, if I reduced the budget, they would be reduced, but, again, not every single officer works overtime. A lot of officers don't. The overall number of overtime went down. I can't tell you that specific correction officers lost money

Page 72

M. SPOSATO
because a lot of people worked and a lot of people didn't. The overtime budget overall went down, but I don't have any specifics if officers made less money. I was never involved in that.
Q. I would assume within the budget there is a portion of the budget that goes to the salaries for the officers.
A. A major part of the budget is the salaries.
Q. Then there is another part that deals with the overtime being paid out as well.
A. We don't really have -- The budget is the budget. You make the budget. They give you a number of overtime, but you try to make that. I mean, as long as you make the budget, you know, because we have revenue that comes in. You add the revenue to the budget. The budget is a complex thing.
If I am understanding your question, you are asking if the overtime portion went down?

Page 73

M. SPOSATO
Q. To be more direct, the correction officers that were working overtime, did they get paid less as you started to rework overtime?
A. As I stated a earlier, when I reduced overtime, there was less overtime. Overall the sheriff's department, the pool, there was less money in overtime. There was less overtime.
As I said, a lot of correction officers chose not to work overtime and a lot of the officers chose to only work a smaller amount. There was eight-hour overtime. There was four hour, two. There were a lot of different things. Some people wouldn't have been affected anyway because they still worked what they worked.
Overall, I would say, yes, the sheriff's department budget was reduced so there was less money in the pool for everyone to split on the overtime, but I can't tell you any specifics of anyone saying I made less money last year.
Q. After making those changes to

Page 74

M. SPOSATO
overtime and other efficiency measures, did you see improvements in these areas?
A. Again, you are tying two things into one. Reducing overtime and seeing better things, you know, the goal that I had was to make things more efficient. I mixed units together and utilized people to do different things. It wasn't like if you take a dollar away, this is better. I didn't focus on the money piece. I reduced overtime, but I didn't focus on the efficiencies of the overtime reduction.
Q. One more time, just to be clear, your changes to overtime did not affect anyone who worked in a security post.
A. Again, your question is not truly answerable because it is not only about security. Every unit has correction officers and security that can work in visiting, could work in rehab, could work in transportation or vice versa. I didn't cut posts.
I just don't understand the

Page 75

M. SPOSATO
question because it is a complex question.
No security was jeopardized by my reduction of overtime if that is what you are asking. Nothing was --
Unfortunately, I am not understanding the point you are trying to make.
Q. Were there ever fewer people at a post that worked in a specific security post after your changes?
A. No. I didn't reduce any security posts, per se. Like I said, we have, again -- There are units that have supervision of inmates that were never affected. There were units that have no supervision of inmates that did a lot of other things that were effective. The posts that had supervision of inmates, we had specific things we had to do there. Those were always the same amount. Those were never taken away.
Q. We are going to change gears a bit. Kind of. Not too much.
Did you collect data on these

Page 76

M. SPOSATO
budget inefficiencies?
A. The budget inefficiency meaning what?
Q. The inefficiencies that you had outlined earlier that you were working to deal with?
A. Nobody sent me a document saying this is an inefficiency. I got documentation on what my staff did on a daily basis, and I tried to rearrange staff to do it either faster, better, different shifts, add a shift. It was different. I got data on a lot of things. Efficiency is not data I would request. I would get data on a lot of things. There was no efficiency -- That was me studying units.
Q. So, what were some of the things that you did get data on?
A. I got data on a lot of things. I got data on how many admissions we had, how many discharges we had, how many visits we did, how many inmates went to court, how many didn't go to court, how many were sentenced. I got data on a lot of things.

Page 77

M. SPOSATO
Q. Did you get data on how many assaults occurred at Nassau County?
A. Again, I had different units for all of this. I probably -- I could ask for data. I don't know if I ever specifically got a monthly or a yearly report of what we had. Use of forces, you know, I would get data on that. I don't have any specifics of things they sent me immediately on. I got data on a lot of different things through a lot of different people.
It is a difficult question to answer because I got data, but I didn't get data on every specific thing that you are asking me.
Q. Was there a group within your administrative circle that was keeping data on the number of assaults that occurred in the jail?
A. Security would know. We had the Criminal Investigations Unit that handled a lot of the investigation into assaults. If somebody was making a

M. SPOSATO

complaint, assaults that we knew about, you know, because sometimes people say they were assaulted and we were never told. Years later or months later we would find out. I don't know.

We had units that would keep track of what their role was. We had inmate complaints. We had a grievance unit. We had assaults of staff, assaults of inmates. We had the Criminal Investigations Unit, the Internal Affairs Unit. We also had hotlines in housing areas where they could call the district attorney's office. They could call these different agencies. We would get data from them. There was numerous, numerous ways to get the data into my staff.

Q. Did they keep data on the number of assaults with weapons that occurred?

A. They would keep data on assaults period if we were aware of them. Yes. You know, weapons or not, an assault is an assault. Whether you punched someone



M. SPOSATO

or had a weapon, it is an assault. We would be notified. There definitely would be stats in a couple of my different divisions on assaults.

Q. Specifically for slashings, were they discussed in a different manner and was data kept on them specifically?

MS. ROGERS: Objection.

You may answer.

A. Again, slashing, broken jaw, anything that was -- Whether it was inmate on inmate, whether it was inmate on officer, we kept records of all of that, any type of assault, any type of force used. If there was force used at all at any time, there were things we had to keep. There were state requirements on things. We always had stats. As long as we were aware of it, we had stats on it. I personally wouldn't get involved in every single one of them, but there were definitely reports to the staff on them. Yes.

Q. Were there inmate deaths while



M. SPOSATO

you were sheriff?

A. Yes.

Q. How many inmate deaths were there?

A. Overall, I am just trying to say, from 2008 to 2017, and, again, I am going to say possibly ten inmate deaths over that time period. I am trying to think. I could be off by one or two, but I would say around that number.

Q. How many inmate deaths occurred in 2016?

A. I would have to see the records of that.

Q. Were there any deaths, to your knowledge, as a result of inmate-on-inmate violence?

A. I don't recall. I don't recall the specifics of an inmate-on-inmate death. There could have been. I would have to see the data on that.

Q. Were you ever made aware of any rise in trends on inmate violence?

A. Again, we manage things in



M. SPOSATO

different ways. We had different units inside and outside. There was gang activity. There were a lot of things. I was made aware of things, if there were, you know, pockets of things, and we needed to move things around, and I would be briefed on things like that.

Q. Was one of those briefings on inmate-on-inmate violence?

A. It depended on if it rose to me. If it was handled underneath me and it didn't need me to make any authorizations of moves, I would be briefed. Again, I was always briefed on use of force. I wasn't briefed every minute, but I would like to know would force be used, you know, because there were always lawsuits and stuff. You get lawsuits and you want to know. I was briefed on a lot of things. If they told me this week this happened verses last week that happened, you know, I can't tell you that.

Q. You said if they needed you to make a decision on something, you would be

Page 82

M. SPOSATO
told about trends on inmate-on-inmate violence. Was that the case?
A. My job was to manage the facility. If we saw that, again, if the county had or the facility had a lot more gang members that were registered gang members than before or if we needed to move people into different housing areas and change locations, they would be briefing. It wasn't like they were asking my approval. It was more notifying me that we are going to make all these moves.
Again, it was about trying to keep everybody safe and separate. It is a very difficult in a large facility. I was a very hands-on guy, so I was engaged.
Q. You were discussing use of force. Could you just describe use of force quickly?
A. Use of force is any time that an officer touches an inmate basically if force is needed, whether it is by touch or by use of O.C. spray. Use of force has many different categories.

Page 83

M. SPOSATO
I like to be aware if force was used. Sometimes it could even be just verbal force. If they were told verbally to stop fighting and they did, that wouldn't rise to my attention. If it was something where they needed to break up a fight or someone was being assaulted and they had to come in and there were injuries, I would be briefed about that.
Q. How often would you say that correction officers had to break up a fight or stop someone from being injured?
A. I can't recall how many uses of force we had. It was a very big place. How often was I notified or how often it happened? They wrote reports. I mean, I didn't see them all. It depended on what level it was. I can't tell you exactly the number I was notified on a use of force.
Q. Did you ever change the use of force policy while you were sheriff?
A. We did amended the policy. I just don't know if I was working for Sheriff Reilly when we amended it or if it

Page 84

M. SPOSATO
was after that. I don't recall the year, but we did make an amendment to the use of force policy.
Q. Why did you make this amendment?
A. I don't recall if the state came down with a directive. We just basically changed body holds. We basically reversed one thing we do. I can't tell you exactly which one we reversed and whether it was under me or Reilly, but we did make a change.
Q. Did this change impact the correction officers?
A. Well, it was the correction officers and supervisors that had to make sure the policies were followed. If the policy says you must first break up a fight and use O.C., then they had to do that first before they would do a body hold or use hands. There were supervisors of the officers that made sure that part of the policy happened.
Q. You said that you saw some

Page 85

M. SPOSATO
incident reports, but you didn't see all of the incident reports.
A. There are a lot of reports for a lot of reasons. They didn't bring me up stacks of reports. If there was something that happened that rose to my attention, I would ask to see the report. It wasn't everyday people coming to me bringing me reports on things.
Q. Could you take a look at Exhibit 4, the use of force policy.
A. Okay.
Q. Are you familiar with this document?
A. Yes. I have seen it. It is the use of force policy.
Q. Was this policy in place on November 18, 2017?
A. I would have to check. I mean, it replaces -- as you see on the first page, it replaces a policy from 2001. This is effective as of 2003. I don't know if there was another one after. I can't tell you if this was in effect in 2018. Wait.

Page 86

M. SPOSATO
Did you say 2017?
Q. Correct. November 18, 2017.
A. Okay.
Q. Could you please take note of Bates number 448.
A. Okay.
Q. Could you please read the section title training, and then confrontation avoidance slash use of force to yourself, please.
A. Section O you are speaking about?
Q. Correct.
A. Okay.
Q. Is this portion from the notice of correction officers specifically?
A. Letter O or the whole policy?
Q. Letter O.
A. Is this O for the correction officers? Is that what you are asking?
Q. Correct. Specifically, O-2, the training topics.
A. I am not understanding your question. The whole policy is for

Page 87

M. SPOSATO
correction officers. I am not understanding you.
Q. O-2 references training materials and 03 references staff being thoroughly trained in departments of mechanical restraints. Had this training material already been created for use in the academy?
A. In 2003?
Q. Correct.
A. I wasn't -- Again, I wasn't the sheriff or the undersheriff in 2003, so I am not going to answer on that. I'm not sure if this is the last policy or not.
Q. Please take note of the final page of the exhibit, Bates number 449.
A. Okay.
Q. Could you please read those four paragraphs to yourself.
A. Okay.
Q. Does Sheriff's Order 7-13 require that uses of force be reported directly to the sheriff?
A. What number is this?

Page 88

M. SPOSATO
Q. This is the same page, 7-13, sheriff's order. It is Bates stamp 449.
A. 449?
Q. Correct.
MS. ROGERS: It should be the last page. Is that right?
MR. WOODS: Correct.
Q. Does sheriff's order 7-13 require that all uses of force be reported to the sheriff?
A. Yes.
Q. Why did you make this change?
A. Again, it was just that I wanted to -- Like I said earlier before I read this, use of force is one thing I wanted to be aware of.
Q. So, what impact did this change have on your workload as sheriff?
A. Again, I can't recall that we had use of forces all the time. It would be brought to my attention, and, again, depending if I needed to see the report or not or if I was briefed by a supervisor, you know, my workload was my workload. I

Page 89

M. SPOSATO
was there every day. Talk with security was a part of my day, so it wasn't increased. It was not increased. It was part of my day.
Q. How did you use the information that you got from these reports?
A. Well, we track things. On use of force, we want to understand why it happened, how to avoid use of force, where it happened, what unit was it in. There are different units for different reasons. We have different classifications housed in different area. Was it a gang, was it a -- There were a lot of reasons of why there was use of force. For me, it was just understanding the amount of use of forces, and where they were happening, and why they were happening.
Q. For what purpose were you tracking these things?
A. As I just said, for use of force, it was, again, whether it was inmate on inmate, were we breaking it up, was it assault of staff or assault on an inmate.

M. SPOSATO

I just wanted to understand where and what units, why was this happening and where it was happening.

Q. Did you mandate that any other reports went straight to your desk?

A. Again, we put a lot of things out. I can't sit here and tell you what stuff came to me personally, automatically. Notifications that -- Obviously, if there was a death in the facility, it came to me. If someone went to the hospital, it would come to me, staff or inmate. I was called on use of forces.

If there was a pipe that broke in the ceiling, if there was no air conditioning or no heat, if there was -- Anything that I felt that my guys -- I wanted to be aware of it in case I had to report it up my chain. You couldn't have it in the summer, no air conditioning, and them not tell me, so I wanted them to know immediately so I could be involved.

Q. So, the number of inmate slashings is something that you were made



M. SPOSATO

aware of only if it prompted a trip to the hospital?

MS. ROGERS: Objection.

You may answer.

A. No. That's not what I said. I said it depended on what it was. First, we had to be aware of it. Second, any time slashings, a guy broke his foot in the rec yard playing basketball, a guy cut his finger on the gate, anything that an inmate or officer went to the hospital, I want to be notified. Slashings specific, again, that's serious. Something like that, I would want to be notified of it.

Can I recall over fifteen years every time that happened? I can't. But I was notified as much as I could on anything that happened like that.

MR. WOODS: Can we take a five-minute break, please.

(Whereupon, an off-the-record discussion was held.)

Q. Quickly, just to rehash, how many slashings occurred in 2016?



M. SPOSATO

A. As I said earlier, I would have to get the stats on that. I can't tell you specifically right here.

Q. Where are those states kept?

A. Again, one of the units would have it, one of the investigative units that tracked it. We have an investigation unit of inmate complaints and a grievance unit. There would be different units. I don't know who, but someone at the sheriff's office would have it.

Q. If you want to see that, who would you ask to show you that?

A. I'm not sure they would do anything. I am gone too many years. You mean now?

Q. In 2017 if you needed to know.

A. Oh, when I was there?

Q. Yes.

A. I would talk to my criminal investigations unit. I would talk to my security captains or I would talk to my grievance unit. Mostly the criminal investigations unit.



M. SPOSATO

Q. The Criminal Investigation Unit would have the number of all slashings that are reported?

A. They handled anything to do with inmates on investigations.

Q. Are all reported slashings are investigated?

A. Not just slashings. If an inmate claims he was assaulted, harassed or slashings -- Well, you would see that, but anything inmate related needed to be investigated specifically inmate wise would be criminal investigations. We also had a grievance procedure too. If they didn't want to tell us, they could do a grievance. There were a couple of different ways to report it.

Q. Were these stats kept to report to a state commission of any sort?

A. The State Commission of Correction, and, I don't want to be specific on what the requirements are, but certain things that rose to a certain level, it could be slashings, it could be

Page 94

M. SPOSATO
an assault, it could be contraband, certain things had to be reported to the state. We have a certain amount of time for my tour commander or my C.A.O., my chief administrative officer that dealt with the State Commission of Correction things that we were mandated to report, obviously, an escape, thankfully we never had one, but a lot of things -- not a lot, a lot, but there were things that needed to be reported in a certain amount of hours to the State Commission of Corrections.
Q. Slashings were one of the things that needed to be reported?
A. I am almost positive that had to be reported. Yes.
Q. You said contraband was another.
A. I'm not sure the level of contraband. If we found a pen that we didn't sell in commissary, you know, I'm not sure that would be reported. I can't give you the you exact. Someone could get you the guidelines. I can't tell you if

Page 95

M. SPOSATO
contraband, every single thing as a whole. It was at tour commander that worked in security that filed it. They did it on their own. There was a report to be filed. I can't tell you what contraband, what rose to the level of contraband that would be reported to the state. A lot of things are contraband. You have a t-shirt that is not sold by us, and it is contraband.
Q. Are there different levels or classifications of contraband?
A. I mean, different levels for the state or different levels in my eyes?
Q. Different levels in terms of the way the jail is run and policies are passed down.
A. Can you explain that a little differently?
Q. Are correction officers trained to see different levels of contraband or different classifications of contraband?
A. We have an inmate handbook. Contraband is a lot of things. It is the hardest thing for any jail in the world and

Page 96

M. SPOSATO
country to manage. Contraband comes in from a lot of different ways. They can make contraband. They can get contraband brought in. It is always a very strong focus of us to try to limit contraband in any facility, which is difficult because you have visits and you have a lot of things. They are trained to make sure that they don't have contraband.
The level of contraband -- Contraband is contraband. It is different. Obviously, there are more serious contraband if we find it, whether it is pills or a knife, but they are trained to try to limit it to the best of their ability contraband from being in the facility at all.
Q. You said you have an inmate handbook. Do correction officers have a handbook similar to that?
A. When they graduate the academy, they get their training book.
Every inmate gets what we have, the inmate handbook that tells them what

Page 97

M. SPOSATO
they are allowed to get, what they shouldn't deserve to get, you know, what they can do to file a grievance, what they can have in their cell, how to get stuff in from their family, how to put money in the commissary, what is available at commissary, clergy service.
It is an inmate handbook with a lot of different rules. It has our rules and regulations of the sheriff's department that they must follow and, obviously, things that they are required to have. It is a handbook.
Q. Within that handbook, does it state which sort of contraband need to be reported to the S.C.O.C.?
MS. ROGERS: Objection.
In the inmate handbook?
MR. WOODS: In the correction officer's training book or manual or however it is described.
A. I can't tell you the answer to that. I don't know if it is in the book when they graduate the academy.

Page 98

M. SPOSATO
Q. When they graduate the academy, do they have to pass an examination to do so?
A. Yes. There are a lot of different qualifications. There is firearms and a lot of tests. It is a long -- There is a lot of running. There is agility. There are a lot of different categories that they must follow and pass for each group.
Q. Do corrections officers have to be re-trained at the academy?
A. We do re-train them. Yes.
Q. How often are they re-trained?
A. It depends. Every year they have to have -- There are different years for different things. I can't specifically tell you. It is every other year for -- Well, firearm is every year. I believe first aid and C.P.R. is every other year. Mental health might be another things. There is definitely firearm and reminders of stuff that we require. Then there is stuff that is added, which I believe is

Page 99

M. SPOSATO
every other training year. I don't want to be specific because you could see the training guidelines.
Q. Is the re-training done in the same process of new officers being trained?
A. Meaning what?
Q. Do they have to go to the academy in the same way, and do they have to pass a new examination?
A. Re-training is more of -- I don't know if they are taking specific exams. They have to go back to the range and qualify. They must qualify to keep their firearm. They have to go back to the same range they trained at, and they go to the same classroom they are trained at. I am not positive on what exams they take, if any, for the in-service training. It is a yearly training.
Q. For the in-service training, can an officer be recommended to in-service training based upon their actions on tour?
A. I am not understanding your question.

Page 100

M. SPOSATO
They are mandated to go to in-service training every year.
Q. If a particular officer gets disciplined based on interactions with a detainee, is a potential recourse to have them re-trained?
A. I mean, I can always -- If there was something that happened, then the officer violated something, could I send them back to training? Yes. It is not something that we normally do. I could always send someone back for additional training.
Q. Can you modify the materials they are trained on?
A. Can I personally?
Q. Correct.
A. We have a training curriculum. Once the training is out, it is out. I don't modify -- Are you talking about when they are a correction officer or in-service?
Q. In-service.
A. The in-service is the

Page 101

M. SPOSATO
in-service. Like I said, there is stuff they have to do that is state mandated every other year or every three years. Firearm has to be done. There would be nothing for me to really modify.
I am not understanding the question, because there is in-service training. This is when they go, and then there is the academy.
Q. Can you modify academy training materials?
A. The sheriff can do a lot of things. The academy is eleven weeks or whatever it is.
I am not understanding the question.
The sheriff can do a lot of things. Why would I modify it if that is your question. It is a hypothetical question.
Q. Exactly. So, you can do this?
A. The sheriff can do a lot of things. I can say you can train this topic verses that, but as long as they train the

M. SPOSATO

mandated stuff -- I didn't get involved in the day-to-day training. The academy is the academy. There was training staff that did that.

Q. Did you ever change any training policies while you were sheriff?

A. I can't -- I don't recall if I did or I didn't.

Q. Does a change in policy, such as the one that we saw earlier in the Sheriff's Order 7-13, can that trigger the need for all officers to be re-trained?

A. Repeat that. Are you talking about the use of force policy?

Q. Something that is handed down if that manner as a change to an existing policy, can that trigger the need for officers to be re-trained?

A. We have in-service training. We have refreshers dealing with that. If there was something I thought I needed, if I want to focus more on mental health or something, I can have them do a half-an-hour class, but there is nothing



M. SPOSATO

that I would see where I would say the whole department needs to be re-trained because of one thing. I don't recall that I have ever done that or anyone has ever done that.

Q. But you could do it if it were necessary?

A. Well, again, it would be a hypothetically question. I was the department head. I oversaw the department. Could I change curriculum? Yes. Could I add things? Yes. Was something worth me saying 1,000 people need to be re-trained? Not that I recall.

