# EXHIBIT 59

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------x
PIERRE SANCHEZ,
Plaintiff,
Index No.
- against - 17-cv-7335
NASSAU COUNTY, SHERIFF MICHAEL SPOSATO, CORRECTION OFFICER KEITH HOLLINGSHEAD, CORRECTION OFFICER ANDREW JAMES, and PATRICK RYAN,

Defendants.

-------------------------------------------x

Video Conference

April 12, 2021
12:40 p.m.

EXAMINATION BEFORE TRIAL of PIERRE SANCHEZ, Plaintiff, taken by Defendant, pursuant to Article 31 of the Civil Practice Law and Rules of Testimony, and Order, held at the above-noted time and place, before Kristen McAlevey, a Stenotype Reporter and Notary Public within and for the State of New York.



A P P E A R A N C E S:

DEWEY PEGNO & KRAMARSKY LLP
Attorneys for Plaintiff
777 Third Avenue, 37th Floor
New York, New York 10017

BY: ANDERS W. PAULEY, ESQ.

WILLIAM P. NOLAN, ESQ.
Attorneys for Defendant
PATRICK RYAN
1103 Stewart Avenue, Suite 200
Garden City, New York 11530

BY: WILLIAM P. NOLAN, ESQ.

NASSAU COUNTY ATTORNEY'S OFFICE
Attorneys for Defendants
NASSAU COUNTY, SHERIFF MICHAEL SPOSATO, CORRECTION OFFICER KEITH HOLLINGSHEAD, CORRECTION OFFICER ANDREW JAMES
One West Street
Mineola, New York 11501
BY: JENNEAN ROGERS, ESQ.



F E D E R A L S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that the sealing, filing and certification of the within deposition be waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form, are reserved to the time of trial;

IT IS FURTHER STIPULATED AND AGREED that the transcript of this deposition may be signed before any Notary Public, with the same force and effect as if signed before a clerk or Judge of the Court;

IT IS FURTHER STIPULATED AND AGREED that all rights provided to all parties by the F.R.C.P. cannot be deemed waived, and the appropriate sections of the F.R.C.P. shall be controlling with respect thereto.

oo0oo



EXHIBITS MARKED PRIOR TO PROCEEDING.

(Four documents were marked as Defendant's Exhibits M through P, for identification, as of this date.)

P R O C E E D I N G S

THE REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.

They further acknowledge that, in lieu of an oath administered in person, I will administer the oath remotely, pursuant to Executive Order Number 202.7 issued by Governor Cuomo on March, 19, 2020.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting. Please indicate your agreement by stating your name and your agreement on the record.

MR. NOLAN: So agreed, William





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

Nolan, Counsel for Patrick Ryan.
MS. ROGERS: Jennean Rogers, Counsel for Nassau County and Keith Hollingshead and Defendant, Andrew James, we agree.
MR. PAULEY: Anders Pauley, Counsel for Mr. Sanchez, and I agree as well.
P I E R R E S A N C H E Z,
Plaintiff, having first been duly sworn by the Notary Public, in and of the State of New York, was examined and testified as follows:
THE COURT REPORTER: Please state your name for the record.
THE WITNESS: Pierre Sanchez.
THE COURT REPORTER: Where do you reside?
THE WITNESS: 21 Melton Drive East, Rockville Centre, New York 11570.
EXAMINATION BY
MR. NOLAN:
Q. Mr. Sanchez, good afternoon. My name is William Nolan and I represent the



P. SANCHEZ
defendant, Patrick Ryan, in this action that you brought. I'll be asking you a series of questions this afternoon. If at any time you don't understand one of my questions, please let me know, I'll rephrase it. And if you can answer, I'd ask you to do so. Do you understand, sir?
A. Yes.
Q. It's presumed that if you respond, that you understood the question; do you understand that, sir?
A. Yes.
Q. I'd also ask that you allow me to finish my question, I'll do the same when you're responding so we're not talking over one another; is that okay?
A. Yes.
Q. The whole purpose of that is so that the court reporter will be able to take down the question and the answer. If at any time you need a break, that's fine, we can accommodate you. But I just ask that if there's an open question, that you respond to that question, and then we can take a break,



P. SANCHEZ
all right?
A. Yes.
Q. Finally, no nods or shakes of the head, all of your responses need to be verbal; do you understand that, sir?
A. Yes.
Q. Prior to this deposition today, did you review any documents with regard to this action or in preparation for the proceeding?
A. Yes.
Q. What did you review?
MR. PAULEY: I'm going to object to the extent it calls for him to disclose what he has discussed or been shown by his counsel.
MR. NOLAN: The question was what did he review, that's all. I'm not asking about any questions or conversations with his attorney.
MR. PAULEY: Yes, but I'm taking the position that the documents that I've shown him to prepare, if any, or prior Counsel has done are work product



P. SANCHEZ
to the extent that they reflect the thoughts and impressions of Counsel in their preparation for the case.
MR. NOLAN: You can note that objection. Are you directing him not to answer it? If you are, we are going to start right off by calling the judge.
MR. PAULEY: I don't really understand that it would be an improper instruction to not to reveal privileged information or information that's subject to work product protection. If you really want to make this something, we go to the judge about it right now, that's fine, but I fail to see how this is critical or necessary or proper.
MR. NOLAN: Because I'm allowed to question him with regard to any documents that he reviewed in preparation for this proceeding. It's very simple.
MR. PAULEY: You take the position then that what I've shown Mr. Sanchez or what prior Counsel have





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ
shown him, that that's not work product.
MR. NOLAN: No, because how do I know if it's work product, did you produce a privilege log on this stuff?
MR. PAULEY: Well, I mean, we're talking about evidence that's been entered in the case, aren't we?
MR. NOLAN: I don't know, because I don't know what he's reviewed. Anders, here's the perfect example of why I said that you're not locking me into any type of timeframe on this deposition.
MR. PAULEY: Okay, I mean, it seems like you're contriving a dispute here. Look, you know, I'd like to get around this. So, Mr. Sanchez, you know, if you can answer that question without revealing your discussions with Counsel, you know, do what you can.
MR. NOLAN: I think there's nothing in that question that asks for any conversation with Counsel.
MR. PAULEY: Go ahead and answer,



P. SANCHEZ
Mr. Sanchez, if you're able.
A. Okay. Basically, just the overall case.
Q. Specifically, what documents did you review, sir?
A. To be honest, we didn't specifically look at any particular documents.
Q. So when I just asked you the question, did you review any documents prior to this proceeding, you said yes. So now you're saying you didn't review any documents?
A. Listen, I don't know why you're starting with an attitude, it's not going to get you very far, number one. Number two, the letter that I received from the Court, just so you know, said I will be here for three hours, you can discuss that with the judge when you get a chance. And my answer to your question is, I reviewed the case with my lawyer, that's my answer.
MR. NOLAN: I'll strike as nonresponsive.
Q. And once again, I will ask you, what specific documents did you review,



P. SANCHEZ
Mr. Sanchez?
A. I already answered that.
Q. No, you didn't.
Did you review any of the complaints that you filed in this action?
MR. PAULEY: I'm going to object to the form. What timeframe are we talking about? I just feel like it might be helpful if we cabin this to particular times or meetings.
Q. Sir, how many complaints have been filed on your behalf in this action?
A. I have no idea.
Q. Okay.
Did you, yourself file any complaints in this action?
A. Yes.
Q. How many?
A. Two or three.
Q. Did you review those complaints in preparation for this proceeding?
A. No.
Q. Did you review the fourth amended complaint in this action?



P. SANCHEZ
A. No.
MR. PAULEY: Objection to the form. Again, what timeframe are we talking about here?
Q. Sir, the fourth amended complaint was filed on your behalf by attorneys within the law clinic, correct?
A. Okay.
Q. Is that a yes, sir?
A. Yes.
Q. At any time before that complaint was filed, did you review that document?
A. At some point, possibly.
Q. Okay.
Did you, after reviewing that, make sure that the facts and information in that complaint were true and accurate?
A. I would suppose so.
Q. Right, because you'd want to make sure that something you're filing with the Court is true and accurate, correct?
A. Yes.
Q. At any point in time before the first amended complaint was filed,





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ

Mr. Sanchez, did you review that document?
A. I'm sure I saw it, yes.
Q. Did you review it to make sure that it was true and accurate before it was filed?
A. I'm sure.
Q. Is that a yes, sir?
A. Yes.
Q. At any point in time between the timeframe of when it was filed with the Court, the fifth amended complaint, and today, did you review that document?
A. At some point, yes.
Q. But within that timeframe that I just posed?
A. Yes.
Q. On June 25, 2020, you gave deposition testimony; is that correct?
A. Yes.
Q. And have you reviewed your deposition transcript at any time after June 25th of 2020?
A. Not really.
Q. Does that not really meaning you



P. SANCHEZ

have, withdrawn.
Do you have a copy, or were you provided with a copy of your transcript from June 25, 2020?
A. Yes.
Q. When did you receive that?
A. Not too long after the deposition.
Q. Okay, and did you have an opportunity to review the questions and the answers that you provided during that testimony?
A. Yes, I was afforded the opportunity to look it over.
Q. Did you also then, after you reviewed that transcript, sign your name?
A. Yes.
MR. NOLAN: Mr. Pauley, I'm going to call for a copy of the executed transcript. I was not provided with a copy of that.
MR. PAULEY: I am not sure that there is one, I think Mr. Sanchez could be mistaken. But if there is, I will



P. SANCHEZ

find it and provide it to you.
Q. Mr. Sanchez, did you review the entire transcript to make sure that all of the answers that you provided were true and accurate?
A. No.
Q. Why not, sir?
A. Because I -- when we're discussing something in a deposition, whatever comes out of my mouth concerning my case is true and accurate, so I wouldn't have to go back over it.
Q. Fair enough.
So if I understand your testimony then, after reviewing the transcript, you realized it was true and accurate and you did not have to make any changes to the transcript; is that fair to say?
A. No, that's not what I said.
Q. Okay, so did you make any changes to the transcript after you reviewed it?
A. I may have glossed over or looked at some of the stuff that you're talking about, but I'm not a hundred percent sure that



P. SANCHEZ

I went over every detail. I wasn't made -- didn't know I had to go over every detail.
Q. So your current Counsel's office provided you with a copy of the transcript, correct?
A. Yes.
MR. PAULEY: Objection to form.
MR. NOLAN: Kristen, could you please put up Exhibit M for today?
(Court reporter screen sharing.)
MS. ROGERS: Just for clarification of the record, where is Mr. Sanchez located?
MR. PAULEY: Should we go off the record for this?
(Discussion held off the record.)
Q. Mr. Sanchez, just to clarify, you are currently in a conference room at your Counsel's office, correct?
A. Yes.
Q. And Mr. Pauley is also in the conference room with you, correct?
A. He's in the office, he's not right next to me.





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ
Q. So, sorry, Mr. Pauley is in another office near where you are, but on the telephone; is that correct?
A. Yes.
Q. Is that your understanding?
A. Yes.
MR. NOLAN: Go to page 270.
Q. Mr. Sanchez, do you see page 270?
A. Yes.
Q. Okay, so you're looking at the hard copy that your Counsel left for you in the conference room; is that correct?
A. Yes.
Q. Do you see where it says, "I hereby certify that having been first duly sworn to testify to the truth, I gave the above testimony."
Do you see that?
A. Yes.
Q. And it says, the next paragraph, "I further certify that the foregoing transcript is a true and correct transcript of the testimony given by me at the time and place specified hereinbefore."



P. SANCHEZ
Do you see that, sir?
A. Yes.
Q. Now, did you sign where it says Pierre Sanchez?
A. I'm not understanding what you mean.
Q. So you see the signature line where it says Pierre Sanchez?
A. Yes.
Q. Did you at some point after your review of the transcript sign on page 270 where your name is?
A. I believe so, yes.
Q. Did you do that in front of a notary?
A. I don't remember.
Q. When you said you believe so, would that have been a notary at your attorney's office?
A. I don't remember. I can't place a time where I was aware that there was a notary that was across from me, I don't know. I don't know if the lawyer that was there was a notary, I'm not a hundred percent sure.



P. SANCHEZ
Q. After you signed the transcript where your name appears on page 270, did you then send that page or the transcript back to your attorneys?
MR. PAULEY: I'm going to object.
A. I have no idea what you're talking about.
Q. So, I don't know if you are just on the record or talking to yourself, but you said I have no idea what you're talking about. So sir, I'll just remind you of one of the instructions I provided. If you don't understand one of my questions, please let me know and I'll rephrase it, okay?
A. (No verbal response.)
Q. Just so I'm clear, you believe you signed page 270 on the signature line where your name appears, correct?
A. Yes.
Q. After doing that, did you then give the transcript or page 270 to your attorneys?
A. I do not know.
Q. Mr. Sanchez, do you currently



P. SANCHEZ
have a file maintained anywhere with regard to this current action?
A. No.
Q. Do you have a copy of the transcript that was sent to you to review?
A. It was emailed to me, I believe.
Q. So, do you have any type of email folders or any type of folders on your computer where you save documents regarding this action?
A. Possibly, yes.
Q. What do you have that you've maintained in any form, whether it's a paper form or on a computer?
MR. PAULEY: Objection to the -- Mr. Sanchez, if you could just give me a second or two before you answer, so that I can object. You can answer.
THE WITNESS: Okay.
Q. You can answer, sir.
A. Yeah, I have some paperwork at my house concerning this case. I'm sure I have emails concerning this case, if that answers your question.