Q. Could you take a look at Plaintiff's Exhibit 3, the State Commission of Correction lesson plan and the basic course for correction officers.

A. Okay.

Q. Are you familiar with this document?

A. I need to look at it for a second.

Q. Okay.



M. SPOSATO

A. I don't want to say I am familiar with this specific document. It is dated 1998. I might have skimmed over the lesson plan over my tenure, but I can't say I am familiar too much with this.

Q. Was this document used in training on November 18, 2017?

A. Again, if we put a class on and this is the curriculum that we have, but I don't know if a class was in on November 18, 2017. We only put a class on when we put a class on. That's when they do the training. I am trying to look at this. I never heard of these people. This must be old.

Q. Does the State Commission of Correction make changes to update their policies?

A. Again, the State Commission of Correction will send over either a new guideline or a change to a policy, a change to training, a change to do something that they would have to do in the facility. It is nothing to do with training. We have



M. SPOSATO

the -- The State Commission of Correction has a lot of things that they change throughout the year.

Q. So, each year or each time that you have a new class in the academy, does the State Commission of Correction send through new materials to train them with?

A. You misunderstood what I said.

It has nothing to do with training. The State Commission of Correction, something might happen statewide where they may want to change a procedure in visiting where you have a higher glass or you can't touch or you have to do this or that. That goes on through the year. It has nothing do with training. It could, but it would be a in the normal course of a new State Commission of Correction directive. Nothing would be only when I have a class. They wouldn't say, oh, Nassau County has a class because they might not know Nassau County has a class. We are just one county in a big state. There are things they put out to

M. SPOSATO
all counties and all prisons. They also oversee the state prisons, and the changing of requirements, that is what they do.
Q. Do they send out new lesson plans each year?
A. I would say no, but you would have to talk to my training team or someone that would be able to get you how often we have changed our lesson plans. I wouldn't be the one to answer that.
Q. We are going to move away from the State Commission of Correction lesson plan.
Were any correction officers injured by inmates during your time as sheriff?
A. Yes.
Q. How often would you say that was an occurrence?
A. I can't give you an -- That is one of the use of force things that I was notified of, a use of force where officers were hurt. It wasn't everyday, but it happened.



M. SPOSATO
Q. If you wanted to see statistic or data on that, who would you ask to see that?
A. We had a procedure. Obviously, if there is a use of force, there are different levels of investigations that go with that. We have investigative staff. That could come from numerous people. It depends where it was, what unit it is. If it was security, I could get it from the investigations units or the captain of security. If it was in visiting, the visiting supervisor or all those units. Use of force happens not only in -- It happened in court. It happened in visiting. It happened in rec yards. It happened all over. It would be a case-by-case basis on where I would get that from.
Q. So, there was no inter-communication between the different ancillary groups that would have this data?
A. No. I had use of force -- I had people that -- We had reporting



M. SPOSATO
requirements on use of force. There were different things that had to happen in a certain amount of time. The state had to be notified. I had staff that also reviewed use of forces and made sure all the proper paperwork was there. That was different supervisors over a lot of years.
Again, it was a different administrator, but they ultimately worked for captains and unit supervisors, so I could have went to specific people. In my level, I would go to higher people. The lower level people underneath me would go to these guys. If you are asking me what I would do, that's where I would get that from, but there are numerous ways to get that.
Q. But you did receive incident reports whenever correction officers were injured by inmates, correct?
A. Well, it depended on the level. If an officer said, oh, I feel like I twisted my back and was back to work tomorrow, that might be in a stat I got



M. SPOSATO
months later, but it wouldn't be something that today I got it. I would be notified there was a use of force, but we wouldn't know if the guy went to the hospital and came back to work. There are a lot of things that would happen. It would take time for me to get certain information.
Q. Did the information inevitably trickle across your desk?
A. Again, it crossed my desk. There was stuff that crossed my desk and stuff that I made it go to other people, either the undersheriff, the deputy undersheriff. The sheriff's office would receive it, but whether it was me personally and/or my team, and we would meet on it weekly or whatever, twice a week, that's how I would go over the information.
Q. What were the most significant hurdles to safety that you had to overcome while you were sheriff of Nassau County?
A. I think statewide, I think not just my jail, I think contraband, I think

M. SPOSATO

gang affiliation. I think there are a lot of security things that happened in our facilities that, you know, basically, it wasn't just one thing. I can't pinpoint one thing. There were a lot of different things that would go on.

Q. To be clear, what sorts of contraband were posing safety issues?

A. A lot of things can pose safety issues. Depending on what it was, you know, if you find pepper in a plastic bag and you threw that into another inmate or another officer's eyes, I would deem that serious. Obviously, a weapon of any sort, whether it was plastic that they filed, whether it was metal or a knife or a screwdriver. It could be a lighter. You could start a fire. It is a lot of different things that I would classify as dangerous depending on the situation.

Q. What were the most significant issues to safety for inmates while you were sheriff?

A. It was safety for inmates and



M. SPOSATO

officers alike. I mean, just because inmate or officer, you know, I don't want an officer slashed, and I don't want an inmate slashed. I don't want an officer with pepper in his eyes, and I don't want an inmate with pepper in his eyes.

Contraband to me -- I didn't single out whether it was an officer or an inmate. A lot of the fights were inmate on inmate. You want to protect the inmate and the officer. So, contraband to me was the protection of all. There was no one singled out to me. If it was something serious, it could hurt anybody that was working in the facility.

Q. What is a patrol at Nassau County jail?

A. What is a patrol?

Q. Correct.

A. We have a few different types of patrol. We have perimeter patrols. We have correction officers outside of the perimeter. We have our regular patrols where we have officers. If you are in a



M. SPOSATO

mental health area, you patrol every fifteen minutes. If you are in a general housing area, you patrol every thirty minutes. Basically, we had supervisors that have to make a patrol, you know, sign books, check the housing areas. Patrols happened in a lot of different ways.

Q. The general housing area patrols, what does that entail?

A. General housing as far as if we were in general population, if you were in -- We have different classifications. We will just stick with the housing areas.

We have three different types of housing. We have a pod, which is inmates that are in their own cell with a sliding gate with a day room. Then you have tiers like you see in the movies behind bars. You are next to each other, but they are all open bars. Then we have dorms, which is basically bunk beds in a dorm.

Again, the patrols would be different depending. If you are on tiers,



M. SPOSATO

you have to walk down four tiers. If you are in a pod, you are walking around the floor, and then up the stairs and then around the floor. If you are in the dorm, you are just kind of walking around the dorm. We have patrol stations that they hit as they patrol.

Q. Did you change the number of patrols in Nassau County?

A. Did I change the number?

Q. Correct. Or the frequency of patrols.

A. Well, you can't change -- If you are a mental health status where we think we need to watch you more, you have to do fifteen minutes. It is state requirement. Then thirty minutes is also general housing. I couldn't have went to higher or lower.

I am not understanding the question.

Did I increase it saying maybe you have to go an extra time, you know, I don't know if I ever did that or not if

M. SPOSATO
that is your question, but fifteen and thirty are what the patrols are.
Q. Would a change in the number of patrols, an increase in the frequency of patrols increase the safety of correction officers and inmates?
A. There is a specific amount of staff in each housing area. We have constant supervision where we feel that if an inmate is in danger to himself, we will put an officer on him twenty-four hours a day. Minus that, fifteen minutes, it takes a long time. You have to go to every single cell and look in on patrol.
Your question is not truly answerable.
If I put 500 people in a housing area, I am not going to have them on constant supervision. The patrols are every fifteen minutes and every half hour. By the time you get around to here, you could be coming back. Fifteen minute and thirty-minute patrols, that's what we did.
Q. So, you mentioned constant


M. SPOSATO
supervision. What are the various types of supervision?
A. Well, we have -- As I said, we have the general supervision. We have the constant observation, which we call the one on one, and then we have active where you are in the yard or the day room. We are watching basically everything as it is happening live.
Q. Did you ever change the supervision policy within the jail?
A. Again, if I did, I would have made the thirty minutes to fifteen. If there was anything over the years, I have a recollection I might have done that one time. I don't recall. I wouldn't have changed it that the fifteen goes higher and the thirty goes higher, but I don't recall specifically to you today that I did he ever change it.
Q. Could you change the situations that trigger a specific level of supervision?
A. Meaning what?


M. SPOSATO
Q. For example, if you decided that being in the day room needed constant supervision versus active supervision, could you do that?
A. It would be impossible to do that. In the day room they are out. They are watching television. They do what they do. You couldn't put an officer for every -- If there are fifty-five in the dorms, I wouldn't put fifty-five officers to do constant supervision in the day room. That wouldn't be realistic. That's why we would have active supervision.
Don't forget, again, in a dorm, we have a bubble. We have officers that are watching actively and officers that are patrolling. If an inmate in that housing area we feel is mental health needed, we would put an officer in there. There are plenty of housing areas that are watching the inmates, they are patrolling, and they have an officer there watching one specific inmate. It is what we do. Everything is security and everything is a case-by-case


M. SPOSATO
thing.
Q. You said that in the rec yard, the level supervision is active supervision.
A. Yes. In the rec yard, we have officers that monitor the rec yard. It is just a rule. They are watching everybody as they are watching.
Q. They are continuously watching during active supervision?
A. That's their job.
Q. In the rec yard, is it designed in such a way as to be able to monitor the entire rec yard?
A. We have huts or booths if you want to call them that. The rec yard is a room. There is no blind spots. Where we situated it, you can see the rec yard.
Q. What level of supervision is used during inmate movements, large inmate movements?
A. Well, it depends on -- Unless you are walking with one or two inmates, it is always that you have an officer in the

Page 118

M. SPOSATO

back and you have an officer in the front. You have officers waiting. If we are going to rec, our rec policy is -- Again, back to where you are housed. If you are in the pods, the rec yard is right outside the door. You open up the door, and the inmates come from inside to outside. We have officers with them. You always have an officer behind. It depends on how many staff we have in the front going to the room and officers behind.

Q. You said if you are in the pod, then the door is right there. What if you are in the tiers?

A. The tiers, they go to a different level. They go downstairs. If you are in a building that we have tiers, the rec yard is outside on the first floor. It is five floors. There is first floor. We would take you out of your housing area, and we would go down the stairs into your rec yard. Again, it is the same way. We have officers waiting in the yard by the door. We would have officers in the front

Page 119

M. SPOSATO

and officers in the back. It is just a different location.

Q. This is all done using active supervision?

A. Active supervision, the guy in the front can't see the last guy. You have officers in the front. You have a line. We are not spread out all over the place. We put everybody out and they move. They move in a rotation. They are not in a ten-row radius. They are one at a time walking into the rec yard down the stairs. Again, you have five floors. There is no rec yard on every floor like there is in the pod setting.

Q. What is the mandated level of supervision for inmate movements?

A. I'm not sure if there is a mandated one. After a certain point, it might be a directive from the sheriff's office over the years. I don't believe there is any mandate by the state. My recollection, there is no mandate of how we move. The department, my security team

Page 120

M. SPOSATO

decides how we move. We have different units. We have different people. We don't bring everybody out. It depends on the classification. Some people might go out alone. Somewhere people might go out separately. There are different procedures and how we do it. I don't know if there is any mandate.

I am not understanding your question.

I don't know what mandate you are referring to on how we do a movement.

Q. You said there might be a policy or procedure in place.

A. We definitely would have a policy on a movement. You can't just say, okay everyone, I will meet you in the rec yard in five minutes. We have officers. Our officers know where they have to be when we are moving them. There would be a policy on that, but it is a standard. It is not based on how many inmates or after so many inmates, like I said, we can move two or three people by themselves with one

Page 121

M. SPOSATO

officer. Anything over a certain amount of people, you add to that. There are policies on that.

Q. Could you take a look at Plaintiff's Exhibit 6, the E-Building Housing Unit Policy.

A. Sure.

Q. Are you familiar with this document?

A. I would need a second to look at it.

Q. Okay.

A. I am familiar with the way it looks. I am going to look it over.

Q. Sure.

A. Is there something you want me to read on it?

Q. Could you please turn your attention to 282.

A. Okay.

Q. Could you please familiarize yourself with Section O for inmate movements?

A. Yes. That's what I am reading.

M. SPOSATO

Q. So, the policy for group movement of inmates O.3, is that supplemented by any other policy?

A. I am not understanding your question.

Q. For example, you said there has to be some level of supervision done for these large groups. Is this policy for group movements, is this the full policy or are there other policies that would interact with this to paint a full picture of what C.O.s are supposed to do when they are moving a large group?

A. This is a policy based on E Building. I don't know if there is a specific movement policy. That's something you would have to check. This is just a policy for E Building.

Again, there are a lot of other stuff that goes on with a movement. I was talking about the officers who are actually walking them. Obviously, there are other things you do, logging in with radios, but that's different security stuff that I



M. SPOSATO

wasn't going to speak of.

Q. Is it county policy to continue to conduct movements immediately after an assault with a weapon?

MS. ROGERS: Objection.

You may answer.

A. I am not understanding what you mean.

Obviously, if we have where something happens in a housing area, we are not going to move anyone in that housing area. If it happens in an area where people need to get back into the housing area, we have to move them back into the housing area. I am not understanding. I would answer that on it depends on the location. If they are in, they are in. We are not going to move them out. If they are out, you have to move them in. You have to make sure that everybody one is protected.

I am not understanding your question a little bit. I'm not sure what you are asking.



M. SPOSATO

Q. So, specifically, if an assault with a weapon were to happen in the rec yard, for example, and there has to be a movement back to the tiers, does that movement have to occur immediately?

A. That would be a call on -- Depending if -- The security supervisors. That wouldn't be a call by me. If something happens outside, we have to get the inmates back inside. How they do that, does it have to be in eleven seconds, that's something the security team would be able to tell you, not me.

My position, obviously, if someone gets assaulted in the rec yard, you want to do whatever you can to get that guy help obviously. If he notifies us that he was assaulted or we notice he was being assaulted, one of the two, then we have to decide how we are going to take care of him and get everybody else protected out of that yard. It is obviously safer if the inmates are in housing areas, but that would be a security call.



M. SPOSATO

Q. For clarity sake, there is no sheriff's policy on movements after an inmate assault?

A. You would have to have five million policies. We have policies on movements, policies on how you report things. I don't believe there is a policy that says if someone, minus assault, if an inmate breaks his ankle, what do you do. I'm not sure we have a policy on every single specific situation that can arise in the sheriff's department.

Q. Let's change gears quickly.

Was contraband an issue that increased during your time as sheriff?

A. Contraband is an issue everyday in every facility. Increased contraband, I am not so sure what you mean. It is an issue every day for us. It always was. We always try to locate contraband, find contraband. Nobody wants you to see contraband. Contraband is very, very well hidden. A lot of times, we don't know who has it. We do searches. We do a lot of

M. SPOSATO

things. We have K-9 dogs. We have a lot of things that we do on own to try to combat contraband. When you have contact visits like we do, and you have -- There are a billion reasons how it could happen. What we focused on every day -- We did random -- We did a lot of things that I am not going to get into. There are a lot of things that we do, but it is a steady focus for everybody.

Q. Throughout your time as sheriff, were you briefed more on instances of contraband being found later in your tenure as sheriff?

A. Again, contraband, the level of contraband being reported to me, like I said, if they found that a guy had two pens, the guy had seven extra boxes of cereal, the guy had nineteen books instead of six that he is required to have, you know, contraband was an issue for me from when I started until when I left. It would be if I was still there. More or less contraband, you know, there is no way to



M. SPOSATO

tell how much contraband is in or out of a jail at any time.

There is not an answer on that question except to say that my focus was the same for a lot of my years there.

Q. Similar to assaults, was there data kept on contraband in the facility?

A. I'm not sure. Depending on what we have. If we found drugs or pills, our Criminal Investigation Unit would notify P.D. They would test it to see what it was. It depends on what it was. If we found books, nineteen books, it is contraband. It might not be to people, but it is contraband. Would that be something that was kept? The guy had twelve books, we would take the books. We would log them in.

There were things that we did. Was that recorded? I can't recall. I know about the serious contraband, like I said, if we found pills or drugs, and, you know, nobody ever knows where it comes from. If you interview the inmates, it wasn't there



M. SPOSATO

when I got there. It was hidden. I can't tell you what exactly is recorded and what was not. We just tried to control it. That's what I can tell you.

Q. Was a discovery of weapon-based contraband something that was logged?

A. Again, when you say logged, there were reports. Obviously, if we found a toothbrush that was shaved into a weapon or we found a piece of plastic from a food tray or we found a piece of metal that could have been used as a shank, of course there was an incident sheet. They would send it to criminal investigations. They would say they found in this in the day room, in the cell, on this person, and that would be somewhere.

Q. Did you ever ask to be briefed on these instances where contraband was found?

A. No. It wasn't about me asking to be briefed. They knew what to brief me on. Like I said, it depended on what level. If they found a screwdriver in a



M. SPOSATO

ceiling tile that maybe a contractor left or something, they would call me up. They would say, look what we found. It wouldn't be like, oh, we found a loaf of bread in a guy's draws or a guy had nine pairs of socks extra and ten pairs of underwear. It depended on what the level of contraband was.

Q. Did you change the training surrounding searches for contraband in housing areas?

A. Again, change? I am not understanding what you mean.

The officer's job every day when they patrol is not just to look in the air. They are supposed to be looking. We do a lot of security things, again, that I am not going to get into. We do a lot of things. There is policy on it.

Contraband is contraband. We try to find ways to find it. We try to find ways to stop it from coming in. We try to do a lot of different things. We have K-9 dogs outside the building. There

Page 130

M. SPOSATO
are a lot of things.
Q. Did the protocol for handling contraband searches change during your time as sheriff?
A. I don't recall if anything was in place or not in place before me or after me.
Q. Do inmate assaults with a weapon always trigger a contraband search?
A. Well, we would always -- If an inmate or officer was assaulted with a weapon, we would want to know. Did we find a weapon? A lot of times there is an assault, and we don't find what was used. We want to know where it came from. We would do an immediate search always of the area at some point. We do a lot of things.
Security is security. There are a lot of things we do after the fact and before the fact. Again, not everything used in an assault is there. It is gone. You don't find it. You search, and you still don't find it. If you do find it, you want to know where it came from. You

Page 131

M. SPOSATO
try to identify it. It doesn't look like anything we have in the facility. Oh, we know this room has food carts in it.
There are ways we can try to identify it and ways we can't, and sometimes we don't find it. It is always a part of our daily -- Contraband is very important in any facility, not just us.
Q. Would you say that more often than not the weapons used in a slashing, for example, were not found?
A. I feel that would be asking me if I knew exactly how many we had, which I don't. I can't tell you if it was found or not. I would say most likely, very rarely do you find weapons. I am not saying we never did. I would say probably most of the time, you know, it is fast, and it is gone. We try to find it, but I can't tell you the specifics of how many cases we have had versus what we had and what we didn't find.
Q. Does not finding the weapon being used in an assault, does that have

Page 132

M. SPOSATO
security implications for the corrections officers?
A. It has security implications for the inmates and the correction officers. Anyone working there. Staff. We don't know how it was used. It depend what the assault was. Was it a cut? Was it a puncture? Of course, it is always a security concern. We don't want to have something that we don't know if it is gone, if it is flushed, if it is over a wall. We don't know. Of course, it is a security issue for us to try to locate it and find it. Of course, we would notify staff that there was a slash or a puncture or this or that, and it is not there, and we would search. Again, you can search all you want. It is a very big place, and you don't always find things. Of course, yes, it would be a concern to us.
Q. What changes, if any, did you make to make those searches more affective?
A. There are only so many things you can do. You can bring in dogs. You

Page 133

M. SPOSATO
can bring in mirrors. You can take everything out of cells. You can look in walls. You do the most you can do at all times. There is nothing added or taken away. A search is a search. If I directed my guys to search a housing area, the expectation would be that they searched every part of the housing area. Whether they removed a washer and dryer, look in sockets -- They can do everything they can possibly do to find a weapon. Again, there are food carts. Things move from dorm to dorm. There are so many moving parts. People are coming in visiting. Family are coming in. There are so many things that can be gone, and you don't know. You still have to do everything you can to search for it.
Q. You mentioned bringing in mirrors. What is that?
A. We have pole so you can look under the beds, you can look behind the toilets. You can look underneath things so you don't have climb underneath the thing

Page 134

M. SPOSATO

or crawl under a corner. You would look under a chair, look under a couch, stuff that we can see.

Q. What kind of actions can trigger the need for a strip search?

A. You would really only be strip searched if you were going to and from -- Again, it is policy. My recollection, it is to and from court and I'm not sure if it is -- I don't know, but definitely on the way back and it is to and from visiting. It is differently from courts and definitely from visiting. I don't know what else.

MR. WOODS: Can we take a five-minute break, please.

(Whereupon, an off-the-record discussion was held.)

Q. In 2016, are you aware if there were more slashings then than in 2015?

A. I don't have that information.

Q. Would that information have been available to you in your capacity as sheriff?

Page 135

M. SPOSATO

A. I am sure it would have been if I was requesting it.

Q. Who would you have requested for that information?

A. Again, it wouldn't be specifically year to year. The same people I told you already, security, criminal investigations. I don't really do things yearly. I do things like months. I don't really do things by the year.