P. SANCHEZ

Q. Yes, thank you.

So some paperwork; what do you have?

MR. PAULEY: Objection to form.

A. I don't know off the top of my head. Information concerning the case, whatever comes in the mail from the Court, et cetera, et cetera.

Q. So, stuff that comes in the mail, sir, where would you put that?

A. It would -- let me see, where would that go, hmm, no specific place.

Q. But those would be in a paper form, correct, hardcopy paper?

A. Yes, yes, yeah.

Q. So you have them somewhere in your home, but you're just not sure right now; is that correct?

A. Yes, yes.

Q. So you can certainly do a search of your home and find those documents, correct?

A. Yes.

MR. PAULEY: Objection to form.



P. SANCHEZ

MR. NOLAN: I'm going to call for production of any file or documents that the witness has at his home, as well as any documents that are in his possession that may be saved on a computer or some type of an electronic device.

MR. PAULEY: Just for the record, you're making a request, I mean he's testified that he's received pleading and correspondence from the Court, that would be on the public record; is that what you're asking him to produce?

MR. NOLAN: That's not what he testified to, and I'd ask that you not give speaking objections. I'm asking for the production, he said documents that he received, he never said pleadings, so I don't know if it's just excluded to what might have been filed. That's why I'm making the production, or asking for the production.

MR. PAULEY: And since you're doing that on the record directed to me, I'm not making a speaking objection to



P. SANCHEZ

your examination of the witness.

MR. NOLAN: You used the word pleadings, he never used the word pleadings.

MR. PAULEY: I'm sorry if I paraphrased what he said in saying things I have received from the Court.

MR. NOLAN: Anders, is there an objection? Because you've used enough time --

MR. PAULEY: I'm noting my objection on the record to your document request, which you made on the record.

MR. NOLAN: So then do so without all of the speaking objections.

MR. PAULEY: I don't think that that rule applies to a request for production, sir.

MR. NOLAN: We're going to agree to disagree.

Q. Sir, what would you have as far as electronic files, documents regarding this action?

A. I have no idea.



P. SANCHEZ

Q. What do you have them saved under on your electronic device?

A. I have no idea.

MR. NOLAN: I'd ask that all electronic devices where anything that Mr. Sanchez has saved documents on be preserved and that nothing be deleted.

Q. Other than the transcript and possibly the four to five complaints that have been filed on your behalf in this action, anything else that you reviewed prior to this proceeding, sir?

A. No.

MR. PAULEY: Objection to form.

Q. Do you currently have any criminal cases pending against you?

A. No.

Q. When was the last time that you were arrested, sir?

A. I don't know the date, but 2016.

Q. Are you currently employed?

A. Yes.

Q. Where are you working?

A. For a glazer company.





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ
Q. That's the same company that you were working for when you testified in June?
A. Yes.
Q. Is your position the same?
A. Yes.
Q. Is it still on a full-time basis?
A. Yes.
Q. Any other employment that you currently have?
A. No.
Q. The 21 Milton Drive in Rockville Centre, that's also the same address where you resided at the time of the June 25th deposition?
A. Yes.
Q. Who do you currently reside there with?
A. My mother owns the house.
Q. So your mother lives there?
A. She has two address, but, yes.
Q. Anyone else besides your mother and yourself at that location?
A. No.
Q. Do you currently have a



P. SANCHEZ
girlfriend?
A. No.
Q. Are you currently dating anyone?
A. No.
MR. PAULEY: Objection to form.
Q. When was the last time that you dated anyone?
MR. PAULEY: Objection to form.
A. Maybe more than four years ago.
Q. Are you currently on any type of dating websites?
A. No.
Q. I'd like to refer your attention to an action that you started in 2017, against an Officer Ridge and the Nassau County Sheriff's Department --
A. You mean 2007?
Q. I'm sorry, that's what I thought I said.
A. You said '17.
Q. I meant '07, thank you.
So specifically on August 1, 2007, did you file a lawsuit against Corrections Officer Ridge, Nassau County



P. SANCHEZ
Sheriff's Department and other defendants?
A. Yes.
Q. When was the last time that you saw that complaint that you filed regarding the Ridge case?
A. I have no idea.
MR. PAULEY: Objection.
Q. Now, you filed that complaint on your own behalf, correct?
A. Yes.
Q. What did you allege in that lawsuit?
MR. PAULEY: Objection to form.
A. I was assaulted by corrections officers.
Q. Specifically Officer Ridge and Officer Drum; is that correct?
A. No, Officer Drum was there, he didn't participate.
Q. So, it was Officer Ridge that assaulted you?
A. Yes. And whoever else was there, I didn't know their names.
Q. That assault occurred when, sir?



P. SANCHEZ
A. I think you just said it; 2007, right?
Q. Do you recall the specific date?
A. No, I don't remember the exact date.
Q. If I told you that the assault was on April 2nd of 2007, would that refresh your recollection?
MR. PAULEY: Objection to the form.
A. Not really.
Q. Okay.
MR. NOLAN: If we could pull up Exhibit P, Kristen.
(Court reporter screen sharing.)
Q. Mr. Sanchez, do you have a hard copy of this exhibit in front of you?
A. Yes.
Q. Did you review that document any time today before this proceeding started?
A. No.
MR. PAULEY: Objection to form.
Q. Okay.
At any time while you were





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ
incarcerated in Nassau County, the jail, were you aware of the grievance proceedings or procedures?
A. Yes.
MR. PAULEY: Objection to form.
Q. What was your understanding as to what the grievance procedure was with regard to the Nassau County jail --
MR. PAULEY: Objection to the form.
Q. -- Correctional Center?
A. Basically, it's there if you have a multitude of issues, you can use it for numerous issues. But it's exactly what it is; it's a grievance hearing, you're stating that something -- you've been wronged in some degree.
Q. This is an opportunity for an inmate to raise a written complaint or grievance with the correction center, correct?
A. Yes.
MR. PAULEY: Objection to form.
Q. And the written grievance forms, where would you be able to obtain those while



P. SANCHEZ
you were incarcerated in the Nassau County Correctional Center?
MR. PAULEY: Objection to form.
A. Well, you can go up to -- it's called the bubble, it's basically like an observation desk, and you can ask the corrections officer for a grievance.
Q. Okay, could you also go to the library and get a grievance form?
MR. PAULEY: Objection to form.
A. Yeah, but even then you got to ask the correction officer in that bubble.
Q. How about within the housing units, would you be able to also get a grievance form from the housing unit?
A. If you go to the bubble and ask them, yes.
Q. Okay.
So in November of 2017, you were aware of the grievance procedure and the accessibility to get the grievance form, correct?
A. Yes.
MR. PAULEY: Objection to form.



P. SANCHEZ
Q. If you can take a look at Exhibit P, is this a copy of the complaint that you filed regarding the Ridge action?
A. Yes.
Q. You drafted this yourself, correct?
A. (Perusing document). Yes.
Q. If you see Page 8?
A. Yes.
Q. It's signed, respectfully submitted, and that's your signature, correct?
A. Yes.
Q. It says Plaintiff, pro se, correct?
A. Yes.
Q. That was dated July 5th of 2007, correct?
A. Yes.
Q. Then if you take a look at page 4?
A. Uh-huh.
Q. There's a statement of facts, correct?
A. Yes.



P. SANCHEZ
Q. And paragraphs 9 through 16, which are pages 4, 5 and 6, are the facts as you alleged them in this complaint, correct?
A. Yes.
Q. Did anyone assist you in drafting this complaint?
MR. PAULEY: I'm going to object to the form and instruct you not to answer if in fact an attorney gave you guidance in doing that.
MR. NOLAN: I'll adopt that.
A. I -- I don't think anyone -- I don't think that at this point anybody -- I think I was pro se at this point, I don't think I had any outside help at this point.
Q. So paragraph 9, it says, "at approximately 10:15 p.m. on the evening of April 2, 2007, while held as a pretrial detainee at Nassau County Correction Center's-Old Satellite Area," do you see that, sir?
A. Yes.
Q. So, the April 2, 2007 date, is that the day that you alleged you were assaulted by corrections officer, including





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ
Officer Ridge?
A. Yes.
Q. Now, as part of your complaint, you had exhibits attached to the complaint, correct?
A. Yes.
Q. You see Exhibit A, it's titled Division of Correction Grievance Form, correct?
MR. PAULEY: That's page 10 of 18.
Q. So you see the page that I'm referring to?
A. Yes.
Q. This is a grievance form that you prepared on April 4th of 2007, correct?
A. Yes.
Q. You gave a description of what your grievance was based upon, correct?
A. Yes.
Q. And in C, actions requested by grievance, "I want a hearing as soon as possible, and I want to talk to Internal Affairs."



P. SANCHEZ
Do you see that?
A. Yes.
Q. When it says, "I want to talk to Internal Affairs," what are you referring to there, sir?
A. It's talking about Internal Affairs, which is basically like a -- an internal police force.
Q. Within the Nassau County Corrections Center?
A. Yes.
Q. Then you signed your name and dated it April 4th of 2007, correct?
A. Yes.
Q. Did you sign that in front of somebody?
A. I think so, I think so.
Q. Do you see where it's decision of grievance coordinator, it says grievance accepted and then signed by somebody on 4/6 of '07?
A. Yeah, I see that.
Q. Did you get a copy of this grievance form provided to you at some point?



P. SANCHEZ
A. I would imagine so.
Q. Right. And you kept that grievance form because you felt it was important, correct?
A. Where did you get that I kept the grievance form?
Q. Well, you attached it to your complaint, correct?
A. I attached to it my complaint?
Q. It's part of the complaint that we're reviewing, correct?
A. Yeah.
Q. There's an Exhibit A, correct?
A. Yes.
Q. And the Exhibit A is the grievance form we just discussed; isn't that right?
A. You're talking about this timeframe? Yes, yes.
Q. Right now everything I'm talking about is 2007.
A. Okay, I misunderstood what you said, okay.
Q. That's fine. So this form was



P. SANCHEZ
provided to you at some point before you filed the complaint in District Court, correct?
A. Yes.
Q. You kept that form because you felt it was important, correct?
A. Yes.
Q. Because you realized at least as of July of 2007 that you were going to be starting a lawsuit against the County and Officer Ridge, correct?
A. Yes.
MR. PAULEY: Objection to form.
Q. So you certainly in 2007 were aware of the importance to keep any documents that might assist you in your lawsuit against the County and Officer Ridge, correct?
A. Yes.
MR. PAULEY: Objection to form.
Q. Now you were also aware based on Exhibit A, that the grievance was accepted, correct?
A. Yes.
Q. You filed this grievance on April 4, 2007, two days after the April 2nd





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ

assault, correct?

A. Yes.

Q. Now, if we take a look at Exhibit B, sir.

A. Uh-huh, yes.

Q. Okay, this is also another grievance form that you filed, correct?

A. Yes.

Q. This one was filed on April 6, 2007, two days later from the first grievance, correct?

A. Yes.

Q. It says, "the reason is, I been requesting to see Internal Affairs, I have yet to see them. The tape from L & M blocks, I want the surveillance from the L & M preserved. This matter is of a serious nature."

Do you see that, sir?

A. Yes.

Q. You wrote that, correct?

A. Yes.

Q. At this point, you had not been interviewed by Internal Affairs, correct?



P. SANCHEZ

A. Yes.

Q. So that's why you filed another grievance form, correct?

A. Yes.

Q. And you felt it was important to Internal Affairs, why?

MR. PAULEY: Objection to form.

A. I just wanted to get more eyes --

Q. Sir, I'll withdraw that question.

Sir, did you feel it was important for you to talk to Internal Affairs at some point after the April 2, 2007 assault?

A. Yes.

MR. PAULEY: Objection to form.

Q. Why was that?

A. I wanted them to get the tapes.

Q. Any other reason why you wanted to talk to Internal Affairs?

A. Basically I wanted them to get the tapes, and I didn't want the tapes to be erased.

Q. Did you also want to inform Internal Affairs as to what Officer Ridge and the other corrections officers did to you?



P. SANCHEZ

A. Yes.

Q. Because you wanted to have that documented, correct?

A. Yes.

Q. Because you knew it was important certainly in April of 2007 to document the fact that you were wronged or grieved by corrections officers, correct?

A. Yes.

MR. PAULEY: Objection to form. Mr. Sanchez, you have to give me a moment to get in there and object.

THE WITNESS: Okay.