Q. So, the monthly slashings numbers was more closely tracked than an overall calendar year?

A. Not that it was more closely tracked. If I was going to meet with people, I wouldn't say, what did we do last year. I would be talking more in the current.

Q. Would you say that your policies of searches following these slashings were effective in finding the weapons that were used to commit the slashing?

A. You know, a lot of times we

Page 136

M. SPOSATO

don't know how it happened. We don't know what was used. So, it is not about a policy of trying to -- We search the way we search.

Obviously, if somebody was slashed, and there was a slashing there, and we knew it wasn't something that would be folded over like a playing card or something, and we thought it was a knife or something, we would search very hard to find it. A lot of times, we would be unsuccessful in finding it. A lot of times, they don't know what was used, you know, whether it was an inmate or an officer. We have had slashings on both sides.

Again, my search policy is my search policy. We do everything we can to find it. If that is basically what you are asking me, the policy is not like we don't care if there is something else. Obviously, if there is something sharp, we want to try to find it. We are just not always successful.

Page 137

M. SPOSATO

Q. Would you say that the searches being conducted were effective?

A. I think the searches were effective minus not just slashings. We found a lot of contraband at different times. Searches are always effective. Just because you don't find something doesn't mean the search wasn't successful. You may have found pills and this or that.

We don't know what is used if we don't find it. I don't know if a doctor could tell you it was a razor blade or something else. Just because we don't find it doesn't mean we weren't successful. We want to find it. The search could have been successful because we found other stuff.

Again, a lot of times the inmate and/or officer can't tell us who slashed them, what was used, did you see where it went. Then we do a lot of interviewing people around, it if it was in a housing area, the cells this way, the cells that way. A lot of people tell you

M. SPOSATO

they don't see anything. It is very difficult. It is not like everyone is saying, there is it over there in the corner. It is very difficult to accomplish, but I would not call a search that we don't find the weapon unsuccessful. We would rather find it, but we successfully find other things. Unfortunately, you don't always find the weapon.

Q. Were these searches effective in preventing further assaults with weapons?

A. Again, you can search today, and a guy filled a toothbrush against the wall tomorrow and you have a weapon again. You search as much as you can. You find as much as you can. I can't tell you that I searched today and there is never going to be anything else. You know, okay, we are going to be good for a week. You have to constantly try to be smarter and try to get people to look different ways and try to watch.



M. SPOSATO

I am answering your question the best way I can answer it. It was all important.

Q. Were these searches able to save anyone from being attacked with a weapon that had been used in the previous commission of a slashing?

A. Again, you first have to know what they were slashed with, and if we found it or not. Again, we could not find it and they can get it from wherever they got it the first time from or make it.

So, searches are effective, but there is no way anyone can ever sit across from me and tell you, yes, I found this, and you can't have another slashing. It is just not possible.

They do buybacks in streets. They do all these things. You are not going to stop it. You try to eliminate it. You try to minimize it, but you are not going to stop it. You try to.

Even if we found somebody got slashed today and we find the weapon, one,



M. SPOSATO

we don't know if that is the weapon unless we identify it with D.N.A., and, two, tomorrow they can make another one.

It is a difficult question to answer. We can only do what we can do by the minute, by the moment, by the day to try to eliminate it.

To say if we found it today we are going to stop it, it is not an answer that anyone can possibly truthfully tell you.

Q. Does not finding a weapon that was used in a slashing decrease safety of the facility?

A. Any time you have a weapon in the facility, you know, it depends where it is, and we don't know what it is or where they have it. I mean, you always go in to the jail especially in searches and you never -- You have to be on guard. Whether you are an inmate or an officer, you have to be vigilant. I don't know about safety, but we don't want to have a weapon. If we don't find it, it doesn't mean the jail is



M. SPOSATO

unsafe. It could have been flushed. It could have been thrown over a wall. It could have been a million things. I don't know what it could have been. It could have been passed to someone.

Every day with or without a slashing, you are always concerned there could be a weapon because there are a lot of moving pieces. We give then pens. They have to write letters to their families. You could put it in an officer's eye. The jail is not unsafe because they have a pen. It is always important for them to find things.

If it is an inmate that is slashed, you know, it is important to find the weapon. We try to make sure the inmates and officers are vigilant. They are doing patrols. They are looking. They are watching. This is how we do the patrols that we do. This is why we do the searches that we do. We always try to make the jails safe. There are never times when we say, oh, we can't find the weapon so the

M. SPOSATO

jail is unsafe. We do everything we can to be vigilant.

Q. Upon multiple instances of being unable to find a weapon that had been used in a slashing, did you consider changing the search policy?

A. Again, you have asked this. There is nothing to change.

One, we don't know what the weapon was or wasn't, and we don't know if it is gone or if it is there. You know, we can only search the best way we can search.

Again, I don't know in my role as the manager what I would possibly add. You can only -- This is the dorm. There are sixty bunks. There is a washer and dryer. There are four showers. There are bathrooms. In the pods, there are bathrooms and toilets in their actual cell. There is a ceiling. There is a stairwell. There are sockets where you plug in. You can search it completely. That's all you can do. It could be passed from this one to that one. You can only search the best



M. SPOSATO

you can search.

There wouldn't be anything I would say -- We don't do less of a search. We search. We search to the best of our ability. You can only search and bring as many people as we can, and we try to find everything possible. There is nothing I can add to the search policy to find -- We have magnetometers, the things you walk through to see metal. We have a lot of things that we have. There are plenty of tools that we have to try to find something. There is nothing that I can say to you, well, -- Otherwise, I would have done it. I wouldn't just say, if I use this tool, I would have find it. We try every way possible to identify contraband, especially if there is a slash or assault of any kind.

You limit things. We have changed things over the years in rec yards. We changed the weights. There are a million things that we have tried. You can only do as much as you can do to try to



M. SPOSATO

find things.

Q. Did you discuss with any external agency or other external group ways to change the search policy?

A. Again, I don't know what external groups you mean. The searching would be me and my security team. My security team you have to trust. They are the security guys. I am the overall manager. They say, here is what we need. We have a lot of different tools, a lot of different things that we have that goes in and tries to identify metal, identify drugs, identify a lot of things.

The recommendations would be, you know, here is the maximum we can do. We can turn off the water, check the toilets. There are a million things. We do it all. We don't not do it all. We do it to the best of our ability to search.

There is nothing I would say, oh, if I talked to the searching God in Maryland, he is going to tell me I am doing -- We search every single possible



M. SPOSATO

area to try to find contraband.

Q. For clarity sake, there was never a discussion of changing search policies after multiple failed attempts to recover a weapon that was used in a slashing?

MS. ROGERS: Note my objection to form.

A. One, I don't know what you mean by failed attempts. I don't know where you are getting that from. There is no such thing.

Again, we find a lot of things. Whether you know about them or people know about them is a different situation.

Changing how we search, there are discussions I have all the time where we notify people we are coming. We do it randomly. There are a lot of security things I am not going to discuss. We change things in searches with timing and places and where, but the physical areas that we are going to search, you can only search it to every ounce of the place.

M. SPOSATO

So, were there discussions in whether we do it at 9:00 at night or 8:00 in the morning, and, you know, there are a lot of security things that I am not going to talk about.

I understand your question to mean, you know, could we search better. Searching better? The answer is no. We did move things around where we did surprise searches. We did a lot of things. We did things that I am not going to tell you about, but there were things that people could be unaware we were coming and unaware because there are toilets. If all of a sudden ten guys walked into a dorm, you are going to hear ten toilets flushing.

To be clear, the actual search model that we used, there is nothing to change on it. We could change all the tools we brought in. We could change times. We could change things like that. We could change how often we do it. We could have the same guy two days in a row, the same cell. We can move things around,



M. SPOSATO

but there is nothing that I can tell you that --

And, again, back to failed searches, I mean someone gets slashed, we want to find the weapon. It is a very large place. It wouldn't be a failed -- I mean, we don't know where it is, if it is flushed or gone. We don't know where it is. No one could every tell you that the guy got slashed today and the thing is there tomorrow.

Again, if a guy gets searched in the jail and three months from now tells us, oh, three months ago I was slashed, but it wasn't bad, then it could be anywhere. If someone tells us it is here, I got slashed in this location, and we do everything we can to search for that location, and it is not there, what makes anyone believe that if it is still there, when it was used, how it was used, you know, I don't know.

Q. Let's change gears.

Is the rec yard a poplar place



M. SPOSATO

for inmate violence to your knowledge?

A. I would say the rec yard is a poplar place because the inmates like to get outside for fresh air. I don't know if there is any more violence in the rec yard than a dorm or a stairwell or here or there. I can't tell you. I can't answer that the rec yard is a more violent location than anywhere else.

Q. Do you track data on where instances of violence occurred in the facility?

A. Well, the information we get on use of force, the use of force will have a date, a time, and a location.

Q. So, there is data on where instances of inmate violence happens?

A. At the location, but, understand, you go in the rec yard for an hour -- I'm not sure if it is an hour or an hour and-a-half for the day. You are in the housing area for the rest. I'm not sure that the rec yard would be the location that would have more violence



M. SPOSATO

where you are at for a small percentages of the day. I can't specifically tell you there is more in the rec yard than there is not, but it is a place where you are only at for a limited amount of time.

MR. WOODS: Could you introduce Exhibit 5, the Tony Fratto investigative package.

MS. ROGERS: Sure.

Q. Plaintiff's Exhibit 5, do you recognize the document?

A. I recognize that it is an inter-department memo. Do I recognize this specific document? No. I know the documents look alike, but not this specific document.

Q. Do you receive these sorts of documents to your desk?

A. This is a piece of a total report package. If I would have a request to see a report package, that would be included. I would not normally get all of this. There are a lot of things that go on. I don't know if I would get a total

Page 150

M. SPOSATO
package like this.
Q. Do you normally receive incident reports from officers involved in inmate-on-inmate assaults?
A. I would be notified of the assault verbally. They would send my staff packages, you know, whether it would be a sheriff, deputy undersheriff or the officer. Would they send it to me? A copy would come up to the sheriff's office probably. I am not even positive of that. I personally wouldn't get packages like this.
Q. Do medical reports make it to your desk?
A. Again, nothing would come individually. It would be a package. Mostly, a package would be in folders, not like this. There would be different parts of the package. There might be pictures if they took pictures. This looks like a thinner one. There would be a lot of stuff in the package. So, if I was to request it, I would see it.

Page 151

M. SPOSATO
Definitely, whoever my highest ranking person, which would be my chief administrative officer that would be the liaison to the state, so the packages would definitely have to be signed off. We have different levels of sign-offs of things. The package would make it to the sheriff's office because he worked for the sheriff. Personally, would I see all of these packages? No.
Q. You said that only if you requested to see it would you see it. How did you decide which one you wanted to see and which ones you didn't?
A. I am saying, if I want to see -- If someone called me or something, and I decided I wanted to look into something after a call I got, I would call up a captain and say, bring me up this. I don't have any cases that I am referring to. I'm saying if I wanted to see this package, I could ask for it, meaning as the sheriff. That's what I am saying. That's what I mean by that.

Page 152

M. SPOSATO
Q. I am asking, what was your decision process behind what you did and what you did not want to see?
A. Obviously, if there was a death in the facility, if there was a major assault, if there was -- There were a lot of different things I requested.
There is nothing I can tell you that I would pinpoint to you that I requested this or that. There are things depending on what was brought to my attention of the day, and there was information that I would ask to see.
Q. How do you describe a major assault?
A. If there was a situation where ten, twelve people, whether it was officers, inmates in a melee type of situation, you know, if the officer or inmate had to be rushed -- We have a medical unit, but if they had to be rush to the hospital like that second, call an ambulance in, stuff like that. Obviously, if someone passed away and the police

Page 153

M. SPOSATO
department came in for an investigation. There are different things. A lot of things on or off the job. There are specific things that I would request.
Q. Could you please turn your attention to Bates number 143 within the packet.
A. Okay.
Q. Can you please look at Item Number 7.
A. Okay.
Q. Can you describe a state reportable incident form?
A. That's what I said to you earlier, one of your earlier contraband or whatever questions, there are certain things that the tour commander has to report to the state. I can't tell you what that form looked looks like. I can tell that whether it is assault of staff, power outage, a water leak, no heat, no air conditioning, I am going to lock down the building or I have to shut down for reasons. There are certain things that the

M. SPOSATO

tour commander, which is our lieutenant, has to notify the state on within a time frame.

Q. Does this reportable incident form go to your desk before it goes to the state?

A. I would only see those if -- I don't know how many times in my career I have seen those. That's the tour commander's responsibility to notify the state of this is what happened. They would call me and say, you know, there is no power in the jail. We have to notify the state. Okay. Thanks. They would call me, but to see all of those reports -- It goes into a portal. I don't know if there is a printout to be honest with you that we even get back once it is in the portal. It is not like you are filing out a form and mailing it. You go into some system. You say this happened, that happened, whatever.

That's basically what it is. They use a portal. Years ago they might have used a form and faxed it. They still



M. SPOSATO

might do portal and fax to be safe, but none of that comes to me.

Q. Do you have access to this portal as well?

A. I do not.

Q. Did you have access to this portal during your time as sheriff?

A. Again, if I wanted access to the portal, I probably could get access to the portal. I have staff that reports to things. As long as I know we are reporting it, there is no reason for me to go into a portal.

Q. We can look at Item 9 on this page.

A. Okay.

Q. For what reason was the Criminal Investigation Unit notified of this incident?

A. Criminal investigation, as I stated to you earlier in multiple of the questions that you had for me today, that's the one unit that handles anything to do with inmates, any investigation. It could



M. SPOSATO

be an assault. It could be anything. It could be contraband found. It could be drugs. It could be numerous, numerous things. The Criminal Investigation Unit is the unit that does all the investigations that are inmate related.

Q. Let's take a look at Item 10 on that list.

For what reason would the Gang Intelligence Unit be notified of this slashing?

A. Well, the Gang Intelligence Unit is notified on most of the things as well just to make sure that if there was any gang affiliation with any of the inmates involved, did they have any intel. You know, there are some intel reasons why the gang unit would be contacted. I can't tell you why in this specific case. I just read it for the first time.

Criminal investigations, we would automatically -- It is like a over type of way that we would try to send as much information from security to gangs to



M. SPOSATO

internal affairs to criminal investigation. Everybody was abreast of an investigation because people have different intel. The gang unit might know that three gang members were told that they are bringing weapons in on phone calls.

We always did it so everybody was involved to try to resolve a situation. It wasn't like the gangs is going to resolve it. Criminal investigation would be first. Most of the time, gangs and criminal investigations worked hand and hand. The gang unit just didn't focus -- They had a big job with gangs, but a lot of intel is inmates that are affiliated with gangs that we have been talking to that has information for investigations that are going on in the Criminal Investigation Unit. It is more trying to get people to speak. The more they speak -- It is more about information gathering.

Q. You just mentioned that the gang unit might have information on weapons being brought into the facility. In what

Page 158

M. SPOSATO
ways are these weapons brought into the facility?
A. If we knew that, there would be no weapons brought in the facility.
What I meant by that is simply that we have a task force on the street in Hempstead. We have a fugitive task force. We have a lot of different intel. We have the N.Y.P.D., the Nassau County P.D., my gang unit. We try to gather as much information as possible. My meaning was that they talk to each other. This guy is known for this on the street. Intel comes in from the street. We get a phone call that this guy could have a weapon. This guy could have drugs. This guy could have this. This guy could have that. It is more of an information sharing. Some of it is true. Some of it is not. We base a lot of our investigations on intel. A lot of this is intel based. That was my point. It is not like we know the guy is bringing in a weapon at 8:30. It is a matter of trying to determine who is working with

Page 159

M. SPOSATO
who, and what groups are together, and getting as much intel, sharing as much information as possible within our own department and with outside departments.
Q. So, when you are getting this information, does this trigger a shakedown or a search for contraband?
A. If my guys got a call from an outside agency that there were drugs being brought in, yes. Again, there are a lot of things we would do. A shakedown would be one. We would wait. Obviously, it is not going to be until tomorrow, so we wouldn't shake it down before we believe it is happening.
These units together would meet. It was not that we would call a meeting for every phone call we got. The Gang Intelligence Unit and security would talk daily. They would determine what they would need to do to try to find before and after it is coming in. They would figure out how to set that up. They would be watching. There is a lot of internal

Page 160

M. SPOSATO
security procedures that we have.
Q. Let's look back at the contraband searches quickly.
Do assaults with weapons trigger the need for a strip search?
A. Again, as I said earlier, not constitute the need. I mean, I think you asked me earlier about when people are strip searched. Obviously, if somebody was just slashed with a knife and we have forty people in a room, to me, that would constitute that they should do whatever they could do to try to find it. If somebody was hiding it in their body or somewhere else, it would -- You know, that would be another question that would be based on security. The security supervisor there would determine what they need to do.
Q. Is there any guidance from the sheriff's office further on when it would be proper to strip search someone?
A. We wouldn't give out guidance to the security team on what to do and what not to do. The security team is on the

Page 161

M. SPOSATO
ground. We are not. They would have to assess where it is located. If it is a guy by himself in a cell or if it is a group of people, you know, they have to find that weapon. I wouldn't have to tell them that they need to search any way possible, especially if there was a slashing or a guy that had an overdose of drugs. They would have the obligation to search to make sure they try to find it because someone is hiding it in their body, and it is going to go somewhere else after that. So, we would try to minimize that by doing the search.
Q. Can an entire unit be authorized for a strip search if there is reasonable suspicion for a weapon?
A. Again, the security team will determine -- Again, if there was a weapon found in a housing area, and they felt they needed to strip search every person to see if it is hidden in their body, they wouldn't need a specific -- No one would call me to ask, can I strip five people or fifty people? The security team is going

M. SPOSATO

to determine to search or not to search based on a reason. They shouldn't just go into a housing area and start strip searching people. It would be determined upon an incident.

Q. Could you put out a policy that would require strip searches in such instances?

MS. ROGERS: Objection.

A. There would be no reason for me to put out or not put out -- The security team does a great job. They would have to know what their role is. I wouldn't need to put it out. Again, you would only be strip searching minus visiting, minus transportation, minus court, you would only be strip searching if there was a need. You don't just go strip searching people. If someone was slashed or somebody had an overdose, we would want to make sure that we find every possible -- We would go to every avenue we can so strip searching would be supported to try to see if it is hidden in somebody's body.



M. SPOSATO

MR. WOODS: Could we take a break, please.

MS. ROGERS: Five minutes?

MR. WOODS: Yes. Thank you.

Q. We are in the home stretch here. I am going to ask you just a handful of some more questions.

A. Okay.

Q. Can corrections officers disable the capability of toilet flushing in housing units?

A. Repeat that question, please.

Q. Can corrections officers turn off the water to stop toilets from being able to be flushed?

A. Can the corrections officers do that? My answer would be no.

Q. Can anyone turn off the water to stop the toilets from being flushed?

A. I would assume the maintenance staff has the way to do it in case there is a flood in the housing areas. I don't know any specific way myself to turn off the water.



M. SPOSATO

Q. Do you know what a pound sign on an inmates's record means?

A. A pound sign? I don't recall the symbols. I know there are symbols. Are you talking about the booking sheet?

Q. On the top of the files in an inmate's record, if there is a pound sign, do you know what that means?

A. I can't recall what symbols are what.

Q. Do you know if there is a symbol that signifies assault or behavior against officers or staff?

A. Yes. I do.

Q. Does that symbol change the way that correction officers handle an inmate?

A. The symbols are there for different reasons, but not how you handle them. It notifies the staff of different things.

Q. Are there cameras in Nassau County Correctional Center?

A. Again, I am not there since December 31 of 2017. We do have some



M. SPOSATO

cameras in the facility.

Q. Do those cameras record film that can be reviewed later?

A. Some.

Q. Where are those cameras?

A. I am not going to disclose the locations of our recorded cameras if they are still recording. I don't know.

Q. Does the camera in the E1-B Rec Yard film?

A. I don't believe -- There are definitely cameras in the rec yard. I don't believe they are recording cameras, but I am not positive of that.

Q. Are there metal detectors in Nassau County?

A. In the jail we are speaking about?

Q. Correct.

A. When you go into the visiting room, visitors bring stuff in that goes through a metal detector. Inmates coming in have metal detectors. Again, there are different things we do on searches, like I

M. SPOSATO

said earlier, so, yes, there are metal detectors.

Q. Are there metal detectors going into the rec yard?

A. I can't recall if there is or not.

Q. Have you ever considered putting metal detectors in the E1-B Rec Yard?

A. As I just stated, I don't recall if there are or if there are not. So, my answer is I don't recall if they are there or not.

MR. WOODS: I think that is all that I have. I don't believe I have any further questions for the witness.

MS. ROGERS: I have a question if you are done.

MR. WOODS: Okay.

EXAMINATION BY

MS. ROGERS:

Q. Mr. Sposato, the indicator on an inmate's file that might show that an



M. SPOSATO

inmate was assaulted to staff, would such an indicator be placed there in order for inmates to be treated negatively?