Q. Under C, Mr. Sanchez, of the August 6, 2007 grievance form that we're looking at, it says, "I want to talk to IA as soon as possible, my family has already contacted them."

Do you see that?

A. Yes.

Q. What family member contacted IA on your behalf?

A. I have might have just put that in there, I'm not sure if -- if it was a



P. SANCHEZ

friend or I had someone call, or if it was an actual family member.

Q. But at this point, meaning April 6, 2007, four days after the April 2, 2007 assault by the corrections officer, you had already reached out to either family or friends, people that you know and told them about this assault, correct?

MR. PAULEY: Objection to form.

A. I'm not a hundred percent sure, but there's a possibility, yes.

Q. That's why you put that in this grievance form to document that, correct?

MR. PAULEY: Objection to form.

A. I would imagine so.

Q. Then, on this form it says your grievance has been sent to SBI; do you see that, sir?

A. Yes.

Q. So this is an acknowledgement that your grievance has been filed and forwarded to here, SBI, correct?

A. Yes.

Q. What does SBI stand for, if you





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ

know?
A. I believe it stands for Service Bureau of Investigations, I believe it is. I could be wrong.
Q. All right, fair enough.
But you believed this was some agency that was going to look into the grievance you filed, correct?
A. Yes.
MR. PAULEY: Objection to form.
Q. And then underneath, under Roman numeral three, it says acceptance appeal of grievance and it says, "I have read and accept the grievance coordinator's decision."
And you signed that on April 11th of 2007, correct?
A. Yes.
Q. And, you also kept a copy of this grievance for your file, correct?
A. Yes.
Q. So now you filed two grievance forms within four days regarding the April 2, 2007 assault, by corrections officers, correct?



P. SANCHEZ

A. Yes.
Q. So, you have spoken to different representatives of the Nassau County Corrections Center with regard to the filing of these two complaints, correct?
A. Yes.
Q. You also kept a copy of this grievance form as well, correct?
A. Yes.
Q. Okay.
You also told a family member and/or a friend with regard to the assault on April 2nd of 2007, correct?
A. Yes.
Q. If we can look at Exhibit C, sir do you see what I'm referring to, sir?
A. Yes.
Q. What is this document?
A. Seems to be almost like a receipt.
Q. Right, in fact it says at the top Nassau County Sheriff's Department Division of Corrections Inmate Grievance Receipt, correct?
A. Yes.



P. SANCHEZ

Q. This has to do with a grievance that you filed, correct?
A. Yes.
Q. Then it says, underneath subject, your grievance, it says, "this is to acknowledge receipt of your grievance in reference to SBI," and it's dated 4/4 of 2007, correct?
A. Yes.
Q. And it says, "a grievance investigator will contact you concerning this matter."
Is that right?
A. Yes.
Q. How did you receive this inmate grievance receipt, do you recall?
A. I don't.
Q. But it was provided to you even though you don't know how you received it, correct?
A. Yes.
Q. Once again, you saved this document for your file, correct?
A. Yes.



P. SANCHEZ

Q. Why did you save this document?
A. It was important.
Q. Right, because you, at this point in time, withdrawn.
At this point in time, April 6th of 2007, had you made a determination as to whether you were going to sue the County and the corrections officers?
A. I knew I was starting an action, and I knew that it had been -- could possibly have that outcome, yes.
Q. Sure.
And because of that, you felt it was important to keep all of these documents, correct?
MR. PAULEY: Objection to form.
A. Yes.
Q. Then it also says, "a grievance investigator will contact you concerning this matter."
Do you see that on that form?
A. Yes.
Q. Did a grievance investigator ever contact you?





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ
A. I'm not a hundred percent sure because as this was going on, I was being moved Upstate. I was already State property at this point.
Q. Okay, do you have any recollection of speaking to any type of grievance investigator regarding your complaint arising from the assault on April 2nd of 2007?
A. It's a good possibility.
Q. So if we look at the next document, Exhibit C-1, do you see that, sir?
A. C-1?
MR. PAULEY: Yes, the next page, Mr. Sanchez. 16 of 18.
Q. Do you see where it says County of Nassau Inter-Departmental memo?
A. Yes.
Q. Do you recall receiving this memo?
A. Not off the top of my head, no.
Q. But you did receive it as you made it an exhibit in your complaint to the district court, correct?



P. SANCHEZ
A. Yes.
Q. It says here, "this is to advise you that I have forwarded your grievance for review/action, an investigator from that unit will contact you in the near future if they have not already done so."
Do you see that?
A. Yes.
Q. That's exactly what you wanted to happen, at least one of the things, was that grievance be sent to Internal Affairs, correct?
MR. PAULEY: Objection to form.
A. Yes.
Q. So, by filing your grievance and detailing the facts in the request in those forms, you got what you were looking for, correct?
A. As far as them having a record of it?
Q. Yes, and also referring it to Internal Affairs.
A. Okay.
Q. Is that correct?



P. SANCHEZ
A. Yes.
Q. Because Internal Affairs, you felt, was going to help you to get the video footage that you wanted to have preserved, correct?
A. Yes.
MR. PAULEY: Objection to form.
Q. You also wanted to talk to an Internal Affairs investigator about the assault, correct?
MR. PAULEY: Objection to form.
A. Yes.
Q. Meaning your assault, the assault that occurred to you on April 2nd of 2007, correct?
A. Yes.
Q. So now, if you turn to Exhibit D, have you found that exhibit, sir?
A. Yes.
Q. At least at the top it says, "Nassau County Sheriff's Department Division of Correction, Notice of Disciplinary Hearing Disposition."
Do you see that sir?



P. SANCHEZ
A. Yes.
Q. What is this form?
A. It's a disciplinary hearing disposition, it's basically their findings.
Q. So you were brought up on some type of infractions as a result of an incident on April 2nd of 2007; is that correct?
MR. PAULEY: Objection to form.
A. I mean, can you say that over?
Q. Sure.
So, this form --
A. Uh-huh.
Q. -- the notice of disciplinary hearing disposition --
A. Uh-huh.
Q. -- was this form created because you were brought up on infractions as a result of an incident on April 2nd of 2007?
MR. PAULEY: Objection to form.
A. No, yeah, I guess that's what this is.
Q. You actually signed this form on April 12th of 2017, correct?
A. Yes.





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ

Q. Now, any other times that you were housed at the Nassau County Corrections Center, did you ever file any other grievances?

MR. PAULEY: Objection to form.

MR. NOLAN: What's the basis of the objection?

MR. PAULEY: I am not going to be giving speaking objections, Counsel, I was already chided by you for that.

MR. NOLAN: I'm just curious, because you've objected to about fifty percent of the questions, and I'm just curious as to, other than form, what the basis here is.

MR. PAULEY: I think you've used vague and ambiguous characterizations, you have not been specific as to timeframe at least on some questions, and also you have, just in facts, not in evidence.

MR. NOLAN: I see, okay.

Can you read back the question, Kristen, please?



P. SANCHEZ

(The requested portion of the record was read by the reporter.)

Q. You can answer, sir.

A. Other than that grievance, you're saying?

Q. Yes, correct.

A. I mean, if I needed to file a grievance, I would have filed a grievance.

Q. I see, okay.

That would have been during any other times where you were housed within the Nassau County Corrections Center, correct?

A. Yes.

Q. Mr. Sanchez, as part of this lawsuit, you named a number of John Doe corrections officers, correct?

A. Yes.

Q. And John Doe Corrections Officer 1 and 2, referred to who?

MR. PAULEY: Objection to form.

A. I would imagine John Doe Number 1 would be Ridge.

Q. Let me withdraw that question.

In this action, sir, the action



P. SANCHEZ

that we're here for, the action that you started in 2017, okay?

A. Okay.

Q. That's what I'm referring to.

A. Oh, okay. Okay.

Q. So that complaint John Doe Corrections Officer 1 and 2, who were you referring to in your initial complaint?

A. John Doe 1 and 2, that would be James and I forgot the other gentleman's name in the yard.

Q. Hollingshead?

A. Yes.

Q. Those would have been the officers that were in the rec yard at the time of your assault on November 18th of 2017, correct?

A. Yes.

Q. Now, John Doe Number 3, who was that referring to?

A. I believe that's Ryan.

Q. Okay.

And that's Patrick Ryan?

A. Yes.



P. SANCHEZ

Q. The first amended complaint that was filed on your behalf, that was adding Patrick Ryan as a defendant to the action, correct?

A. Yes.

Q. Now as part of the lawsuit, there was an opportunity to attempt to identify John Doe Number 3, correct?

A. Yes.

Q. Were you a part of those attempts to identify John Doe Number 3?

A. Yes.

Q. What was your involvement?

A. Well, first I had to give a description, I had to basically explain every bit of information that I had, or that I stored in my brain concerning the defendant. And I was shown many pictures of corrections officers or employees and it took a long time, but eventually the last photo I was shown was the person I was looking for.

Q. On how many occasions were you shown photographs of what you believed to be corrections officer or corrections personnel?





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ

A. Three separate occasions.
Q. When was the first one?
A. The first one was in Nassau County.
Q. How many photos did you review during that first occasion?
A. I have no idea.
Q. When was the second occasion?
A. I think a week or two after the first one, maybe.
Q. You were still in Nassau County Corrections at this time?
A. Yes.
Q. You were shown photographs by whom?
A. It was a plainclothes corrections officer, so I'm not a hundred percent sure.
Q. When was the last occasion?
A. The last occasion was -- photos were sent, and I had to go in person to my lawyer to see the photos in person.
Q. Where did you go?
A. I had to go to the college at the time.



P. SANCHEZ

Q. Okay.
A. Yeah.
Q. Do you know what college?
A. Yeah, it was in Columbia.
Q. All right.
And who was present with you when you were shown those photographs?
A. A law student, a lawyer.
Q. What was the name of the attorney?
A. She was a female, I don't remember her name off the top of my head.
Q. Okay.
Was she the attorney that was primarily handling your case and supervising the law students?
A. No, no, no. No, no, it was a student.
Q. Right, but you said there was also an attorney that was present?
A. No, I'm considering them my attorney, that's what I'm saying.
Q. I see.
So the only one present was a law



P. SANCHEZ

student with you?
A. Yes.
Q. How many photos did you review?
A. I do not remember off the top of my head.
Q. Can you give me an approximate number?
A. Less than ten.
Q. On how many separate occasions did you review those photos that were sent to your attorney at the college?
A. Just that one time.
Q. Do you recall the number that you identified?
A. No, I don't remember the number, no.
MR. NOLAN: Can we just take a two-minute break really quick?
MR. PAULEY: Yes, that's fine. Can we go off the record?
(A brief recess was taken from 1:40 p.m. to 1:55 p.m.)
(Court reporter screen sharing.)
Q. Mr. Sanchez, Defendant's



P. SANCHEZ

Exhibit A was a document that you were shown at the deposition on June 25, 2020; is that correct?
A. Yes.
Q. And the last time, according to this document, withdrawn.
On November 18, 2017, you were at the Nassau County Corrections Center, correct?
A. Yes.
Q. You were first admitted to the corrections center on July 31st of '17; is that correct?
A. Yes.
Q. Then you were discharged from Nassau County Corrections Center in 2017 on December 27th of 2017, correct?
A. Yes.
Q. At that point in time, you went to Rikers, correct?
A. Yes.
Q. Then there came a point in time on April 4th of 2018 when you went back to Nassau County Corrections Center, correct?
A. Yes.





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ
Q. So I just want to use that as a timeframe.
Now, there came a point in time, sir, in 2017 that you filed a complaint in the United States District Court for the Eastern District regarding the assault that occurred to you on November 18, 2017, correct?
A. Yes.
Q. That was a complaint that you filed on your own or pro se, correct?
A. Yes.
Q. At the time that you filed that complaint, you were still housed at the Nassau County Corrections Center, correct?
A. Yes.
Q. In fact, you filed that complaint on December 18th of 2017, correct?
A. Yes.
Q. As part of that complaint, you put in facts regarding what you believed to be important facts that you wanted the Court to be aware of, correct?
A. Yes.
Q. If fact, you put down in that



P. SANCHEZ
complaint your allegations of what occurred to you as part of that complaint, correct?
MR. PAULEY: Objection to form.
A. I put down some of that -- some of the facts that's in the complaint, yes.
Q. You said some of the facts, did you leave some facts out?
A. Yeah, I did.
Q. Really, why did you do that?
A. I didn't know that I had to explain from A to Z everything that happened.
Q. Okay.
Now, at this point in time, how many lawsuits had you been a plaintiff in?
A. Two others.
Q. The first one would have been the 2017 complaint regarding the corrections officers that assaulted you?
A. It's 2007.
Q. 2007, I keep saying '17, yes.
A. Yeah.
Q. And then what's the next one?
A. I had a -- a lawsuit in between that one and the current one.