A. The different symbols, and I don't recall which symbol is for what, but it is information so the staff knows different things about them. They are not treated differently. There are times that we -- Again, if there is an escape risk, obviously, for an escape, you would do things a little different. Minus that, nobody is treated differently because of symbols.

MS. ROGERS: Thank you. I have nothing further.

MR. WOODS: Thank you.

MS. DIGNAM: Thank you very much everybody.

(Whereupon, at 2:25 P.M., the Examination of this witness was concluded.)

° ° ° °



M. SPOSATO

D E C L A R A T I O N

I hereby certify that having been first duly sworn to testify to the truth, I gave the above testimony.

I FURTHER CERTIFY that the foregoing transcript is a true and correct transcript of the testimony given by me at the time and place specified hereinbefore.

_________________________

MICHAEL SPOSATO

Subscribed and sworn to before me this _____ day of ________________ 20___.

_________________________

NOTARY PUBLIC



M. SPOSATO

E X H I B I T S

PLAINTIFF'S EXHIBITS


| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| Exh 1 | Notice of Deposition | 4 |
| Exh 2 | Perros V. County of Nassau | 4 |
| Exh 3 | Course ID 1-LI-99-SCOC | 4 |
| Exh 4 | Sheriff's Order Modification | 4 |
| Exh 5 | Memo dated 2/13/18 | 4 |
| Exh 6 | Sheriff's Order CD 05-00-30 | 4 |
| Exh 7 | Sheriff's Order CD 05-03-11 | 4 |


(Exhibits retained The Reporter.)

I N D E X


| EXAMINATION BY | PAGE |
|---|---|
| Mr. Woods | 4 |
| Ms. Rogers | 166 |


INFORMATION AND/OR DOCUMENTS REQUESTED

INFORMATION AND/OR DOCUMENTS PAGE

(None)

QUESTIONS MARKED FOR RULINGS

PAGE LINE QUESTION

(None)

M. SPOSATO
C E R T I F I C A T E

STATE OF NEW YORK )
: SS.:
COUNTY OF NASSAU )

I, LAURA ANZELONE, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of July 2020.

[signature]
LAURA ANZELONE



ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Sanchez, v. Nassau County Et Al
DATE OF DEPOSITION: 6/30/2020
WITNESSES' NAME: Michael Sposato

| PAGE | LINE (S) | CHANGE | REASON |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

____________________________
Michael Sposato

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF ____________, 20__.

____________________ ____________________
(NOTARY PUBLIC) MY COMMISSION EXPIRES:

**&**

**&** 3:16

**0**

**03** 87:5
**05-00-30** 169:8
**05-03-11** 169:9
**07335** 1:6

**1**

**1** 3:16 4:2 8:4 33:15,17 169:6,7
**1,000** 103:14
**1,100** 71:19
**1,200** 71:19
**10** 156:8
**10027** 2:5
**10:10** 1:14
**11501** 1:22 2:10 4:14
**116th** 2:5
**143** 153:7
**14th** 170:19
**166** 169:14
**18** 85:19 86:3 104:8,12
**1992** 15:23
**1994** 16:9,11,12 18:5 21:25
**1998** 104:4

**2**

**2** 86:22 87:4 169:6
**2/13/18** 169:8
**20** 168:19 171:22
**2001** 85:22
**2003** 85:23 87:10 87:13
**2005** 18:6 21:25 22:3,13,23 25:3
**2006** 22:23 25:3,6 25:9
**2008** 27:16,23,25 31:23 80:7
**2011** 27:25 32:25 33:3
**2014** 13:23
**2015** 134:21
**2016** 80:13 91:25 134:20
**2017** 33:15 80:7 85:19 86:2,3 92:18 104:8,12 164:25
**2018** 9:5 33:15,17 85:25
**2020** 1:13 170:19
**24514** 170:22
**27** 16:12 18:5
**2797** 1:9
**282** 121:20
**2849** 1:8
**2:17** 1:6
**2:25** 167:20

**3**

**3** 1:10 103:17 169:7
**30** 1:13 3:15
**31** 33:15 164:25

**4**

**4** 85:12 169:6,6,7,7 169:7,8,8,9,13
**435** 2:5
**448** 86:6
**449** 87:17 88:3,4

**5**

**5** 149:8,11 169:8
**500** 114:18

**6**

**6** 121:6 169:8
**6/30/2020** 171:3

**7**

**7** 4:3 153:11 169:9
**7-13** 87:22 88:2,9 102:12

**8**

**831** 2:5
**8:30** 158:24

**9**

**9** 126:2 129:25 155:15
**99** 169:7
**9:00** 146:3

**a**

**a.m.** 1:14
**ability** 39:23 46:7 96:17 143:6 144:21
**able** 7:22 28:24 60:3 65:25 67:3 68:19 106:9 117:14 124:14 139:5 163:16
**abreast** 157:3
**absence** 26:2
**abundance** 67:8
**academy** 54:25 56:7,8 57:4 58:18 59:14 87:9 96:22 97:25 98:2,13 99:9 101:10,11,14 102:3,4 105:6
**access** 155:4,7,9 155:10
**accomplish** 63:5,8 138:6
**acting** 25:25 27:17 27:22,24 28:2 31:24 32:2,5,9,11 32:14,15,23
**action** 8:17 170:15
**actions** 38:8,9 99:23 134:5
**active** 59:16 115:7 116:4,14 117:4,11 119:4,6
**actively** 116:17
**activity** 81:4
**actual** 142:20 146:18
**add** 57:22 60:18 60:21 65:3,5 72:20 76:13 103:13 121:3 142:15 143:9
**added** 98:25 133:5
**addition** 12:5
**additional** 6:24 100:13
**address** 4:19
**addressing** 70:24
**adhere** 29:11 38:11
**adhered** 48:6
**administer** 3:10
**administration** 33:14
**administrations** 49:7
**administrative** 39:21 48:20 49:4 49:17,18 77:19 94:6 151:4
**administrator** 108:10
**admissions** 76:21
**affairs** 69:12 78:12 157:2
**affect** 71:10 74:16

**affective** 132:23
**affiliated** 157:16
**affiliation** 110:2 156:16
**agencies** 40:20 78:16
**agency** 53:18 144:4 159:10
**agility** 98:9
**ago** 51:19 147:15 154:24
**agreed** 3:4,19 4:24 5:4,10,13,15
**aid** 98:21
**air** 90:16,21 129:17 148:5 153:22
**al** 171:2
**alike** 111:2 149:16
**alleged** 10:23 11:7
**allowed** 97:2
**alluded** 65:14
**alongside** 9:25
**ambulance** 152:24
**amended** 30:15 83:23,25
**amendment** 84:3 84:6
**amount** 67:23 68:24 73:14 75:21 89:17 94:4,12 108:4 114:8 121:2 149:6
**analysis** 68:4
**ancillary** 68:9 69:3 70:5,7,11,15 107:23
**andrew** 1:9
**ankle** 125:10
**answer** 6:21 7:3,7 7:14,15,23 11:4 13:8 14:6,9 25:18 35:11 36:8 44:2 58:10 68:13 71:5 77:15 79:10 87:14 91:5 97:23 106:11 123:7,17 127:4 139:3 140:6,10 146:9 148:8 163:18 166:13
**answerable** 74:19 114:17
**answered** 6:13
**answering** 139:2
**anybody** 111:15
**anyway** 73:17
**anzelone** 1:22 170:6,22
**appoint** 47:14,16
**appointed** 16:24 25:3,6,19 27:25 33:10 44:11 47:16
**appointment** 16:21 34:15
**approval** 50:23 59:8 60:5,7 82:12
**approve** 60:8
**approved** 34:15 35:12
**approximate** 39:6
**approximately** 10:19 12:12 14:12
**area** 89:14 112:2,4 112:9 114:9,19 116:19 118:21 123:11,13,13,15 123:16 130:18 133:7,9 137:24 145:2 148:23 161:20 162:4
**areas** 29:19 67:7 68:7 74:3 78:14 82:9 112:7,14 116:21 124:24 129:12 145:23 163:23
**aside** 14:4
**asked** 7:2,8 11:20 45:8 142:8 160:9
**asking** 40:7 58:17 60:18 72:24 75:5 77:17 82:11 86:21 108:15 123:25 128:22 131:13 136:21 152:2
**assault** 78:24,25 79:2,15 89:25,25 94:2 123:5 124:2 125:4,9 130:15,22 131:25 132:8 143:19 150:7 152:7,16 153:21 156:2 164:13
**assaulted** 51:8 78:4 83:8 93:10 124:16,19,20 130:12 167:2
**assaults** 51:2,4 77:3,20,25 78:2,10 78:10,20,23 79:5 127:7 130:9 138:13 150:5 160:5
**assess** 61:4 161:3
**assessment** 61:15
**assigned** 70:9,10
**assume** 6:14 72:7 163:21
**ate** 18:23
**attacked** 139:6
**attempts** 145:5,11
**attention** 58:4 83:6 85:7 88:22 121:20 152:13 153:7
**attorney** 2:9 5:25 7:11 9:9,10 12:10
**attorney's** 4:20 9:3 40:13 78:15
**attorneys** 2:4,9 5:5,16
**authority** 5:7
**authorization** 21:13
**authorizations** 81:13
**authorize** 50:20 50:21
**authorized** 3:10 161:16
**automatically** 90:9 156:23
**available** 26:3 97:7 134:24
**avenue** 162:23
**averaged** 71:19
**avoid** 89:10
**avoidance** 86:10
**aware** 58:8,22 78:23 79:20 80:23 81:5 83:2 88:17 90:19 91:2,8 134:20

**b**

**b** 165:10 166:9 169:2
**back** 17:2 19:7 28:7 99:13,15 100:11,13 108:24 108:24 109:6 114:23 118:2,4 119:2 123:14,15 124:5,11 134:12 147:4 154:19

160:3
**background** 34:10
**bad** 147:16
**bag** 110:12
**banks** 63:16
**bars** 112:20,21
**base** 158:20
**based** 40:8 42:11 55:12 99:23 100:5 120:23 122:15 128:6 158:22 160:18 162:3
**baseline** 6:4
**basic** 20:21 23:24 37:24 42:12 50:25 54:21 103:18
**basically** 16:6,17 18:11,25 19:6,22 23:19 26:4,8 30:2 31:9 36:20 37:2,3 37:4 39:15 42:6,9 42:15 43:4 46:3 46:23 55:25 63:11 82:22 84:9,9 110:4 112:5,22 115:9 136:20 154:23
**basis** 55:20 65:8 76:11 107:19
**basketball** 91:10
**bates** 86:6 87:17 88:3 153:7
**bathrooms** 142:19 142:20
**bay** 15:23,25
**bayside** 14:10
**beds** 112:22 133:23
**began** 31:23
**beginning** 10:20 22:23
**behavior** 164:13
**believe** 9:9 11:23 12:3 15:23 17:13 54:23,25 98:20,25 119:22 125:8 147:21 159:15 165:12,14 166:16
**best** 6:10 26:21 31:3,5 40:5 42:19 42:23 46:7 58:13 63:2 64:17 96:16 139:3 142:13,25 143:5 144:21
**better** 61:18,25 63:13 66:12,13 67:18 74:6,10 76:12 146:8,9
**big** 42:24 49:23 83:15 105:24 132:19 157:15
**billion** 126:6
**bit** 6:4 34:10 75:24 123:24
**biweekly** 45:15
**blade** 137:13
**blind** 117:18
**blizzard** 37:19
**blood** 170:15
**body** 84:9,21 160:15 161:12,22 162:25
**book** 96:23 97:21 97:24
**booking** 164:6
**books** 112:7 126:20 127:14,14 127:17,18
**booths** 117:16
**boxes** 126:19
**bread** 129:5
**break** 7:6,9 20:24 83:7,12 84:19 91:21 134:17 163:3
**breaking** 89:24
**breaks** 125:10
**brett** 2:6 5:25
**brief** 19:11 43:23 68:4 128:23
**briefed** 50:2,25 51:2,11 81:8,14,15 81:16,20 83:10 88:24 126:13 128:19,23
**briefing** 50:11 82:10
**briefings** 81:9
**briefly** 49:22 69:8
**bring** 12:22 34:17 48:21 85:5 120:4 132:25 133:2 143:6 151:20 165:22
**bringing** 85:9 133:20 157:6 158:23
**broad** 14:2 40:16 65:7
**broke** 90:15 91:9
**broken** 79:11
**brought** 8:17 47:18 88:22 96:5 146:21 152:12 157:25 158:2,5 159:11
**bubble** 116:16
**budget** 35:20 38:4 38:10,24 39:3,11 39:14 42:21 64:21 64:22,23,23,24 71:20 72:3,8,8,10 72:16,16,16,19,21 72:21 73:20 76:2 76:3
**budgetary** 37:8
**building** 46:4 118:18 121:6 122:16,19 129:25 153:24
**buildings** 18:13
**bunk** 112:22
**bunks** 142:17
**bureau** 69:14
**buses** 65:5
**business** 22:20 33:25
**buybacks** 139:19

**c**

**c** 2:2 4:5 168:2 170:2,2
**c.a.o.** 94:5
**c.c.** 19:13
**c.o.** 71:3
**c.o.s** 122:13
**c.p.r.** 98:21
**caleb** 2:6 5:23
**calendar** 135:14
**call** 61:16 67:8 78:14,15 115:6 117:17 124:7,9,25 129:3 138:6 151:19,19 152:23 154:13,15 158:15 159:9,18,19 161:24
**called** 4:5 18:22 90:13 151:17
**calls** 157:7
**camera** 165:10
**cameras** 164:22 165:2,3,6,8,13,14

**capability** 163:11
**capacity** 28:2 48:17 51:15 134:24
**captain** 20:9,9 56:13 107:12 151:20
**captains** 26:18 30:24 48:24,25 92:23 108:11
**captions** 10:5
**card** 136:9
**care** 42:15 43:2,5 124:21 136:22
**career** 154:9
**carts** 131:4 133:13
**case** 1:5 6:2 9:4,13 9:18 10:24 11:9 11:17,18,19,22 12:5 67:10 82:3 90:19 107:19,19 116:25,25 156:20 163:22 171:2
**cases** 10:6 11:13 131:21 151:21
**categories** 82:25 98:10
**cd** 169:8,9
**ceiling** 90:16 129:2 142:21
**cell** 97:5 112:17 114:15 128:17 142:20 146:25 161:4
**cells** 133:3 137:24 137:25
**center** 16:16 39:4 40:14 43:18 47:13 55:14 164:23
**cereal** 126:20
**certain** 17:17 50:19 55:10,11 64:25 68:24 93:24 93:24 94:2,4,12 108:4 109:8 119:20 121:2 153:17,25
**certification** 3:7
**certified** 2:6
**certify** 168:4,8 170:8,13
**chain** 26:9,12,13 58:20 90:20
**chair** 134:3
**change** 13:18 33:13 34:9 51:23 57:19 58:6 59:4,5 59:6,18 62:8 67:4 67:12 68:2,7,9,20 75:23 82:10 83:21 84:13,14 88:13,18 102:6,10,17 103:12 104:22,22 104:23 105:3,13 113:9,11,14 114:4 115:11,21,22 125:14 129:10,13 130:4 142:9 144:5 145:22 146:20,20 146:21,22,23 147:24 164:16 171:5
**changed** 19:25 48:12,13 49:7 56:3,4 58:9 62:8 66:16 67:19,21 68:10 84:9 106:10 115:18 143:22,23
**changes** 20:20 30:5 52:13,15 58:23 59:9,12 71:16 73:25 74:15 75:11 104:18 132:22
**changing** 106:3 142:7 145:4,17
**check** 85:20 112:7 122:18 144:18
**chief** 22:3,14,18 23:11,17,18,25 24:25 25:12,13 32:19 94:5 151:3
**chiefs** 23:3,12,15
**choose** 57:9
**chose** 57:11 73:12 73:13
**circle** 77:19
**circulate** 55:3
**civil** 1:20 8:16 9:18 37:10 39:5 39:14
**claim** 17:6
**claims** 93:10
**clarity** 125:2 145:3
**class** 102:25 104:9 104:11,12,13 105:6,21,22,24
**classification** 120:5
**classifications** 89:13 95:12,22 112:13
**classify** 110:20
**classroom** 99:17
**clear** 74:15 110:8 146:18
**clergy** 41:3 97:8
**climb** 133:25
**close** 37:20
**closely** 48:18,20 135:13,15
**closer** 53:8
**collect** 75:25
**college** 15:8
**combat** 126:4
**combine** 67:2,4
**come** 16:23 18:15 26:20,22 27:11 45:22 48:9,11 57:16 58:16 59:9 60:17 61:5 63:5 83:9 90:13 107:9 118:8 150:11,17
**comes** 52:11 53:22 72:20 96:2 127:24 155:3 158:14
**coming** 19:17,20 52:6 58:2 85:9 114:23 129:23 133:15,16 145:19 146:14 159:23 165:23
**command** 25:24 26:4,6,16
**commander** 94:5 95:3 153:18 154:2
**commander's** 154:11
**commissary** 94:22 97:7,8
**commission** 52:8 53:6,11,17 54:3,7 54:16,20 55:9,24 93:20,21 94:7,13 103:17 104:17,20 105:2,7,11,19 106:13 139:8 171:25
**commissioner** 27:8 46:20,22,22 47:2,8,10,14,17 48:10,21 49:2,12

**commissioner's** 51:18
**commissioners** 26:18 46:14 47:11 47:11
**commit** 135:23
**committee** 38:12
**committees** 38:13
**communication** 107:22
**communications** 69:14
**community** 15:7 40:25 41:3,6
**compensation** 71:2,10,12
**compiling** 55:15
**complaint** 8:14 9:14,15 12:20 78:2
**complaints** 78:9 92:9
**completely** 142:23
**complex** 40:17 72:21 75:2
**concern** 132:10,21
**concerned** 31:14 141:8
**concerns** 42:3
**concluded** 167:22
**conditioning** 90:17,21 153:23
**conduct** 10:23,25 11:7,10,13 123:4
**conducted** 137:3
**conferencing** 33:24
**confirmed** 32:6
**confrontation** 86:10
**consider** 142:6
**considered** 166:8
**constant** 114:10 114:20,25 115:6 116:3,12
**constantly** 138:23
**constitute** 160:8 160:13
**consultant** 34:8
**consulting** 33:20 33:21,22,23,24 34:4,7
**contact** 16:23 126:4
**contacted** 156:19
**continue** 15:5 123:3
**continuously** 117:10
**contraband** 50:6 94:2,18,21 95:2,6 95:7,9,10,12,21,22 95:24 96:2,4,4,6 96:10,11,12,12,14 96:17 97:16 109:25 110:9 111:8,12 125:15 125:17,18,21,22 125:23,23 126:4 126:14,16,17,22 126:25 127:2,8,15 127:16,22 128:7 128:20 129:8,11 129:21,21 130:4 130:10 131:8 137:6 143:18 145:2 153:16 156:3 159:8 160:4
**contract** 34:12
**contractor** 129:2
**control** 42:15 43:3 43:6 45:19 47:21 128:4
**conversation** 54:3
**conversations** 53:25 54:13
**cook** 16:11,15 19:13 43:18
**cooking** 16:18
**cooks** 18:12,21 19:18,21 21:14
**copy** 3:13,16 150:10
**corner** 134:2 138:5
**corporal** 29:18
**correct** 7:3 11:3 11:12 12:2 29:16 31:24,25 36:3 86:3,14,22 87:11 88:5,8 100:18 108:21 111:20 113:12 165:20 168:9
**correction** 1:8,8,9 10:3 20:16 21:15 29:17 44:5,18,22 45:2,20 47:22 53:7,12,18 54:17 54:17,22 56:16 57:3,6 58:12,13 59:14 67:22 70:8 70:20 71:11,17,25 73:3,11 74:20 83:12 84:15,16 86:17,20 87:2 93:22 94:7 95:20 96:20 97:20 100:22 103:18,19 104:18,21 105:2,7 105:12,20 106:13 106:15 108:20 111:23 114:6 132:5 164:17
**correctional** 16:16 18:16 39:4 43:17 47:13 55:14 164:23
**corrections** 21:9 29:6,14 43:19 44:23 46:25 52:8 54:4,7 55:10,25 94:13 98:12 132:2 163:10,14,17
**couch** 134:3
**counsel** 3:5,16 23:6
**count** 67:14
**counties** 44:10 106:2
**country** 96:2
**county** 1:7,7 2:8,9 4:19 8:12 9:3,9 12:9 14:4 15:4 17:2 21:12 22:24 23:12 27:19 32:18 32:19,20 33:3,10 34:12,14,16,19 35:2,7,17,23 39:25 40:6 41:14,15 43:14,17,19 44:9 45:21 55:14 77:3 82:6 105:22,23,24 109:23 111:18 113:10 123:3 158:10 164:23 165:17 169:6 170:4 171:2
**county's** 43:11
**countywide** 38:15
**couple** 44:8 47:11 79:4 93:17