P. SANCHEZ
Q. Who was that against?
A. Nassau and Long Beach.
Q. And then the third lawsuit is the 2017 complaint that we're just discussing; is that correct?
A. Yes.
Q. Any other lawsuits that you've been a party to?
A. The only other -- it was one other filing, but it was thrown out. It was in the wrong jurisdiction or something along those lines.
Q. When was that, sir?
A. That had to do with my case, but it was a -- it was a 1983 action, it was somewhere a long the time when I was locked up.
Q. What timeframe are we talking?
A. The last incarceration.
Q. So where did you file that complaint, that 1983 case?
A. It was the Eastern District.
Q. What were the allegations that you raised in that complaint?



P. SANCHEZ
A. It was misconduct concerning my trial in Queens Court.
Q. Who were the defendants in that action?
A. It was a prosecutor and people in her office.
Q. Okay.
That complaint ended up being dismissed?
A. Yeah, it was in the wrong jurisdiction.
Q. Did you then re-file it in another jurisdiction?
A. No, I remedied it another way, and fixed the situation.
Q. What happened as a result of that lawsuit; is that still pending, was it settled, was it dismissed?
A. No, no. No, it was dismissed because it was -- it wasn't in the right forum or something along those lines, or there was something incorrect that I did. But the case was thrown out anyway, so I didn't make a deal.





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ
Q. Did you file that lawsuit pro se?
A. Yes.
Q. In all of the complaints that you have filed, have you put all of the facts surrounding the underlying allegations in the complaint?
MR. PAULEY: Objection to form.
A. I mean, I'm not a lawyer, so I might not do things exactly how they're supposed to be.
Q. Okay.
A. Having the truth on my side, that lends me to believe that, you know, I don't have to do everything perfectly. If the truth comes out, the truth comes, so there's only -- in my opinion, it doesn't really make a difference.
MR. NOLAN: Kristen, if we can take a look at Defendant's Exhibit B, from June 25, 2020.
Q. Sir, now this is a copy of the first complaint that you filed in the Eastern District arising from the November 18, 2017 assault, correct?



P. SANCHEZ
A. Yes.
MR. NOLAN: If we can just go down a little bit, Kristen, to page 4.
Q. This is a page where you were able to put down the facts regarding the November 18, 2017 assault, correct?
A. Yes.
Q. There was also an opportunity for you to lay out all of the facts that you believed were important to your lawsuit, correct?
MR. PAULEY: Objection to form.
A. I disagree with that, because starting right from this time period on until almost the time that I came home, it was nonstop correspondence with the Court coming from my end. Like I said, me not being a lawyer, I was just writing nonstop to the Court telling them with specifics what was going on with my personal safety, what was going on with me in general. So, I mean, yes this is the complaint, the original complaint, and these are some of the things that I listed in that complaint.



P. SANCHEZ
Q. This is actually the first complaint or contact you had with the District Court, correct?
A. Yes.
Q. Was it your understanding that you should put into the complaint, the first complaint that you were filing in the Eastern District all of the facts that you believed were important to your case?
MR. PAULEY: Objection to form.
A. Yes, and the most important fact that I was trying to convey --
Q. You answered, sir, thank you.
This was filed on December 18th of 2017, correct?
A. Yes.
Q. And you remained at Nassau Corrections Center for another ten days, correct?
MR. PAULEY: Objection to form.
A. Before being transferred?
Q. Yes, you were transferred, if we recall, from Defendant's A on December 27th of 2017?



P. SANCHEZ
A. Okay.
Q. So it's actually nine days, excuse me.
So you remained in Nassau Corrections for nine days after you filed the District Court complaint, correct?
A. That's what it says, yes.
Q. At any time before you left with discharge from Nassau County Corrections Center in December of 2017, did you ever file a grievance with regard to the November 8, 2017 incident?
A. No.
MR. PAULEY: Objection to form.
MR. NOLAN: Let's go to Defendant's Exhibit N.
Q. Mr. Sanchez, this is now a second or an amended complaint that you filed with the Eastern District; is that correct?
A. Yes.
Q. Why did you file this second or amended complaint, sir?
MR. NOLAN: You know what, Kristen -- do you have this in front of





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ

you, sir?
A. Yes.
Q. Okay, why don't you take a look at that, if you would?
A. (Perusing document). Okay.
Q. So now, if we go to I guess it's page 5.
A. Yeah.
Q. Now, you signed this on April 27th of 2018, correct?
A. Yes.
Q. You signed this in front of a notary, correct?
A. Yes.
Q. You signed stating, "I declare under penalty of perjury that the foregoing is correct."
Correct?
A. Yes.
Q. So, the pervious five pages of this document, you filled out all of the information in this complaint, correct?
A. Yes.
Q. And you filled this out because



P. SANCHEZ

you believed these were important facts with regard to the lawsuit that you had started against the defendants which were Nassau County Corrections and Nassau County and Officers John Doe Number 1 and Number 2 as well as Armor Correctional Health Services, correct?
MR. PAULEY: Objection to form.
A. Yes.
Q. And you included additional information that was not in your first complaint, correct?
A. Yes.
Q. That additional information included looks like the fifth page of the complaint, I believe you're on it right now, so this page, sir, this was additional information that you included in this second or amended complaint, correct?
MR. PAULEY: Objection to form.
A. It's all new information as well.
Q. I'm going to go to that in a second.
But specificity the page that's



P. SANCHEZ

on the screen, which I believe is the page that you're looking at, this page is all additional information that you included now in the second amended complaint, correct?
A. Yes.
Q. And then if we go to page 2, I think this is what you were referring to and it says, "I called 311 three times when I got to Rikers," correct?
A. Yes.
Q. Then it says, "filed two reports in writing," do you see that, sir?
A. Yes.
Q. What reports did you file?
A. Grievances.
Q. Do you have copies of those grievances?
A. They didn't give me copies.
Q. Did you make a copy of the grievance before you gave it to -- withdrawn.
Who did you give it to?
A. It wasn't a -- it wasn't the Nassau County, it was different. An actual captain came and spoke to me both times, so



P. SANCHEZ

when you call 311, a captain comes and speaks to you and I guess through the 311 process, they alert the captain, and they have to prove that they came and spoke to you, so you can't just say that they did when they didn't. And on both occasions, when the captain came and spoke to me, he sat down, he wrote up everything we spoke about, and he documented our conversations.
Q. So those two reports that you just testified about were filed with a corrections captain at Rikers; is that correct?
A. Yes.
MR. PAULEY: Objection to form.
Q. Did you ever get a copy of either of those reports?
A. No.
Q. Have you attempted to get a copy of those reports?
MR. PAULEY: Objection to form.
A. I believe it's part of the record.
Q. What record is that, sir?





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ
A. The record of my case.
Q. Okay, so, have you ever seen those two reports that you just testified to, as part of what you just described as the record of your case?
A. Yeah, I can, I understand the question. So, when another defendant before they left, I guess they got in touch with Rikers Island and they produced some information that they would have not have known. So I'm sure it's on the record, I mean I could be mistaken, but I believe it's already on the record.
Q. Well, you just testified, sir, that it's a part of this record, your record, and I'm asking you, have you ever seen those --
A. That's what I saying.
Q. Let me finish.
Have you ever seen those reports?
A. No.
Q. Have you, or anyone on your behalf that you're aware of, attempted to obtain these two reports?



P. SANCHEZ
MR. PAULEY: Objection to form, and I'm going to instruct you not to answer to the extent that your answer would include your communications with Counsel.
MR. NOLAN: Okay, I'll adopt that.
Q. So, to your knowledge, has anyone obtained these records, sir?
A. Yes, to my knowledge. Yes, it's part of the record.
Q. Do you think that those two reports could help this case if they exist?
MR. PAULEY: Objection to form.
A. The fact of me speaking to a captain on two different occasions and calling 311, I'm sure it's well documented.
MR. NOLAN: That's not my question, sir, I'm going to strike as nonresponsive.
Q. I asked you if they exist; do you think they would be important that you would have as part of this case?
MR. PAULEY: Objection to form.



P. SANCHEZ
A. I'm telling you, they are a part of this case.
Q. Okay, but you're not sure if you've seen them?
A. Yes.
Q. These, I believe you testified, were two grievances that you filed at Rikers, correct?
MR. PAULEY: Objection to --
A. The 311 process is a grievance.
Q. Okay, is that a written grievance that Rikers has?
A. No, it's a phone system that you call, like an outside -- it deals with -- I don't know exactly who they deal with, but they then contact the jail and then a captain comes and speaks to you, or I guess maybe an officer, it depends on the severity of it and it's handled that way.
Q. Did you ask the captain or the officer who took these two reports to provide you with a copy of the reports?
A. Yeah, they said that that was not protocol.



P. SANCHEZ
Q. So now, at this point in time in 2018, you were represented by a criminal defense attorney, correct?
A. 2018?
Q. Yes, May of 2018, you still had a pending case going on, correct?
A. Yes.
Q. Okay.
Did your criminal defense attorney ever attempt to get these documents on your behalf?
MR. PAULEY: Objection to form, and don't answer if you would have to disclose your communications with that lawyer.
A. I don't even have an answer for you.
Q. Who was your criminal defense attorney at this point in time in 2018?
A. Chris Devine.
MR. NOLAN: I'm going to call for the production of these two reports, if they are in the possession of Counsel, I will put it in writing.





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ
MR. PAULEY: Just to clarify, are you speaking to me and to Ms. Rogers?
MR. NOLAN: To either Counsel, but more specifically to you, the request will go to both.
MR. PAULEY: Okay. And I mean, since we're on the record, as far as I know, we have given you what we have, but I'm happy to look into that for you.
MR. NOLAN: Okay.
Q. Also under C here, sir, it says, "I wrote housing in Nassau before I was transferred to Rikers."
Do you see that?
A. Yes.
Q. When you say housing in Nassau, what are you referring to?
A. Housing is the people that, like, move you around within the jail or if you're going back and forth between jails, you can write them.
Q. What did you write them about?
A. I think I wrote them about going back and forth and wanting to go back to



P. SANCHEZ
Rikers. I didn't get into specifics, but just going back to Rikers.
Q. Do you have a copy of what you sent to housing?
A. No.
Q. Why not?
A. I don't have a copier.
Q. Did you have access to anything in a library to make a copy?
A. Those machines are out of order, and I don't even know if it was made available to me at that time.
Q. Did you attempt to make a copy of the correspondence that you sent to housing in Nassau?
MR. PAULEY: Objection to form, asked and answered.
A. I mean if I was afforded it, I would have utilized it.
Q. The complaints that you filed in on December 18th of 2017 and May 2nd of 2018, were you able to make copies of those complaints that you filed?
A. Maybe when I got to another jail.



P. SANCHEZ
Q. So, if you had filed it while you were, certainly the first one, while you were at Nassau Corrections Center, how could you then copy something at another jail that you had already sent to the Court?
A. Wait, explain that again, because that didn't make sense.
MR. NOLAN: Why don't we read back the last question, if you would, Kristen?
(The requested portion of the record was read by the reporter.)
Q. So you just testified, sir, that maybe you made a copy of the complaints before you got to another jail. And my question is, how would you be able to copy the complaint that you had already filed with the Court?
A. How would I be able to copy a letter that I already filed with the Court, I wouldn't be able to.
Q. Right, but you said maybe you did when you got to another facility?
A. I misunderstood what you were saying. I thought you were saying --



P. SANCHEZ
pertaining to what we were talking about, was I able to make a copy of anything, and I said maybe when I went to another jail.
Q. Right, but if you had already sent it, mailed it, how would you be able to make a copy at another jail if you no longer possessed what you had filed or sent?
A. I didn't know you were specifically talking about the complaint.
Q. Once again, sir, if you are confused or do not understand a question, please tell me that, and I'll rephrase it, but you did not say that.
A. You jumped from the letter.
Q. Sir, there's no question pending.
Do you understand my instruction to you? If you do not understand a question, please tell me that, otherwise it's presumed you understood the question. You've heard that instruction before, correct?
A. Got it, got it, got it. I got it.
Q. All right, so you don't have a copy of the letter that you sent to housing in





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ
Nassau, correct?
A. No.
Q. Has anybody on your behalf attempted to get the letter that you filed with housing from Nassau Corrections?
A. I have no idea.
Q. Now, with regard to the May 2, 2018 complaint, withdrawn.
Sir, I'd like to turn your attention now to any contacts that you had with John Doe Number 3 who you have identified as Patrick Ryan, all right?
A. Yes.
Q. When was the first time you had any contact with Mr. Ryan?
A. So the first time I had contact with Mr. Ryan would be -- I guess that would be one of the first days that he worked when I was in E1B and he worked E1B.
Q. During your housing, from July 31st of '17 through December 27th of '17 at Nassau Corrections Center, how many different housing units were you housed in?
A. Okay, from the time that I got



P. SANCHEZ
there until the slashing, and then I was moved.
Q. Okay.
A. We can go about it that way.
Q. That's fine.
So July 31st to November 18th of '17, you were in E1B, correct?
A. Yes.
Q. During the time that you were in E1B, were you within the same cell during that period of time?
A. Yes.
Q. Do you recall the names of any of the other inmates that were housed with you in E1B?
A. No.
Q. So the first time that you had contact with Mr. Ryan was when?
A. It would have to have been one of the first days that he worked and I was there between I think you said July some date until December -- I mean, I'm sorry, November 18th.
Q. Using November 18th of 2017 as a reference date, when was the first time you



P. SANCHEZ
had contact with Ryan prior to November 18th of 2017?
A. Not far from November 18, 2017, and I don't have exact dates and times.
Q. So would that have been in early November of 2017?
A. I would imagine so.
MR. NOLAN: Kristen, if we could just put up Exhibit C.
(Court reporting screen sharing.)
Q. Mr. Sanchez, I'm showing you what was marked as Defendant's Exhibit C on June 25th of 2020; do you have a hard copy of that in front of you, sir?
A. I'm looking for it right now.
Q. Okay.
A. I see it.
Q. Do you recognize this document, sir?
A. My C and your C is different, hold on.
Q. If you take a look at the screen.
A. Yeah, I'm looking at the screen.
Q. It was filed 4/1 of '20?