**course** 17:14 22:19,22,24 23:3,5 23:10,13 54:21 56:17 68:17 103:19 105:19 128:13 132:9,13 132:15,20 169:7
**court** 1:2 3:12 6:18 33:24 65:4 76:23,24 107:16 134:10 162:17
**courtesy** 6:23
**courts** 134:13
**crawl** 134:2
**create** 51:15,16 53:15
**created** 46:11 87:8
**creating** 46:10 48:8
**credits** 15:13
**criminal** 10:8 69:12 77:23 78:11 92:21,24 93:2,14 127:11 128:15 135:8 155:19,21 156:5,22 157:2,11 157:13,19
**crossed** 109:11,12
**crux** 42:16
**current** 135:19
**curriculum** 56:15 56:20,22 58:4,6 59:22 100:19 103:12 104:10
**custody** 42:15 43:3,5
**cut** 59:2 60:13 74:24 91:10 132:8
**cv** 1:6

**d**

**d** 3:2 168:2 169:12
**d.n.a.** 140:3
**daily** 76:11 131:8 159:21
**danger** 114:11
**dangerous** 110:21
**daniela** 2:14
**data** 75:25 76:14 76:15,15,19,20,21 76:25 77:2,6,9,11 77:15,16,19 78:16 78:18,19,22 79:8 80:22 107:3,23 127:8 148:11,17
**date** 1:13 4:4 9:2,6 25:10 49:19 148:16 171:3
**dated** 104:4 169:8
**day** 17:15,15 20:4 20:4 30:7,7 31:8,8 36:17,17,24 37:22 37:24 39:12,12 45:11 46:17,18,23 46:23 49:20,20 57:7,7 58:15,19 61:5 65:6,6 66:19 89:2,3,5 102:3,3 112:18 114:13 115:8 116:3,7,12 125:20 126:7 128:16 129:15 140:7 141:7 148:22 149:3 152:13 168:19 170:19 171:22
**days** 3:15 20:3 37:20 146:24
**deal** 19:15 39:22 76:7
**dealing** 102:21
**deals** 72:13
**dealt** 48:24 55:19 94:6
**death** 80:20 90:11 152:5
**deaths** 79:25 80:4 80:8,12,16
**december** 33:15 164:25
**decide** 18:21 31:2 124:21 151:14
**decided** 18:11 27:20 51:22 59:2 116:2 151:18
**decides** 34:20 120:2
**decision** 81:25 152:3
**decisionmaker** 56:9
**decrease** 140:14
**deem** 110:14
**defects** 5:14
**defendant** 1:17 8:16 9:18 10:8
**defendants** 1:11 2:9 9:25 13:5
**definitely** 45:15 79:3,23 98:23 120:16 134:11,14 151:2,6 165:13
**definition** 29:10
**degree** 15:9
**delete** 60:19,22
**deliberation** 35:8
**department** 1:8 11:15,21 25:4,25 26:20,24 30:4,8 31:11,20 35:21,24 36:2,11 37:6 39:2 40:12,14,15 42:20 47:6 48:23,25 49:12 55:8 61:11 63:9 69:7 73:8,20 97:11 103:3,11,11 119:25 125:13 149:14 153:2 159:5
**departments** 38:16 87:6 159:5
**depend** 132:7
**depended** 31:6 81:11 83:18 91:7 108:22 128:24 129:8
**depending** 49:21 50:8,12 51:3,12 57:23 59:20 88:23 110:11,21 112:25 124:8 127:9 152:12
**depends** 30:13 35:2 52:23 58:24 98:16 107:10 117:23 118:10 120:4 123:17 127:13 140:17
**deposed** 10:10,14 11:25
**deposition** 1:17 3:7,8,13 5:8,11,19 8:3 10:16,18 11:8 12:8,18 169:6 171:3
**deputy** 26:17,17 26:25 27:5,8 29:25 32:17 37:11 109:14 150:9
**describe** 26:21 69:2 82:19 152:15 153:13

**described** 97:22
**description** 169:5
**deserve** 97:3
**designed** 117:13
**desk** 90:6 109:10 109:11,12 149:19 150:16 154:6
**detainee** 100:6
**detainees** 17:7 19:4 21:7 24:6 28:13 29:16,20 45:4
**detector** 165:23
**detectors** 165:16 165:24 166:3,4,9
**determine** 158:25 159:21 160:19 161:19 162:2
**determined** 162:5
**diets** 18:17,18
**difference** 32:3
**differences** 41:24
**different** 26:9,19 27:11,12 29:2 30:16,23,24 31:22 32:17,21 36:22 37:4,7,17,21 38:12 38:16 40:20 41:7 42:5 45:25 49:13 49:14,15 52:9,11 55:22 56:19 57:15 57:25 63:10,11,23 64:4,15,15 65:17 65:18,22 67:5,24 69:23 73:16 74:9 76:12,13 77:4,12 77:12 78:16 79:4 79:7 81:2,2 82:9 82:25 89:12,12,13 89:14 92:10 93:17 95:11,13,14,15,21 95:22 96:3,12 97:10 98:6,9,17,18 107:7,22 108:3,8,9 110:6,20 111:21 112:8,13,15,25 118:17 119:3 120:2,3,7 122:25 129:24 137:6 138:24 144:12,13 145:16 150:20 151:7 152:8 153:3 157:4 158:9 164:19,20 165:25 167:5,8,12
**differently** 62:19 63:22 65:24 95:19 134:13 167:9,13
**difficult** 77:14 82:16 96:7 138:3 138:5 140:5
**dignam** 2:6 5:25 167:18
**direct** 73:2
**directed** 133:6
**directions** 30:2
**directive** 30:14 53:23 57:19 84:8 105:20 119:21
**directives** 28:24 30:9,11,11,15
**directly** 24:13,14 24:19 26:10,11 87:24
**disable** 163:11
**discharges** 76:22
**disciplined** 100:5
**disclose** 165:7
**discovery** 50:6 128:6
**discuss** 57:15 61:20 144:3 145:21
**discussed** 11:8 79:7
**discussing** 64:19 70:4 82:18
**discussion** 21:4 70:3 91:23 134:19 145:4
**discussions** 30:20 145:18 146:2
**dissect** 64:8
**district** 1:2,2 16:3 40:13 78:14
**division** 37:10 39:5,8 68:5
**divisions** 26:24 29:2 39:13 79:5
**doctor** 137:12
**document** 8:7,9 76:8 85:15 103:22 104:3,7 121:10 149:12,15,17
**documentation** 76:10
**documents** 12:14 12:17,22 13:10,15 29:4 149:16,19 169:16,16
**doe** 1:10 8:13 10:2
**dogs** 126:2 129:25 132:25
**doing** 21:8 42:19 45:11 63:13 67:9 141:20 144:25 161:14
**dollar** 74:10
**door** 118:7,7,14,25
**dorm** 112:23 113:5,7 116:15 133:13,14 142:16 146:16 148:7
**dorms** 112:22 116:11
**downstairs** 118:17
**drastic** 59:7
**draws** 129:6
**drop** 20:19
**dropping** 21:6
**drugs** 127:10,23 144:15 156:4 158:17 159:10 161:9
**dryer** 133:10 142:18
**due** 71:15
**duly** 4:6 168:5 170:10

**e**

**e** 2:2,2 3:2,2 4:5 121:6 122:16,19 168:2 169:2,12 170:2,2
**e1** 165:10 166:9
**earlier** 7:3 73:6 76:6 88:15 92:2 102:11 153:16,16 155:22 160:7,9 166:2
**earn** 15:9
**eastern** 1:2
**education** 15:5
**effect** 3:11,14 70:25 85:25
**effective** 75:18 85:23 135:22 137:3,5,7 138:12 139:14
**efficiencies** 74:13
**efficiency** 64:2,3 64:20 65:12 74:2 76:14,17

**efficient** 61:23 64:17 67:3 68:21 71:9 74:7
**efficiently** 61:25 63:3,8,18 66:13 67:11
**eight** 15:13 70:16 73:14
**eighty** 61:6
**either** 10:20 51:9 66:13 70:9 76:12 104:21 109:14
**elected** 33:8 44:12
**elements** 42:12
**eleven** 56:16 101:14 124:12
**eliminate** 139:21 140:8
**emergencies** 37:18
**emergency** 26:3
**employee** 34:18
**employees** 43:7
**employment** 34:12 41:11,13,14
**enforcement** 23:5 23:8 37:10 39:5 39:14
**engaged** 38:7 58:14 82:17
**engaging** 38:9
**entail** 112:10
**enter** 15:19
**entire** 117:15 161:15
**errata** 171:1
**escape** 94:9 167:10,11
**escorts** 20:16
**especially** 140:20 143:19 161:8
**esq** 2:6,11
**et** 171:2
**everybody** 69:10 82:15 117:8 119:10 120:4 123:21 124:22 126:11 157:3,8 167:19
**everyday** 40:18 44:25 85:9 106:24 125:17
**exact** 9:2 18:6 25:10 94:24
**exactly** 9:22 10:5 23:10 43:21 83:19 84:11 101:22 128:3 131:14
**examination** 4:9 98:3 99:10 166:22 167:21 169:13 170:9,11
**examined** 4:8
**example** 60:4 116:2 122:7 124:4 131:12
**examples** 62:9
**exams** 99:13,18
**exclusively** 47:4
**exec** 17:2
**executive** 32:18,19 32:20 33:4,11 34:16,20 35:3,17 40:2,6
**exh** 169:6,6,7,7,8,8 169:9
**exhibit** 8:3,4 85:12 87:17 103:17 121:6 149:8,11 169:5,5
**exhibits** 4:2 13:12 169:4,10
**existing** 102:17
**expectation** 133:8
**experience** 42:11
**expires** 171:25
**explain** 26:13 46:19 71:13 95:18
**explained** 21:10
**extend** 6:22
**external** 39:22 40:9 41:23 144:4 144:4,7
**extra** 113:24 126:19 129:7
**eye** 141:12
**eyes** 95:14 110:14 111:6,7

**f**

**f** 3:2 170:2
**facilities** 43:12 53:8,14 110:4
**facility** 43:2,11 44:16 45:17 49:20 50:16 54:8 55:4 71:9 82:5,6,16 90:11 96:7,18 104:24 111:16 125:18 127:8 131:3,9 140:15,17 148:13 152:6 157:25 158:3,5 165:2
**fact** 130:20,21
**facts** 9:12
**failed** 145:5,11 147:4,7
**familiar** 8:6,8 9:12 85:14 103:21 104:3,6 121:9,14
**familiarize** 121:22
**families** 141:11
**family** 33:25 97:6 133:15
**far** 20:13,14 24:8 57:6 112:11
**fast** 131:19
**faster** 65:5 76:12
**fax** 155:2
**faxed** 154:25
**february** 25:7,9 27:16
**federal** 1:19 40:19 69:21
**feel** 61:22 108:23 114:10 116:19 131:13
**felt** 31:10,10 49:16 52:2 62:8 63:13 65:2,4 90:18 161:20
**fewer** 75:9
**fifteen** 91:16 112:3 113:17 114:2,13 114:21,23 115:14 115:18
**fifty** 20:2 116:10 116:11 161:25
**fight** 83:8,12 84:19
**fighting** 83:5
**fights** 111:10
**figure** 159:23
**file** 97:4 166:25
**filed** 8:25 95:4,5 110:16
**files** 164:7
**filing** 3:6 154:20
**fill** 49:8,10
**filled** 138:16
**film** 165:3,11
**final** 32:22 56:9 87:16

**find** 51:4 62:21 63:2,17 78:5 96:14 110:12 125:21 129:22,22 129:23 130:13,15 130:23,24,24 131:7,17,20,23 132:14,20 133:12 136:12,20,24 137:8,12,14,16 138:7,8,9,10,18 139:11,25 140:25 141:14,17,25 142:5 143:7,9,13 143:17 144:2 145:2,14 147:6 159:22 160:14 161:5,11 162:22
**finding** 131:24 135:22 136:13 140:13
**fine** 7:7,13 14:8
**finger** 91:11
**finish** 6:21 15:17
**fire** 110:19
**firearm** 98:20,23 99:15 101:5
**firearms** 56:17 98:7
**first** 4:6 8:3,24 84:19,21 85:21 91:7 98:21 118:19 118:20 139:9,13 156:21 157:12 168:5
**fit** 67:18
**five** 12:13 20:24 91:21 116:10,11 118:20 119:14 120:19 125:5 134:17 161:24
163:4
**flood** 163:23
**floor** 113:4,5 118:19,20 119:15
**floors** 118:20 119:14
**flushed** 132:12 141:2 147:9 163:16,20
**flushing** 146:17 163:11
**focus** 63:23 74:11 74:12 96:6 102:23 126:10 127:5 157:14
**focused** 47:12 126:7
**folded** 136:9
**folders** 150:19
**follow** 56:14 97:12 98:10
**followed** 45:20 47:21 59:22 84:18
**following** 46:8 135:21
**follows** 4:8
**food** 18:20,24 19:23 128:11 131:4 133:13
**foot** 91:9
**force** 3:14 39:22 69:22 79:15,16 81:15,17 82:19,20 82:21,23,24 83:2,4 83:15,20,22 84:4 85:12,17 86:10 87:23 88:10,16 89:9,10,16,23 102:15 106:22,23 107:6,15,24 108:2 109:4 148:15,15
158:7,8
**forces** 77:8 88:21 89:17 90:14 108:6
**foregoing** 168:8
**forget** 116:15
**form** 3:20 5:2 145:9 153:14,20 154:6,20,25
**former** 4:18
**forth** 19:8 170:10
**forty** 12:13 15:13 20:2 160:11
**forward** 33:4 56:20
**found** 50:10,15 94:21 126:14,18 127:10,14,23 128:9,11,12,16,21 128:25 129:4,5 131:12,15 137:6 137:10,17 139:11 139:16,24 140:9 156:3 161:20
**four** 70:16,17 73:15 87:20 113:2 114:12 142:18
**fourth** 10:16
**frame** 154:4
**fratto** 149:8
**free** 67:20
**frequency** 113:12 114:5
**frequently** 40:10 45:18
**fresh** 148:5
**front** 118:2,11,25 119:7,8
**fugitive** 158:8
**full** 7:22 32:25 34:6 122:10,12
**fully** 35:16
**further** 3:19 5:4,9 5:13 53:10 54:24 138:13 160:21 166:17 167:16 168:8 170:13

**g**

**gained** 68:14
**gang** 69:20 81:3 82:7,7 89:14 110:2 156:10,13 156:16,19 157:5,5 157:14,24 158:11 159:20
**gangs** 156:25 157:10,12,15,17
**gate** 91:11 112:18
**gather** 158:11
**gathering** 157:22
**gears** 13:18 75:23 125:14 147:24
**general** 112:3,9,11 112:12 113:19 115:5
**getting** 145:12 159:3,6
**give** 7:22 14:2 29:10 47:9 53:2 72:17 94:24 106:21 141:10 160:23
**given** 4:18 10:18 22:13 25:22 26:6 31:3,5 59:13 168:10 170:12
**gives** 21:12
**giving** 53:12
**glass** 105:15
**go** 6:3 12:10 14:23 18:14 27:10 40:4 45:10 48:4 53:9

57:4 58:20 66:3,8 67:20 76:24 99:8 99:13,15,16 100:2 101:9 107:7 108:13,14 109:13 109:19 110:7 113:24 114:14 118:16,17,22 120:5,6 140:19 148:20 149:24 154:6,21 155:13 161:13 162:3,19 162:22 165:21
**goal** 74:6
**god** 144:23
**goes** 72:9 105:16 115:18,19 122:21 144:13 154:6,16 165:22
**going** 6:14 13:18 13:25 14:5 34:9 37:19,25 38:25 44:24 49:19 53:4 53:22 57:17 58:18 59:6 60:12,13 62:20 75:23 80:8 82:13 87:14 106:12 114:19 118:3,11 121:15 123:2,12,19 124:21 126:9 129:19 134:8 135:16 138:20,22 139:21,23 140:10 144:24 145:21,24 146:5,12,17 153:23 157:10,19 159:14 161:12,25 163:7 165:7 166:4
**good** 4:15,16 5:21 42:13,17 138:22
**government** 22:21 23:7 35:22 63:15 63:16
**graduate** 14:20 54:24 96:22 97:25 98:2
**great** 162:13
**grievance** 78:9 92:9,24 93:15,16 97:4
**ground** 161:2
**group** 77:18 98:11 122:2,10,14 144:4 161:4
**groups** 27:9 40:9 40:19,22 41:2,5,7 41:11,13,14 42:3 57:17 63:10,11 70:13 107:23 122:9 144:7 159:2
**guard** 140:21
**guess** 23:9 33:16
**guidance** 51:25 52:5 53:13,15 54:9,11 59:21 160:20,23
**guideline** 55:6 56:2,3,6,14 58:2 58:25 104:22
**guidelines** 51:21 94:25 99:4
**guy** 82:17 91:9,10 109:5 119:6,7 124:17 126:18,19 126:20 127:17 129:6 138:16 146:24 147:11,13 158:13,16,17,17 158:18,23 161:3,8
**guy's** 129:6
**guys** 20:3 90:18 108:15 133:7 144:10 146:16 159:9

**h**

**h** 4:5 169:2
**h.r.** 41:15
**half** 22:21 102:25 114:21 148:22
**hall** 18:22
**hand** 157:13,14 170:19
**handbook** 95:23 96:20,21,25 97:9 97:14,15,19
**handed** 102:16
**handful** 163:7
**handle** 38:14,15 67:20 164:17,19
**handled** 37:10 50:9 51:13 77:24 81:12 93:5
**handles** 55:22 155:24
**handling** 130:3
**hands** 82:17 84:22
**happen** 30:3 51:4 60:16 66:19 105:12 108:3 109:7 124:3 126:6
**happened** 36:24 37:14,18,22,23 49:23 51:21 81:21 81:22 83:17 84:24 85:7 89:10,11 91:17,19 100:9 106:25 107:16,16 107:17,18 110:3 112:8 136:2 154:12,22,22
**happening** 46:18 51:25 89:18,19 90:3,4 115:10 159:16
**happens** 65:16 107:15 123:11,13 124:10 148:18
**harassed** 93:10
**hard** 35:19 136:11
**hardest** 95:25
**harvard** 22:20
**head** 25:14,15 35:24 67:14 103:11
**health** 40:14,15 57:24 98:22 102:23 112:2 113:15 116:19
**hear** 7:11 146:17
**heard** 104:15
**heat** 90:17 153:22
**heights** 2:4
**held** 1:20 21:4 37:9 70:3 91:23 134:19
**hello** 44:23
**help** 21:9 42:8 124:18
**hempstead** 158:8
**hereinbefore** 168:11 170:10
**hereto** 5:6,17
**hereunto** 170:18
**hicksville** 14:25 15:3
**hidden** 125:24 128:2 161:22 162:25
**hiding** 160:15 161:12

**high** 14:20,23,25 15:6
**higher** 19:12,16 20:7,10 27:7 36:13 105:15 108:13 113:20 115:18,19
**highest** 36:13 151:2
**hired** 16:11 54:22 56:15
**history** 9:15
**hit** 113:8
**hold** 21:22 34:3,5 84:21
**holdovers** 62:10 62:16
**holds** 84:9
**holiday** 30:6
**hollingshead** 1:8
**home** 163:6
**honest** 154:18
**hospital** 51:10 90:12 91:3,12 109:5 152:23
**hotel** 15:12 17:4
**hotlines** 78:13
**hour** 12:12 73:14 73:15 102:25 114:21 148:21,21 148:22
**hours** 67:5 94:12 114:12
**housed** 89:13 118:5
**housing** 21:18,20 29:19 44:19 45:7 68:7 78:13 82:9 112:4,7,9,11,14,16 113:19 114:9,19 116:18,21 118:21 121:7 123:11,12 123:14,16 124:24 129:12 133:7,9 137:24 148:23 161:20 162:4 163:12,23
**human** 41:13 69:19
**hurdles** 109:22
**hurt** 49:24 65:19 106:24 111:15
**huts** 117:16
**hypothetical** 101:20
**hypothetically** 103:10

**i**

**i.t.** 33:22
**idea** 63:25
**ideas** 42:4
**identification** 4:3
**identified** 61:14 62:16
**identify** 60:25 131:2,6 140:3 143:18 144:14,14 144:15
**immediate** 130:17
**immediately** 77:11 90:23 123:4 124:6
**impact** 39:23 84:14 88:18
**implemented** 52:22
**implications** 132:2 132:4
**important** 40:23 131:9 139:4 141:14,17
**impossible** 116:6
**improvements** 74:3
**incident** 49:24 85:2,3 108:19 128:14 150:4 153:14 154:5 155:20 162:6
**included** 149:23
**increase** 113:23 114:5,6
**increased** 89:4,4 125:16,18
**indicator** 166:24 167:3
**individual** 27:9
**individually** 150:18
**inefficiencies** 70:25 76:2,5
**inefficiency** 76:3,9
**inevitably** 109:9
**information** 6:25 9:11 53:22 89:6 109:8,9,20 134:22 134:23 135:5 148:14 152:14 156:25 157:18,22 157:24 158:12,19 159:4,7 167:7 169:16,16
**initial** 12:20 61:15
**injured** 83:13 106:16 108:21
**injuries** 83:10
**inmate** 51:8 78:9 79:12,13,13,25 80:4,8,12,17,17,20 80:20,24 81:10,10 82:2,2,22 89:23,24 89:25 90:13,24 91:11 92:9 93:10 93:12,13 95:23 96:19,24,25 97:9 97:19 110:13 111:3,5,7,10,10,11 111:11 114:11 116:18,24 117:21 117:21 119:18 121:23 125:4,10 130:9,12 136:15 137:20 140:22 141:16 148:2,18 150:5,5 152:21 156:7 164:17 167:2
**inmate's** 164:8 166:25
**inmates** 16:17 17:16 20:15,18 45:4 68:23 75:15 75:17,19 76:23 78:11 93:6 106:16 108:21 110:23,25 112:17 114:7 116:22 117:24 118:8 120:23,24 122:3 124:11,24 127:25 132:5 141:19 148:4 152:19 155:25 156:17 157:16 165:23 167:4
**inmates's** 164:3
**input** 17:25 20:12 24:22 28:19 32:23 53:7 54:17 56:21
**inside** 16:18 81:3 118:8 124:11
**instances** 126:13 128:20 142:4 148:12,18 162:9