P. SANCHEZ
A. I can only see the top part though.
Q. Yeah, I realize that, but I'm just giving you that point of reference to see if you can find it in your packet.
A. I see it, I see it (indicating).
Q. Do you recognize this document?
A. Yes.
Q. Did you review this document before it was filed with the Court on April 1st of 2020?
A. I believe so.
Q. Okay, and this was filed -- if you go to page 19.
A. Yes.
Q. This was filed by Brett Digham and four law students on your behalf, correct?
A. Yes.
Q. Now, if you could take a look at paragraph number 20, which is on page 5.
A. (Witness complies.) Yes.
Q. The paragraph states, "while gang members are at risk of violence by rival gangs, detainees such as Mr. Sanchez who are





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ
not affiliated with a gang are even more vulnerable to gang threats and violence because they lack protection that gang involvement often provides to those in detention."
Do you see that?
A. Yes.
Q. What did you mean by that paragraph?
A. I'm guessing what it's stating.
Q. Which is what, sir?
MR. PAULEY: Objection to form.
A. I don't know, I mean, what it states.
Q. So you were not a member of a gang at that point in time, correct?
MR. PAULEY: Objection to form.
A. No, I was not.
Q. Now, this is a paragraph that's part of the April 1, 2020 fourth amended complaint, correct?
A. Yes.
Q. So in there it says, "detainees such as Mr. Sanchez who are not affiliated



P. SANCHEZ
with a gang."
Do you see that?
A. Yes.
Q. Is that a true statement?
A. That is a true statement.
Q. "Are even more vulnerable to gang threats and violence because they lack protection that gang involvement often provides to those in detention."
Do you see that?
A. Yes.
Q. So you were not afforded any type of protection by a gang because you were not a member; is that correct?
A. Yes.
Q. And because you did not have protection from gangs, did you feel more vulnerable while at the Nassau Corrections Center?
A. No, I only felt vulnerable after Ryan called me a snitch, that was the only time I felt vulnerable.
Q. So that would have been when, in November of 2017?



P. SANCHEZ
A. That would have been whenever he worked and he referred to me as a snitch.
Q. Which I thought -- okay.
So the first time you believe you had any contact with him was in November of 2017, correct?
A. I said the first time I had contact with Ryan was when he was working and I was in E1B, so I wouldn't know -- I wouldn't know --
Q. I believe we have established, I believe you said that was in early November and we used the November 18, 2017 date as a point of reference; do you recall that, sir?
A. No, you said early November, I said --
Q. And you agreed with me.
A. And I said sometime before November 18th when he was working.
MR. NOLAN: Was the fifth amended complaint, was that marked as an exhibit, anyone?
MS. ROGERS: No, we didn't have it then.



P. SANCHEZ
MR. NOLAN: I know, and it wasn't part of what I sent today. Can we go off the record for a second?
MR. PAULEY: Sure.
(Discussion held off the record.)
(Fifth amended complaint was marked as Defendant's Exhibit Q, for identification, as of this date.)
(Court reporter screen sharing.)
Q. So, now, Mr. Sanchez, do you have a copy of the fifth amended complaint in front of you?
A. Yes.
Q. Prior to August 5th of 2020, did you ever review this document before it was filed?
A. I must have.
Q. Okay, did you review the complaint to make sure that all of the facts that were alleged in this fifth amended complaint were correct?
A. Yes.
Q. Had you seen anything that was factually incorrect, that's something that you





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ

would have brought to your attorney's attention, correct?

A. Yes.

Q. Because as you've testified earlier, it's important that documents filed with the Court are true and accurate, correct?

A. Yes.

MR. PAULEY: Objection to the form.

Q. So, if you could go to page 10, specifically paragraph 48, do you see that?

A. Yes.

Q. It says shortly before the November 18, 2017 assault on Mr. Sanchez, Defendant, Correction Officer Ryan, was doing rounds when Mr. Sanchez requested a job on the food court, do you see that?

A. Yes.

Q. So when it says, shortly before the November 18, 2017 assault, this would have been the first time that you had any contact with Mr. Ryan, correct?

A. Yes.

Q. So does that refresh your



P. SANCHEZ

recollection now that shortly before November 18th of 2017 was early November of 2017?

MR. PAULEY: Objection to the form.

A. Yeah.

Q. You can answer, sir?

A. Yes.

Q. So now, if you take a look at provision or paragraph 18, sir, on page 5.

A. Yes.

Q. So if you look at the third paragraph of that, I'm sorry, third sentence of paragraph 18, it says, "detainees who do provide such information are referred to as snitches, a designation that puts them at risk of assault by other detainees, it is a breech of security to expose information that will put a detainee at risk."

Do you see that?

A. Yes.

Q. What did you mean by that sentence, sir?

MR. PAULEY: Objection to the



P. SANCHEZ

form.

A. That the word snitch would be detrimental to an inmate's safety.

Q. And can put you at risk and at harm, correct?

A. Yes.

Q. And you were called a snitch in early November of 2017, correct?

MR. PAULEY: Objection to the form.

A. Yes.

MR. NOLAN: I don't need that anymore, Kristen, thank you.

Q. So in early November of '17 when you had the first contact with Patrick Ryan, where were you?

A. You're saying the first time I saw him or the first interaction of him calling me a snitch?

Q. Well, my understanding of your testimony is that the first time you saw and had any interaction with him was in early November of 2017; is that correct?

MR. PAULEY: Objection to the



P. SANCHEZ

form.

A. There must have been like a misunderstanding or something, are you specifically asking --

Q. I'll ask you another question, sir.

In early November of 2017, was that the first time you saw Mr. Ryan?

A. I can't -- I can't say for a hundred percent because if he worked the unit and I was there since August -- since -- I forget the date that you said I got there, July, I -- I'm not a hundred percent sure.

Q. Okay, but the first time that you had any type of physical contact or interaction with him was early November of 2017, correct?

A. Yes, yes.

Q. At that point you did not know his name, correct?

A. Yes.

Q. Yes, you did not know his name, correct?

A. Yes.





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ
Q. Where were you when you had that first contact with Mr. Ryan?
A. I was in my cell, actually.
Q. What cell was that?
A. I believe it was 47 or 48. Either 47 or 48.
Q. All right.
At this point in time, what was going on on the floor?
A. Everybody was locked in and the TVs were on, and people were like positioned, you know, you could do whatever you wanted in your cell at that time, as long as it's allowed. And I believe I was watching TV, sitting down in my cell though locked in, and he was making rounds, and when he got to my door is when I asked him about the food cart situation.
Q. We're going to get there.
The TVs were on and the volume was up, correct?
A. I mean, they're not blasting, but yeah, the volume was on.
Q. How far was your cell from where



P. SANCHEZ
the TV was?
A. Almost right over it.
Q. When you say approximately, how many feet away from you?
A. All right, so I'm on the second tier, but I'm right in the eye shot of the -- of the TV. So, I want to say I'm about ten, fifteen feet away from the TV, but the TV is on the first floor, so it's kind of a little off, you know.
Q. So how far down was the first tier from where your cell was?
A. One landing, I don't know what that would be, maybe eight feet.
Q. How many other TVs were there that were on the first tier or first landing?
A. One other TV around the corner.
Q. That TV was on as well?
A. Yes.
Q. Could you hear what was on on that TV?
A. I don't remember.
Q. But you remember that you could definitely hear the TV that was closest to



P. SANCHEZ
you, correct?
A. Yeah, I was watching it, yeah.
Q. So if you couldn't hear it and you wanted to watch it, you could tell a corrections officer to turn it louder, correct?
A. Yes.
Q. And that's something you have done in the past, asked them to raise the volume?
A. You'd have to -- some -- I mean, you could ask them that, yeah.
Q. Was there anybody in the cell next to you?
A. I'm not a hundred percent sure, but I would say, pretty sure, yes.
Q. Do you know who that individual was?
A. No.
Q. Can you describe that individual?
A. Maybe an older black guy.
Q. The cell and the older black guy, if you are looking out of the cell, would that individual have been on your right-hand side



P. SANCHEZ
or your left-hand side?
A. That individual would have been on my left-hand side.
Q. Would there also have been another cell with an inmate in that cell to your right-hand side?
A. Yes.
Q. Do you know who that individual was?
A. No.
Q. Can you describe that individual?
A. No, because there's more of a distance, not that it really makes a difference, but there is a little bit more of a difference between the person on my right and the person on my left, I don't know why. Yeah, it's a little bit more distance.
Q. What happened when you had that first contact with Mr. Ryan in early November of 2017?
A. So, he was making his rounds and when he got close to my door, so I -- I noticed that he looped around, so that would have meant that he put the key in that -- the





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ

thing they call the punch. And then he came down my side, and when he came down my side, I said, sir, can I ask you a question. He said, what's up. And I said, is there any way that when the next spot opens up on the food cart, can you put me on the food cart. And he said, I'll look into it, and just kept walking.

Q. What is the food cart, the cart?

A. It's a -- it's a way that they bring the food to the inmates in that housing. They go to the kitchen and they pack up the food and bring it back to the housing unit.

Q. At this point in time, was Mr. Ryan a regular CO within the housing dorm where you were admitted?

A. I have no idea.

Q. Okay.

Was there a specific corrections officer that you were aware of who was regularly assigned to your dorm?

A. I mean, there was people that I saw more than not.

Q. Okay.

A. Yeah.



P. SANCHEZ

Q. Who were those officers?

A. It was a corporal, he had a bald head, I think his name was Mr. G.

Q. Yes.

A. And that's all I can really remember now.

Q. With regard to the food cart, had you ever requested to be a part of the food cart prior to asking Patrick Ryan?

A. Yeah, whenever you know, you get transferred around or when you go to places, that's a question you want to ask, because you get out more than half the time that everybody else would be locked in, you would be out.

Q. Now, you had been in this housing dorm for a number of months at this point in time, correct?

A. Yes.

Q. Was this the first time you asked to do the food cart?

A. Yes.

Q. Why is that?

A. It possibly was because maybe somebody was going home or had went home or



P. SANCHEZ

they just let somebody out for that day or that week to work, but it wasn't like in stone that they were going to work.

Q. At any point in time, did you ever ask Mr. G, the Corporal, to do the food cart?

A. The only reason why I didn't ask him is because he doesn't really do rounds.

Q. Is that a no, you never asked Mr. G to do the food cart?

A. That's a no.

Q. So other than asking Patrick Ryan if you could do the food cart, did you ask him anything else at that point in time?

A. No.

Q. What did he say to you, if anything?

A. He said I'll look into it.

Q. Okay.

Did any of the inmates who were on either side of you say anything when you made that request?

A. No.

Q. Did you even know if either of



P. SANCHEZ

the inmates on either side of you heard you make that request?

MR. PAULEY: Objection, calls for speculation.

Q. You can answer.

A. I would have -- that would really be speculation, I don't know.

Q. Did anyone say anything, did any inmate in the housing dorm say anything out loud about your request to work the foot cart?

A. No.

Q. When is the next contact that you had with Patrick Ryan?

A. So, before he goes home on whatever shift that was, I'm not sure if it was the next time he made a round or if it was a couple of rounds from the time that we're talking about, but it would have to be before we came back out, so it would have to be in like a three-hour timeframe, he comes back around, and when I go to the gate to follow-up and ask him about the food cart situation, he says a couple of words that at first I didn't hear what he said, and the last part of what





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ
he said was something snitch. And it was pretty loud, and he kept walking.
Q. So you said that there were a couple of words that you could not hear him say; is that correct?
A. Yes.
Q. Where was he standing when he said those first few words?
A. He was walking past my cell.
Q. Had he passed the cell and now was in front of the cell on your right-hand side?
A. He would have been going towards the cell on my left-hand side.
Q. Had he already passed your cell completely?
A. I mean, he might have took a starter step, but he didn't slow down too much, he just kept walking.
Q. Could you see him through your cell when he passed your cell?
A. I could see the back of him.
Q. Where are you situated within your cell?