**instructed** 7:13 13:7
**intel** 156:17,18 157:4,16 158:9,14 158:21,22 159:3
**intelligence** 69:21 156:11,13 159:20
**inter** 107:22 149:14
**interact** 28:13 40:10 44:17 45:3 122:12
**interacted** 40:21
**interaction** 28:17 40:18 43:8 44:25
**interactions** 17:7 19:3 24:5,9 41:10 41:20,23 100:5
**interested** 15:17 170:16
**intern** 2:6 5:24
**internal** 29:4 69:11 78:12 157:2 159:25
**interview** 127:25
**interviewing** 137:23
**introduce** 8:2 149:7
**investigated** 93:8 93:13
**investigation** 65:2 77:24 92:8 93:2 127:11 153:2 155:19,21,25 156:5 157:2,3,11 157:19
**investigations** 69:12 77:23 78:12 92:22,25 93:6,14 107:7,12 128:15 135:9 156:6,22 157:13,18 158:21
**investigative** 92:7 107:8 149:9
**involved** 53:24 54:2 56:5,11,23 60:2 72:6 79:21 90:23 102:2 150:4 156:17 157:9
**island** 43:13
**issue** 57:18 125:15 125:17,20 126:22 132:14
**issues** 41:6 110:9 110:11,23
**item** 153:10 155:15 156:8
**items** 19:23

**j**

**jablonski** 22:12
**jail** 16:12 17:19,20 19:16,25 20:10 21:11 24:7,10 28:16 31:15 37:9 37:23 38:21,25 39:10,16 42:13,17 44:14 45:21 47:4 49:17 61:2 62:23 77:21 95:16,25 109:25 111:18 115:12 127:3 140:20,25 141:13 142:2 147:14 154:14 165:18
**jails** 42:14 43:4,15 53:19 141:24
**james** 1:9
**january** 33:15,17
**jaw** 79:11
**jennean** 2:11
**jeopardized** 75:3
**job** 15:24 16:14,20 17:3 33:18 34:4 35:18 38:22 39:24 40:2,4,4,5,7 41:25 42:23,24 66:8,12 67:5 82:4 117:12 129:15 153:4 157:15 162:13
**jobs** 57:12
**joe** 22:12
**john** 1:10 8:13 10:2
**judge** 3:12
**july** 170:19
**june** 1:13

**k**

**k** 126:2 129:25
**kaivan** 2:13
**kam** 1:6
**keep** 35:18 39:23 40:2 49:19 68:17 78:7,19,22 79:17 82:15 99:14
**keeping** 77:19
**keith** 1:8
**kept** 36:12,14 68:22 79:8,14 92:5 93:19 127:8 127:17
**kind** 33:21 75:24 113:6 134:5 143:20
**kitchen** 16:18 17:10,22,25 18:7,8 18:10,19 19:6,21 20:8,12,17 21:5,7 21:19,21 22:2,8 36:10
**kitchens** 19:7
**knew** 78:2 128:23 131:14 136:8 158:4
**knife** 96:15 110:17 136:10 160:11
**know** 6:9 7:4 10:4 16:7 17:18 19:14 20:20 23:4 24:8 29:25 30:5 31:21 35:14 36:12 37:8 37:18 40:7 42:14 42:18,22 43:5,21 43:23,24 44:15 45:5,24 46:7 47:18 48:2 49:25 50:5,7,10,14,17 53:2,21,24 56:2 58:14 59:5,21 60:12 61:19 67:9 68:17 72:19 74:6 77:6,9,22 78:3,6 78:24 81:6,17,17 81:19,22 83:24 85:23 88:25 90:22 92:11,18 94:22 97:3,24 99:12 104:11 105:23 109:5 110:4,12 111:3 112:6 113:24,25 120:8 120:12,20 122:16 125:24 126:22,25 127:21,23 130:13 130:16,25 131:4 131:19 132:7,11 132:13 133:17 134:11,14 135:25 136:2,2,14,15 137:11,12 138:21 139:9 140:2,17,18 140:23 141:5,17

142:10,11,12,14 144:6,17 145:10 145:11,15,15 146:4,8 147:8,9,23 147:23 148:5 149:15,25 150:8 152:20 154:9,13 154:17 155:12 156:18 157:5 158:23 160:16 161:5 162:14 163:23 164:2,5,9 164:12 165:9
**knowing** 40:5
**knowledge** 23:2 48:15 80:17 148:2
**known** 16:25 17:2 22:8 158:14
**knows** 127:24 167:7

**l**

**l** 3:2,2 4:5 168:2
**laborer** 16:7
**large** 38:22 42:20 42:20 45:16 63:9 82:16 117:21 122:9,14 147:7
**largest** 43:14
**laura** 1:22 170:6 170:22
**law** 2:6 5:24 23:5 23:7
**lawsuit** 8:12,25 9:8
**lawsuits** 81:18,19
**lawyer** 13:2,11
**lay** 67:16
**lb** 1:6
**leaders** 22:20
**leadership** 22:25
**leak** 153:22
**leaner** 67:13
**learn** 8:24 17:16 64:9
**leave** 27:21 49:7 67:22
**leaving** 27:19
**left** 27:17 126:23 129:2
**legal** 2:4
**legislative** 37:8 38:8,9
**legislature** 32:7 33:4,6,11 34:16,25 35:9,13 40:12
**length** 19:25 20:2
**lesson** 103:18 104:5 106:5,10,13
**letter** 86:18,19
**letters** 141:11
**level** 19:12 31:8 49:21 50:8,13,13 51:3 83:19 93:25 94:20 95:7 96:11 108:13,14,22 115:23 117:4,20 118:17 119:17 122:8 126:16 128:25 129:8
**levels** 36:23 68:10 95:11,13,14,15,21 107:7 151:7
**li** 169:7
**liaison** 55:18,24 151:5
**lieutenant** 154:2
**lieutenants** 26:19
**lighter** 110:18
**liked** 36:10
**limit** 96:6,16 143:21
**limited** 149:6
**line** 24:14 46:2 119:8 169:19 171:5
**lion's** 39:10
**list** 70:18 156:9
**listen** 42:2,22 45:9 53:13
**little** 6:3 19:12 34:10 53:10 71:5 95:18 123:24 167:12
**live** 13:24 115:10
**lived** 14:11
**lives** 14:3
**llc** 171:1
**loaf** 129:5
**local** 22:20
**locate** 125:21 132:14
**located** 161:3
**location** 45:7 119:3 123:18 147:18,20 148:10 148:16,19,25
**locations** 67:17 82:10 165:8
**lock** 50:16 153:23
**lockups** 53:20
**log** 127:18
**logged** 128:7,8
**logging** 122:24
**long** 12:11 13:21 14:11 18:3 21:22 24:24 27:13 33:12 35:8,14 51:18 58:10 72:18 79:19 98:8 101:25 114:14 155:12
**look** 36:17 62:6,22 64:9 85:11 103:16 103:23 104:14 114:15 121:5,11 121:15 129:4,16 131:2 133:3,10,22 133:23,24 134:2,3 138:24 149:16 151:18 153:10 155:15 156:8 160:3
**looked** 61:7 66:6 153:20
**looking** 41:8 129:17 141:20
**looks** 121:15 150:22 153:20
**lost** 71:25
**lot** 10:3 17:18 18:18 20:4 30:3 30:23 36:21 37:7 37:12,17 38:4,4,12 38:17 40:20,25 41:3,5 42:3,5 43:7 43:7,8 45:24 46:14,15 48:4,22 48:22,24 49:3,8,14 51:4 52:10 53:20 54:11 56:12,18 57:13 59:17 60:9 61:19 63:10,10,12 64:4,6,7,7 65:10 65:16,22 66:16,18 66:18,18 69:5,17 69:23 71:22 72:2 72:2 73:11,13,16 75:17 76:14,16,20 76:25 77:11,12,24 81:4,20 82:6 85:4 85:5 89:15 90:7 94:10,10,10 95:8 95:24 96:3,8 97:10 98:5,7,8,9

101:13,18,23 105:3 108:8 109:6 110:2,6,10,19 111:10 112:8 122:20 125:24,25 126:2,8,9 127:6 129:18,19,24 130:2,14,18,20 135:25 136:12,13 137:6,19,22,25 141:9 143:11 144:12,12,15 145:14,20 146:5 146:11 149:24 150:23 152:7 153:3 157:15 158:9,20,21 159:11,25
**low** 19:24
**lower** 108:14 113:20

**m**

**m** 4:1,5 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1
**magnetometers** 143:10
**mailing** 154:21
**mailroom** 69:13
**main** 42:16
**maintenance** 163:21
**major** 49:24 50:15 51:10 61:2,13,16 63:4 72:10 152:6 152:15
**making** 46:6,17 73:25 77:25
**manage** 35:20,20 42:18 61:12 62:2 63:17 80:25 82:4 96:2
**managed** 49:15 61:7 62:18
**management** 15:12 17:4 19:18 20:21 22:25 37:2 38:5,21,25 39:9 62:25 63:15 65:23
**manager** 11:14,21 28:5 36:21 37:5 38:18 64:16 142:15 144:11
**managing** 36:14
**mandate** 90:5 119:23,24 120:9 120:12
**mandated** 68:15 68:18,19 94:8 100:2 101:3 102:2 119:17,20
**mandates** 55:9 58:11 68:22
**manner** 79:7 102:17
**manual** 55:7 97:21
**march** 25:9
**marked** 4:3 8:4 13:12 169:19
**marriage** 170:15
**married** 13:19,22 14:14
**mary** 2:6
**maryland** 144:24
**material** 87:8
**materials** 55:3,16 59:13 87:5 100:15 101:12 105:8
**matter** 30:12 63:14 158:24 170:17
**matters** 31:14
**maximum** 144:17
**mayors** 23:6
**mean** 24:7 28:20 30:13 39:20 41:4 43:24 63:7 64:22 67:15 72:18 83:17 85:20 92:17 95:13 100:8 111:2 123:9 125:19 129:14 137:9,15 140:19 140:25 144:7 145:10 146:8 147:5,8 151:25 160:8
**meaning** 76:3 99:7 115:25 151:23 158:12
**means** 164:3,9
**meant** 32:5 158:6
**measures** 74:2
**mechanical** 87:7
**medical** 40:13 69:15 150:15 152:22
**meet** 12:11,25 13:4 36:22 41:8 41:16 42:6 61:22 109:18 120:18

135:16 159:18
**meeting** 12:15 36:25 37:14,24 38:3 159:19
**meetings** 23:23 24:2,2 37:16 41:2 50:3
**melee** 152:19
**members** 24:15 82:7,8 157:6
**memo** 149:14 169:8
**mental** 40:15 57:24 98:22 102:23 112:2 113:15 116:19
**mentality** 43:3
**mentioned** 21:5 53:5 114:25 133:20 157:23
**menu** 18:15 19:23
**mess** 18:22
**met** 12:9 18:14 37:2 41:7 42:2,10
**metal** 110:17 128:12 143:11 144:14 165:16,23 165:24 166:2,4,9
**michael** 1:9,17 4:13 168:15 171:3 171:21
**midnight** 33:14
**million** 49:25 65:20 125:6 141:4 143:24 144:19
**mineola** 1:21 2:10 4:14
**minimize** 139:22 161:14
**minus** 43:13 58:2 58:3 114:13 125:9
137:5 162:16,16 162:17 167:12
**minute** 20:24 81:16 91:21 114:23,24 134:17 140:7
**minutes** 12:13 112:3,5 113:17,18 114:13,21 115:14 120:19 163:4
**mirrors** 133:2,21
**misunderstood** 105:9
**mixed** 74:8
**model** 146:19
**modification** 169:7
**modify** 51:20 52:12 100:15,21 101:6,11,19
**moment** 140:7
**money** 65:25 71:15,25 72:5 73:9,21,24 74:11 97:6
**monitor** 117:7,14
**month** 18:6 25:5
**monthly** 41:2 77:7 135:12
**months** 10:22 78:5 109:2 135:10 147:14,15
**morning** 4:15,16 5:21 146:4
**morningside** 2:4
**move** 68:20 81:7 82:8 106:12 119:10,11,25 120:2,24 123:12 123:15,19,20 133:13 146:10,25
**moved** 67:17 69:9
**movement** 120:13 120:17 122:3,17 122:21 124:5,6
**movements** 21:8 21:13 117:21,22 119:18 121:24 122:10 123:4 125:3,7
**moves** 81:14 82:13
**movies** 112:19
**moving** 36:12 69:3 120:21 122:14 133:14 141:10
**multiple** 26:23 44:21 45:16,17 46:5,12 57:15 64:10,11 68:5,6,6 69:17,17 142:4 145:5 155:22

**n**

**n** 2:2 3:2 168:2 169:12
**n.y.p.d.** 158:10
**name** 4:11 5:23 69:6 171:2,3
**named** 8:16 9:4,17 9:21,24 10:7 13:5
**names** 9:22
**nassau** 1:7,7 2:8 4:19 15:3,7 16:15 23:12 27:19 35:23 43:11,15 44:9 45:21 55:14 77:3 105:22,23 109:23 111:17 113:10 158:10 164:22 165:17 169:6 170:4 171:2
**native** 14:19
**necessary** 103:8
**need** 23:20 31:10 31:10 45:7 54:15 55:8 64:14,14 68:11 81:13 97:16 102:13,18 103:14 103:23 113:16 121:11 123:14 134:6 144:11 159:22 160:6,8,19 161:7,23 162:14 162:18
**needed** 23:23 24:3 30:2 49:16 50:5,7 50:22,23 52:2 54:9,10 60:7 62:8 65:2,4 66:6,15 68:12 70:20 81:6 81:24 82:8,23 83:7 88:23 92:18 93:12 94:11,15 102:22 116:3,19 161:21
**needs** 46:17 48:12 48:13 56:25 58:3 103:3
**negatively** 167:4
**never** 58:21,22 59:12,18 62:13 66:8 67:21 72:5 75:15,22 78:4 94:9 104:15 131:18 138:20 140:21 141:24 145:4
**new** 1:2,21,23 2:5 2:5,10 4:7,14 14:10,16,19 20:3 30:19 33:18 34:17 34:20,24 35:6 44:11 51:20,21,24

51:25 52:18,20,25 53:23 59:24 99:6 99:10 104:21 105:6,8,19 106:5 170:3,7 171:1
**night** 146:3
**nine** 129:6
**nineteen** 126:20 127:14
**ninety** 39:3
**non** 39:21 63:16
**normal** 105:18
**normally** 10:2 23:22 100:12 149:23 150:3
**notary** 1:22 4:7 5:7,12 168:22 170:6 171:25
**note** 86:5 87:16 145:8
**notice** 1:19 5:14 86:16 124:19 169:6
**notifications** 90:10
**notified** 9:4 51:5 79:3 83:16,20 91:13,15,18 106:23 108:5 109:3 150:6 155:19 156:11,14
**notifies** 124:18 164:20
**notify** 127:12 132:15 145:19 154:3,11,14
**notifying** 82:12
**november** 85:19 86:3 104:8,11
**number** 67:25 71:23 72:17 77:20 78:20 80:11 83:20 86:6 87:17,25 90:24 93:3 113:9 113:11 114:4 153:7,11 169:5
**numbers** 135:13
**numerous** 40:19 40:19 46:12,12 47:24,24 51:17 78:17,17 107:9 108:17 156:4,4
**nutritionist** 18:14

**o**

**o** 3:2 4:5,5 86:12 86:18,19,20,22 87:4 121:23 168:2
**o.3** 122:3
**o.c.** 82:24 84:20
**oath** 3:11 6:5
**object** 14:2
**objection** 7:12,16 25:17 35:10 36:7 39:19 62:12 79:9 91:4 97:18 123:6 145:8 162:10
**objections** 3:20 4:25
**obligation** 161:10
**observation** 115:6
**observe** 29:7,9,10
**obviously** 39:13 58:12 64:5 71:20 90:10 94:8 96:13 97:12 107:5 110:15 122:23 123:10 124:15,18 124:23 128:9 136:6,23 152:5,24 159:13 160:10 167:11
**occur** 124:6
**occurred** 77:3,20 78:21 80:12 91:25 148:12
**occurrence** 106:20
**office** 2:9 4:20 9:3 19:5 36:3 40:13 46:15 78:15 92:12 109:15 119:22 150:11 151:9 160:21
**officer** 1:8,9,10 21:15 44:5,22 49:23 51:9 54:17 56:16 58:13 66:4 70:20 71:22 79:14 82:22 91:12 94:6 99:22 100:4,10,22 108:23 111:3,4,5,9 111:12 114:12 116:9,20,23 117:25 118:2,10 121:2 130:12 136:16 137:20 140:22 150:10 151:4 152:20
**officer's** 97:21 110:14 129:15 141:12
**officers** 8:13 10:4 18:20,23 20:16 21:9 29:14,17 44:18,24 45:2,21 46:8 47:22 54:22 57:4,6 58:12 59:14 67:22,25 70:9 71:11,17,19 71:23,25 72:5,9 73:3,12,13 74:21 83:12 84:15,17,23 86:17,21 87:2 95:20 96:20 98:12 99:6 102:13,19 103:19 106:15,23 108:20 111:2,23 111:25 114:7 116:11,16,17 117:7 118:3,9,12 118:24,25 119:2,8 120:19,20 122:22 132:3,6 141:19 150:4 152:19 163:10,14,17 164:14,17
**official** 35:23
**officially** 25:23 27:16
**offs** 151:7
**oh** 92:19 105:22 108:23 129:5 131:3 141:25 144:23 147:15
**okay** 8:5 20:25 71:7 85:13 86:4,7 86:15 87:18,21 103:20,25 120:18 121:13,21 138:21 153:9,12 154:15 155:17 163:9 166:21
**old** 52:24 104:16
**once** 57:2,3,4 100:20 154:19
**ones** 11:24 29:15 46:2,3,6,9,16 48:5 48:7 55:23 151:15
**ongoing** 11:22
**open** 49:10 112:21 118:7
**opening** 17:3,5
**operating** 39:16
**operation** 20:5

**operations** 30:7 39:12 46:24 65:7
**operator** 16:2,7
**opinion** 67:19
**order** 19:23 30:18 30:19 31:18,21 87:22 88:3,9 102:12 167:3 169:7,8,9
**ordering** 18:25
**orders** 28:21,22,23 29:3,6,7,12,22,24 30:21,22,23 31:3 31:12,14,17,22 48:14 52:17
**organization** 26:14
**original** 3:8,16
**originally** 14:17 22:9
**ounce** 145:25
**outage** 153:22
**outcome** 170:16
**outlined** 76:6
**outside** 26:6 69:22 81:3 111:23 118:6 118:8,19 124:10 129:25 148:5 159:5,10
**overall** 11:14 28:5 28:11 30:15 36:21 37:5 38:5 39:9,16 71:23 72:3 73:8 73:19 80:6 135:14 144:10
**overcome** 109:22
**overdose** 161:9 162:21
**overlap** 30:12 70:12,14
**overlapping** 70:22 70:23
**overlaps** 65:18
**override** 30:19
**oversaw** 103:11
**oversee** 19:16 106:3
**overseeing** 37:3 47:7
**oversees** 47:3,5
**oversight** 52:7 53:6,19 65:13
**overtime** 64:5 65:13,15,16,20,21 66:4,22 67:12 68:21 70:15,18,25 71:8,16,22,24 72:3 72:13,17,24 73:4,5 73:7,7,9,10,12,15 73:22 74:2,5,12,13 74:15 75:4
**oyster** 15:23,25