P. SANCHEZ
A. Right in front of my gate, but kind of like peering out through the crack, so I could see him walking down the left side.
Q. So you were standing?
A. Yes.
Q. So, you were able to see him come from the right-hand side and pass in front of your cell; is that correct?
A. Yeah, he went past my cell going towards the left-hand side and kept walking.
Q. And if I understand your testimony, he does not stop in front of your cell to speak to you; is that correct?
A. It's kind of -- to explain to you, it was kind of like brushing me off, like, and then when I heard the last part of the sentence, I understood why he was brushing me off.
Q. So the first part of the sentence, you could not hear, correct?
A. Exactly.
Q. The only part of sentence that you heard was snitch?
A. At the very end, yes.



P. SANCHEZ
Q. Did you hear anything else other than snitch?
A. No. He was saying something, I want to say like in an aggressive way, like maybe like, leave me alone or basically body language and what he said was -- what I took out of it was basically don't ask me -- don't ask me that, don't bother me with that.
Q. But at this point in time, when he said snitch, he was past your cell and was closer to the inmate in the cell on your left-hand side; is that correct?
A. When he said the word snitch and was walking past my cell, when I looked out my door, I could see his back and him walking down the tier going to the left-hand side.
Q. So past now your cell, moving towards the other cells further down the tier, correct?
A. Yes.
Q. How do you know he wasn't saying snitch to someone else further down the tier?
A. Coupled with the other incident, if the other incident never happened, that



P. SANCHEZ
would have been a high possibility.
Q. What other incident?
A. The other incident of when he did the punch and I was standing by the telephone and he came through, looked directly at me and called me a snitch in front of maybe fifteen, twelve -- maybe twenty inmates standing looking at the television.
Q. So this is a second time at a later date?
A. Yes.
Q. But, right then and there when he passed, you didn't know if he was calling you or somebody else on the tier a snitch, correct?
MR. PAULEY: Objection to form, that's not the testimony.
Q. You can answer.
A. Yeah, I did not. The way you stated it back is not how I see myself saying that. I knew he was talking to me, but he was walking past me as he was talking to me.
Q. After you heard him say snitch and you testified you believed he was calling





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ

you a snitch, correct?
A. Yes.
Q. Did you hear anything said by any of the inmates closest to you?
A. No.
Q. Did you hear any inmates in the dorm E1B say anything after he called you a snitch?
A. No, but it's a weird thing, because it was also like a weird silence after he said it too, I can't -- I can't make that because he said it, but there was a weird silence afterwards.
Q. And this weird silence occurred while the TVs were still on?
A. Yes.
Q. Were the TVs lowered at that point in time?
A. No, that's not what I'm trying to infer.
Q. So the volume on the TVs remained the same while you were in your cell in early November of 2017 on the day you were called the snitch, correct?



P. SANCHEZ

A. I believe so, yes.
MR. PAULEY: We've been on the record for about two hours, if we could maybe take a break when it's convenient.
MR. NOLAN: Okay, if you need a break, you know, I'm trying to get this done.
MR. PAULEY: And I appreciate that. Just, when you get to a point where you're ready, I didn't want to cut it off.
MR. NOLAN: Let me finish up with this day then.
Q. Did you bring to the attention of any corrections officers on that day when you were called a snitch that Patrick Ryan called you a snitch?
A. No.
Q. Did you bring to any corrections officer or any corrections employee the fact that you were called a snitch by Mr. Ryan in early November of 2017?
A. No.
Q. Did you fear for your safety in



P. SANCHEZ

early November of 2017 when Mr. Ryan called you a snitch?
A. So, at this point in time --
Q. Sir, that's a yes or no.
A. I can't answer it then.
Q. All right, let me ask it this way then.
After being called a snitch, did you bring to anyone's attention that you feared for your safety?
A. No -- oh, yes, I did actually.
Q. When was that?
A. When I was in Rikers Island.
Q. I'm sorry?
A. That was Rikers Island when I was talking to the captains.
Q. At any time while you were within Nassau County Corrections, up to December 27th of 2017, did you ever tell anyone that worked in the facility or for Nassau County Corrections that you feared for your safety?
A. You're talking about after I got cut?
Q. No.



P. SANCHEZ

A. Before I got cut?
Q. Yes.
A. I didn't fear for my safety before I got cut.
Q. Okay.
So you weren't concerned about being called a snitch then; is that correct?
MR. PAULEY: Objection to form.
A. No, that's not what I'm saying.
Q. Okay.
A. I'm saying that in a correctional situation, things happen all the time; daily, hourly, that would make things go one way or another. A small thing can blow up to be a big thing and vice versa. The second time was the -- was the time that I started thinking more about my safety, more so than the first time. I thought he was just talking nonsense, to be honest with you.
Q. So, after the second time you were called a snitch, did you ever tell anybody, before you were slashed -- and when I say anybody; corrections officer, corrections employee for Nassau County Correction Center,





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ

that you feared for your safety?
A. No.
MR. NOLAN: Why don't we take a -- what do you need, Anders?
MR. PAULEY: Can we take ten for this?
MR. NOLAN: Sure.
(A brief recess was taken from 2:05 p.m. to 2:17 p.m.)
Q. Mr. Sanchez, from July 31st of 2017 when you were admitted to E1B, up until the end of October of 2017, did any inmates in the dorm threaten you?
A. No.
Q. Did any of the inmates during that time raise any issues with you?
A. No.
Q. Any problems with any of the inmates in the dorm during that period of time?
A. No.
Q. So from November 1st to November 18th of 2017, did you have any problems with any of the inmates in E1B dorm?



P. SANCHEZ

A. No.
Q. Did any of the inmates from November 1st through November 18th of 2017 threaten you in any way?
A. No.
Q. So now, when's the next time that you had any contact with Mr. Ryan?
A. It would be one more time before I was slashed.
Q. So, we know early November 2017 was the first time, correct?
A. I mean, without having, you know, the schedule in front of me, I mean you know --
Q. Should I bring you back to the complaint that said in early November of 2017, do you need to see that, sir?
MR. PAULEY: Objection. I'm going to object to the form, to the extent I don't think that's what the complaint says.
MR. NOLAN: Okay.
Q. How many days before you were assaulted on November 18th of 2017 did you



P. SANCHEZ

have the second contact with Mr. Ryan?
A. I do not know.
Q. Was it the week of November 18, 2017?
A. I do not know.
Q. Where were you when this second contact occurred?
A. I was on the first floor standing by the TV, same side as my cell.
Q. What day of the week was it?
A. I have no idea.
Q. What time was it?
A. We don't have clocks.
Q. Had you had breakfast?
A. I don't remember.
Q. Had you had lunch?
A. I would imagine I had breakfast.
Q. Had you had lunch?
A. I don't know.
Q. Were you out in the rec yard before this occurred?
A. I -- I don't know that.
Q. So, you know it happened sometime between early November of 2017 up until



P. SANCHEZ

November 18th of 2017, correct?
A. Yes.
Q. Did it happen on November 18th of 2017?
A. No.
Q. Did it happen the day before?
A. No.
Q. Did it happen two days before November 18th of 2017?
A. I do not know.
Q. Did it happen four days before November 18th of 2017?
A. I do not know.
Q. Where were you on the first floor when the second contact occurred?
A. Standing a little bit off to the side of the couch, watching TV, standing up.
Q. This would have been in the common area?
A. Yes.
Q. Who was present in this area at that time?
A. So there's two TVs and the dorm is split, so I mean, a rough estimate, half





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ

the dorm would normally be on this side, half the dorm would normally be on this side (indicating). But of course, it probably wasn't exactly half the dorm.

Q. How many total individuals were near you at the time of this second contact with Mr. Ryan?

A. Fifteen, twenty people.

Q. Are you aware if there were any people in their cells at this point in time?

A. I have no idea.

Q. Certainly inmates could come and go at this point in time, correct?

A. They have this policy where they lock you out of your cell, but there are times when they do open up your cell for you to grab something.

Q. Do you know the names of any of the other inmates who were in this area at the time of the second contact with Mr. Ryan?

A. No.

Q. Can you describe any of them?

A. No.

Q. What did Mr. Ryan say to you at



P. SANCHEZ

this second contact?

A. So, Mr. Ryan was actually talking to -- like, when he came in, he was doing the punch, I wasn't really paying attention to him when he first came in. When he came around the TV, he was -- had the key out, and I actually heard the key jingling before he came around the corner, and he was talking to somebody at first, looked directly at me and said loud enough for me to hear standing where I was standing where the TV was, like kind of like in between us, something to the effect of fucking snitch. And when he said that, everybody that was standing close to the television, looked, I felt like everybody was looking at me, but it was pretty much known that he was talking directly to me, he was looking right at me.

Q. How far away from you was he when he called you a fucking snitch?

A. Ten, fifteen feet.

Q. How many other inmates were near you?

A. There was about ten, twenty



P. SANCHEZ

inmates standing there, watching TV.

Q. All in the same area?

A. Yeah, yes.

Q. Were there inmates to the left of you?

A. It was more so to the right of me.

Q. Okay, were there any in front of you?

A. Yes, those are the ones that were sitting in the couch -- on the couch.

Q. Anyone standing in front of you?

A. No, I think the space of the couch took that up, so it was to the left, people sitting down right in front of me, some off to the right, and not really anybody off to the left of me.

Q. So you would have been standing behind the couch?

A. Yeah, a little bit behind the couch.

Q. What did you do when he called you a fucking snitch?

A. I'm sure my face changed a couple



P. SANCHEZ

shades. I didn't remark back, I didn't say anything. I just -- it felt like every eyeball in the place was looking at me, but I just tried to appear normal.

Q. So you knew he was looking directly at you when he said fucking snitch, correct?

A. Yes.

Q. If I understand your testimony, the other ten to fifteen inmates that were near you, according to your testimony, also believed he was calling you a fucking snitch, correct?

A. Yes.

Q. At that point in time, you don't deny that you were a fucking snitch?

A. What, to him?

Q. Yes.

MR. PAULEY: Objection to form.

Q. Did you hear the question, sir?

A. Yes, yes, yes.

Q. Did you answer?

A. No, I didn't answer. I was really like caught off guard, and shocked,





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ
like, nervous slash, like, embarrassed. And I wish I did say something, though, to be honest with you.
Q. So you didn't say anything to him, you didn't deny what he said to you, correct?
A. Yes.
Q. How long was he in that area after he called you a fucking snitch?
A. Not too long after, because he would have had to walk up the stairs and walk out, so he only had a couple more -- he only had one more punch to do before he was out of the housing unit.
Q. How long was he in the area where the TVs were before he called you a fucking snitch?
A. Not long. He went and did the punch, which was right next to the television on the right-hand side of it, turned back, looked directly at me, called me a fucking snitch and went about his business.
Q. So we're talking a matter of second between when he calls you a fucking



P. SANCHEZ
snitch and when he leaves the area; is that fair to say?
A. Yeah, that's probably be pretty fair to say.
Q. Okay, and five to ten seconds?
A. I mean, I didn't have a stopwatch. I mean, that sounds about normal.
Q. So now, I understand your testimony, you don't say anything to him when he calls you the fucking snitch, correct?
A. Yes.
Q. Now, he leaves the area, do you deny to the other inmates that he called you a fucking snitch -- I'm sorry, excuse me, I'm going to withdraw the question.
Do you deny and say to the inmates that you're not a snitch?
A. Okay, so here's the thing. As he leaves, people start like filtering away from me. It's not, like, a mass incident, it's like they ran away from me, but as I'm standing there, I could feel people, like, moving away from me.
Q. Okay.



P. SANCHEZ
A. And there wasn't really anybody that I had an interaction with where it was, like, an open communication line where I could have been, like, I don't know what this guy is talking about, where I could have really voiced what my feelings were. So I was kind of just standing there, like, trying not to look out of place, but it just seemed like all eyes were on me.
Q. So at that point in time, you don't say anything to any of the inmates?
A. No.
Q. In your complaint it says you know being called a snitch put you in a vulnerable situation, correct?
A. Yes.
Q. So at that point in time, I assume you must have really feared for your safety, correct?
A. Yes.
Q. Now, ten to fifteen inmates within your housing dorm believe you're a snitch because Officer Ryan called you a fucking snitch, correct?



P. SANCHEZ
A. Yes.
Q. And you don't attempt to tell anybody that that's not true, correct?
A. Yes.
Q. And this is days before you were slashed in the rec yard on November 18th of 2017, correct?
A. Yes.
Q. At that point in time after you're called a fucking snitch by Officer Ryan, do you go to any other corrections officers and say hey, this guy just called me a fucking snitch, I fear for my safety; do you do that?
A. No.
Q. Do you reach out to a family member at that point in time like you did in 2007 to say this just happened, a corrections officer called me a fucking snitch, I fear for my safety, do something; did you do that?
A. I wasn't on -- I didn't have the same family ties that I had this time. And if you look at my phone records, I almost never used the phone. But no, I didn't.