**p**

**p** 2:2,2 3:2 4:5
**p.d.** 127:12 158:10
**p.m.** 167:20
**package** 149:9,21 149:22 150:2,18 150:19,21,24 151:8,23
**packages** 150:8,13 151:5,11
**packet** 153:8
**page** 85:22 87:17 88:2,7 155:16 169:5,13,16,19 171:5
**paid** 72:13 73:4
**paint** 122:12
**pairs** 129:6,7
**paperwork** 108:7
**paragraphs** 87:20
**parole** 40:16
**part** 38:22 55:7,9 70:6 72:10,12 84:23 89:3,5 131:8 133:9
**particular** 100:4
**parties** 3:6 5:6,17 170:14
**parts** 133:14 150:20
**pass** 55:11 57:5 98:3,10 99:10
**passed** 95:17 141:6 142:24 152:25
**patrol** 111:17,19 111:22 112:2,4,6 113:7,8 114:15 129:16
**patrolling** 116:18 116:22
**patrols** 111:22,24 112:7,10,24 113:10,13 114:3,5 114:6,20,24 141:20,22
**paycheck** 71:14,15
**pen** 94:21 141:13
**pens** 126:19 141:10
**people** 18:23 20:20 23:6,6,8 27:10 28:24 30:25 40:21 42:7,22 43:8 46:5 49:7,13 51:7 53:13 57:14 57:15,16 58:19 61:9 62:25 63:23 65:3,4,19 67:6,9 67:16,20 68:12,19 68:24 69:18,22 70:5 72:2,3 73:17 74:8 75:9 77:13 78:3 82:9 85:9 103:14 104:15 107:9,25 108:12 108:13,14 109:13 114:18 120:3,5,6 120:25 121:3 123:14 127:15 133:15 135:7,17 137:23,25 138:24 143:7 145:15,19 146:14 152:18 157:4,20 160:9,12 161:5,24,25 162:5 162:19
**pepper** 110:12 111:6,7
**percent** 39:3,4
**percentages** 149:2
**perfectly** 7:7 14:7
**performance** 40:8
**perimeter** 111:22 111:24
**period** 78:23 80:9
**permanent** 32:7,9
**perros** 169:6
**person** 6:19 44:3 56:24 128:17 151:3 161:21
**personal** 67:18
**personally** 20:15 24:9,19 36:20 48:14 55:8,20 56:5 79:21 90:9 100:17 109:17 150:13 151:10
**personnel** 38:4

**pertaining** 29:22
**phone** 157:7 158:15 159:19
**physical** 145:23
**physically** 24:18
**pick** 20:18
**picking** 21:6,17
**picture** 122:12
**pictures** 150:21,22
**piece** 74:11 128:11 128:12 149:20
**pieces** 141:10
**pierre** 1:4 6:2 8:11
**pills** 96:15 127:10 127:23 137:10
**pinpoint** 110:5 152:10
**pipe** 90:15
**place** 42:21 45:16 63:9,14 66:15 83:15 85:18 119:9 120:15 130:7,7 132:19 145:25 147:7,25 148:4 149:5 168:11
**placed** 167:3
**places** 68:25 145:23
**plaintiff** 1:4,18 2:4 8:12
**plaintiff's** 4:2 8:4 103:17 121:6 149:11 169:4
**plaintiffs** 9:21
**plan** 103:18 104:5 106:14
**plans** 106:6,10
**plant** 16:3,8
**plastic** 110:12,16 128:11
**play** 66:17
**played** 40:23
**playing** 91:10 136:9
**please** 4:11 6:9 69:25 86:5,8,11 87:16,19 91:21 121:19,22 134:17 153:6,10 163:3,13
**pleasure** 34:14
**plenty** 116:21 143:12
**plug** 142:22
**plus** 39:13
**pockets** 81:6
**pod** 112:16 113:3 118:13 119:16
**pods** 118:6 142:19
**point** 25:2 47:17 60:11 75:7 119:20 130:18 158:22
**pole** 133:22
**police** 40:12 53:19 152:25
**policies** 17:19 20:17,22 43:20 45:19,22 46:8,10 46:11,15 47:21,24 47:25 48:3,6,8,9 51:16,17,18,24 52:4 54:18 55:16 56:10 58:7 59:13 84:18 95:16 102:7 104:19 121:4 122:11 125:6,6,7 135:21 145:5
**policy** 20:13 51:15 51:20 52:18,18,21 52:22,23 53:3,4 58:23 83:22,23 84:4,19,24 85:12 85:17,18,22 86:18 86:25 87:15 102:10,15,18 104:22 115:12 118:4 120:15,17 120:22 121:7 122:2,4,9,10,15,17 122:19 123:3 125:3,8,11 129:20 134:9 136:4,18,19 136:21 142:7 143:9 144:5 162:7
**policymaking** 17:24 20:11 24:21 28:18 32:22
**political** 39:18
**pool** 73:8,21
**poplar** 147:25 148:4
**popped** 38:2
**population** 112:12
**portal** 154:17,19 154:24 155:2,5,8 155:10,11,14
**portion** 38:24 72:8 72:25 86:16
**pose** 34:20 110:10
**posing** 110:9
**position** 17:8,12 19:10 21:23,24 24:6 25:16 28:14 32:11 33:9 34:7 39:17,18 60:25 124:15
**positions** 26:16,19 49:5,8,10 57:14 66:25 68:18 69:23
**positive** 12:4 94:16 99:18 150:12 165:15
**possible** 139:18 143:8,18 144:25 158:12 159:4 161:7 162:22
**possibly** 12:3 80:8 133:12 140:11 142:15
**post** 57:14 70:22 74:17 75:10,11
**posted** 57:13
**posts** 68:6 70:6 74:24 75:13,19
**potential** 100:6
**pound** 164:2,4,8
**power** 153:21 154:14
**premiss** 43:6
**prepare** 12:7 13:2
**present** 2:13
**pretty** 33:20,25 43:25
**preventing** 138:13
**previous** 45:23 62:11,17 139:7
**previously** 7:2
**printout** 154:18
**prison** 44:4
**prisons** 53:20 106:2,3
**private** 40:22
**privilege** 5:2
**probably** 77:5 131:18 150:12 155:10
**probation** 40:16
**problems** 61:2,14 61:17 62:10,14
**procedure** 1:20 23:4 93:15 105:14 107:5 120:15

**procedures** 17:17 50:19 120:7 160:2
**proceeding** 10:8
**process** 99:6 152:3
**promoted** 22:3
**promotion** 22:14
**prompted** 91:2
**proof** 5:7
**proper** 108:7 160:22
**prospective** 44:6
**protect** 111:11
**protected** 123:22 124:22
**protection** 111:13
**protocol** 130:3
**public** 1:22 4:7 5:8 5:12 32:18 38:11 168:22 170:6 171:25
**pumping** 16:8
**punched** 78:25
**puncture** 132:9,16
**purpose** 71:9 89:20
**pursuant** 1:18
**put** 28:20,23,24 30:3,8,14,18,19,21 31:9,11,17,18,21 33:4 42:21 48:14 51:24 52:13,14,17 52:18,20 53:4,23 56:9,20 68:11 90:7 97:6 104:9 104:12,13 105:25 114:12,18 116:9 116:11,20 119:10 141:12 162:7,12 162:12,15
**putting** 52:3 166:9

**q**

**qualifications** 98:6
**qualify** 99:14,14
**queens** 14:10
**question** 5:2 6:9 6:14,15,22,25 7:8 7:14,15 11:5,6,24 13:8 31:16 40:3 56:25 68:13 70:11 71:4 72:24 74:18 75:2,2 77:14 86:25 99:25 101:8 101:17,20,21 103:10 113:22 114:2,16 120:11 122:6 123:24 127:5 139:2 140:5 146:7 160:17 163:13 166:19 169:19
**questions** 7:18 11:20 153:17 155:23 163:8 166:17 169:19
**quick** 20:24
**quickly** 4:23 28:7 46:20 82:20 91:24 125:14 160:4

**r**

**r** 2:2,11 3:2 168:2 170:2
**radios** 122:24
**radius** 119:12
**ran** 44:3,14,15 46:23 62:24
**random** 126:8
**randomly** 145:20
**range** 99:13,16
**rank** 29:18
**ranking** 151:3
**ranks** 19:16 20:10 27:12 48:5 65:10 66:7
**rare** 52:19 58:16
**rarely** 131:16
**razor** 137:13
**reach** 50:24
**read** 12:21 86:8 87:19 88:16 121:18 156:21
**reading** 5:18 121:25
**realistic** 116:13
**really** 42:16 61:20 66:17 72:15 101:6 134:7 135:9,11
**rearrange** 76:11
**reason** 7:21 15:15 27:19 36:24 42:9 57:21 155:13,18 156:10 162:3,11 171:5
**reasonable** 161:17
**reasons** 31:22 32:21 37:21 41:9 65:17,20 85:5 89:12,15 126:6 153:25 156:18 164:19
**rec** 91:9 107:17 117:3,6,7,13,15,17 117:19 118:4,4,6 118:19,23 119:13 119:15 120:18 124:3,16 143:22 147:25 148:3,6,9 148:20,24 149:4 165:10,13 166:5,9
**recall** 9:2,6,22 10:5,21 11:18 22:16 23:10,14 25:10 27:20 28:22 39:7 59:19 60:10 60:16,23 80:19,19 83:14 84:2,7 88:20 91:16 102:8 103:4,15 115:17 115:19 127:21 130:6 164:4,10 166:6,12,13 167:6
**recalling** 59:8
**receive** 108:19 109:16 149:18 150:3
**received** 12:20 15:13
**recognize** 149:12 149:13,14
**recollection** 54:19 115:16 119:24 134:9
**recommend** 48:12
**recommendations** 144:16
**recommended** 99:22
**record** 4:12,17 21:3 69:24 70:2 91:22 134:18 164:3,8 165:3 170:11
**record's** 8:10
**recorded** 127:21 128:3 165:8
**recording** 165:9 165:14
**records** 79:14 80:14
**recourse** 100:6
**recover** 145:6

**reduce** 60:4 67:15 67:16 75:12
**reduced** 48:22 49:3 65:21 67:15 68:14 71:20,21 73:7,20 74:11
**reducing** 66:3 74:5
**reduction** 60:6 66:14 74:13 75:4
**references** 87:4,5
**referring** 53:3 62:4 120:13 151:21
**refreshers** 102:21
**regard** 65:13
**registered** 82:7
**regular** 55:20 111:24
**regularity** 52:3
**regulations** 97:11
**rehab** 69:14 74:22
**rehash** 91:24
**reilly** 22:6 27:17 83:25 84:12
**reilly's** 27:18
**related** 93:12 156:7 170:14
**relationship** 54:13
**religious** 18:17
**remain** 18:3
**remember** 6:24 8:19 9:20,24 25:5
**reminders** 98:23
**removed** 133:10
**repeat** 11:6 53:9 102:14 163:13
**rephrase** 6:10
**replace** 35:4 40:6
**replaces** 85:21,22
**replacing** 35:4
**report** 17:21 20:7 26:10,10 32:13 56:18 77:8 85:8 88:23 90:20 93:18 93:19 94:8 95:5 125:7 149:21,22 153:19
**reportable** 153:14 154:5
**reported** 24:16,18 87:23 88:10 93:4 93:7 94:3,12,15,17 94:23 95:8 97:17 126:17
**reporter** 4:4 6:18 169:10
**reporting** 107:25 155:12 171:1
**reports** 17:17 19:17,20 20:5 79:23 83:17 85:2 85:3,4,6,10 89:7 90:6 108:20 128:9 150:4,15 154:16 155:11
**represent** 6:2
**request** 76:15 149:21 150:24 153:5
**requested** 135:4 151:13 152:8,11 169:16
**requesting** 135:3
**require** 87:23 88:10 98:24 162:8
**required** 57:20 60:15 97:13 126:21
**requirement** 113:18
**requirements** 54:20 79:18 93:23 106:4 108:2
**reserved** 3:21 5:3
**resolve** 42:7 157:9 157:11
**resources** 41:14 64:21 69:19
**respective** 3:5 5:6 5:17
**responsibilities** 16:4,13 18:9 23:16,21 24:12 25:22 28:3,25 32:3
**responsibility** 31:19 32:8 36:17 39:11 50:14 154:11
**rest** 53:15 148:23
**restaurant** 15:12 17:4
**restraints** 87:7
**result** 67:13 80:17
**retained** 169:10
**retired** 18:7
**revenue** 72:20,20
**reversed** 84:10,11
**review** 12:14,17
**reviewed** 12:19 108:6 165:4
**rework** 73:5
**rid** 49:5,6,9
**right** 11:11 15:22 21:20 50:23 51:6 61:6,8,9 67:6 88:7 92:4 118:6,14
**rikers** 43:13,15 44:9
**rise** 80:24 83:6
**risk** 167:10
**rogers** 2:11 4:17 5:22 10:25 11:4 11:10 13:14,25 14:9 20:23 25:17 35:10 36:7 39:19 62:12 79:9 88:6 91:4 97:18 123:6 145:8 149:10 162:10 163:4 166:19,23 167:15 169:14
**role** 11:20 16:5 17:25 18:4,24,25 19:4,14,19 20:12 20:14 22:15 23:17 23:18 24:12,22 26:7 27:2 28:9 38:5 40:23 46:20 47:8,9 54:23 60:2 61:24 64:12 65:9 78:8 142:14 162:14
**roles** 27:3,4 30:16 37:7,12 38:17
**room** 2:5 112:18 115:8 116:3,7,12 117:18 118:12 128:17 131:4 160:12 165:22
**rose** 36:10 51:7 81:11 85:7 93:24 95:6
**rotated** 19:7
**rotation** 119:11
**routine** 23:3
**row** 119:12 146:24
**rule** 117:8
**rules** 1:19 43:20 59:21 97:10,10

**rulings** 169:19
**run** 4:22 35:21 42:17 43:2 49:17 61:3 63:8 95:16
**running** 42:13 53:14 98:8
**runs** 44:16
**rush** 152:22
**rushed** 152:21

**s**

**s** 2:2 3:2,2 4:5,5 169:2 171:5
**s.c.o.c.** 55:16,19 97:17
**safe** 63:8 82:15 141:24 155:2
**safer** 61:25 124:23
**safety** 32:18 38:11 109:22 110:9,10 110:23,25 114:6 140:14,23
**sake** 8:10 125:2 145:3
**salaries** 71:18,18 72:9,11
**sanchez** 1:4 6:2 8:11,17,19,22 171:2
**save** 65:25 68:21 139:6
**saw** 28:16 62:23 63:20 82:5 84:25 102:11
**saying** 21:7 58:25 64:3 73:24 76:9 103:14 113:23 131:17 138:4 151:16,22,24
**says** 35:6 84:19 125:9
**schedule** 18:12 30:6
**scheduled** 20:21
**scheduling** 18:24
**school** 14:21,23,25 15:6
**scoc** 169:7
**screwdriver** 110:18 128:25
**se** 75:13
**sealing** 3:6
**search** 130:10,17 130:23 132:18,18 133:6,6,7,18 134:6 136:4,5,11,18,19 137:9,16 138:6,15 138:18 142:7,13 142:13,23,25 143:2,4,5,5,6,9 144:5,21,25 145:4 145:17,24,25 146:8,18 147:19 159:8 160:6,22 161:7,10,14,16,21 162:2,2
**searched** 133:8 134:8 138:20 147:13 160:10
**searches** 125:25 129:11 130:4 132:23 135:21 137:2,4,7 138:12 139:5,14 140:20 141:23 145:22 146:11 147:5 160:4 162:8 165:25
**searching** 144:7 144:23 146:9 162:5,16,18,19,23
**second** 25:24 26:4 26:6 50:3 51:10 91:8 103:24 121:11 152:23
**seconds** 124:12
**section** 86:9,12 121:23
**security** 39:15 50:18 61:19 62:3 62:5,7 65:22 68:4 68:7 70:6,10,17,19 74:16,20,21 75:3 75:10,13 77:22 89:2 92:23 95:4 107:11,13 110:3 116:25 119:25 122:25 124:8,13 124:25 129:18 130:19,19 132:2,4 132:10,13 135:8 144:8,9,10 145:20 146:5 156:25 159:20 160:2,18 160:18,24,25 161:18,25 162:12
**see** 24:8 44:24 63:12 65:8 74:3 80:14,21 83:18 85:2,8,21 88:23 92:13 93:11 95:21 99:3 103:2 107:2 107:3 112:19 117:19 119:7 125:22 127:12 134:4 137:21 138:2 143:11 149:22 150:25 151:10,13,13,14 151:17,22 152:4 152:14 154:8,16 161:21 162:24
**seeing** 74:5
**seen** 85:16 154:10
**selected** 16:19
**sell** 94:22
**send** 100:10,13 104:21 105:7 106:5 128:15 150:7,10 156:24
**sent** 9:10 13:11 22:24 76:8 77:10
**sentenced** 76:25
**separate** 18:23 27:3,4,9 82:15
**separately** 120:7
**serious** 50:22 91:14 96:13 110:15 111:15 127:22
**serves** 34:13
**service** 3:15 97:8 99:19,21,22 100:3 100:23,24,25 101:2,8 102:20
**services** 2:4
**set** 23:25 159:24 170:10,19
**setout** 63:5
**setting** 119:16
**seven** 61:6 126:19
**sewer** 16:2
**shake** 159:15
**shakedown** 159:7 159:12
**shank** 128:13
**share** 39:10
**sharing** 158:19 159:3
**sharp** 136:23
**shaved** 128:10
**sheet** 128:14 164:6 171:1

**sheriff** 1:9 4:18 16:22,24,25 22:4,5 22:6,7,10,11,19 23:19,20,22 24:3 24:14,17,20 25:19 26:2,3,11,15,22 27:16,17,18,22,24 27:25 28:3 30:14 30:18 31:3,5,24 32:2,4,5,6,7,9,9,11 32:14,15,23 33:2,7 33:12,13 34:11,13 34:17,21,23,24 35:7,16,18,22 36:6 36:15 38:14,20 39:17 40:10,24 41:12,17,21,25 42:12 44:11,16 47:3,5,9,15,20 48:10,15,17 50:11 51:15 55:13 57:18 59:11,15,16 62:11 62:17,18,20,22 63:6,7 80:2 83:22 83:25 87:13,24 88:11,19 101:13 101:18,23 102:7 106:17 109:23 110:24 125:16 126:13,15 130:5 134:25 150:9 151:9,24 155:8
**sheriff's** 1:7 11:15 11:21 24:24 25:4 25:24 26:2,20,24 28:21 30:4,7,11,22 31:14,20 36:3,11 36:16,19 37:5,11 38:22 39:2 46:15 47:6 48:3 50:14 51:17 52:17 55:7 60:25 61:11 63:9 69:7 73:8,20 87:22 88:3,9 92:12 97:11 102:12 109:15 119:21 125:3,13 150:11 151:8 160:21 169:7,8,9
**sheriffs** 28:6 29:25 45:23 46:13 47:24 48:2
**shield** 1:8,9
**shift** 68:2,20 76:13
**shifts** 64:7 65:17 65:18 66:16 67:4 67:19 76:13
**shirt** 95:9
**short** 70:21
**show** 26:15 92:14 166:25
**showers** 142:18
**shroff** 2:13
**shut** 153:24
**sick** 65:19
**side** 37:11 39:14 39:15 46:25
**sides** 35:13,15 136:17
**sidney** 25:14,15
**sign** 23:9 112:6 151:7 164:2,4,8
**signature** 170:22
**signed** 3:9,11,14 5:11 151:6
**significant** 109:21 110:22
**signifies** 164:13
**signing** 5:18
**similar** 96:21 127:7
**simpler** 71:5
**simply** 32:5 60:11 158:6
**single** 49:22 50:3 58:15 71:22 79:22 95:2 111:9 114:15 125:12 144:25
**singled** 111:14
**sit** 42:4 59:17 90:8 139:15
**sitting** 67:9
**situated** 117:19
**situation** 31:6 51:11 58:17 110:21 125:12 145:16 152:17,20 157:9
**situations** 57:23 115:22
**six** 10:22 14:12 126:21
**sixty** 142:17
**skimmed** 104:4
**slash** 16:7 86:10 132:16 143:19
**slashed** 111:4,5 136:7 137:21 139:10,25 141:17 147:5,11,15,18 160:11 162:20
**slashing** 79:11 131:11 135:24 136:7 139:8,17 140:14 141:8 142:6 145:7 156:12 161:8
**slashings** 79:6 90:25 91:9,13,25 93:3,7,9,11,25 94:14 134:21 135:12,22 136:16 137:5
**sliding** 112:18
**small** 149:2
**smaller** 39:7 73:14
**smarter** 138:23
**sockets** 133:11 142:22
**socks** 129:7
**sold** 95:10
**somebody** 47:19 77:25 136:6 139:24 160:10,15 162:20
**somebody's** 162:25
**sort** 19:20 23:13 38:8 93:20 97:16 110:15
**sorts** 23:21 26:5 29:21 37:15 110:8 149:18
**sources** 55:17
**speak** 44:13 54:14 54:15 123:2 157:21,21
**speaking** 6:19,21 20:6 64:20 86:12 165:18
**specific** 18:4,17,17 19:10 20:19 22:18 29:23 31:19 36:25 38:3 62:9 66:8 68:25 71:25 75:10 75:20 77:16 91:13 93:23 99:3,12 104:3 108:12 114:8 115:23 116:23 122:17 125:12 149:15,16 153:5 156:20 161:23 163:24