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ
Q. Did you reach out to your criminal defense attorney and let the criminal defense attorney know that you were just called a fucking snitch by a corrections officer?
A. No.
MR. PAULEY: I'm going to object to form and instruct you not to answer.
Q. Did you reach out to anyone outside of Nassau County Corrections Center and let them know that you were threatened by a corrections officer and called a fucking snitch?
A. When I sat down and wrote to the Eastern District, that was me bringing eyes to the situation.
Q. Fair enough. I'll ask you a little differently.
Did you reach out to anybody outside of the Nassau County Corrections Center before November 18th of 2017 and tell them that you were threatened by a corrections officer who called you a fucking snitch?
A. Repeat that one more time, sir?



P. SANCHEZ
MR. NOLAN: Could you read that back, Kristen?
(The requested portion of the record was read by the reporter.)
A. No.
Q. Did you request that you be placed in protective custody after being called a fucking snitch by Officer Ryan?
A. No.
Q. In fact, after the incident had occurred, you requested not to be in protective custody, correct?
A. You're talking about after I was slashed?
Q. Yes.
A. Yes.
Q. Any other occasions prior to November 18th of 2017 where you had contact with Mr. Ryan?
A. Say that one more time?
Q. Any other occasions prior to November 18th of 2017 where you had some type of contact with Mr. Ryan?
A. Other than those two incidents?



P. SANCHEZ
Q. Correct.
A. And other than just probably seeing him in the housing unit, no.
Q. When you say probably seeing him in the housing unit, you saw him again in the housing unit before you were slashed?
A. No, I'm saying in -- before 2018, besides the two incidents, one where I'm in the my cell, one where I'm downstairs, is there any other instance when he was E1B besides those two incidents that I can recall?
Q. No, where you had specific contact with him.
A. No, no, no.
Q. Okay. I'd like to turn your attention now to November 18th of 2017.
How long were you in the rec yard before you were slashed?
A. So, kind of went at length about this in the other deposition. There is no clocks, so I don't know. But I mean, there's not an exact number I can give you.
Q. Approximately, sir.
A. I really don't know.



P. SANCHEZ
Q. Let me ask you this.
At any time before you were slashed, were any of the inmates leaving the rec yard returning to the housing dorm?
A. You said were the inmates leaving the rec yard going back to the housing unit?
Q. Yes.
A. No, uh-uh.
Q. At the time that you were slashed, all of the inmates were still in the rec yard; is that your testimony?
A. The ones that went to rec, yes.
Q. The ones that went to rec, correct.
A. Yes.
Q. Your approximate, how many inmates went to rec on November 18th on 2017?
A. I have no idea.
Q. So between the last contact that you had with Mr. Ryan a few days before November 18, 2007, up to November 18th of 2017, did you ever request to stay in your cell completely?
A. No.





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ

Q. Did you ever, during that same period of time from the last contact with Mr. Ryan up to the date you were slashed, did you ever tell any corrections employees that you did not want to go to the rec yard?
A. No.
Q. So any time that you were able to leave your cell, you did so during that same period of time?
MR. PAULEY: Objection to form.
A. You said any time I was able to leave my cell, I could leave my cell?
Q. Yes, did you do that during that same period of time that we just discussed?
A. Yes.
Q. Any time that rec was available to you, between the last contact with Officer Ryan up until the day you were slashed, did you go to rec time?
A. I am not sure if I went to every rec since the last interaction with Mr. Ryan, but it's a possibility. But I'm not a hundred percent sure.
Q. If you did not go to rec, where



P. SANCHEZ

would you go?
A. You would stay in your cell and you would just come out when they came back.
Q. On November 18th of 2017, did you tell either of the officers that were monitoring the rec yard that you feared for your safety?
A. No.
Q. On November 18th of 2017, did you tell any corrections officer or personnel that you feared for your safety on that day?
A. No.
Q. Now, just before the slashing occurred, did you hear any inmates say anything to you?
A. Like concerning slashing?
Q. Anything.
A. No, they would -- I didn't even -- I didn't even know that I was like even -- I didn't even know anyone even cared that I was outside, or like that I was standing there. I didn't even know.
Q. So you weren't concerned on November 18th of 2017 for your safety as a



P. SANCHEZ

result of being called a snitch on two occasions; is that correct?
MR. PAULEY: Objection.
A. No, that's not what I'm saying.
Q. Okay.
So, you feared for your safety on November 18th of 2017; is that what you're saying?
A. No, I -- it's, I mean -- I don't know how to answer that.
Q. It's a yes or no.
A. It's really not a yes or no. I mean, you would have to put yourself in my predicament, but I know it's hard for you to do.
Q. Do you understand the question sir? I can have Kristen read it back to you.
A. Yeah, have her read it back to me.
MR. NOLAN: If you would, Kristen.
(The requested portion of the record was read by the reporter.)
A. I'm saying that of course my



P. SANCHEZ

safety was always in the front of my mind, I just wasn't -- if you would have asked me five minutes before I got cut and jumped if that was going to happen right there, when it was five ten minutes prior, I probably would have said no.
Q. Officer Hollingshead was in the yard, he was one of the officers you learned his name later, correct?
A. Yes.
Q. Did you go up to him and tell him that you feared for your safety?
A. No.
Q. And officer James was also in the rec yard monitoring as well, on November 18th of 2017?
A. By monitoring, you're talking about being in the bubble?
Q. Yes.
A. No.
Q. He wasn't there?
A. No, I'm saying, you asked me did I go up to him?
Q. Right, so you did not go up to





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ

him?
A. No.
Q. And you didn't say anything to him verbally when you were close to the bubble saying I fear for my safety today?
A. No, I didn't -- that never happened.
Q. So, now if I understand your testimony, from June 25th you were standing on the sideline watching a pickup basketball?
A. Yes.
Q. There were a number of inmates that were also watching the pickup game near you, correct?
A. Yes.
Q. Do you know the names of any of those individuals who were near you?
A. No.
Q. Can you describe any of them?
A. I mean, other than being people around my age group, male, that's about it.
Q. And these were inmates that resided or you were in the dorm area with for some time, correct?



P. SANCHEZ

A. I don't know if they just came in, they were there, some of them were there, some of them -- I really don't know.
Q. Was there anyone that you were acquainted with that you would talk to on any type of a regular basis, another inmate?
A. No.
Q. Now, before you were assaulted, did you hear any of the inmates say anything?
A. Not really.
Q. When you say not really, was something said?
A. I mean, if I'm in a rec yard and there's people playing basketball and people moving around, there's people talking, they're not talking to me.
Q. Okay.
A. I mean, so you're asking me do I hear things; I mean, yeah, I can hear the ball bouncing, I can hear people talking, what they're saying, I'm not paying attention to, so.
Q. Okay.
A. Yeah.



P. SANCHEZ

Q. Did you hear anyone yell out you're a fucking snitch?
A. No.
Q. Did you hear anybody yell out watch your back?
A. No.
Q. Did you tell anyone that you felt this was just a random incident and was not related to anything?
A. Yeah, I -- I said that to get out of protective custody.
Q. So that wasn't true?
A. No.
Q. So you lied to the investigators when you said it was a random incident; is that correct?
A. Yes.
MR. PAULEY: Objection to the form.
Q. When you went back into that, did you go back into E1B?
A. No.
Q. After the incident on November 18th of 2017, where were you housed?



P. SANCHEZ

A. I went to the hospital for a day, I went to the hospital inside the jail, not outside the jail. I did go outside the jail, but I came back within like an hour or two, but I went to the hospital inside the jail and then he moved me to the protective custody unit.
Q. Right, but then you said that you lied about calling it a random incident, so you could get out of the protective custody unit and get back into general population, correct?
MR. PAULEY: Objection to form.
Q. Did you know that if you were getting out of protective custody that you were going to go back into general population?
A. Yes.
Q. At any point in time before you were transferred to Rikers, did you go back into the general population at the Nassau County Corrections Center?
A. Yes.
Q. When was that?
A. I want to say maybe ten days





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ
after the incident.
Q. Okay.
A. Yeah.
Q. So you wanted to get out of protective custody even though you believed you being called a snitch threatened your life; is that correct?
A. Yes.
Q. So at this point in time that you were slashed in the face and neck area, and you received approximately twenty-eight stitches to close that wound, correct?
A. Sutures yes.
Q. Okay, and you requested to get out of protective custody and go back into general population ten days after the slashing, correct?
A. Yes.
Q. At this time, did you feel that you were no longer, withdrawn.
Did you no longer fear for your safety going back into the general population?
A. No, it was the fact that the assault occurred and was initiated by the



P. SANCHEZ
corrections officer, so having me in protective custody does not help me, it's more of a secluded block in a more secluded part of the jail. And not only that, the same officer came up to that unit and did a punch while I was in that unit.
Q. When did that occur, sir?
A. Right before I got out of there.
Q. So you got out of Nassau on December 27th of 2017, correct?
A. Yeah.
Q. If I understand your testimony, approximately ten days before the 27th, you were now back in general population, correct?
A. Yes.
Q. So it was sometime that you were in the protective custody unit in either November or December of 2017 that you saw Mr. Ryan again?
A. Yes, he came up there and did a punch.
Q. Did he say anything to you?
A. No, he didn't even notice me.
Q. When you returned in April of



P. SANCHEZ
2018, did you ever see officer Ryan again?
A. No.
Q. So now you realize that you could also come in contact with Officer Ryan when you moved back to general population, correct?
A. Yeah, I could see him anywhere in the jail.
Q. Right, okay.
Did you ever request that they put you in solitary where you would only be by yourself?
A. Solitary by myself, no.
Q. Sir, the medical treatment that you received with regard to what you sustained as a result of the slashing, did you receive any other medical treatment outside of Nassau County Corrections Center other than going to the emergency room on the date of the incident?
A. They did some follow-ups and they took out the sutures.
Q. That would have been within the medical wing of the jail, correct, at Nassau?
A. Yes.



P. SANCHEZ
Q. Now, any other medical treatment that you've had other than what occurred at Nassau County Corrections?
A. No.
Q. Sir, could you take off your mask so I could see the --
A. (Witness complies).
Q. So if you could, could you describe for us what the scar or area where you were slashed appears like?
A. It comes from, like, behind my ear and it comes up to, like, a little bit before the corner of my mouth (indicating).
MR. NOLAN: Just let the record reflect that he was pointing behind his right ear, coming up to the corner of his mouth.
Q. Currently you have a goatee type of style?
A. Yes.
Q. Have you always worn facial hair like that?
A. Yeah, on and off. I try to hide it a little more, it doesn't really hide it,





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ

but I try, you know.

Q. Thank you.

At any point in time, did anyone take any photographs of the area where you were slashed?

A. Yes.

Q. Where did that take place?

A. In the medical unit before they transported me to the hospital.

Q. Do you know how many photographs were taken?

A. No.

Q. Any other photographs that you were aware of that was taken of the area where you were slashed and any scarring?

A. No.

Q. Has anyone asked you about the scar?

A. Yeah, people ask me all the time.

Q. Like who?

A. People, customers, people at my job that weren't aware, you know. Random questions.

Q. Was there anyone that you were



P. SANCHEZ

interested in having a relationship with, did that individual or individuals say anything about the scar?

MR. PAULEY: Object to form, I think that's a compound.

Q. You can answer, sir.

A. Nothing that comes off the top of my head.

Q. Okay.

Do you know if Mr. Ryan was working on November 18th of 2017?

A. I have no idea.

Q. You did not see him on the day you were slashed, correct?

A. I don't believe so.

Q. When you say you don't believe so, having gone through a prior deposition and being involved in this lawsuit, do you have any recollection of seeing Officer Ryan on November 18th of 2017?

A. No.

Q. Other than the correspondence that you sent to housing, the 311 calls and the two reports to the officers at Rikers, did



P. SANCHEZ

you send out any other correspondence regarding a complaint stemming from the day you were slashed?

A. Yes, so, after -- after I came back from Rikers and more outside attention was brought to my situation and it was -- there was no way that they were going to keep me from Nassau and basically the cat was out of the bag and I was back in at Nassau, I was writing to the administration almost daily or at least every couple of days, I was writing to them explaining to them the situation I was in.

Q. When you say the cat was out of the bag, wasn't the cat out of the bag on December 18th of 2017 when you filed the complaint in the eastern district?

A. Yes, but the -- I knew that the jail wouldn't know immediately.

Q. How did you know that?

A. You said that I've filed lawsuits before. I knew that the jail would not know immediately, and for my safety, I did not want to be in the jail and become a party to



P. SANCHEZ

someone creating a case around me or trying to put something in my cell or trying to make the situation way worse then what it was.

Q. Did that ever happen to you on any prior occasions where somebody tried to put something in your cell?

A. No, but I got beat up by corrections officers and then I got a corrections officer called me a snitch and then I got slashed a couple days later. So I mean, my track record wasn't too great.

Q. I see.

So, did anyone tell you that you were slashed because of being called a snitch by a corrections officer?