**specifically** 23:11 28:23 36:19 55:5 63:24 77:7 79:6,8 86:17,22 92:4 93:13 98:18 115:20 124:2 135:7 149:3
**specifics** 54:12 61:21 72:4 73:23 77:10 80:20 131:21
**specified** 168:11
**speculating** 25:8
**split** 73:22
**spoke** 18:15 40:11
**spoken** 8:21
**sposato** 1:9,18 4:1 4:13,15,18 5:1,21 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1,24 167:1 168:1,15 169:1 170:1 171:3,21
**spots** 117:18
**spray** 82:24
**spread** 67:6 119:9
**squad** 18:12 20:19
**ss** 170:4
**stacks** 85:6
**staff** 18:16,20 21:6 21:8 22:3,14,18 23:3,11,13,15,17 23:18,25 24:15,25 25:12,13 26:15 35:20 36:11,21,23 37:24 38:19 42:19 43:7,19 45:24 48:22 49:11 50:4 51:12 55:21 56:13 57:8,10,12 58:5 61:22 62:24 64:7 64:13,14,14 66:14 66:14,15 67:17,17 67:21,23 68:22 70:8 76:10,11 78:10,18 79:23 87:5 89:25 90:13 102:4 107:8 108:5 114:9 118:11 132:6,15 150:7 153:21 155:11 163:22 164:14,20 167:2,7
**staffed** 68:18 70:6
**staffing** 33:23 67:13 68:6,10
**stairs** 113:4 118:22 119:13
**stairwell** 142:21 148:7
**stamp** 88:3
**standard** 120:22
**start** 19:14 110:19 162:4
**started** 36:9 73:5 126:23
**stat** 108:25
**state** 1:23 4:7,11 43:14 44:12 51:25 52:5,8,11 53:6,11 53:16,17,18,20 54:3,7,16,20 55:9 55:11,12,24 56:6 58:2,11,25 59:10 59:20,21,24 79:18 84:7 93:20,21 94:3,7,13 95:8,14 97:16 101:3 103:17 104:17,20 105:2,7,11,19,25 106:3,13 108:4 113:17 119:23 151:5 153:13,19 154:3,7,12,15 170:3,7
**stated** 47:23 73:6 155:22 166:11
**statement** 14:3
**states** 1:2 92:5
**statewide** 105:13 109:24
**stationed** 44:18
**stations** 113:7
**statistic** 107:2
**stats** 51:6 79:4,19 79:20 92:3 93:19
**status** 113:15
**stay** 15:14,16 19:25 20:2 34:23 35:5,6
**steady** 70:22 126:10
**stick** 112:14
**stipulated** 3:4,19 4:24 5:4,10,13,15
**stipulations** 4:23
**stock** 19:24
**stop** 83:5,13 129:23 139:21,23 140:10 163:15,20
**straight** 90:6
**street** 1:21 2:5,10 4:14 158:7,14,15

**streets** 139:19
**stretch** 163:6
**strike** 21:25
**strip** 134:6,7 160:6 160:10,22 161:16 161:21,24 162:4,8 162:16,18,19,23
**strive** 36:13
**strong** 96:5
**student** 2:6 5:24
**study** 15:11
**studying** 76:17
**stuff** 12:10 17:15 17:18,19 18:25 23:24 50:4 53:21 81:18 90:9 97:5 98:24,25 101:2 102:2 109:12,13 122:21,25 134:3 137:18 150:23 152:24 165:22
**subject** 30:12
**subscribed** 168:18 171:22
**substantial** 41:19
**successful** 136:25 137:9,15,17
**successfully** 138:9
**sudden** 146:16
**summer** 90:21
**supervise** 16:17 29:19
**supervised** 43:18
**supervising** 17:16 29:15
**supervision** 5:25 68:23 75:15,17,19 114:10,20 115:2,3 115:5,12,24 116:4 116:4,12,14 117:4 117:5,11,20 119:5 119:6,18 122:8
**supervisor** 18:8,10 19:11,15,21 20:12 22:2 28:11 55:22 57:11 88:24 107:14 160:18
**supervisor's** 20:14
**supervisors** 17:23 18:7 19:7 23:24 44:21 45:10 46:2 46:4,16 48:4 84:17,22 108:8,11 112:5 124:8
**supervisory** 24:11 28:9
**supplement** 7:2
**supplemented** 122:4
**supplied** 18:20
**supported** 162:24
**supposed** 122:13 129:17
**sure** 15:21 21:2 22:22 28:16 42:18 46:6,17 48:5 55:2 58:9 84:18,23 87:15 92:15 94:20 94:23 96:9 108:6 119:19 121:8,16 123:21,24 125:11 125:19 127:9 134:10 135:2 141:18 148:21,24 149:10 156:15 161:10 162:21
**surprise** 146:11
**surrounding** 129:11
**suspicion** 161:17
**swear** 57:5
**sworn** 3:9 4:6 5:11 6:4 57:2,3 168:5 168:18 170:10 171:22
**symbol** 164:13,16 167:6
**symbols** 164:5,5 164:10,18 167:5 167:14
**system** 154:21

**t**

**t** 3:2,2 4:5 95:9 168:2 169:2 170:2 170:2
**table** 26:14
**take** 7:6,9 20:23 23:3,13 43:15 52:21 53:7 74:10 85:11 86:5 87:16 91:20 99:18 103:16 109:7 118:21 121:5 124:21 127:18 133:2 134:16 156:8 163:2
**taken** 1:18 5:9 75:22 133:5
**takes** 114:13
**talk** 42:5 45:9 54:6 89:2 92:21,22,23 106:8 146:6 158:13 159:21
**talked** 41:22 144:23
**talking** 45:6 100:21 102:14 122:22 135:18 157:17 164:6
**task** 23:22 69:21 158:7,8
**tasked** 43:9 55:15
**tasks** 26:5
**teach** 58:18
**team** 37:3 48:20 49:4,17,18 51:6 106:8 109:17 119:25 124:13 144:8,9 160:24,25 161:18,25 162:13
**television** 116:8
**tell** 18:6 29:23 35:3 44:14 52:16 54:12 56:4 59:17 59:19 60:20 61:21 69:8 71:24 73:23 81:22 83:19 84:10 85:24 90:8,22 92:3 93:16 94:25 95:6 97:23 98:19 124:14 127:2 128:3,5 131:15,20 137:13,20,25 138:19 139:16 140:11 144:24 146:12 147:2,10 148:8 149:3 152:9 153:19,20 156:20 161:6
**telling** 60:15
**tells** 96:25 147:14 147:17
**ten** 39:4 80:8 119:12 129:7 146:16,17 152:18
**tenure** 104:5 126:15
**terms** 64:20 95:15
**test** 127:12
**testified** 4:8 11:19
**testify** 11:16 168:5

**testifying** 35:14
**testimony** 168:6 168:10 170:12
**tests** 98:7
**thank** 4:20 163:5 167:15,17,18
**thankfully** 94:9
**thanks** 154:15
**thing** 12:19 27:6 40:17 44:9,13 49:22 58:15 70:19 72:22 77:16 84:10 88:16 95:2,25 103:4 110:5,6 117:2 133:25 145:13 147:11
**things** 18:18 30:3 31:7,8 36:23 37:8 37:9,9,15,17,20,22 37:25 38:4,5,15,15 38:19 42:6,7,8,8 42:21 43:22 44:8 49:15,25 50:19 52:9,11 54:11 55:10,12 56:19 57:22,25 59:23,24 60:15 61:6,17,19 61:23,25 62:3,5,7 62:15 63:4,12,18 63:22,23 64:5,17 64:25 65:22,23 66:16 67:21 68:15 68:16,16 73:16 74:4,6,7,9 75:18 75:20 76:14,16,19 76:20,25 77:10,12 79:17,18 80:25 81:4,5,6,7,8,20 85:10 89:8,21 90:7 93:24 94:3,7 94:10,11,15 95:8 95:24 96:9 97:13 98:18,22 101:14 101:19,24 103:13 105:3,25 106:22 108:3 109:7 110:3 110:7,10,20 122:24 125:8 126:2,3,8,10 127:20 129:18,20 129:24 130:2,18 130:20 132:20,24 133:13,16,24 135:9,10,11 138:9 139:20 141:4,15 143:10,12,21,22 143:24 144:2,13 144:15,19 145:14 145:21,22 146:5 146:10,11,12,13 146:22,25 149:24 151:7 152:8,11 153:3,4,5,18,25 155:12 156:5,14 159:12 164:21 165:25 167:8,12
**think** 42:17 43:4 58:3 61:18 62:18 63:14,16 64:2 80:10 109:24,24 109:25,25 110:2 113:16 137:4 160:8 166:15
**thinner** 150:23
**thirteen** 56:17 60:18
**thirty** 112:4 113:18 114:3,24 115:14,19
**thoroughly** 87:6
**thought** 50:17 61:8,8 63:21 65:23 66:11 102:22 136:10
**three** 17:14,22 22:21 37:20 59:3 60:4,14 101:4 112:15 120:25 147:14,15 157:5
**threw** 110:13
**thrown** 141:3
**tier** 45:6
**tiers** 112:19,25 113:2 118:15,16 118:18 124:5
**tile** 129:2
**time** 1:14 3:21 5:3 6:19 7:12,12 14:13 20:14,19 25:12 27:23 33:19 34:19 40:23 41:11 41:17,21 47:15,17 51:18 52:21 59:11 59:25 61:4 63:6 64:22 66:7,19 71:20 74:14 79:17 80:9 82:21 88:21 91:8,17 94:4 105:5 106:16 108:4 109:8 113:24 114:14,22 115:17 119:12 125:16 126:12 127:3 130:4 131:19 139:13 140:16 145:18 148:16 149:6 154:3 155:8 156:21 157:12 168:10
**timeline** 53:2
**times** 10:13 32:17 51:19 57:23 60:17 125:24 130:14 133:5 135:25 136:12,14 137:7 137:19 141:24 146:22 154:9 167:9
**timing** 145:22
**title** 16:16,17 19:13 21:10,11,11 27:7 34:6 43:16 43:18 46:23 86:9
**titles** 27:12
**today** 7:23 109:3 115:20 138:15,20 139:25 140:9 147:11 155:23
**toilet** 163:11
**toilets** 133:24 142:20 144:19 146:15,17 163:15 163:20
**told** 9:7 43:16 78:4 81:20 82:2 83:4 135:8 157:6
**tomorrow** 108:25 138:17 140:4 147:12 159:14
**tony** 149:8
**tool** 143:17
**tools** 143:13 144:12 146:21
**toothbrush** 128:10 138:16
**top** 164:7
**topic** 101:24
**topics** 29:21 86:23
**total** 149:20,25
**totally** 35:7
**touch** 82:23 105:15

**touches** 82:22
**tour** 24:7 45:13 54:8 94:4 95:3 99:23 153:18 154:2,10
**toured** 24:10 28:15 45:5,14,14 45:17
**touring** 44:20
**town** 15:22,24
**track** 78:8 89:8 148:11
**tracked** 92:8 135:13,16
**tracking** 89:21
**train** 58:11 60:13 98:14 101:24,25 105:8
**trained** 21:14 87:6 95:20 96:9,15 98:13,15 99:6,16 99:17 100:7,16 102:13,19 103:3 103:14
**training** 17:12 19:10,12,13 22:15 22:18,24 32:10 54:18,21 55:4,7,15 55:21,22 56:6,10 56:12,13,24 57:7,8 57:10,12,20,25 58:4,5,7,23 59:2 59:12,22 60:5,6,14 60:19,22 86:9,23 87:4,7 96:23 97:21 99:2,4,5,11 99:19,20,21,23 100:3,11,14,19,20 101:9,11 102:3,4,7 102:20 104:8,14 104:23,25 105:11 105:17 106:8 129:10
**transcribe** 6:19
**transcript** 168:9,9
**transportation** 69:10 74:23 162:17
**tray** 128:12
**treated** 167:4,9,13
**tree** 26:21
**trends** 80:24 82:2
**trial** 3:21 5:3
**trickle** 109:10
**tried** 61:10,12,24 62:22,25 63:7 64:8,9,11 65:11 76:11 128:4 143:24
**tries** 144:14
**trigger** 102:12,18 115:23 130:10 134:6 159:7 160:6
**triggered** 37:16
**trip** 91:2
**true** 158:20 168:9 170:11
**truly** 74:19 114:16
**trust** 144:9
**truth** 168:5
**truthful** 7:23
**truthfully** 140:11
**try** 6:9 42:7,21,23 61:23 62:2 63:12 64:16,17 72:18 96:6,16 125:21 126:3 129:22,22 129:24 131:2,5,20 132:14 136:24 138:23,23,24 139:21,22,23 140:8 141:18,23 143:7,13,17,25 145:2 156:24 157:9 158:11 159:22 160:14 161:11,14 162:24
**trying** 62:21 65:7 75:7 80:6,9 82:14 104:14 136:4 157:20 158:25
**turn** 121:19 144:18 153:6 163:14,19,24
**twelve** 70:17 127:17 152:18
**twenty** 114:12
**twice** 109:18
**twisted** 108:24
**two** 12:3 16:8,9 17:14 19:6 27:2 44:10 70:13 73:15 74:4 80:10 117:24 120:25 124:20 126:18 140:3 146:24
**tying** 74:4
**type** 53:3 57:19 79:15,15 152:19 156:24
**types** 41:4 111:21 112:15 115:2

**u**

**u** 3:2
**ultimate** 47:20
**ultimately** 108:10
**unable** 142:5
**unanimous** 35:15
**unanimously** 35:12
**unanswerable** 31:16
**unaware** 146:14 146:15
**undergo** 17:11 19:9 32:10
**underneath** 28:12 28:25 36:22 47:3 51:7,12 81:12 108:14 133:24,25
**undersheriff** 25:4 25:6,11,14,20,21 25:23 26:17,18,23 26:25 27:2,5,6,7,8 27:14,15 28:8,10 28:19 29:3 30:17 30:17 31:4 47:7 48:11,16,23,25 49:13 59:16 87:13 109:14,15 150:9
**undersheriff's** 28:22 29:7,12,22 30:10
**undersheriffs** 46:13
**understand** 6:6,8 6:11,15 7:4,9,16 8:15 17:14,20 40:3 44:7 61:10 64:11 66:9,20 74:25 89:9 90:2 146:7 148:20
**understanding** 72:23 75:7 86:24 87:3 89:17 99:24 101:7,16 113:21 120:10 122:5 123:8,16,23 129:14
**understood** 6:15
**underwear** 129:7
**unfortunately** 75:6 138:10

**union** 63:11
**unions** 41:16,20 41:22 42:5
**unique** 16:16 21:11 43:11,16,24 43:25 44:13 65:16
**unit** 21:20 56:12 64:10 65:3 66:6,9 66:20 68:12 69:10 69:11,15,15,19,20 69:21 70:11 74:20 77:23 78:10,12,13 89:11 92:9,10,22 92:24,25 93:2 107:10 108:11 121:7 127:11 152:22 155:19,24 156:5,6,11,14,19 157:5,14,20,24 158:11 159:20 161:15
**united** 1:2
**units** 21:18 26:9 37:4 44:19 45:17 46:4,5 50:9 64:8 64:11 67:2 68:6,9 68:10,13,14 69:3,5 69:6,17,18 70:5,7 70:15 74:8 75:14 75:16 76:17 77:4 78:7 81:2 89:12 90:3 92:6,7,10 107:12,14 120:3 159:17 163:12
**unnamed** 10:3
**unsafe** 50:17 141:2,13 142:2
**unsigned** 3:13
**unsuccessful** 136:13 138:7
**update** 104:18
**updating** 52:24
**ups** 20:7
**use** 64:21 77:8 81:15 82:18,19,21 82:24,24 83:20,21 84:3,20,22 85:12 85:17 86:10 87:8 88:16,21 89:6,8,10 89:16,17,22 90:14 102:15 106:22,23 107:6,15,24 108:2 108:6 109:4 143:16 148:15,15 154:24
**uses** 83:14 87:23 88:10
**usually** 23:13
**utilize** 66:14
**utilized** 74:8

**v**

**v** 169:6 171:2
**vacate** 25:15
**various** 115:2
**verbal** 83:4
**verbally** 83:4 150:7
**veritext** 171:1
**versa** 70:19 74:23
**verses** 81:21 101:25
**versus** 116:4 131:22
**vice** 70:19 74:23
**videoconference** 1:20
**vigilant** 140:23 141:19 142:3
**violated** 100:10
**violence** 80:18,24 81:10 82:3 148:2 148:6,12,18,25
**violent** 148:9
**visiting** 30:6 52:10 69:11,20 70:20 74:22 105:14 107:13,14,17 133:15 134:12,14 162:16 165:21
**visitors** 165:22
**visits** 76:22 96:8 126:5
**vote** 33:5,6 35:15
**voted** 33:5 34:24 35:9

**w**

**wait** 6:20 85:25 159:13
**waiting** 118:3,24
**waived** 3:8 5:9,14 5:20
**walk** 44:23 113:2 143:10
**walked** 45:8 146:16
**walking** 113:3,6 117:24 119:13 122:23
**wall** 132:12 138:17 141:3
**walls** 133:4
**want** 6:3 7:6 10:15 10:19 25:7,8 36:5 50:18 69:6,16 81:19 89:9 91:12 91:15 92:13 93:16 93:22 99:2 102:23 104:2 105:13 111:3,4,5,6,11 117:17 121:17 124:17 130:13,16 130:25 132:10,19 136:24 137:16 140:24 147:6 151:16 152:4 162:21
**wanted** 20:20 50:16 51:23 52:20 88:15,17 90:2,19 90:22 107:2 151:14,18,22 155:9
**wants** 125:22
**washer** 133:10 142:17
**wasteful** 66:22,24 67:8
**watch** 64:6 113:16 138:25
**watching** 115:9 116:8,17,21,23 117:8,9,10 141:21 159:25
**water** 16:3 144:18 153:22 163:15,19 163:25
**way** 12:8 26:21 36:14 41:24 61:2 61:7,9,24 62:23 63:2,17,22 64:15 65:25 66:23 67:6 67:24 95:16 99:9 117:14 118:23 121:14 126:25 134:12 136:4 137:24,25 139:3 139:15 142:13 143:18 156:24 161:7 163:22,24 164:16 170:16
**ways** 63:17 64:8 64:16 65:8 66:11 78:17 81:2 93:17

96:3 108:17 112:8 129:22,23 131:5,6 138:24 144:5 158:2
**weapon** 79:2 110:15 123:5 124:3 128:6,10 130:10,13,14 131:24 133:12 138:7,11,17 139:7 139:25 140:2,13 140:16,24 141:9 141:18,25 142:5 142:11 145:6 147:6 158:16,24 161:6,17,19
**weapons** 78:20,24 131:11,17 135:23 138:14 157:7,24 158:2,5 160:5
**wear** 57:2
**week** 17:14 22:22 56:17 81:21,21 109:19 138:22
**weekly** 45:15 109:18
**weeks** 56:16 59:3 60:4,14 101:14
**weight** 31:15,18
**weights** 143:23
**weinstein** 2:14
**went** 7:19 9:14 15:7,22 17:13 18:19 20:9 22:16 22:17,19,22 25:2 30:23 32:15,16,17 32:20 45:13 65:9 66:10 71:24 72:4 72:25 76:23 90:6 90:12 91:12 108:12 109:5
113:19 137:22
**west** 1:21 2:5,10 4:13
**whereof** 170:18
**wise** 93:13
**witness** 3:9,15,17 4:6 5:19 11:2 13:16 166:18 167:21 170:9,12 170:18
**witnesses'** 171:3
**woods** 2:6 4:10,21 5:23 11:3,12 14:7 21:2 69:24 88:8 91:20 97:20 134:16 149:7 163:2,5 166:15,21 167:17 169:13
**word** 66:25
**work** 18:21 35:19 39:25 40:2 42:22 43:9 48:18,19 55:23 67:4 69:22 70:18 73:12,13 74:21,22,22 108:24 109:6
**worked** 15:21,22 17:9 18:13,13 23:19 24:13,19 62:19 70:16 72:2 73:18,18 74:16 75:10 95:3 108:10 151:9 157:13
**workforce** 15:20
**working** 5:24 31:23 67:23 71:2 73:3 76:6 83:24 111:16 132:6 158:25
**workings** 17:20
**workload** 88:19 88:25,25
**works** 71:22
**world** 23:9 95:25
**worth** 103:13
**write** 17:17 141:11
**writing** 56:18
**wrong** 61:6 63:21 66:25
**wrote** 83:17

**x**

**x** 1:3,12 169:2,12

**y**

**yard** 91:10 115:8 117:3,6,7,13,15,17 117:19 118:6,19 118:23,24 119:13 119:15 120:19 124:4,16,23 147:25 148:3,6,9 148:20,24 149:4 165:11,13 166:5 166:10
**yards** 107:17 143:22
**year** 10:20,21 22:17 47:18 73:24 84:2 98:16,19,20 98:21 99:2 100:3 101:4 105:4,5,17 106:6 135:7,7,11 135:14,18
**year's** 59:2
**yearly** 59:23 77:7 99:20 135:10
**years** 14:12 16:8,9 45:24 46:12 47:25 48:2 49:14,15 51:19 55:23 56:4 59:17 60:9,18 65:9 66:18,20 78:5 91:16 92:16 98:17 101:4 108:8 115:15 119:22 127:6 143:22 154:24
**yesterday** 12:9
**york** 1:2,21,23 2:5 2:5,10 4:7,14 14:10,16 44:12 170:3,7 171:1
**yorker** 14:19

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.