A. Did anyone tell me? No.

Q. Right, so right now it's your testimony that you were slashed because you were called a snitch, correct?

A. Yes.

Q. Because you're not aware of any other inmates who heard you being called a snitch, correct?

MR. PAULEY: Objection to form.





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ
A. You said I'm not --
Q. I'll withdraw the question.
You're not aware of the names of any inmates who heard, allegedly, Mr. Ryan calling you a snitch, correct?
A. Yes.
Q. The letters that you were writing daily or almost daily, do you have any copies of those letters?
A. No, because I didn't have access at that time to --
Q. I'm sorry, to what?
A. I didn't have access to a copy machine.
Q. The copy machines still weren't working at this time, is that your testimony?
A. Well, my testimony is that they -- I wasn't the biggest priority to bring it down there to get photocopies.
Q. I see, so, based on that testimony, I assume then you asked some corrections employee for access to a copy machine but they said no; is that what happened?



P. SANCHEZ
A. Yeah, there's been incidents that I was in Nassau that I asked them to use the copy machine or try to get something copied and I couldn't get it.
Q. And that's what happens with the letters that you were writing daily to the various, you know, agencies?
A. By me writing them on a regular basis, it would overlap and I wouldn't have time to make photocopies anyway.
Q. So now, you didn't have time to make the photocopies, it wasn't that the machine wasn't working; is that your testimony, sir?
A. No, my testimony is that your client called me a snitch in front of half the dorm, that's my testimony.
MR. NOLAN: We're going to strike that as nonresponsive.
Q. And if you could, answer the question that I posed to you.
A. That is my response.
Q. I see, okay.
A. Yeah.



P. SANCHEZ
Q. So since you wrote the letters, have you seen them as part of this proceeding --
A. No, no.
Q. You have not?
A. No.
Q. Have you --
A. I haven't.
Q. Have you requested anyone to obtain those letters from what --
A. No.
Q. Can I finish, sir?
A. No.
Q. I can't?
A. I haven't, I haven't. I haven't received them. I haven't seen them.
Q. Have you requested that someone get those letters on your behalf as they would be part of this lawsuit?
A. Maybe you should.
Q. I asked you, sir; did you?
A. I'm telling you, maybe you should.
Q. Okay.



P. SANCHEZ
Now the question -- and I am going to strike as nonresponsive -- is, and if you don't understand the question, please let me know.
Did you request anybody on your behalf to help your lawsuit request those letters from whatever agency you filed them with?
A. I don't understand.
MR. PAULEY: I'm going to object to the form and I'm going to instruct you not to answer if you have to disclose communications with your Counsel.
Q. You can answer, sir.
A. I can't answer.
Q. Why is that?
A. Because it has something to do with my Counsel.
MR. NOLAN: Counsel, I'm going to ask you then for copies of these letters if you have them in your possession, because you certainly should have turned them over.





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ

MR. PAULEY: I hear your request. Again, I believe that we've produced everything in our possession, custody or control, and I'm happy to discuss this with you after the deposition.

MR. NOLAN: But, if you have them in your possession and you have not turned them over, I'm going to recall your client so I can question him with regard to those documents.

MR. PAULEY: As I told you already, I believe we have turned everything over in our possession, custody or control. If you would like to discuss this after the deposition, then we can do so, but I think you shouldn't waste the small amount of time you have left talking to me.

MR. NOLAN: I just need ten minutes to look at my notes and I might be done.

MR. PAULEY: Very well.

(A brief recess was taken from 4:01 p.m. to 4:09 p.m.)



P. SANCHEZ

Q. Mr. Sanchez, the letters that you wrote to the various different agencies, did you get any responses to those letters?

A. The agencies -- I wrote to the warden, I wrote to sheriff's department, I don't know, we should look into that.

Q. Now, why don't you answer my question.

Did you, yourself actually get a response to any of those letters that you wrote?

A. So, one response that I did get was before I went Upstate, I want to say about after week or two before I went Upstate, a corrections officer came to my cell and he said, I'm going to need you to do me a favor, I need you pack up all of your stuff, that puts you in protective custody. So I said well, who is making that determination and he said you've been writing letters constantly, making waves and the sheriff's department has decided to put you in protective custody and you don't have a chance of getting yourself out. It's a decision that they made, and it



P. SANCHEZ

has to do with the letters you have written administration, so that was the response.

Q. Who was that corrections officer?

A. I don't know, but there was an order for me to be put back in protective custody.

Q. Did you see the order?

A. Yeah, they had the paperwork with them when they did it.

Q. So there was a written order moving you back to protective custody and it's your testimony that it was as a result of the letters that you were writing; is that correct?

A. Yes, direct result.

Q. Any other response other than that CO telling you that you had to go to PC?

A. No, nothing in writing.

Q. Were you actually moved to protective custody?

A. Yes.

MR. NOLAN: I have no further questions.

MS. ROGERS: I have a couple of



P. SANCHEZ

questions.

EXAMINATION BY

MS. ROGERS:

Q. Mr. Sanchez, good afternoon. I'm sure you remember me, Ms. Rogers, I represent Nassau County and Officers Hollingshead and Officer James, you just stated --

MR. PAULEY: Look, I'm looking at a court order that says that Mr. Nolan is authorized --

MS. ROGERS: I am entitled to ask him some follow-up questions. He just said something about Nassau County -- Nassau County officers putting him in protective custody based on letters that he wrote. I can ask him questions regarding his testimony.

MR. PAULEY: I, as a courtesy, I will allow a few, but you've got to keep it brief.

MS. ROGERS: Gee, thanks.

MR. PAULEY: Mr. Nolan has been authorized to conduct a three-hour deposition, you have not --





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ

MS. ROGERS: I --

MR. NOLAN: I disagree with Anders, and I will take that to the judge, because I never agreed to limiting this that way and you know it, and you're being disingenuous.

MR. PAULEY: I am reading a court order, sir, from February 26th that says, the Court authorizes Defendant, Ryan, to conduct a supplemental three-hour deposition of Plaintiff.

MS. ROGERS: I don't know, you're eating up time needlessly. If you have to leave, you know, you're eating up time for no apparent reason. I have a couple of questions, I don't see what the problem is. Mr. Sanchez has testified, and I have some follow-up questions. I mean, I don't understand what the problem is.

MR. PAULEY: How many questions do you have? How many minutes do you think this is going to go on --

MS. ROGERS: I don't know how



P. SANCHEZ

many questions, that depends on how he answers the questions. Now, you know that, Anders.

MR. PAULEY: Yes, but you've taken your seven hours of deposition on the record, this is the problem --

MS. ROGERS: It's true, it shouldn't have taken seven hours; however, depending on how he answers the questions, then we will know how long it will take. If he answers the questions straightforward, these are some straightforward questions, if I get straightforward answers, we'll be out of here in five minutes, okay.

MR. PAULEY: Is that a representation?

MS. ROGERS: That is not a representation, we may have been done --

MR. NOLAN: Why would you go there, you have done depositions, this is so disingenuous on your part and now I know what I'm dealing with, but let's go.



P. SANCHEZ

MR. PAULEY: I'd like you to just tell me what you don't understand about that order, sir.

MS. ROGERS: Oh, my god.

MR. NOLAN: Because, you know when I was discussed with the judge, I said I would hope to be able to get it done in two and a half, three hours, but I said I have zero discovery at this time and I'm not being locked into that. And you know I said that.

MR. PAULEY: It doesn't matter what you said if the court ordered otherwise.

MS. ROGERS: Are you afraid, what are you afraid of?

MR. PAULEY: I'm afraid of my client being badgered.

MS. ROGERS: Can we start? Thank you.

Q. Mr. Sanchez, you stated that an officer came to you and said that you were being put into protective custody because you wrote letters, you've been writing letters



P. SANCHEZ

complaining about your safety; is that right?

A. Yes.

Q. One of the letters that you wrote during that time was that letter to the district judge?

A. Yes, Bianco.

Q. To Judge Bianco?

A. Yes.

Q. In that letter did you state that you were afraid for your safety?

A. Yes.

Q. And you testified that, that when you were sent to protective custody, withdrawn.

You testified that you were sent to protective custody after the incident occurred; is that right?

A. After the slashing?

Q. After the slashing.

A. Yes.

Q. Did you recognize anyone from protective custody as being in the rec yard on the day of the slashing?

A. No.





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ

Q. Also, you testified earlier that you filed a complaint against Corrections Officer Ridge back in 2007; is that right?
A. It is against John Doe, but they later found out it was Ridge.
Q. Okay.
In respect to that complaint, you filed a grievance regarding your interaction with Officer Ridge during the time that you were at Nassau Correctional Center; is that right?
A. Yes.
Q. After filed that grievance in April 2007, was your safety threatened by officers at that point?
A. Was my safety threatened, I mean, I got beat up by corrections officers.
Q. Did you file the grievance because you got beat up or --
A. Yes.
Q. So after you filed the grievance stating that you were beat up --
A. Uh-huh.
Q. -- was your safety threatened



P. SANCHEZ

because you filed a grievance?
A. Possibly, I don't know. I went Upstate very shortly after that.
Q. So you went Upstate, do you have any independent recollection of your safety being threatened while you were at Nassau County Correctional Center after you filed that grievance?
A. Okay, so here is the answer to your question. I got beat up by some corrections officers, wrote a grievance, filed a lawsuit; this situation and that situation, big difference.
Q. I'm not asking you to make a correlation between the two situations, I'm merely asking you, after you filed your grievance on April 4th of 2007, was your safety threatened by correction officers?
A. My safety already been threatened, I already got -
Q. After you filed your grievance --
A. Uh-huh.
Q. -- was your safety threatened by correction officers at Nassau County



P. SANCHEZ

Correctional Center?
A. One more incident --
Q. It's a very simple question, Mr. Sanchez.
A. No, I'm trying --
MR. PAULEY: I'm going to object, it's been asked and answered and this has nothing to do with the --
MS. ROGERS: No, it has not, Anders.
MR. PAULEY: -- supposedly new topic that you brought up.
MS. ROGERS: It wasn't asked and answered.
MR. PAULEY: You have asked this and had opportunity to ask about this for seven hours of record time before today. This is not a new topic, the new topic that you claimed necessitated additional questions.
MS. ROGERS: This is a topic that he testified on today, I am able to ask him a question.
MR. PAULEY: You are not.



P. SANCHEZ

Q. It's an simple question, could you answer the question, Mr. Sanchez?
A. I got to side with my lawyer on that one.
Q. Your lawyer is not saying anything. Your lawyer just made an inappropriate objection.
MR. PAULEY: It is not an inappropriate objection.
MS. ROGERS: You can object to form, Anders.
MR. PAULEY: It is not an inappropriate objection, you do not have the right, under the rules to take any further deposition today.
MS. ROGERS: It is an inappropriate objection, it's a follow-up question.
MR. PAULEY: Look, if you want to finish this line of questioning, that's fine. Otherwise, I am ending this deposition. Bill has asked his questions, he's closed the record, you are not entitled to ask additional





Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c

P. SANCHEZ

questions.

MR. NOLAN: I did not close the record. I do not object.

MS. ROGER: Bill, do you have any questions for him, do you have any questions that you want to ask?

MR. NOLAN: Any more? No.

MS. ROGERS: All right, let's go. It's good, I don't need it.

MR. PAULEY: Okay, is the record closed?

MS. ROGERS: The record is closed.

(Continued on next page to accommodate the jurat.)



P. SANCHEZ

THE COURT REPORTER: Ms. Rogers and Mr. Pauley, I need to confirm for the record that you would like copies of today's transcript.

MS. ROGERS: I'll forgo a copy.

MR. PAULEY: Yes, I would like a copy, please.

(Time noted: 4:19 p.m.)

Pierre Sanchez

Subscribed and sworn to before me this day of , 20__

Notary Public



P. SANCHEZ

INDEX


| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Pierre Sanchez | Mr. Nolan | 5 |
| | Ms. Rogers | 144 |


EXHIBITS


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| M | Previous transcript | 4 |
| N | Fourth amended complaint | 4 |
| O | Plaintiff's response | 4 |
| P | Ridge complaint | 4 |
| Q | Fifth amended complaint | 84 |


REQUESTS


| DESCRIPTION | PAGE |
|---|---|
| Copy of the executed transcript | 14 |
| Production of any file or documents that the witness has at his home, as well as any documents that are in his possession that may be saved on a computer or some type of an electronic device | 22 |
| All electronic devices where anything that Mr. Sanchez has saved documents on be preserved and that nothing be deleted | 24 |
| Production of these two reports, if they are in the possession of Counsel | 72 |




P. SANCHEZ

CERTIFICATION

STATE OF NEW YORK )
) ss
COUNTY OF SUFFOLK )

I, KRISTEN MCALEVEY, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

THAT the foregoing transcript is a true and accurate transcript of my original stenographic notes.

IN WITNESS WHEREOF, I have hereunto set my hand this 12th day of April, 2021.

KRISTEN MCALEVEY



Electronically signed by Kristen McAlevey (501-075-916-3738) 65ba2c1b-a8b7-4d2a-964f-c046e6384a4c