UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------X

Pierre Sanchez,

                 *Plaintiff*,            **MEMORANDUM AND ORDER**

     -against-                   17-CV-7335(KAM)

Nassau County,

                 *Defendant*,

Correction Officer Keith Hollingshead,

                 *Defendant*,

Correction Officer Andrew James,

                 *Defendant*,

Former Sheriff Michael Sposato,

                 *Defendant*,

Correction Officer Patrick Ryan,

                 *Defendant*.

---------------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

     Plaintiff Pierre Sanchez ("Plaintiff"), acting *pro se*, commenced the instant 42 U.S.C. § 1983 action against Nassau County ("the County"), corrections officers Keith Hollingshead and Andrew James, former Nassau County Sheriff Michael Sposato ("Nassau County Defendants"), and former corrections officer Patrick Ryan

("Defendant Ryan") on December 18, 2017.[1]  In the most recent and operative pleading, the fifth amended complaint filed on August 5, 2020 with the assistance of counsel, Plaintiff alleges that his face was slashed from mouth to ear and he was beaten by pretrial detainees while he and other pretrial detainees at Nassau County Correctional Center ("NCCC") were in the recreation yard. Plaintiff alleges failure to protect and failure to intervene claims against Defendants Ryan, Hollingshead, and James, supervisory liability against Defendant Sposato, and municipal liability against the County.  (ECF No. 151.)  For purposes of this Memorandum and Order, all defendants except Defendant Ryan are referred to as "Nassau County Defendants," unless individually identified.

Presently before the Court are Defendant Ryan's motion for summary judgment and Nassau County Defendants' motion for summary judgment.  (ECF Nos. 215, 216.)  For the reasons set forth below, the Court finds as follows:

1. Defendant Ryan's motion for summary judgment is GRANTED as to the failure to intervene claim against Defendant Ryan and is

---

[1] In his first complaint, Plaintiff included as defendants only the County and Nassau County Correctional Center.  (ECF No. 1, Compl. at 1.)  In later amended complaints, Plaintiff added the other individual defendants, first as John Does and later by name.  (ECF Nos. 15, 21, 126, 151.)  Pursuant to a settlement and a stipulation of dismissal with prejudice, Plaintiff withdrew all claims against an additional defendant, Armor Medical Group.  (ECF No. 116, 118.)

      DENIED as to the failure to protect claim against Defendant
      Ryan.

2. Nassau County Defendants' motion for summary judgment is
      GRANTED as to the failure to protect claim against Defendant
      James, but is DENIED as to the failure to protect claim
      against Defendant Hollingshead.

3. Nassau County Defendants' motion for summary judgment is
      DENIED as to the failure to intervene claims against Defendant
      James and Defendant Hollingshead.

4. Nassau County Defendants' motion for summary judgment is
      DENIED as to the supervisory liability claim against
      Defendant Sposato.

5. Nassau County Defendants' motion for summary judgment is
      DENIED as to the municipal liability claim against the County.

Accordingly, the remaining claims are Plaintiff's failure to
protect claims against Defendants Ryan and Hollingshead; his
failure to intervene claims against Defendants James and
Hollingshead; his supervisory liability claim against Defendant
Sposato; and his municipal liability claim against the County.

## BACKGROUND

    The following facts are drawn from the parties' submissions
in connection with this motion, including Defendants' Rule 56.1
Statements of Facts, Plaintiff's Counter 56.1 Statements, and

Defendants' Reply 56.1 Statements.[2] Upon consideration of a motion for summary judgment, the Court must construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).

The Court initially notes that, in their responses to Plaintiff's Counter 56.1 Statement, neither Nassau County Defendants nor Defendant Ryan submitted Reply Rule 56.1 Statements that comply with Federal Rule of Civil Procedure 56, Local Rule 56.1, or this Court's Chambers Practices. At summary judgment, as the moving party, Defendants must establish in their Rule 56.1 Statements that there are no disputed issues of material fact and support their statements with admissible evidence; as the non-moving party, in his Counter Rule 56.1 Statement, Plaintiff must proffer factual statements supported by admissible evidence sufficient to raise genuine disputes of material fact.

In their submissions, Nassau County Defendants dispute a significant number of Plaintiff's opposing factual statements in his Counter 56.1 Statement, but Defendants repeatedly fail to offer

---

[2] (*See* ECF No. 183-1, Defendant Ryan's Rule 56.1 Statement ("Def. Ryan 56.1"); ECF No. 184-1, County Defendants' Rule 56.1 Statement ("County Defs. 56.1"); 186, Plaintiff's Response to County Defendants' Rule 56.1 Statement ("Pl. Resp. County Defs. 56.1"); ECF No. 187, Plaintiff's Response to Defendant Ryan's Rule 56.1 Statement ("Pl. Resp. Def. Ryan 56.1"); ECF No. 188, Millson Declaration and exhibits attached thereto; ECF No. 189, Millson Second Declaration and exhibits attached thereto; ECF No. 194, Defendant Ryan Reply Rule 56.1 Statement ("Def. Ryan Reply 56.1"); ECF No. 196, County Defendants Reply Rule 56.1 Statement ("County Defs. Reply 56.1"); ECF No. 197, Gross Declaration and exhibits attached thereto; ECF No. 200, Nolan Declaration and exhibits attached thereto.)

4

or cite to admissible evidence to support their opposition, in violation of Federal Rule of Civil Procedure 56(c) and Local Rule 56.1. Plaintiff's additional 56.1 facts, offered as the non-moving party in opposition to Defendants' summary judgment motions, establish genuine disputes of material fact because Nassau County Defendants merely state in response that there has been "no finding of fact" that Plaintiff's proffered facts occurred. (*See, e.g.*, ECF No. 196, at ¶¶ 106-16; 336-43; 354-69.) At summary judgment, there is no need for a prior "finding of fact." Instead, the Court must determine whether a moving party has offered sufficient evidence that there is no genuine dispute of material fact, or whether a non-moving party has provided evidence that establishes genuine disputes of material fact. It is sufficient for a party to cite to admissible record evidence, such as deposition testimony or an affidavit, to establish the existence or non-existence of a material factual dispute. *See* Fed. R. Civ. P. 56(c); *see also United States v. Gentges*, 531 F. Supp. 3d 731, 735 n.1 (S.D.N.Y. 2021) ("Any party's failure to provide record support for its challenge to another party's factual statement could allow the Court to deem the challenged facts undisputed." (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001))). The Court therefore may find that Nassau County Defendants have not disputed the facts in Plaintiff's Counter 56.1

Statement for which the Nassau County Defendants failed to proffer evidence to support their opposition.

In his Reply 56.1 Statement, Defendant Ryan also repeatedly disputes Plaintiff's proffered facts without citing to admissible record evidence, including by stating only that "Plaintiff has merely regurgitated his deposition testimony as a material fact not in dispute." (*See*, *e.g.*, ECF No. 194, Def. Ryan Reply 56.1 at ¶¶ 187-88; 195-203.)  Federal Rule of Civil Procedure 56(c)(1)(a), however, explicitly states that deposition testimony may be used to support a factual statement for purposes of summary judgment. Fed. R. Civ. P. 56(c)(1)(a).

Accordingly, because Defendants are the moving parties, to the extent that Plaintiff's Counter 56.1 Statement establishes facts in dispute which the Defendants oppose but do not cite to record evidence in support of their opposition, those facts will be considered in the light most favorable to Plaintiff, unless the Court has identified record evidence supporting a contrary view. *See* Fed. R. Civ. P 56(e)(2); *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (collecting cases) (holding that "responses that do not point to any evidence in the record that may create a genuine issue of material fact do not function as denials, and will be deemed admissions of the stated fact." (alteration, citation, and internal quotation marks omitted)).  As discussed in detail below, Plaintiff's factual statements that Defendants have

failed to challenge with supporting evidence are sufficient for the Court to find the existence of disputed material facts precluding summary judgment.

Unless otherwise noted, the following facts are undisputed, or the opposing party has not proffered evidence in the record to dispute them.  Disputes are noted where the parties have submitted admissible evidence to establish a factual dispute.

**I.  Factual Background**

**A. New York State Corrections Officer Training Materials**

The New York State Commission of Correction has model training materials ("Model Instructions") for corrections officers, which provide sample lesson plans for corrections officers' training. (ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶ 133; ECF No. 196, County Defs Reply 56.1 at ¶ 133.)  The Model Instructions, *inter alia*, state the following:

STAFF SUPERVISE INMATES.

If you don't monitor and manage inmates, you are not properly supervising inmates therefor [sic] you are not doing your job!

All too often, inmate escapes, assaults and disturbances have occurred due to lack of proper supervision.[3]

---

[3] Nassau County Defendants dispute the statements in this paragraph in part, asserting that the statements are "accurate quotation[s] from the training materials cited" but are "incomplete" and "taken out of context." (ECF No. 196, County Defs. Reply 56.1 at ¶ 133.)  The Court has reviewed Exhibit 5, and concludes that Defendants' asserted dispute is not genuine, as the statement is not meaningfully incomplete or meaningfully removed from all context. *See Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 312, 314-15 (2d Cir. 2008) ("Under Rule 56, it is the court's responsibility to determine whether the opposing party's response to the assertion of a material fact presents a dispute that is genuine.").

(ECF No. Pl. Resp. County Defs. 56.1 at ¶ 133; ECF No. 189-3, Exhibit 5 ("Ex. 5") at 8.)  The Model Instructions instruct that staff must remain within "earshot" of inmates during "active supervision" (when inmates have "immediate access" to other inmates, such as in a day space or exercise area) and "must be able to respond immediately to emergency situations."  (ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶ 134; ECF No. 189-4, Exhibit 6 ("Ex. 6") at 12-13.)  The Model Instructions also state that "[s]upervision cannot be met by staying behind an officer's work station.  Walking around a housing unit, talking to inmates, observing activities and behaviors are prime elements to effective supervision."  (ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶ 133; ECF No. 189-18, Exhibit 64 ("Ex. 64") at 6.)  The Model Instructions further advise that corrections officers use the "ACID model" to "control disturbances," which provides, *inter alia*, that officers should observe the "type of incident," "names of inmates involved," "number of inmates involved," and "types of weapons involved" in any incident.  (ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶¶ 137-38; ECF No. 189-19, Exhibit 65 ("Ex. 65") at 10-11.)  After an incident has occurred, the ACID model instructs, *inter alia*, that "inmate movement within your unit and throughout the facility, particularly in areas near or leading to the housing

unit, needs to be stopped immediately." (ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶¶ 139; ECF No. 189-19, Ex. 65 at 692.)[4]

### B. Inmate Handbook at NCCC

At NCCC, the "Inmate Handbook" describes the administrative procedure for filing a complaint, or grievance, concerning the facility. (Pl. Resp. County Defs. 56.1 at ¶ 344; ECF No. 196, County Defs. Reply 56.1 at ¶ 344.) The Inmate Handbook states that a detainee "must file a grievance within five (5) days of the date of the act or occurrence leading to the grievance." (Pl. Resp. County Defs. 56.1 at ¶ 345; ECF No. 196, County Defs. Reply 56.1 at ¶ 345.) Nassau County Defendants assert that "every inmate gets [a handbook]," but there is no evidence in the record as to how the handbook is disseminated to inmates. (ECF No. 188-43, Exhibit 54 ("Ex. 54") at 96:19-97:08.)

### C. Policies in Nassau County and at NCCCC

From 2011-2018, Defendant Sposato was the Sheriff of Nassau County and had responsibility for NCCC.[5] (ECF No. 184-1, County Defs. 56.1 at ¶ 8; ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶ 8; ECF No. 188-42, Ex. 54 at 38:21-38:23, 39:09-39:16). As

---

[4] Nassau County Defendants dispute the statements in this paragraph in part, asserting that the statements are "accurate quotation[s] from the training materials cited" but are "incomplete" and "taken out of context." (ECF No. 196, County Defs. Reply 56.1 at ¶ 133.) The Court has reviewed Exhibit 5, Exhibit 6 and Exhibit 19 and concludes that Defendants' asserted dispute is not genuine, as the statements are not meaningfully incomplete or deprived of relevant context. *See Major League Baseball Properties*, 542 F.3d at 312, 314.

[5] Defendant Sposato's term as Sheriff of Nassau County ended on January 1, 2018. (ECF No. 43, Exhibit 54 at 33:12-16.)

Sheriff, Defendant Sposato rarely changed NCCC policies or created new policies.[6]  (ECF No. 188-43, Ex. 54 at 51:14-52:01.)  The parties dispute whether Defendant Sposato's actions as Sheriff included reducing the size of NCCC staff, and whether he was involved in creating policies for the training program for corrections officers.[7]  (ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶¶ 149-50; ECF No. 196, County Defs. Reply 56.1 at ¶¶ 149-50; ECF No. 188-43, Ex. 54 at 48:17-49:17; 54:16-57:21.)

The parties dispute whether there are policies to deter assaults at NCCC, including whether there was any formal written policy on investigating assaults on detainees and whether NCCC recorded or preserved video footage after assaults.  (ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶¶ 181-82; ECF No. 196, County Defs. Reply 56.1 at ¶¶ 181-82.)

---

[6] Nassau County Defendants dispute this statement, asserting that the statement is "an incomplete excerpt of the testimony cited" and is "taken out of context." (ECF No. 196, County Defs. Reply 56.1 at ¶ 149.)  The Court has reviewed Exhibit 54 and concludes that Defendants' asserted dispute is not genuine to the extent that it contests the frequency of Defendant Sposato's policy creation, as the statement is not meaningfully incomplete or deprived of relevant context. *See Major League Baseball Properties*, 542 F.3d at 312, 314.  Defendant Sposato testified that he "didn't create policies very often"; that it "wasn't a regularity that [he] was putting out policies"; and that "a new policy would be very rare." (ECF No. 188-43, Ex. 54 at 51:14-52:04; 52:14-53:19.)

[7] The parties' disputes regarding these statements appear to derive from different interpretations of Defendant Sposato's testimony.  (*See* No. 196, County Defs. Reply 56.1 at ¶¶ 149, 150 (challenging Plaintiff's statements of fact as "an incomplete excerpt of the testimony cited" and "taken out of context").)  Because Defendant Sposato's testimony on the training program and on whether he reduced the number of administrative staff includes several contradictory statements, and therefore requires a credibility determination, the factual disputes must be resolved by a factfinder.  (*See, e.g.,* ECF No. 188-43, Ex. 54 at 48:17-49:17; 54:16-60:02.)

### i.   Training

During Defendant Sposato's tenure, newly hired corrections
officers at NCCC attended a training academy with classroom
coursework on various subjects.  (ECF No. 186, Pl. Resp. County
Defs. 56.1 at ¶ 152; ECF No. 196, County Defs. Reply 56.1 at ¶
152.)   The parties dispute whether NCCC corrections officers
received training regarding detainee supervision techniques or
NCCC's policies for detainee supervision.[8]  (ECF No. 186, Pl. Resp.
County Defs. 56.1 at ¶ 154; ECF No. 196, County Defs. Reply 56.1
at ¶ 154; ECF No. 42, Exhibit 53 ("Ex. 53") at 63:15-63:22.)  After
graduating, NCCC corrections officers attended annual "in service"
trainings.  (ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶ 156;
ECF No. 196, County Defs. Reply 56.1 at ¶ 156.)   The parties
dispute whether there were any "in service" trainings on preventing
and responding to detainee assaults.  (ECF No. 186, Pl. Resp.
County Defs. 56.1 at ¶ 157; ECF No. 196, County Defs. Reply 56.1
at ¶ 157.)

### ii.  Supervision Policies

The parties dispute whether corrections officers are required
by any policies or procedures to engage in "active supervision"

---

[8] Although Plaintiff provided the Model Instructions for corrections officer
training as evidence of New York's training standards, the parties dispute
whether NCCC corrections officers were trained based on the model.  Furthermore,
it is not clear if the Model Instructions are required to be taught to
corrections officers in New York.  (ECF No. 186, Pl. Resp. County Defs. 56.1 at
¶¶ 152-54; ECF No. 196, County Defs. Reply 56.1 at ¶¶ 152-54.)

11

when detainees are not in their individual cells, e.g., when
detainees are in the recreation yard. (ECF No. 186, Pl. Resp.
County Defs. 56.1 at ¶¶ 167-68; ECF No. 196, County Defs. Reply
56.1 at ¶¶ 167-68; ECF No. 42, Ex. 53 at 44:20-45:10, 54:3-54:9.)
The parties dispute whether the custom or procedures at NCCC
permitted corrections officers to spend their shift supervising
the recreation yard from a plexiglass shack, and how often officers
would leave the shack during the recreation period. (ECF No. 186,
Pl. Resp. County Defs. 56.1 at ¶¶ 171-72; ECF No. 196, County Defs.
Reply 56.1 at ¶¶ 167171-72.) They also dispute whether corrections
officers could interact with detainees without leaving the shack.
(ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶ 175; ECF No. 196,
County Defs. Reply 56.1 at ¶ 174.)

**D. 2007 Incident at NCCC**

In 2007, Plaintiff filed a grievance that he was assaulted by
corrections officers. (Def. Ryan 56.1 at ¶ 8; Pl. Resp. Def. Ryan
56.1 at ¶ 8.) Plaintiff filed a lawsuit alleging that he was
assaulted by NCCC correction officers, in which he attached copies
of his grievance paperwork as an exhibit. (ECF No. 47, Exhibit
188-59 ("Ex. 59") at 26:23-27:24; Def. Ryan 56.1 at ¶ 10; Pl. Resp.
Def. Ryan 56.1 at ¶ 10.) In 2009, the case settled. (ECF No.
188-56, Exhibit 9 ("Ex. 9") at 3.)

**E. 2017 Incident at NCCC**

In 2017, Plaintiff was detained at NCCC from July 31, 2017 to December 27, 2017, while awaiting trial. (County Defs. 56.1 at ¶ 3; Pl. Resp. County Defs. 56.1 at ¶¶ 3, 40.)  During this five-month period when Plaintiff was in custody at NCCC, Defendant Sposato was the Nassau County Sherriff overseeing NCCC and Defendants Hollingshead, James, and Ryan all worked as corrections officers at NCCC. (County Defs. 56.1 at ¶¶ 9-11; Pl. Resp. County Defs. 56.1 at ¶¶ 9-11.)

In 2017, NCCC had a computer database that held information on detainees, including their disciplinary histories. (ECF No. 196, County Defs. Reply 56.1 at ¶ 160.)  The reports on each detainee in the database were called "inmate pedigrees." (*Id.* at ¶ 161.)  A hash mark notation in an inmate pedigree signified, informally, that a detainee had a history of assaulting corrections staff.[9]  Plaintiff's inmate pedigree contained a hash mark notation

---

[9] Nassau County Defendants dispute that the hash mark notation is an informal mark that signifies a history of assaulting corrections staff. (ECF No. 196, County Defs. Reply 56.1 at ¶¶ 162-63.)  Nassau County Defendants do not cite to record evidence to dispute this fact but argue that there is "no admissible evidence" in support of this statement. (ECF No. 196, County Defs. Reply 56.1 at ¶ 163.)  To support his statement, Plaintiff cites to sworn testimonies, by Defendant James and Defendant Ryan, which are admissible for purposes of summary judgment. Fed. R. Civ. P. 56(c)(1)(A); (*see* ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶¶ 162-63; ECF No. 188-45, Exhibit 57 ("Ex. 57") at 24; ECF No. 188-44, Exhibit 55 ("Ex. 55") at 70:05-71:18.)

Defendant Ryan asserts that he "can neither confirm or deny" the factual assertion, which is insufficient to establish a disputed fact for a Rule 56.1 Statement. (ECF No. 187, Pl. Resp. Def. Ryan 56.1 at ¶¶ 105-07); *see Scarpinato v. 1770 Inn, LLC*, No. 13-CV-0955(JS), 2015 WL 4751656, at *2 n.3 (E.D.N.Y. Aug. 11, 2015) ("[I]the context of a local 56.1 statement, an answer that '[a party] can neither admit nor deny this statement based upon the factual record' is not

on most pages.[10]   (ECF No. 196, County Defs. Reply 56.1 at ¶¶ 166, 252; ECF No. 194, Def. Ryan Reply 56.1 at ¶¶ 108, 194.)   Defendant Ryan had access to the NCCC computer database.   (ECF No. 194, Def. Ryan Reply 56.1 at ¶ 193; ECF No. 45, Exhibit 57 ("Ex. 57") at 24.)

In the fall of 2017, Defendant Ryan was assigned to the E1-B housing unit, where Plaintiff was housed.   (ECF No. 188-40, Exhibit 51 ("Ex. 51") at 114:2-114:7.)   Four formal complaints had been filed against Defendant Ryan in the preceding nine months—by a visitor, two inmates, and an attorney—and he was reassigned to the E1-B housing unit, without a firearm, while the complaints were being investigated.   (ECF No. 196, County Defs. Reply 56.1 at ¶¶ 224-25; ECF No. 194, Def. Ryan Reply 56.1 at ¶¶ 129, 137, 143, 162, 166-68.)   The Sheriff's Department Internal Affairs Unit ("IAU") closed each investigation after finding that the

---

a sufficient response to establish a disputed fact." (internal quotation marks and citation omitted)).

[10] Nassau County Defendants dispute—without citing to record evidence—that Plaintiff's inmate pedigree contained a hash mark notation, stating only that Plaintiff "offered no admissible evidence" in support.   (ECF No. 196, County Defs. Reply 56.1 at ¶¶ 166.)   Plaintiff cites to Plaintiff Exhibit 36, which appears to be a printout of Plaintiff's inmate pedigree and contains a hash mark notation.   (ECF No. 188-26, Ex. 36.)   Nassau County Defendants do not state why Exhibit 36 would be inadmissible evidence; moreover, a printout of inmate pedigrees from NCCC's computer database would be properly considered under Federal Rule of Civil Procedure 56(c)(1)(A) as electronically stored information, and it could be authenticated under Federal Rule of Evidence 902(14) if it could be properly certified under Rule 902(11).   Fed. R. Civ. P. 902(14).  Further, because Plaintiff is not offering the printout for the truth of its contents, it is not hearsay.   *See* Federal Rule of Evidence 802(c).

complaints were "not sustained."[11]   (ECF No. 194, Def. Ryan Reply 56.1 at ¶¶ 135, 142, 160, 170.)

The parties dispute the following events.  Plaintiff asserts that in late October or early November 2017, he asked Defendant Ryan if he could be assigned to a job working the food cart, which was a desirable position for detainees at NCCC.  (*Id.* at 114:11-114:16.)  Plaintiff contends that Defendant Ryan told Plaintiff that Defendant Ryan would "go check it out."  (*Id.*)  Later that day, Defendant Ryan called Plaintiff a "snitch" while walking by Plaintiff's cell, loudly enough for other detainees to hear.  (*Id.* at 114:16-114:23.)  Plaintiff asserts that there was a "weird silence" in his housing unit afterwards.  (ECF No. 188-47, Exhibit 59 ("Ex. 59") at 101:2-101:16.)  Plaintiff asserts that, around two weeks later, Defendant Ryan called Plaintiff a "fucking snitch," in front of multiple other detainees while they were gathered watching television, and that the other detainees moved away from Plaintiff afterwards.  (*Id.* at 110:6-111:4.)

Defendant Ryan broadly disputes this account, including asserting that (1) he does not recall being assigned to the E1B

---

[11] After a fifth formal complaint was filed in May 2018, IAU found that Defendant Ryan had "fraternized with an incarcerated inmate" and had "accepted multiple calls from an incarcerated inmate to his personal cellular phone," violating NCCC's policies. (ECF No. 196, County Defs. Reply 56.1 at ¶¶ 229, 236; ECF No. 194, Def. Ryan Reply 56.1 at ¶¶ 171, 178; ECF No. 189-14, Exhibit 56A ("Ex. 56A") at 2, 18.)  Defendant Ryan resigned in September 2018, and the County agreed to discontinue any pending disciplinary proceedings.  (ECF No. 196, County Defs. Reply 56.1 at ¶ 238; ECF No. 194, Def. Ryan Reply 56.1 at ¶ 170.)

housing units; (2) he has no recollection of having a conversation with Plaintiff in the fall of 2017; and (3) he had never heard the word "snitch" in the context of his work as a corrections officer. (ECF No. 188-48, Exhibit 60 ("Ex. 60") at 122:6-10; 123:5-123:13; 126:13-127:3.)  He also asserts that he had never used the word 'snitch' in the context described by Plaintiff.  (*Id.* at 134:12-134:23.)

The parties do not dispute, however, that Defendant Ryan was aware that referring to a detainee as a "snitch" could put a detainee in danger.  (ECF No. 187, Pl. Resp. Def. Ryan 56.1 at ¶ 204; ECF No. 194, Def. Ryan Reply 56.1 at ¶ 204.)  The parties dispute whether Plaintiff feared for his safety prior to the incident on November 18, 2017, which occurred as follows.  (ECF No. 184-1, County Defs. 56.1 at ¶ 31; 197-20, Exhibit T ("Ex. T") at 103:18-104:5; ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶ 31; 197-20, Ex. T at 104:7-104:21.)

On November 18, 2017, Plaintiff went to recreation at 1:00 PM, where he and other E1B residents were assigned to the A-B recreation yard for a period of one hour.  (ECF No. 184-1, County Defs. 56.1 at ¶¶ 12, 19; ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶¶ 12, 19.)  Defendants Hollingshead and James were the corrections officers assigned to supervise the A-B recreation yard at that time.  (ECF No. 184-1, County Defs. 56.1 at ¶ 14; ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶ 14; County Defs. Reply 56.1

16

at ¶ 270.) The parties dispute whether corrections officers inspect the jackets of all detainees and sweep the yard for contraband prior to the start of recreation periods, and whether Defendant James did so on November 18, 2017. (ECF No. 184-1, County Defs. 56.1 at ¶¶ 16-18; ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶¶ 16-18.)

The parties dispute the size of the yard, but agree that it included a small see-through "shack" with plexiglass walls. (ECF No. 184-1, County Defs. 56.1 at ¶ 23; ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶ 23; County Defs. Reply 56.1 at ¶ 270.) The shack was around seven feet away from the entrance of the yard and overlooked the entire yard. (*Id.*) The parties dispute the extent to which Defendants Hollingshead and James could see detainees in the yard from the shack. (ECF No. 184-1, County Defs. 56.1 at ¶ 27; ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶ 27; ECF No. 188-43, Ex. 54 at 117:13-117:19.) From the shack, correction officers were able to intervene if they observed a threat to a detainee, and they could communicate by radio and telephone with other NCCC staff.[12] (ECF No. 196, County Defs. Reply 56.1 at ¶¶ 279-80.) The parties dispute whether it was customary at NCCC for corrections officers to remain in the shack during a recreation period. (ECF

---

[12] Nassau County Defendants dispute the "implication[s]" that may derive from these factual assertions but agree that the factual statements "accurately summarize[] the deposition testimony cited." (ECF No. 196, County Defs. Reply 56.1 at ¶¶ 279-80.) Therefore, the Court accepts as undisputed these factual statements proffered by Plaintiff with support from record evidence.

No. 186, Pl. Resp. County Defs. 56.1 at ¶ 281; ECF No. 196, County
Defs. Reply 56.1 at ¶ 281.)

There were no metal detectors in the yard, but there was at
least one camera, stationed above the door leading from the E1B
housing unit. (ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶ 267;
ECF No. 188-39, Exhibit 50 ("Ex. 50") at 35:6-35:21.) The camera
did not record the incident on November 18, 2017, and there was no
video evidence of the incident. (ECF No. 196, County Defs. Reply
56.1 at ¶¶ 268-69.) The parties dispute whether the cameras were
generally inoperable. (*Id.* at ¶¶ 267-69; *see* ECF No. 189-9,
Exhibit 31 ("Ex. 31") at 2.)

At some point during the recreation period, Sanchez was
attacked by unknown detainees, who slashed his right cheek from
his mouth to his ear and beat him on the ground. (ECF No. 186,
Pl. Resp. County Defs. 56.1 at ¶¶ 283-85; ECF No. 196, County Defs.
Reply 56.1 at ¶¶ 283-85.) Plaintiff was bleeding from the cut and
his clothing was bloodstained. (ECF No. 186, Pl. Resp. County
Defs. 56.1 at ¶¶ 283-85.) Afterwards, the detainees "scattered
into the recreation yard." (ECF No. 186, Pl. Resp. County Defs.
56.1 at ¶ 286; ECF No. 196, County Defs. Reply 56.1 at ¶ 286.)

Defendants Hollingshead and James saw Plaintiff with a
laceration on the right side of his face. (ECF No. 186, Pl. Resp.
County Defs. 56.1 at ¶ 32.) The parties dispute how they became
aware of the laceration. Plaintiff asserts that Defendants

Hollingshead and James were directly behind him in the shack when he was assaulted. (ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶ 232; ECF No. 188-40, Ex. 51, at 80:18-81:3, 81:25-82:12.) He asserts that, after getting to his feet after he was attacked, he looked towards the shack for several minutes, but neither Defendant left the shack until the end of the recreation period. (ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶¶ 233-34; ECF No. 188-40, Ex. 51, at 80:18-80:23.) Nassau County Defendants assert that Defendant Hollingshead stopped Plaintiff in the recreation yard because there was blood on Plaintiff's shirt, whereas Defendant James was by the door, moving detainees back to housing, when he realized that Plaintiff had been cut. (ECF No. 184-1, County Defs. 56.1 at ¶¶ 33-34.)

The parties agree that Defendant Hollingshead stayed with Plaintiff, while Defendant James directed the other detainees to their housing unit. (ECF No. 184-1, County Defs. 56.1 at ¶ 39; ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶ 295.) Plaintiff asserts that Hollingshead told him to "calm down" and that "things come full circle," which Nassau County Defendants dispute. (ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶ 296; ECF No. 188-40, Ex. 51, at 90:10-91:2, 179:20-180:24.) Defendants Hollingshead and James contacted their supervisors and a medic, and allowed Plaintiff to go to the bathroom to attend to his wound. (ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶¶ 40-41.) Plaintiff was taken

19

to the medical unit by a third officer, and then taken to the hospital via ambulance. (*Id.* at ¶¶ 43-44.) Plaintiff was treated at the hospital for his injury and returned to NCCC later that afternoon. (ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶ 55; ECF No. 197-19, Exhibit S ("Ex. S") at 5.)

Defendants Hollingshead and James notified Sergeant Jonathan Bertin, among others, about the incident. (ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶¶ 40-41.) Sergeant Bertin was the first-floor building sergeant for the E housing unit. (ECF No. 188-46, Ex. 58 at 21:6-21:13.) Bertin supervised the officers assigned to the first floor, and conducted preliminary investigations of inmate assaults. (*Id.* at 21:20-22:16.) He was responsible for carrying out the preliminary investigation of Plaintiff's assault. (*Id.* at 114:7-114:17.) There was no NCCC policy that Bertin knew of that described how a building sergeant should investigate an inmate assault, or secure and identify contraband when an assault involved an unknown object.[13] (*Id.* at 121:5-121:18.) Any procedure

---

[13] Nassau County Defendants dispute this statement in part. (ECF No. 196, County Defs. Reply 56.1 at ¶ 305.) Nassau County Defendants assert that the "statement accurately summarizes the deposition testimony cited" but contend that "the statement is vague as to 'formal NCCC policy' and 'specifying what steps should be taken.'" (*Id.*) Nassau County Defendants do not cite to record evidence. The Court has reviewed the relevant deposition transcript, and concludes that Defendants' asserted dispute is not genuine. *See Major League Baseball Properties,* 542 F.3d at 312, 314. Bertin's deposition included the following exchange between himself and the lawyer questioning him:

> Q: Is there a policy in place that lays out the steps that a building sergeant should take to investigate an inmate assault?
> A: Not that I know of.
> Q: Okay. So this is another thing at NCCC that would be learned on the job?

for an investigation was learned on-the-job or through supervisor directions.[14]  (ECF No. 196, County Defs. Reply 56.1 at ¶ 307; ECF No. 188-46, Ex. 58 at 121:11-121:18.)  There was no staff handbook that listed NCCC policies or procedures.  (ECF No. 188-41, Ex. 42 at 26:06-26:07.)  Corrections officers could access policies on a computer, but there was no search function on the intranet page that listed the policies.  (*Id.* at 26:08-28:19.)

After the incident, the detainees were not searched prior to returning from the recreation yard to the housing unit.  (*Id.* at ¶ 45.)  Bertin did not ask Defendants Hollingshead or James if they had searched any detainees who were in the A-B recreation yard, or if they had searched the yard or adjoining areas after Plaintiff was attacked, or if they had identified any suspects.  (ECF No. 196, County Defs. Reply 56.1 at ¶¶ 312.)  Around 40 minutes after the end of the recreation period, the E1A and B blocks of the E1 housing unit were locked down.  (ECF No. 186, Pl.

---

A: Or through supervisory direction.

(ECF No. 188-46, Ex. 58 at 121:11-121:18.)  The following exchange also took place during Bertin's deposition:

Q: Is there a standard operating procedure or policy in place at NCCC to secure and identify contraband when there's been an assault on an inmate with an unknown object?
A: I don't know.
Q: Okay. But you, as the building sergeant, you know, for this housing block in 2018, do not recall such a policy being in place?
A: No, I don't recall.

(*Id.* at 143:16-144:1.)

[14] *See supra,* note 13.

Resp. County Defs. 56.1 at ¶¶ 46; ECF No. 188-56, Exhibit 58 ("Ex. 58") at 176:9-176:17; ECF No. 189-9, Ex. 31.)   Two hours later, NCCC staff searched the E1A and B blocks to locate contraband used in the assault.   (ECF No. 196, County Defs. Reply 56.1 at ¶ 317; ECF No. 188-46, Ex. 58 at 194:6-194:25.)   The recreation yard was also searched.   (ECF No. 186, Pl. Resp. County Defs. at ¶ 50; ECF No. 197-21, Exhibit U ("Ex. U") at 49).   No weapon or contraband of any kind was found.   (ECF No. ECF No. 196, County Defs. Reply 56.1 at ¶ 328; ECF No. 197-21, Exhibit U ("Ex. U") at 49.)

Later that same day, November 18, Bertin reported the assault to the Criminal Investigation Unit ("CIU") and the Gang Investigation Unit ("GIU") for further investigation.   (*Id.*; ECF No. 46, Ex. 58, 215:22-216:21.)   Generally, CIU would follow up on a report within 24 hours.   (ECF No. 46, Ex. 58 at 216:22-217:7.) Neither CIU nor GIU began conducting interviews about the assault within 24 hours.   (*Id.* at 216:22-217:22.)   GIU or CIU usually conducted interviews and then informed supervisory staff at NCCC as to how to proceed.   (*Id.* at 219:20-220:3.)   Because neither GIU nor CIU had begun interviews by November 19, 2017, the day after the assault, Bertin was instructed by Captain Fratto to begin a preliminary investigation.   (*Id.* at 219:20-221:2.)   Bertin investigated by (1) asking corrections officers if any detainee had provided information about the assault; and (2) making a general announcement about seeking information about the assault,

and then walking through the housing unit to see if detainees would disclose any information. (*Id.* at 221:21-224:3.) NCCC never identified the individuals who assaulted Plaintiff. (ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶ 329; County Defs. 56.1 at ¶ 329.)

**F. After the November 18, 2017 incident**

Plaintiff was placed in involuntary protective custody ("IPC") after he returned from the hospital. (ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶ 329; ECF No. 197-21, Ex. U at 6.) On November 21, 2017, Plaintiff requested to be moved out of IPC and placed in general population and stated that the assault was a "random incident." (ECF No. 188-23, Exhibit 27 ("Ex. 27").) Plaintiff feared for his safety while in IPC because (1) IPC housing was populated with members of violent criminal gangs; (2) his cell was being cleaned out to remove blood when he arrived at IPC, after an assault on a detainee in that cell; (3) members of a gang who were in IPC told Sanchez that they had attacked the detainee who had previously occupied his cell based on the encouragement of a corrections officer; and (4) Defendant Ryan was among the corrections officers assigned to IPC at the time Plaintiff was housed there. (ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶¶ 331-43.) While in IPC, Plaintiff did not file a formal grievance about the assault because he was fearful of retaliation. (*Id.* at ¶ 348.) He was released from IPC to general population on November 28, 2017. (ECF No. 188-23, Exhibit 23 ("Ex. 23" at 1.)

On November 29, 2017, CIU[15] interviewed Plaintiff about the assault. (ECF No. 184-1, County Defs. 56.1 at ¶ 59; ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶ 59.) The parties dispute what Plaintiff told the CIU investigators. (ECF No. 184-1, County Defs. 56.1 at ¶ 59; ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶ 59.) Nassau County Defendants assert that Plaintiff told the investigator that he did not know who cut him and that he did not want to elaborate further, and then signed a form declining to consult with the District Attorney's office regarding possible criminal prosecution. (ECF No. 197-30, Exhibit DD ("Ex. DD") at 39-40.)

Plaintiff disputes this account, and asserts that he told the CIU investigator that he "was cut and beat up right in front of two corrections officers, and they did nothing to help [him], and that [he] had a prior situation with an officer that referred to [him] as a snitch." (ECF No. 40, Ex. 51 at 126:14-126:21.) Plaintiff also asserted that he was uncomfortable speaking to the CIU investigator because the interview took place in a room that was visible to a significant number of detainees, a concern which he told the investigator. (*Id.* at 121:23-122:16.) He asserts that he signed the form because he wanted to leave the room as quickly as possible. (*Id.* at 128:20-129:7.)

---

[15] CIU is part of the Sheriff's Bureau of Investigations. (ECF No. 197-21, Ex. U at 39-40; ECF No. 188-40, Ex. 51 at 123-16:124:24.)

In December 2017, Plaintiff wrote letters to various members of NCCC staff, including staff in the housing unit and the warden, stating that he wanted to be transferred to Rikers Island.  (ECF No. 196, County Defs. Reply 56.1 at ¶¶ 367-69; ECF No. 188-40, Ex. 51 at 208:7-211:7.)  In his letters, Plaintiff stated that his request was connected to an incident with a corrections officer and to his assault, and that he would explain further once he had been moved.[16]  (ECF No. 196, County Defs. Reply 56.1 at ¶¶ 367-69; ECF No. 188-40, Ex. 51 at 208:7-211:7.)  On December 18, 2017, Plaintiff, *pro se*, filed the first complaint in this action.  (ECF No. 1.)

Plaintiff was transferred to Rikers Island on December 27, 2017. (County Defs. 56.1 at ¶ 5; Pl. Resp. County Defs. 56.1 at ¶ 5).  After his transfer, he called 3-1-1, "spoke to two captains" at Rikers, submitted written statements about the incidents at NCCC, and wrote numerous letters documenting the incident to various parties, including a second letter to the NCCC warden.[17] (ECF No. 196, County Defs. Reply 56.1 at ¶¶ 367-69; ECF No. 188-40, Ex. 51 at 214:18-215:10.)

---

[16] Defendants dispute the factual statements in this paragraph but provide no record evidence to contradict Plaintiff's deposition testimony.  (ECF No. 196, County Defs. Reply 56.1 at ¶¶ 367-69.)

[17] Defendants dispute the factual statements in this paragraph but provide no record evidence to contradict Plaintiff's deposition testimony.  (ECF No. 196, County Defs. Reply 56.1 at ¶¶ 373.)

Plaintiff was transferred back to NCCC on April 4, 2018. (ECF No. 184-1, County Defs. 56.1 at ¶ 6; ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶ 6.) After his transfer, he wrote a letter to the then-presiding judge in this action, then United States District Court Judge Joseph F. Bianco,[18] stating that he was believed he was in danger at NCCC, given that he believed the assault had been provoked by corrections officers and that corrections officers were aware of the instant action. (ECF No. 16, Letter; ECF No. 196, County Defs. Reply 56.1 at ¶¶ 376-80; ECF No. 188-40, Ex. 51 at 214:18-215:10.)

On May 18, 2018, the Sheriff's Department Internal Affairs Unit ("IAU") interviewed Plaintiff about the Judge Bianco letter. (ECF No. 196, County Defs. Reply 56.1 at ¶ 382; ECF No. 189-12, Exhibit 40 ("Ex. 40") at 2.) During the interview, Plaintiff stated that he had been assaulted on November 18, 2017, and that he believed that the assault had been provoked by corrections officers in retaliation for his 2007 lawsuit. (ECF No. 196, County Defs. Reply 56.1 at ¶ 383.) Plaintiff stated that he had not immediately reported this suspicion because corrections officers "run the jail."[19] (*Id.* at ¶ 385; Exhibit 63 ("Ex. 63") at 3:35-

---

[18] The action was reassigned to the undersigned in April 2019.

[19] Defendants purport to dispute the statements in this paragraph because "there has been no finding of fact that these events took place" but agree that the statements are "an accurate summary of the record cited." (ECF No. 196, County Defs. Reply 56.1 at ¶¶ 373.) The Court therefore finds that the statements are undisputed.

3:49.)  Plaintiff also stated that "it wasn't every officer . . .
it's like two or three, it's not like it was a big conspiracy."[20]
(*Id.* at ¶ 385; Ex. 63 at 6:15-6:49.)  In response to questioning
from the IAU investigator as to why Plaintiff had waited to report
his suspicions until he wrote the Judge Bianco letter, Plaintiff
stated:

> I filed a lawsuit immediately, when I went to Rikers, I
> told them immediately.  I spoke to captains and put it
> in writing, all that.  But I just didn't want to have it
> in the open here [at NCCC] because what are you going to
> do?  Ask for a grievance?  You know what I'm saying,
> what is that going to do?  I have to ask the corporal
> for a grievance and then they'll be like 'why.' . . . I
> just wanted to get moved.  That's what I really wanted.
> I wanted to get the fuck out of this jail.[21]

(Ex. 63 at 11:20-11:46.)

On June 12, 2018, Plaintiff was transferred to Fishkill
Correctional Facility.  (ECF No. 196, County Defs. Reply 56.1 at
¶ 388.)  On August 29, 2019, Plaintiff was released from custody.
(*Id.* at 389.)

**G. Other Assault Incidents at NCCC**

From 1999-2018, at least 11 detainees filed complaints about
being assaulted while in custody at NCCC, either by other detainees

---

[20] Plaintiff disputes this statement in part, stating that it is "vague,
ambiguous and taken out of context."  The Court has reviewed the relevant
audiotape, and concludes that Plaintiff's asserted dispute is not genuine.  *See
Major League Baseball Properties,* 542 F.3d at 312, 314.

[21] Plaintiff disputes this statement in part, stating that the quotation as
stated by Defendants was "misleading."  The Court has reviewed the relevant
audiotape, and concludes that Plaintiff's asserted dispute is not genuine.  *See
Major League Baseball Properties,* 542 F.3d at 312, 314.

or by corrections officers.[22]   (*See* ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶¶ 106-116, 118, 120, 123.)   Plaintiff testified that some corrections officers at NCCC encouraged detainees to

---

[22] Plaintiff's Counter Rule 56.1 Statement includes details concerning lawsuits and alleged assaults on NCCC detainees.  (*See* ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶¶ 106-123.)  To support these factual statements, Plaintiff cites to the complaint filed in each case, as well as news articles.  (*Id.*)  To each of those factual statements, Nassau County Defendants state the following: "Disputed, and neither relevant nor material.  The statement is a recitation of allegations only; there has been no finding of fact establishing this allegation."  (*See* ECF No. 196, County Defs. Reply 56.1 at ¶¶ 106-116, 118, 120, 123.)  Defendant Ryan states the following to each factual statement:

> Defendant can neither confirm or deny this fact. Defendant objects to this statement in that it is neither material as required by Local Rule 56.1, nor relevant. Additionally, Local Rule 56.1 requires the moving party to list material facts not in dispute, Plaintiff has merely regurgitated the allegations contained in his amended complaints. This is a clear violation of Rule 56.1 and a waste of the Court's time.

(*See* ECF No. 194, Def. Ryan Reply 56.1 at ¶¶ 106-116, 118, 120, 123.)

The Court notes that complaints and news articles generally are not considered admissible evidence for the purpose of supporting or opposing a motion for summary judgment.  *See Henek v. CSC Holdings, LLC*, 449 F. Supp. 3d 35, 38 n.2 (E.D.N.Y. 2020) (collecting cases); *Outerbridge v. City of New York*, No. 13 CIV. 5459 (AT), 2015 WL 5813387, at *4 (S.D.N.Y. Sept. 30, 2015) ("It is well-established that "newspaper articles offered for the truth of the matters asserted therein are inadmissible hearsay that may not be considered by the Court in deciding a motion for summary judgment.").

Here, however, although the news articles and complaints are inadmissible to prove the truth of the matters asserted, they may be admissible to establish that Defendants had *notice* of the articles and lawsuits alleging assaults on NCCC inmates.  *See generally Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986) ("Whether or not the claims had validity, the very assertion of a number of such claims put the City on notice.").  The factual statements therefore are material and relevant to Plaintiff's claim against the County for deliberate indifference to Plaintiff's constitutional rights by failing to train and supervise its employees.  As discussed below, a plaintiff must establish for such a claim "that the need for more or better supervision to protect against constitutional violations was obvious"; further, that "obvious need may be demonstrated through proof of repeated complaints of civil rights violations."  *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995).  The Court discusses the legal elements of this claim in detail below, including whether the complaints and news articles cited to by Plaintiff are sufficient to establish notice.

28

attack other detainees.[23]   Additionally, criminal gangs operated inside NCCC in 2017, and Defendant James was aware of gang violence incidents in the facility.[24]

## II.   Procedural History

On December 18, 2017, Plaintiff, *pro se*, filed the original complaint in this action against Defendant Nassau County and against NCCC.   (ECF No. 1.)   The action was assigned to Judge Bianco.   On May 2, 2018, Plaintiff filed an amended complaint against Nassau County, NCCC, John Does #1 and #2, and Armor Correctional Health Services.[25]   (ECF No. 15.)   Also on May 2, 2018, Plaintiff filed the "Judge Bianco letter."   (ECF No. 15.) On May 14, 2018, Plaintiff requested to amend his complaint again

---

[23] In support of this factual statement, Plaintiff cites to his deposition testimony.   (*See* ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶ 105; ECF No. 188-40, Ex. 51 at 171:4-173:6.)   Nassau County Defendants dispute this statement by stating "Disputed. The statement is a recitation of allegations only; there was no finding that these events in fact took place, nor is there any admissible evidence in support thereof."   (ECF No. 196, County Defs. Reply 56.1 at ¶ 105.) Deposition testimony is record evidence.   Fed. R. Civ. P. 56(c)(1)(a). Defendant Ryan disputes this statement only by stating "Denied."   (ECF No. 194, Def. Ryan Reply 56.1 at ¶ 47.)   As noted above, purported disputes as to Plaintiff's Counter 56.1 Statement for which the Defendants do not cite to record evidence or challenge the admissibility of evidence are not genuine disputes, unless the Court has otherwise identified record evidence supporting a dispute of fact.   *See* Fed. R. Civ. P 56(e)(2); *Baity*, 51 F. Supp. 3d at 418.

[24] Nassau County Defendants dispute this statement, asserting that Defendant James's deposition testimony and Sergeant Bertin's deposition testimony, cited by Plaintiff in support of this statement, was "taken out of context" and "misleading and inaccurate."   (ECF No. 196, County Defs. Reply 56.1 at ¶ 103.) The Court has reviewed the deposition testimony, and concludes that Nassau County Defendants' asserted dispute as to the operation of criminal gangs is not genuine, as the deposition testimony is not meaningfully taken out of context.   *See Major League Baseball Properties, Inc.*, 542 F.3d at 312; (*see* ECF No. 188-44, Ex. 55 at 31:17-31:20; ECF No. 46, Ex. 58 at 182:4-182:17.)

[25] Defendant Armor Correctional Health Services is referred to as Armor Medical Group.

because he "sent the wrong front cover." (ECF No. 19.) On May 30, 2018, Judge Bianco granted Plaintiff's motion to amend and ordered the Nassau County Attorney and the United States Marshals Service to help ascertain the names and identities of John Does #1 and #2, named in the second amended complaint, and serve them. (ECF No. 22.) The second amended complaint was entered on the docket on May 31, 2018 and included as defendants John Does #1-5. (ECF No. 21.) After Armor Medical Group moved to dismiss for failure to state a claim, Plaintiff moved for summary judgment against all defendants. (ECF Nos. 47, 52.) In March 2019, Armor's motion to dismiss was granted and Plaintiff's motion for summary judgment was denied. (ECF Nos. 74, 79.)

In April 2019, the case was reassigned to the undersigned. In June 2019, the Nassau County Attorney identified John Does #1 and #2 as Defendants Hollingshead and James. (ECF No. 99.) After the parties agreed to mediation, Plaintiff secured pro bono counsel. (ECF Nos. 101, 110.) Armor and Plaintiff agreed to a settlement, and stipulated to a dismissal with prejudice. (ECF No. 116, 118.) After the parties engaged in discovery, Plaintiff filed what he designated as a fourth amended complaint on April 1, 2020.[26] In July 2020, Plaintiff alerted the Court that he

---

[26] The Court notes that the amended complaint filed on April 1, 2020 is titled "Amended Complaint (Fourth)" but is the third amended complaint. (ECF No. 126; *see also* ECF No. 1, Compl.; ECF No. 15, Amended Complaint; ECF No. 21, Amended Complaint.) To avoid confusion, however, the Court will refer to the April 1, 2020 amended complaint as the fourth amended complaint.

identified John Doe #3 through photographs produced during discovery. (ECF No. 150.)

Accordingly, Plaintiff filed the operative fifth amended complaint, including claims against Defendant Ryan, on August 5, 2020.[27] (ECF No. 151.) He asserts the violation of his Fourteenth Amendment rights by (1) a failure to protect and intervene, against Defendants Ryan, Hollingshead, and James; (2) supervisory liability for unsafe conditions at NCCC, against Defendant Sposato; and (3) municipal liability for failure to train and supervise employees, against Nassau County. On March 28, 2022, Defendants moved for summary judgment. (ECF Nos. 215, 216.)

## LEGAL STANDARD

Summary judgment is appropriate when a movant demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.'" *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In deciding the motion, the Court must resolve all

---

[27] The Court notes that the amended complaint filed on August 5, 2020 is titled "Amended Complaint, *Fifth Amended Complaint*" but is the fourth amended complaint. (ECF No. 151; *see also* ECF No. 1, Compl.; ECF No. 15, Amended Complaint; ECF No. 21, Amended Complaint; ECF No. 126, Fourth Amended Complaint.) To avoid confusion, however, the Court will refer to the August 5, 2020 amended complaint as the fifth amended complaint.

ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).

When bringing a motion for summary judgment, the movant carries the burden of demonstrating the absence of any disputed issues of material fact and entitlement to judgment as a matter of law. *Rojas*, 660 F.3d at 104. The movant must point to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It may also indicate the absence of a factual dispute by "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). Put another way, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574,587 (1986).

Once the moving party has met its burden, the nonmoving party "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp.*, 477 U.S. at 322-23). The non-movant cannot rely on the allegations in his or her pleadings,

conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).  In deciding a motion for summary judgment, the Court is not to weigh evidence, assess the credibility of witnesses, or resolve issues of fact. *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994) (citations omitted).

## DISCUSSION

### I.  PLRA Exhaustion

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The statute requires "proper exhaustion" of administrative remedies prior to bringing a federal lawsuit, including "compliance with an agency's deadlines and other critical procedural rules." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 311 (2d Cir. 2020) (citation omitted). The exhaustion requirement is mandatory and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Hill v. Curcione*, 657 F.3d 116, 124 (2d Cir. 2011) (internal quotation marks and citation omitted).

The NCCC provides an administrative remedy through its "Inmate Grievance Program." (ECF No. 188-7, Exhibit 10 ("Pl. Ex. 10") at 9.) NCCC's "Inmate Handbook" states the following regarding the process for filing grievances:

> You may attempt to resolve your complaint in an informal manner with the housing area officers and/or supervisors prior to filing a written (formal) grievance. If the housing area officers and/or supervisors are unable to resolve your complaint, or if you do not wish to attempt to resolve your complaint in an informal manner, you may access the grievance process by completing a Grievance form.

(*Id.*) It further states that inmates "must file a grievance within five (5) days of the date of the act or occurrence leading to the grievance." (*Id.*)

The parties agree that Plaintiff did not file a grievance at NCCC within five days of the alleged assault against Plaintiff. (*See* ECF Nos. 215-4, Nassau County Defs Mem. of Law at 11-12; 215-11, Pl. Mem. at 16-17; 216-2 Def Ryan Mem. of Law at 16.) Defendants assert that Plaintiff's failure to file a grievance within five days constitutes failure to exhaust under the PLRA and bars Plaintiff's action in its entirety. (*See* ECF Nos. 215-4, Nassau County Defs Mem. of Law at 11-12; 216-2 Def Ryan Mem. of Law at 16-17.) Plaintiff counters that he was not a prisoner when the operative complaint (the fifth amended complaint) in this action was filed, and thus the PLRA's exhaustion requirement does not bar his claims. (ECF No. 215-11, Pl. Mem. at 13-14.)

34

## A. Application of the PLRA to Amended Pleadings

"The relevant time at which a person must be 'a prisoner' within the meaning of the PLRA in order for the Act's restrictions to apply is 'the moment the plaintiff files his complaint.'" *Jones v. Cuomo*, 2 F.4th 22, 26 (2d Cir. 2021) (alteration and citation omitted) (concluding plaintiff was not subject to PLRA's exhaustion requirement because he was detained under a civil sex offender confinement statute when he filed his complaint). The Second Circuit has stated that "[t]he natural reading of the text of the PLRA is that, to fall within the definition of 'prisoner,' the individual in question must be *currently detained as a result* of an accusation, conviction, or sentence for a criminal offense." *Id.* at 25. Here, neither party disputes that Plaintiff was a prisoner for the purposes of the PLRA at the time he filed the original complaint in this action, on December 28, 2017, (ECF No. 1, Compl.), and that Plaintiff was released from custody on August 29, 2019. (ECF No. 188-33, Pl. Ex. 45, at 2.) Therefore, he was not incarcerated when he filed the operative complaint, the fifth amended complaint, on August 5, 2020. (ECF No. 151, Fifth Am. Compl.) Accordingly, Plaintiff was not a prisoner for purposes of the PLRA when he filed the operative fifth amended complaint in this action. *See Jones*, 2 F.4th at 25.

The Second Circuit has not yet decided, however, whether the PLRA's exhaustion requirement applies when a plaintiff was a

prisoner at the time of the filing of the original complaint, but is no longer a prisoner when an amended complaint is filed.  There is a split among the circuit courts that have addressed the issue, which the Supreme Court has not yet resolved.  *Compare Garrett v. Wexford Health*, 938 F.3d 69 (3d Cir. 2019) (holding that the PLRA's exhaustion requirement did not apply to a formerly incarcerated plaintiff's amended complaint), *cert. denied* 140 S. Ct. 1611 (2020); *Saddozai v. Davis*, 35 F.4th 705 (9th Cir. 2022) (same); *with Harris v. Garner*, 216 F.3d 970 (11th Cir. 2000) (en banc) (holding that release from prison after a lawsuit was filed was irrelevant to a different PLRA requirement, irrespective of a later amended complaint); *Smith v. Terry*, 491 F. App'x 81 (11th Cir. 2012) (summary order) (applying the holding in *Harris* to the PLRA's exhaustion requirement); *May v. Segovia*, 929 F.3d 1223 (10th Cir. 2019) (holding that PLRA exhaustion applied to any claims brought prior to a plaintiff's release from prison).[28]

---

[28] The Sixth Circuit has discussed the issue, but only as dicta.  In *Cox v. Mayer*, the Sixth Circuit held that lack of PLRA exhaustion barred claims filed by a prisoner plaintiff (and dismissed by the district court for lack of exhaustion) where the plaintiff moved for reconsideration of the district court's dismissal after he was released from prison.  332 F.3d 422 (6th Cir. 2003).  The plaintiff, however, never filed an amended or supplemental complaint after his release.  The plaintiff argued before the Sixth Circuit that he could cure his failure to exhaust by submitting a supplemental complaint under Rule 15(d), now that he was no longer incarcerated.  *Id.* at 428.  The Sixth Circuit determined that the plaintiff had waived this argument by failing to move to amend the pleadings before the district court, but surmised that even if plaintiff had not waived the argument, Plaintiff's proposed supplemental complaint could not cure the failure to exhaust.  *Id.*  In *Mattox v. Edelman*, the Sixth Circuit reexamined *Cox* and noted that its prior conclusion had been non-binding dicta, but stated that the prior decision was "likely correct that Rule 15(d) could not save an action" where PLRA exhaustion had not been met at the time of filing.  851 F.3d 583, 593 (6th Cir. 2017).  Nevertheless, the Sixth

In *Jones v. Bock*, the Supreme Court held that PLRA exhaustion is an affirmative defense.  549 U.S. 199, 212 (2007).  Prior to *Jones*, there was a circuit split as to whether prisoner plaintiffs were required to plead exhaustion in a complaint or whether it fell to defendants to present exhaustion as an affirmative defense. *Id.* at 211.  The Supreme Court noted that (1) Federal Rule of Civil Procedure 8(a) required only a "short and plain statement of the claim"; (2) the PLRA was not the source of any claim; and (3) the PLRA discussed exhaustion extensively but did not discuss pleading.  *Id.* at 212; Fed. R. Civ. P. 8(a).  The PLRA's silence was "strong evidence that the usual practice should be followed," and the "usual practice" was to consider exhaustion as an affirmative defense.  *Jones*, 549 U.S. at 212.  The Supreme Court further explained that "courts should generally not depart from the usual practice under the Federal Rules on the basis of perceived policy concerns."  *Id.*  The Supreme Court also rejected the argument that the PLRA mandated a different pleading standard due to its "screening" function.  *Id.* at 214.  That screening function "[did] not—explicitly or implicitly—justify deviating from the usual procedural practice beyond the departures specified by the PLRA itself."  *Id.*

---

Circuit determined that *Cox* was distinguishable from the facts in *Mattox*, and thus its conclusion that Rule 15(d) "likely" could not correct a prior failure to exhaust is also non-binding dicta.

Circuit courts have cited the Supreme Court's reasoning in *Jones* to hold that PLRA exhaustion does not apply where a plaintiff who was a prisoner at the time of an original complaint files an amended or supplemental complaint after release. In *Jackson v. Fong*, the Ninth Circuit addressed a lawsuit that a prisoner-plaintiff initiated while in custody. 870 F.3d 928, 931 (9th Cir. 2017). The prisoner-plaintiff first had submitted a claim to the California Department of Corrections and Rehabilitation's administrative review process, and appealed the denial of his claim. *Id.* at 931-32. When his appeal was denied, the prisoner-plaintiff sought review both through the administrative process and in federal court: after appealing to the "third and final level of [administrative] review," but before receiving a decision, he filed suit in federal court. *Id.* at 932. Before he received a decision on his still-pending appeal, he was released from custody, and his administrative appeal was closed due to his release. *Id.* He later filed a third amended complaint. *Id.* The district court granted summary judgment to the defendants due to the prisoner-plaintiff's lack of PLRA exhaustion at the time of his original complaint. *Id.*

In *Jackson*, the Ninth Circuit determined that *Jones* had instructed that pleading rules were to be instituted by "established rulemaking procedures" rather than on "a case-by-case basis by the courts." 870 F.3d at 933-34 (citation omitted).

38

Accordingly, the Ninth Circuit looked to the Federal Rules of Civil Procedure for guidance on whether the PLRA's exhaustion requirement barred a formerly incarcerated plaintiff's amended complaint, analyzing the amended complaint as a supplemental complaint under Federal Rule of Civil Procedure 15(d). *Id.* at 934. Because a supplemental complaint, under Rule 15(d), "completely supersede[d] any earlier complaint, rendering the original complaint non-existent and . . . its filing date irrelevant," and because a supplemental complaint could "defeat an affirmative defense applicable to an earlier complaint," a prisoner who was in custody when he initiated an action but who was released prior to filing an amended operative complaint was "not a 'prisoner' subject to a PLRA exhaustion defense." *Id.* at 934, 937.

The Ninth Circuit recently reaffirmed *Jackson*'s holding in *Saddozai v. Davis*. 35 F.4th 705 (9th Cir. 2022). In *Saddozai*, the Ninth Circuit noted that "[b]oth parties agree[d] that Plaintiff had not exhausted his administrative remedies at the time he filed his initial complaint in federal court. The parties also agree[d] that Plaintiff had fully exhausted by the time he filed his third amended complaint," or the operative complaint. 35 F.4th at 708. The Ninth Circuit stated that it had made clear in *Jackson* that the PLRA exhaustion requirement applied "based on when a plaintiff files the operative complaint." *Id.* It was

39

irrelevant that the prisoner-plaintiff in *Jackson* had been released from custody at the time of the operative complaint, whereas the prisoner-plaintiff in *Saddozai* had not been. *Id.* The cure for the initial lack of PLRA exhaustion in *Jackson* was not due to plaintiff's new "status as a non-prisoner," but was "because [he] filed a new operative complaint *at a time when the PLRA exhaustion requirement no longer applied to him*." *Id.* (emphasis added). In *Saddozai*, therefore, what mattered was that the prisoner-plaintiff had added facts concerning administrative exhaustion in his operative complaint. *Id.* at 708-09. The Ninth Circuit considered the operative complaint to be a supplemental complaint under Rule 15 because it added facts relevant to PLRA exhaustion. *Id.* at 709. Because a supplemental complaint "can defeat an affirmative defense applicable to an earlier complaint," the initial lack of PLRA exhaustion—an affirmative defense—was cured by the prisoner-plaintiff's later, operative complaint. *Id.* (internal quotation marks omitted).

In *Garrett v. Wexford Health*, the Third Circuit similarly held that the PLRA's exhaustion requirement did not bar a former prisoner's third and fourth amended complaints, filed after his release. 938 F.3d 69, 88 (3d Cir. 2019). In *Garrett*, the original complaint "acknowledged on the first page . . . that, although [the prisoner-plaintiff] had filed grievances concerning his claims, the grievance process was not complete." *Id.* at 76. He

was later released from custody. *Id.* at 78. When he filed a third amended complaint, post-release, the record showed that he had fully exhausted at least three of his claims prior to his release. *Id.* at 79. After his third amended complaint was dismissed for lack of PLRA exhaustion at the time of the original lawsuit, he filed a fourth amended complaint, which was again dismissed for failure to exhaust. *Id.* at 79-80.

The Third Circuit analyzed the amended complaints under Federal Rules of Civil Procedure 15(a) and 15(d).[29] *Id.* at 81. Regarding Rule 15(a), the Third Circuit stated that "[i]n general, an amended pleading supersedes the original pleading and renders the original pleading a nullity" and that "where a party's status determines a statute's applicability, it is his status at the time of the amendment and not at the time of the original filing that determines whether a statutory precondition to suit has been satisfied."[30] *Id.* at 82. Regarding Rule 15(d), the Rule "expressly provides" that a supplemental complaint may cure a deficient pleading. *Id.* at 83. Because the plaintiff was no longer a

---

[29] The third amended complaint included both "additional claims arising out of the events described in the original complaint" that had not been alleged in prior pleadings, and "new facts and claims that arose only after the filing of the original complaint." *Garrett*, 938 F.3d at 81. The Third Circuit thus determined that the third amended complaint was both an amended complaint and a supplemental complaint. *Id.*

[30] The Third Circuit acknowledged, however, that even where an original pleading has been superseded by an amended pleading, the original pleading maintains some effect: "an amended pleading still may relate back to the filing date of the original pleading for statute of limitations purposes." *Garrett*, 938 F.3d at 82 n.18.

prisoner at the time of filing of the third amended complaint, he was no longer subject to the PLRA exhaustion requirement. *Id.* at 84. Though the third amended complaint in *Garrett* did not explicitly allege that the plaintiff was not a prisoner at the time of its filing, it was "obvious" from the face of the third amended complaint that he was not. *Id.* at 84 n.20. Therefore, the third amended complaint cured the lack of PLRA exhaustion at the filing of the original complaint. *Id.* at 84. The Third Circuit noted that *Jones* supported this holding because *Jones* "teaches . . . that the usual procedural rules apply to PLRA cases unless the PLRA specifies otherwise." *Id.* at 87.

Other circuit courts, however, reject the premise that a post-release amended complaint cures a plaintiff's prior failure to exhaust his or her claims under the PLRA. In *Harris v. Garner*, the Eleventh Circuit held that the plain meaning of the word "brought" in the PLRA meant "commenced"; a PLRA requirement that no action for mental injury could be "brought" by a prisoner without a prior showing of physical injury thus applied to a lawsuit filed by a prisoner but decided after the prisoner's release. 216 F.3d 970 (11th Cir. 2000) (en banc); *see* 42 U.S.C. § 1997e(e). Further, the Eleventh Circuit noted that if there "were a conflict between [Rule 15] and the PLRA, the rule would have to yield to the later-enacted statute." *Id.* at 982. Rule

15 "[could] not overrule a substantive requirement or restriction contained in a statute." *Id.* at 983.

In a later unpublished opinion, *Smith v. Terry*, the Eleventh Circuit explicitly extended *Harris*'s reasoning to the PLRA's exhaustion requirement.  491 F. App'x 81, 83 (11 Cir. 2012) (per curiam).  In *Smith*, a prisoner-plaintiff filed a complaint in federal court after submitting a claim for administrative review, but before receiving a decision on his appeal of the initial denial of his claim.  *Id.* at 82.  He then filed a supplemental complaint after receiving the denial of his appeal, and argued that his supplemental complaint cured the original lack of PLRA exhaustion. *Id.*  The Eleventh Circuit stated that the "only facts pertinent to determining whether a prisoner has satisfied the PLRA's exhaustion requirement are those that existed when he filed his original complaint," and thus any supplemental complaint could not cure a PLRA exhaustion defect.  *Id.* at 83.

In *May v. Segovia*, the Tenth Circuit similarly held that a plaintiff's failure to exhaust claims under the PLRA barred his claims despite plaintiff's filing of a second amended complaint after his release from prison.  929 F.3d 1223 (10th Cir. 2019). In *May*, the prisoner-plaintiff filed a complaint in federal court, and then moved for leave to file a second amended complaint after the parties moved for summary judgment.  *Id.* at 1225-26.  The district court granted the motion for leave to amend, but not until

43

six months had passed, during which time the plaintiff had been released from custody.  *Id.* at 1226.  The claims in the second amended complaint were later dismissed, *inter alia*, for lack of PLRA exhaustion at the time of the initial complaint.  *Id.*

The Tenth Circuit reasoned that an amended complaint does not render an original complaint inoperative for all purposes: an "amended complaint, as the operative complaint, supersedes the original complaint's *allegations* but not its *timing*."  *Id.* at 1229. Because exhaustion is an affirmative defense and not a pleading requirement, the "question under the PLRA [was] the timing of the claim alleged, not the sufficiency of the allegations."  *Id.* Therefore, the Tenth Circuit held that PLRA exhaustion could not be cured by an amended complaint: later, superseding allegations would not change the fact that a plaintiff was a prisoner at the time he first "brought" an unexhausted claim.  *Id.*

As noted above, the Second Circuit has not decided whether a lack of PLRA exhaustion bars an amended or supplemental complaint filed by a non-prisoner plaintiff where the original complaint was filed while the plaintiff was in custody.  The few courts in this Circuit to address the issue have yielded opposite conclusions.[31] *Compare Ojo v. United States*, No. 15-CV-6089 (ARR), 2018 WL

---

[31] This Court recently found that a plaintiff who was a prisoner at the time he filed a complaint was subject to PLRA exhaustion despite his later release from custody.  *See Johnson v. Santiago*, No. 20-CV-6345 (KAM), 2022 WL 3643591, at *5 (E.D.N.Y. Aug. 24, 2022).  Because the plaintiff in *Johnson* did not file an amended complaint, however, this Court did not address the issue presented here.

3863441, at *8 n.5 (E.D.N.Y. Aug. 14, 2018) (rejecting defendants'
argument about plaintiff's "end run" around the PLRA and noting
that "federal courts have found that the PLRA's exhaustion
requirement does not apply when a plaintiff files suit while
incarcerated but later amends the complaint after release"); *with
Makell v. Cnty. of Nassau*, No. 19-CV-6993 (BMC), 2022 WL 1205096,
at *3 (E.D.N.Y. Apr. 22, 2022) (reasoning that amended complaints
override original complaints "only regarding the determination of
whether the amended complaint states a plausible claim" and that
an original complaint "continues to have force and effect for all
other purposes").

This Court analyzes the application of the PLRA's exhaustion
requirement following the Supreme Court's instructions in *Jones*
that "courts should generally not depart from the usual practice
under the Federal Rules on the basis of perceived policy concerns
[in the PLRA]." 549 U.S. at 212. The PLRA "deal[s] extensively
with the subject of exhaustion" but, similarly to *Jones*, "is
silent" on the issue of whether an action is "brought" by a
plaintiff at the time of the filing of the original complaint or
at the time of the filing of the operative complaint. *Id.*; §
1997e(a). As in *Jones*, therefore, although there is "no question"
that PLRA exhaustion is generally mandatory, the PLRA exhaustion
requirement does not override the "usual practice" under Federal
Rule of Civil Procedure 15, as discussed below. 549 U.S. at 211-

12 (finding that where the PLRA is silent on an issue, the "usual practice should be followed").

Federal Rule of Civil Procedure 15 allows parties to amend or supplement their pleadings, including complaints. *See* Fed. R. Civ. Pro. 15.  Rule 15(a) allows plaintiffs to amend their complaints, under certain conditions. *See id.*  The "usual practice" for such amended complaints is that they render null any prior complaint. *See Pettaway v. Nat'l Recovery Sols.*, LLC, 955 F.3d 299, 303 (2d Cir. 2020) ("An amended pleading ordinarily supersedes the original and renders it of no legal effect."); *see also Unclaimed Prop. Recovery Serv., Inc. v. Kaplan*, 734 F.3d 142, 145 (2d Cir. 2013) (noting that defendants "marshal no legal authority to support the proposition that the author of a complaint may apply [substantive copyright] law to interfere with the course of litigation by allowing the filing of a complaint but disallowing the creation and filing of an amended version of that complaint"). Rule 15(d), by contrast, allows plaintiffs to file a supplemental complaint "setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. Pro. 15(d).  Courts have noted repeatedly that a supplemental complaint "can defeat an affirmative defense applicable to an earlier complaint." *Saddozai*, 35 F.4th at 709 (citing *Jackson*, 870 F.3d at 934); *cf. Mathews v. Diaz*, 426 U.S. 67, 75 (1976) (holding that a supplemental complaint cured a

46

failure to exhaust under 42 U.S.C. § 405(g)); *Black v. Sec'y of Health & Hum. Servs.*, 93 F.3d 781, 790 (Fed. Cir. 1996) ("[D]efects in a plaintiff's case—even jurisdictional defects—can be cured while the case is pending if the plaintiff obtains leave to file a supplemental pleading under Rule 15(d) reciting post-filing events that have remedied the defect.").

It is true that, as the Eleventh Circuit stated in *Harris*, Rule 15 "[could] not override a substantive requirement or restriction contained in a statute." 216 F.3d at 983.  As noted above, however, the PLRA does not contain substantive restrictions on the filing of amended or supplemental complaints under Rule 15. Section 1997e(a) states that "no action shall be brought" by prisoners, which some courts have found overrides the possibility of former prisoners filing amended or supplemental pleadings under Rule 15.  *See Makell*, 2022 WL 1205096, at *4.  But the Supreme Court stated in *Jones* that the PLRA's phrasing, "no action shall be brought," is "boilerplate language" that should be interpreted as applying to *claims*, not entire actions.  549 U.S. at 220 (noting that statutes of limitations are often introduced with similar phrasing but bar only individual claims, not entire complaints). In *Jones*, such boilerplate language meant that an entire action was not barred by the lack of PLRA exhaustion (which would depart from usual statutory interpretation); rather, individual claims might be.  *Id.*  Given that the boilerplate language "no action

shall be brought" did not require "depart[ing] from usual practice" in *Jones*, the same language does not require a departure from Rule 15 here.  *Id.*

Here, the Court considers Sanchez's fifth amended complaint to be an amended complaint under Rule 15(a), as it replaced defendant "John Doe 3" with Defendant Ryan.[32]  (*See* ECF Nos. 1, 15, 21, 126, 151.)  As in *Saddozai*, the Court also considers the fifth amended complaint to be a supplemental complaint under Federal Rule of Civil Procedure 15(d) because it added facts "that happened after the date of the pleading to be supplemented."  Fed. R. Civ. P. 15(d); *see Saddozai*, 35 F.4th at 709.  The fifth amended complaint alleged that Plaintiff "is presently employed as a construction worker," thus adding facts relevant to PLRA exhaustion that occurred after the date of the original complaint. *See Garrett*, 938 F.3d at 84 (finding it "obvious" from the face of the operative amended and supplemental complaint that plaintiff was a non-prisoner and thus the lack of PLRA exhaustion at the time of the initial complaint was cured).

As stated above, a supplemental complaint can cure defects from a prior complaint.  *See Saddozai*, 35 F.4th at 709; *Travelers Ins. Co. v. 633 Third Assoc.*, 973 F.2d 82, 87-88 (2d Cir. 1992) (finding that district court could grant leave to amend even though

_____

[32] Prior to the fifth amended complaint, Plaintiff identified Defendant Ryan as "John Doe 3" through photographs provided by Nassau County Defendants.  (*See* 07/08/2020 Order; ECF No. 150.)

original pleading was defective for purposes of standing); *see also* Wright, Miller, & Kane, *Federal Practice and Procedure*: *Civil 3d § 1507*, pg. 273 ([E]ven though [Rule 15(d)] is phrased in terms of correcting a deficient statement of 'claim' or a 'defense,' a lack of subject-matter jurisdiction should be treated like any other defect for purposes of defining the proper scope of supplemental pleading.").

Indeed, the Supreme Court addressed a similar issue in *Mathews v. Diaz*, wherein a plaintiff had failed to exhaust procedures for his Medicare application, as required by 42 U.S.C. § 405(g), until after an amended complaint had been filed joining him to an action. 426 U.S. at 71-72. In holding that the initial failure to exhaust could be cured by a supplemental pleading, the Supreme Court stated:

> Although 42 U.S.C. § 405(g) establishes filing of an application as a nonwaivable condition of jurisdiction, [the plaintiff] satisfied this condition while the case was pending in the District Court. A supplemental complaint in the District Court would have eliminated this jurisdictional issue; since the record discloses, both by affidavit and stipulation, that the jurisdictional condition was satisfied, it is not too late, even now, to supplement the complaint to allege this fact.

*Id.* at 75; *see also Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007) ("[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction.").

In *May*, the Tenth Circuit stated that *Diaz*'s holding does not apply in the context of PLRA exhaustion.  929 F.3d at 1229.  The Tenth Circuit noted that the exhaustion requirement in 42 U.S.C. § 405(g), "like all jurisdictional exhaustion requirements," required, in *Diaz*, a "pleading requirement that [could] be satisfied only by changing the allegations in the complaint."  *Id.* Because PLRA exhaustion is an affirmative defense, and therefore is *not* a pleading requirement that could be satisfied by changing allegations in a complaint, the Tenth Circuit concluded that *Diaz* does not support the argument that a supplemental complaint can cure PLRA exhaustion.[33]  *Id.*

This Court respectfully disagrees.  Several months before *Diaz*, the Supreme Court stated in *Mathews v. Eldridge* that § 405(g) exhaustion contained a two-part analysis.  424 U.S. 319 (1976). The Supreme Court held in *Eldridge* that § 405(g) "consists of two elements, only one of which is purely 'jurisdictional' in the sense that it cannot be 'waived'": the non-waivable, jurisdictional element was the requirement that a "claim for benefits shall have been presented to the Secretary [of Health, Education and Welfare]," whereas the "waivable element is the requirement that the administrative remedies prescribed by the Secretary [for such a claim] be exhausted."  *Eldridge*, 424 U.S. at 328.  In other

---

[33] The Ninth Circuit and Third Circuit, in contrast, cite *Diaz* in support of their holdings that a supplemental pleading can cure PLRA exhaustion.  *See Jackson*, 870 F.3d at 934; *Garrett*, 938 F.3d at 83.

words, it was a jurisdictional requirement that a plaintiff *file* a claim before the agency before initiating a lawsuit, but it was a non-jurisdictional requirement that the plaintiff pursue all remedies for that claim before the lawsuit. Further, in *Diaz*, when the Supreme Court discussed how a supplemental complaint could cure a failure to exhaust under § 405(g), it discussed both the non-waivable, jurisdictional element of the statute (filing a claim for benefits with the Secretary) and the waivable, non-jurisdictional element (exhaustion of that claim). 426 U.S. at 75-76.

In *May*, as noted above, the Tenth Circuit distinguished PLRA exhaustion from § 405(g) exhaustion by stating that the latter was jurisdictional and could be cured by changing allegations in a supplemental complaint, whereas a lack of PLRA exhaustion was an affirmative defense and thus could not be so cured. 929 F.3d at 1229. But *Eldridge* and *Diaz* both confirm that § 405(g) exhaustion includes a waivable, non-jurisdictional element; indeed, in *Diaz*, the Supreme Court used the word "allege" and "allegations" when referencing both the non-waivable, jurisdictional element and the waivable, non-jurisdictional element of the § 405(g) exhaustion analysis. *Compare Diaz*, 426 U.S. at 75 (finding that because "the jurisdictional condition [of filing a claim] was satisfied, it is not too late . . . to supplement the complaint to allege [that] fact,"), *with Diaz*, 426 U.S. at 76 (noting that certain

"allegations did not satisfy the exhaustion requirements of §
405(g)."). Accordingly, the distinction created by the Tenth
Circuit in *May*—that *Diaz* establishes that a jurisdictional defect
(such as lack of § 405(g) exhaustion) may be cured by a
supplemental complaint because it is based on the initial pleading,
but a non-jurisdictional affirmative defense (such as lack of PLRA
exhaustion) may not—loses meaning.

Further, courts *do* recognize the allegations in amended and
supplemental complaints for at least limited purposes when
considering PLRA exhaustion. Otherwise, a plaintiff could not use
allegations in an amended complaint to establish that
administrative remedies were "unavailable," the narrow exception
to PLRA exhaustion recognized by the Supreme Court. *See Ross v.
Blake*, 578 U.S. 632, 648 (2016). It is true that plaintiffs need
not plead exhaustion in a complaint and that defendants must assert
PLRA exhaustion as an affirmative defense. *Jones*, 549 U.S. at
216. But courts regularly rely on the facts asserted in amended
and supplemental complaints to determine if PLRA exhaustion has
been met, once the affirmative defense is raised. *See, e.g.,
Rucker v. Giffen*, 997 F.3d 88, 90, 93 (2d Cir. 2021) (concluding
that exhaustion was "unavailable" to plaintiff based on
allegations in amended complaint). Indeed, albeit in dicta, the
Supreme Court has noted that a defect in PLRA exhaustion in an
original complaint "was arguably cured" by later amended

complaints—supporting the conclusion that courts may assess PLRA exhaustion as of the date of the filing of an operative amended complaint. *See Ramirez v. Collier*, 142 S. Ct. 1264, 1276 (2022) (citing *Rhodes v. Robinson*, 621 F.3d 1002, 1005 (9th Cir. 2010) ("As a general rule, when a plaintiff files an amended complaint, the amended complaint supercedes[sic] the original, the latter being treated thereafter as non-existent.")).

Accordingly, this Court concludes that Plaintiff is not barred by the PLRA exhaustion requirement. The Second Circuit recognizes that plaintiffs who file actions "after release from confinement are no longer 'prisoners' for purposes of § 1997e(a) and . . . need not satisfy the exhaustion requirements of [that] provision." *Greig v. Goord*, 169 F.3d 165, 167 (2d Cir. 1999). Importantly, it is not Plaintiff's "status as a non-prisoner that cure[s] the initial lack of exhaustion." *Saddozai*, 35 F.4th at 708. Instead, it is because Plaintiff has "filed a new operative complaint at a time when the PLRA exhaustion requirement no longer applie[s] to him"—Plaintiff was released from custody on August 29, 2017, prior to filing the operative fifth amended complaint. (ECF No. 188-33, Pl. Ex. 45, at 2; ECF No. 151, Fifth Am. Compl.)

Defendants argue that the PLRA bars Plaintiff's action, but only briefly address whether PLRA exhaustion may be assessed at the time of Plaintiff's filing of an operative amended complaint. Nassau County Defendants contend that an amended complaint cannot

53

cure a defect in exhaustion, but do not cite any controlling legal authority in support of this assertion. (ECF No. 215-15, Nassau County Defs. Reply Mem. of Law, at 1.) Defendant Ryan argues that *Berry v. Kerik*, 366 F.3d 85 (2d Cir. 2004), precludes the conclusion that PLRA exhaustion may be assessed relative to an amended complaint. (ECF No. 216-4, Def. Ryan Reply Mem. of Law, at 7.) He argues that the PLRA exhaustion analysis in *Berry* turned "on whether a plaintiff [was] a confined prisoner at the time he files suit." (*Id.*) *Berry*, however, is distinguishable. The alleged mistreatment that the *Berry* plaintiff suffered occurred in 1998, and he was released from custody in 1999. 366 F.3d at 86–87. After his release, however, he *returned* to custody after being arrested for larceny. *Id.* at 87. While incarcerated on the subsequent larceny charge, he filed two § 1983 lawsuits concerning mistreatment that allegedly occurred during his prior term of custody. *Id.* The Second Circuit stated that "[b]ecause [the plaintiff] was a confined prisoner at the time he filed his lawsuits, [S]ection 1997e(a) is applicable." *Id.* at 87. Significantly, an amended complaint was never filed by the plaintiff in *Berry*. In contrast, although Plaintiff was incarcerated at the time of the original complaint, he was *not* incarcerated when he filed the operative fifth amended complaint. Accordingly, *Berry* does not control.

54

## B. Availability of PLRA Exhaustion

Even if the Court assumes that PLRA exhaustion can be assessed only as of the filing date of the original complaint, however, lack of exhaustion could not be decided on summary judgment in this case. "Under the PLRA, a prisoner need exhaust only 'available' administrative remedies." *Ross*, 578 U.S. at 638. The Supreme Court has established "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief," and thus is unavailable to exhaust. *Id.* at 643. An administrative remedy may be unavailable when (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Lucente* , 980 F.at 311 (quoting *Williams v. Priatno*, 829 F.3d 118, 123-24 (2d Cir. 2016) (quoting *Ross*, 578 U.S. at 643-44)).

Once a defendant meets the "burden of establishing the existence and applicability of the grievance policy," the plaintiff bears the burden of establishing *de facto* unavailability. *Saeli v. Chautauqua Cnty.*, NY, 36 F.4th 445, 453 (2d Cir. 2022). Availability of administrative procedures is determined objectively: the Court asks if "a similarly situated

individual of ordinary firmness [would] have deemed them available." *Lucente*, 980 F.3d at 311-12 (quoting *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004), *abrogated on other grounds by Ross*, 578 U.S. at 637, 643)).

Often, however, courts must analyze disputed facts when assessing the availability of remedies for purposes of PLRA exhaustion. Every circuit to consider the issue, including the Second Circuit, has held that judges may address factual disputes relevant to PLRA exhaustion without the participation of a jury. *See Messa v. Goord*, 652 F.3d 305, 3009 (2d Cir. 2011) (per curiam); *Lee v. Willey*, 789 F.3d 673, 678 (6th Cir. 2015); *Small v. Camden Cnty.*, 728 F.3d 265, 271 (3d Cir. 2013); *Dillon v. Rogers*, 596 F.3d 260, 272 (5th Cir. 2010); *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008); *Bryant v. Rich*, 530 F.3d 1368, 1373-77 (11th Cir. 2008); *Wyatt v. Terhune*, 315 F.3d 1108, 1119-20 (9th Cir. 2003), *overruled on other grounds by Albino v. Baca*, 747 F.3d 1162, 1166, 1170-71 (9th Cir. 2014); *see also Carbajal v. McCann*, 808 F. App'x 620, 639 (10th Cir. 2020) (summary order). Although "a § 1983 suit seeking legal relief is an action at law within the meaning of the Seventh Amendment," *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709, (1999), and thus the Seventh Amendment right to a jury trial generally applies, "not every factual issue that arises in the course of a litigation is triable to a jury as a matter of right," especially those regarding

"[m]atters of judicial administration."  *Willey*, 789 F.3d at 678 (internal quotation marks omitted).

The majority of circuit courts to address the issue, however, have held that district courts may only decide factual disputes relevant to PLRA exhaustion "that are not bound up with the merits of the underlying dispute."  *Messa*, 652 F.3d at 309 ("[T]he factual disputes relating to exhaustion are not intertwined with the merits of [plaintiff's] underlying excessive force claim."); *Willey*, 789 F.3d at 678 n.3 (noting that "the factual disputes concerning exhaustion were not intertwined with the merits of Lee's underlying Eighth Amendment claim"); *Small*, 728 F.3d at 270 ("[T]he Seventh Amendment is not implicated as long as the facts are not bound up with the merits of the underlying dispute."); *Dillon*, 596 F.3d at 272 n.2 ("We do not determine today who should serve as factfinder when facts concerning exhaustion also go to the merits of a prisoner's claim.").

Here, the factual disputes relevant to PLRA exhaustion go to and are inextricably entangled with the merits of Plaintiff's underlying claims.  As noted above, the parties do not dispute (1) that the NCCC provides an administrative remedy through its "Inmate Grievance Program," which requires inmates to file a grievance within five days; or (2) that Plaintiff failed to do so within five days of the alleged assault.  [ECF No. 188-7, Pl. Ex. 10 at 9; ECF Nos. 215-4, Nassau County Defs Mem. of Law at 11-12; 215-

57

11, Pl. Mem. in Opp. at 16-17; 216-2 Def Ryan Mem. of Law at 16.]
The parties dispute, however, whether the ability to file a
grievance was "available" to Plaintiff.

Plaintiff argues that the grievance process was unavailable
because of intimidation by prison staff. *See Lucente*, 980 F.3d at
312 ("[W]e have noted that 'threats or other intimidation by prison
officials may well deter a prisoner of ordinary firmness from
filing an internal grievance, but not from appealing directly to
individuals in positions of greater authority within the prison
system, or to external structures of authority such as state or
federal courts') (quoting *Hemphill*, 380 F.3d at 688)). He asserts
that (1) he had filed and settled a prior lawsuit against NCCC
corrections officers based on a 2007 incident involving excessive
force against a detainee; (2) partially in retaliation, Defendant
Ryan loudly called him a 'snitch' several times within the hearing
of other inmates; (3) shortly after being called a snitch, he was
slashed across the face and beaten by other inmates in front of
Defendants Hollingshead and James, who did not intervene; (4) he
was later told by different corrections officers that "things come
full circle" and "you should learn to keep your mouth shut"; (5)
he was interviewed by law enforcement about the assault in a room
with windows where many other inmates could see him, and he advised
the law enforcement officers of his concerns about safety; and (6)
he filed grievances and a lawsuit upon his transfer to a different

58

facility, where he did not fear repercussions.  (ECF No. 215-11, Pl. Mem. in Opp. at 16-18; ECF No. 188, Millson Declaration, at ¶ 52; Exhibit 63, Audio Recording: May 11, 2018 Interview of Pierre Sanchez by Internal Affairs Unit ("Ex. E") at 02:35-02:45); ECF No. 40, Ex. 51 at 214:18-215:10.)

Defendants agree that Plaintiff settled a lawsuit with NCCC staff concerning a 2007 incident, but dispute the other facts that Plaintiff asserts in support of his argument that administrative remedies were unavailable due to intimidation by prison officials. (ECF No. 215-4, Nassau County Defs Reply at 1-4; ECF No. 196, County Defs. Reply 56.1 at ¶¶ 282, 290-293, 353-54, 384; ECF No. 216-2, Def Ryan Mem. of Law at 16-20; ECF No. 194, Def. Ryan Reply 56.1 at ¶¶ 196-202.)  Nassau County Defendants argue that Plaintiff has changed his assertions surrounding the alleged assault, and that he initially "told investigators that he did not want to pursue the matter," meaning that administrative remedies were available to him.  (ECF No. 215-4, Nassau County Defs. Reply at 2.)  Defendant Ryan contends that Plaintiff asserts only a "generalized fear of retaliation," which is insufficient to establish that administrative remedies were unavailable.  (ECF No. 216-2, Def Ryan Mem. of Law at 16-20).

The above disputed facts—including whether Defendant Ryan twice called Plaintiff a 'snitch' within the hearing of other detainees, and whether Defendants Hollingsworth and James ignored

Plaintiff during the alleged assault—go straight to the merits of Plaintiff's underlying failure to protect claims against Defendants Hollingsworth, James, and Ryan. Because of this "peculiarity . . . [of] overlap between the factual issues relating to exhaustion and those relating to the merits" in this case, the Seventh Amendment may be implicated. *Pavey*, 544 F.3d at 741-42. In similar circumstances, courts in this Circuit have determined that "a jury should find the facts that will determine the exhaustion issue" where "resolution of the exhaustion question at the summary judgment stage would run perilously close to resolving disputed issues of material facts on the plaintiff's substantive . . . claim."[34] *Daum v. Doe*, No. 13-CV-88(LV), 2016 WL 3411558, at *2 (W.D.N.Y. June 22, 2016) (adopting report and recommendation) (internal quotation marks omitted); *see also Stephens v. Venetozzi*, No. 13-CV-5779 (RA), 2020 WL 7629124, at *3-4 (S.D.N.Y. Dec. 21, 2020) (concluding that where "the factual issues underlying the availability of administrative remedies are plainly

_____

[34] In similar circumstances in *Pavey*, the Seventh Circuit determined that "any finding that the judge makes, relating to exhaustion, that might affect the merits may be reexamined by the jury if—and only after—the prisoner overcomes the exhaustion defense and the case proceeds to the merits." 544 F.3d at 742. The Seventh Circuit further stated that the appropriate sequence would be for the district court to conduct a hearing on exhaustion; where "the failure to exhaust was innocent" because of the unavailability of administrative remedies, the plaintiff "must be given another chance to exhaust." *Id.* In this case, however, the Seventh Circuit's approach would lead to an odd and contradictory result: Plaintiff is no longer in custody, and thus cannot now exhaust his claim, even if the Court finds that lack of PLRA exhaustion is excused due to the unavailability of administrative remedies. Accordingly, the Court follows the lead of other district courts in the Second Circuit and determines that material disputed facts relevant to the availability of PLRA exhaustion must be decided by a jury.

intertwined with Plaintiff's substantive claim . . . the Court will leave it to the jury to determine the factual issues."); *Rickett v. Orsino*, No. 10-CV-5152 (CS)(PED), 2013 WL 1176059, at *23 (S.D.N.Y. Feb. 20, 2013), *report and recommendation adopted*, 2013 WL 1155354 (S.D.N.Y. Mar. 21, 2013) (concluding that "the exhaustion-related factual disputes are not amenable to pre-trial resolution because the facts pertaining to Plaintiff's exhaustion excuses *are* intertwined with the merits of his underlying claims"). Accordingly, the Court concludes that the disputed facts concerning the availability of administrative remedies for purposes of PLRA exhaustion cannot be decided on summary judgment.

## II.  Section 1983

Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42 U.S.C. § 1983.  Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). *See also Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999).  To maintain a Section 1983 claim, a plaintiff must allege two elements.  First, "the conduct

complained of must have been committed by a person acting under color of state law." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994) (citation omitted).    It is undisputed that the Defendants were acting under color of state law. (*See*, *e.g.*, County Defs. 56.1 at ¶¶ 8-11; Pl. Resp. County Defs. 56.1 at ¶¶ 8-11.)  Second, "the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Id.  See also McCugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014).

To prevail on a Section 1983 claim against an individual defendant, a plaintiff also must overcome the doctrine of qualified immunity, which protects government officials from civil damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted).  Courts assess qualified immunity through a two-part inquiry: (1) "whether the facts, viewed in the light most favorable to the plaintiff, show that [a government] official's conduct violated a constitutional right"; and (2) "whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011) (alterations, citations, and internal quotation marks omitted).  "A right is 'clearly established' when the contours of the right are sufficiently clear

62

that a reasonable official would understand that what he is doing violates that right." *Reyes v. Fischer*, 934 F.3d 97, 103 (2d Cir. 2019) (alterations, citation, and internal quotation marks omitted).  The Supreme Court has clarified that courts may exercise discretion in deciding the order in which to conduct the qualified immunity analysis.  *Id.* (citing *Pearson*, 555 U.S. at 241). Further, where "there remains a genuine factual dispute, the existence of qualified immunity cannot be determined until the factual dispute is resolved." *Franco v. Gunsalus*, 972 F.3d 170, 174 (2d Cir. 2020).  "At the summary judgment stage, a claim may be dismissed on qualified immunity grounds only when a court finds that an official has met his or her burden of demonstrating that no rational jury could find these two prongs to be satisfied." *Liverpool v. Davis*, 442 F. Supp. 3d 714, 733 (S.D.N.Y. 2020) (citing *Coolick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012)).

### A. Failure to Protect[35]

"Prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (internal quotation marks and citation omitted).   Not every injury, however, "translates into

---

[35] This Court separately analyzes Plaintiff's failure to protect and failure to intervene claims, although the parties do not do so.  The claims are distinct, even though both claims require a showing that an officer "acted with "deliberate indifference to a substantial risk of serious harm" to an inmate or detainee.  *Compare McDaniel v. City of New York,* No. 19-CV-8735(KPF)(RWL), 2022 WL 421122, at *10 (S.D.N.Y. Feb. 11, 2022), *with House*, 2020 WL 6891830 at 11.

constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834.  In *Darnell v. Pineiro*, the Second Circuit held that pretrial detainees' "claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment," which is the standard for convicted prisoners.  849 F.3d 17, 29 (2d Cir. 2017).  Because pretrial detainees have not been convicted of a crime, they "may not be punished in any manner—neither cruelly and unusually nor otherwise." *Id.* (internal quotations and citations omitted); *see also House v. City of New York*, No. 18-CV-6693 (PAE)(KNF), 2020 WL 6891830, at *11 (S.D.N.Y. Nov. 24, 2020).  Failing to protect a pretrial detainee from assault rises to the level of a constitutional violation of the Fourteenth Amendment only where an official acted with "deliberate indifference to a substantial risk of serious harm" to the detainee. *Id.* at 836 (internal quotation marks omitted) (citations omitted).

To establish deliberate indifference for a failure to protect claim, a plaintiff must satisfy a "two-prong test comprised of both objective and subjective standards." *McDaniel v. City of New York*, No. 19-CV-8735 (KPF)(RWL), 2022 WL 421122, at *6 (S.D.N.Y. Feb. 11, 2022) (adopting report and recommendation).  For the objective prong, the plaintiff must show that "the challenged conditions were sufficiently serious to constitute objective

64

deprivations of the right to due process." *Darnell*, 849 F.3d at 29; *see also Fredricks v. Parrilla*, No. 20-CV-5738 (AT) (JLC), 2022 WL 3053654, at *7 (S.D.N.Y. Aug. 3, 2022), *report and recommendation adopted* 2022 WL 4227077, at *1 (S.D.N.Y. Sept. 13, 2022). For the subjective prong, the plaintiff must also establish that the "officer acted with at least deliberate indifference to the challenged conditions," which, in the context of the Fourteenth Amendment, means that he or she "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35; *see also Vega v. Semple*, 963 F.3d 259, 273–74 (2d Cir. 2020).

   i.   **Defendant Ryan**

Defendant Ryan primarily argues that Plaintiff is unable to establish a failure to protect claim because Plaintiff's alleged interactions with Ryan never happened and Defendant Ryan never called Plaintiff a snitch. (ECF No. 216-2, Def Ryan Mem. of Law at 10-12.)

These assertions, however, are disputed material facts that cannot be resolved by the Court at summary judgment. Defendant Ryan's and Plaintiff's deposition testimony are directly at odds as to whether Defendant Ryan encountered Plaintiff or called him

a snitch.  (*Compare* ECF No. 188-40, Ex. 51 at 110:6-111:4, 114:16-
114:23, *with* ECF No. 188-48, Ex. 60 at 134:12-134:23.)  Defendant
Ryan contends that, regardless of that central factual dispute,
Plaintiff made "only vague and conclusory statements and fails to
sufficiently support or corroborate" his claims.  (ECF No. 216-2,
Def Ryan Mem. of Law at 12.)  Plaintiff's deposition testimony,
however, was neither vague nor conclusory.  He testified to the
alleged incident in detail, as shown by the following excerpt:

> When he was walking past my cell, I asked him if I could
> get on the food cart when it was possible. He said,
> let me go check it out. Then he went and finished his round.
> Then I didn't see him for a while. When he did his next
> round . . . when he walked past my cell, I wasn't paying
> attention to outside my cell at that point . . . I didn't
> hear the first thing he said, but he blurted out snitch
> at the end of when he was walking past my cell. There
> was one other time that -- and this was a couple of weeks
> after that, but there was another time that he was
> standing by the television, and he walked by . . . and
> he looked right at me in front of a couple of inmates
> standing around the television, and he looked right at
> me and called me a snitch and kept moving. Everybody
> looked at me when he called me a snitch.

(ECF No. 188-40, Ex. 51 at 114:11-115:9.)  Plaintiff also
testified that after Defendant Ryan called him a snitch,
"people start[ed] filtering away from me.  It's not, like, a
mass incident, it's like they ran away from me, but as I'm
standing there, I could feel people, like, moving away from
me."  (ECF No. 188-47, Ex. 59 at 114:13-114:24.)

Such deposition testimony is admissible for purposes of
summary judgment under Federal Rule of Civil Procedure 56(c).

Further, the testimony is supported by Plaintiff's statements to an IAU investigator in the May 2018 IAU interview, where he stated, *inter alia*, that "[the assault] happened because of a situation that happened in front of other inmates with me and another guard . . . [corrections officers] that were on during the day the slashing happened, were referring to me as a snitch." (Ex. 63 at 00:46-1:05.)  The Court has no position as to Plaintiff's or Defendant Ryan's credibility, and issues no finding regarding whether Defendant Ryan encountered Plaintiff in the manner described in Plaintiff's testimony.  When taking the record as a whole, however, and by making determinations of credibility, a rational jury *could* find that Defendant Ryan called Plaintiff a snitch in front of other detainees and thus placed him at risk of harm.  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see Quezada v. Roy*, No. 14-CV-4056 (CM), 2017 WL 6887793, at *15 (S.D.N.Y. Dec. 14, 2017) (finding triable issue of fact, based on Plaintiff's deposition testimony, "as to whether prison employees referred to [plaintiff] as a snitch in front of other inmates").

If a rational fact finder resolved these disputed issues of fact in Plaintiff's favor, Plaintiff would be able to establish a failure to protect claim as a matter of law.  The objective prong of a Fourteenth Amendment failure to protect claim requires Plaintiff to establish that conditions were "sufficiently serious" to trigger constitutional protection.  Courts in this Circuit have

found that "when an inmate is the victim of an undisputedly unprovoked attack, sufficiently severe injuries may constitute per se showings of a sufficiently serious condition of confinement." *Gordon v. Drummond*, No. 19-CV-8405(GBD)(GWG), 2021 WL 5314604, at *7 (S.D.N.Y. Nov. 16, 2021) (alterations and citations omitted), *report and recommendation adopted*, 2022 WL 884971 (S.D.N.Y. Mar. 25, 2022); *see also House*, 2020 WL 6891830, at *13 (collecting cases where victims were subjected to unprovoked attacks and thus met objective prong); *Warren v. Goord*, 579 F. Supp. 2d 488, 491, 494 (S.D.N.Y. 2008), *aff'd*, 368 F. App'x 161 (2d Cir. 2010) (where inmate watching television was attacked with a razor by another inmate, resulting in a three-inch face wound and stitches); *Knowles v. N.Y.C. Dep't of Corr.*, 904 F. Supp. 217, 221 (S.D.N.Y. 1995) (finding that objective prong was "easily satisfie[d]" after plaintiff's "face [was] suddenly and unexpectedly slashed with a sharp instrument possessed by a fellow inmate" resulting in a "deep cut to his face"); *see King v. Dep't of Correction*, No. 95-CV-3057 (JGK), 1998 WL 67669, at *5 (S.D.N.Y. Feb. 18, 1998) ([T]he injury sustained by the plaintiff, a cut to his face, neck, and shoulder requiring 12-13 stitches, and the manner in which he received the injury, are sufficient to satisfy the objective requirement of the Eighth Amendment claim.").

Here, it is undisputed that Plaintiff was slashed across the face from his ear to his mouth and required medical attention,

including numerous stitches.  Further, Defendant Ryan does not argue that Plaintiff did anything to provoke the attack; conversely, he asserts that "the assault was a sudden and random incident in the recreation yard between inmates."  (ECF No. 216-2, Def Ryan Mem. of Law at 12.)  Such a severe and unprovoked attack constitutes a "*per se* showing[]" of the objective prong of a Fourteenth Amendment failure to protect claim.  *Gordon*, 2021 WL 5314604, at *7, *report and recommendation adopted*, 2022 WL 884971.

Even if Plaintiff was unable to establish the objective prong due to the unprovoked and serious nature of the assault, sufficiently serious conditions of confinement may also be established by "a particularized, substantial risk of serious harm."  *House*, 2020 WL 6891830, at *12.  Courts in this Circuit have noted that "a claim for deliberate indifference may lie where a corrections officer identifies an inmate as being an informant or 'snitch' in front of other inmates."  *Campbell v. Gardiner*, No. 12-CV-6003 (MWP), 2014 WL 906160, at *4 (W.D.N.Y. Mar. 7, 2014); *see Burns v. Martuscello*, 890 F.3d 77, 91 (2d Cir. 2018) ("If a prison snitch is found out, then the inmate's . . . service as an informant may well prompt life-threatening physical harm. And even if the informant is never unmasked, she must shoulder the burden of the knowledge that, if her status as a snitch ever does come to light, violence may well befall her."); *Hamilton v. Fischer*, 16-CV-6449,  2013 WL 3784153, at *15 (W.D.N.Y.2013) ("[C]ourts have

recognized that being labeled a snitch in the prison environment can indeed pose a threat to an inmate's health and safety in violation of the Eighth Amendment." (internal quotation marks and citations omitted)).   Further, courts have found harm, albeit in the context of an Eighth Amendment excessive force claim, where a prison official called a prisoner a snitch and the prisoner suffered actual harm. *See Quezada*, 2017 WL 6887793, at *14; *Watson v. McGinnis*, 964 F. Supp. 127, 132 (S.D.N.Y. 1997) ("[A] guard's intentionally calling a prisoner a snitch in order to cause him harm by other inmates states an Eighth Amendment excessive force claim."). Accordingly, Plaintiff could establish a particularized and substantial risk of serious harm if the jury found that Defendant Ryan called him a snitch in front of other inmate, and Plaintiff thus could establish the objective prong of a Fourteenth Amendment failure to protect claim.

As to the subjective prong of a Fourteenth Amendment failure to protect claim, if a jury were to credit Plaintiff's account and find that Defendant Ryan repeatedly called Plaintiff a snitch in front of other inmates, Plaintiff could establish that Defendant Ryan "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.   It is undisputed that Defendant Ryan was aware

70

that referring to someone as a "snitch" in a prison setting could put them in danger. (*See* ECF No. 194, Def. Ryan Reply 56.1 at ¶ 204; *see also* ECF No. 188-45, Ex. 57 at 25-27.)  There is also record evidence, undisputed by Defendant Ryan, that other prison officials understood that referring to a detainee as a "snitch" could be dangerous. (*See* ECF No. 194, Def. Ryan Reply 56.1 at ¶ 203; ECF No. 188-41, Ex. 52 at 152:10-153:7.)  One NCCC official, Lieutenant Arthur Krueger, testified in his deposition that it would be a "no-no" for a corrections officer to refer to an inmate as a snitch around other inmates; that it could lead to "anything from . . . [that inmate] being ostracized to maybe a physical assault,"; and that an officer would "quite possibly" be disciplined for engaging in such behavior. (ECF No. 188-41, Ex. 52 at 152:10-153:7.)  Further, the Second Circuit noted that "courts have found an Eighth Amendment violation where a guard publicly labels an inmate as a snitch, because of the likelihood that the inmate will suffer great violence at the hands of fellow prisoners." *Burns*, 890 F.3d at 91; *Hamilton*, 2013 WL 3784153, at *15 (noting "courts have recognized that being labeled a snitch in the prison environment can indeed pose a threat to an inmate's health and safety in violation of the Eighth Amendment" (internal quotation marks and citations omitted)); *Tate v. City of New York*, No. 16-CV-1894 (KAM)(SMG), 2017 WL 10186809, at *11 (E.D.N.Y. Sept. 29, 2017) (noting that plaintiff can meet subjective prong "by

71

identifying a specific threat or any facts rendering it likely that plaintiff would be subject to imminent, physical harm" (internal quotation marks omitted)).  It is undisputed that Plaintiff was harmed by the assault.  Under these circumstances, Plaintiff could establish the subjective prong of a failure to protect claim.

Nassau County Defendants, however, contend that all individual defendants, including Defendant Ryan, are entitled to qualified immunity. (ECF No. 215-4, Nassau County Defs. Mem. of Law at 22.)  Setting aside whether the Court should consider an argument not raised by Defendant Ryan, the Court finds that qualified immunity does not bar this claim against Defendant Ryan. The Supreme Court "does not require a case directly on point for a right to be clearly established," but "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (alterations. internal quotation marks and citation omitted).  Accordingly, a clearly established violation requires "a body of relevant case law, particularized to the facts of the case, that makes plain that [Defendant Ryan's] conduct was in violation of the [Fourteenth] Amendment." *Liverpool v. Davis*, 442 F. Supp. 3d 714, 734 (S.D.N.Y. 2020).

Assuming the facts in Plaintiff's favor, a body of relevant case law exists here.  It has long been "clearly established" that

"[p]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (internal quotation marks and citation omitted).  Indeed, the Second Circuit has stated plainly that "[i]n the prison context, the clearly established standard for [a failure to protect] claim is that the official acted with deliberate indifference toward the safety of the prisoner." *Gordon v. City of New York*, No. 05-CV-0351, 2005 WL 2899863, at *1 (2d Cir. Nov. 3, 2005) (citing *Hayes v. N.Y.C. Dep't of Corr.*, 84 F3.d 614, 620-21 (2d Cir. 1996)). And, in *Darnell*, the Second Circuit clearly held that deliberate indifference occurs where a "defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety."  849 F.3d at 35.

The case law encompasses the facts of this case.  In *Burns v. Martuscello*, the Second Circuit stated that it is "*well understood* that inmates known to be snitches are widely reviled within the correctional system" and that "a number of courts have found an Eighth Amendment violation where a guard publicly labels an inmate as a snitch, because of the likelihood that the inmate will suffer great violence at the hands of fellow prisoners."  890 F.3d at 91 (emphasis added) (citing intra- and inter-Circuit case law that

73

predates November 2017). The Second Circuit concluded that, therefore, being unmasked as an alleged informant, whether or not true, "may well prompt life-threatening physical harm." *Id.* In *Benefield v. McDowall*, a 2001 decision cited by *Burns*, the Tenth Circuit reiterated a prior holding that "labeling an inmate a snitch satisfies the *Farmer* standard, and constitutes deliberate indifference to the safety of that inmate," and noted that at least four other circuits had "recognized that labeling an inmate a snitch has the potential for great harm and may violate constitutional guarantees." 241 F.3d 1267, 1271 (10th Cir. 2001). Though it is true that the Second Circuit's *Burns* decision was issued shortly after the events at issue here, this Court "finds that its legal conclusions were obvious, and would have been obvious to a competent officer" in November 2017. *Liverpool*, 442 F. Supp at 735. Indeed, none of the Defendants disputes the risk created by a corrections officer calling a detainee a "snitch" in front of other detainees, and multiple courts within the Second Circuit agree. (*See* ECF No. 196, County Defs. Reply 56.1 at ¶ 262; ECF No. 194, Def. Ryan Reply 56.1 at ¶ 204); *see, e.g.,* *Quezada*, 2017 WL 6887793, at *14; *Campbell*, 2014 WL 906160, at *4; *Hamilton*, 2013 WL 3784153, at *15; *Snyder v. McGinnis*, No. 03-CV-0902, 2004 WL 1949472 at *11 (W.D.N.Y. Sept. 2, 2004); *Allah v. Juchnewioz*, No. 93-CV-8813 (LMM), 1999 WL 562100, at *3 (S.D.N.Y. July 30, 1999).

74

Further, though typically "only decisions by the Supreme Court or the Second Circuit suffice to clearly establish that conduct is unlawful within this Circuit," the Second Circuit "has recognized that law may be clearly established by decisions from other circuits, if those decisions 'clearly foreshadow a particular ruling on the issue.'" *Liverpool*, 442 F. Supp at 735 (quoting *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014)). Although *Burns*' discussion of *Benefield* takes place in the context of a First Amendment claim regarding prison informants, *Benefield* clearly foreshadowed the Second Circuit's reasoning that "violence may well befall" prison snitches who are "unmasked." *Burns*, 890 F.3d at 91. And, importantly, *Benefield* directly states that not only is it "clearly established" in the Tenth Circuit that being called a snitch—and having that label be publicized to other inmates—violated the Eighth Amendment,[36] but that many other circuits have recognized the "potential for great harm" in publicly labeling inmates as snitches. 241 F.3d at 1271. The number of cases regarding the obvious risk of harm created by labeling an inmates as a "snitch" in front of other detainees constitute the type of situation the Supreme Court has described as a "consensus

---

[36] After *Darnell*, it was "clearly established" law in this Circuit that deliberate indifference claims concerning pretrial detainees fall under the Fourteenth Amendment's Due Process Clause.  849 F.3d at 34-35.  Because the Eighth Amendment requires a greater showing by a plaintiff, it was also "clearly established" that where a defendant-officer's action—e.g. publicly calling an inmate a snitch—violated the Eighth Amendment, it would also violate the Fourteenth Amendment. *Id.*

of cases of persuasive authority" establishing "that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999).

Accordingly, the Court "cannot conclude that it was objectively reasonable for [Defendant Ryan] to believe that his actions (as they are alleged by [Plaintiff]) did not violate" the Constitution. *Dennis v. Westchester Cnty. Jail Corr. Dep't*, 485 F. App'x 478, 481 (2d Cir. 2012) (summary order). For all of the reasons discussed above, Defendant Ryan has failed to meet the burden of demonstrating that "no rational jury could conclude (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

The Court need not, however, come to a decision on the merits of qualified immunity. There exist genuine and material disputes of fact at this stage, including whether Defendant Ryan called Plaintiff a snitch, that preclude summary judgment based on qualified immunity. *See Thevenin v. French*, 850 F. App'x 32, 36–38 (2d Cir. 2021) (summary order) (affirming the district court's denial of summary judgment based on qualified immunity where the record contained disputed issues of fact); *Bonilla v. United States*, 357 F. App'x 334, 335 (2d Cir. 2009) (summary order) ("Although qualified immunity is a question of law for the [c]ourt,

if there are factual disputes that bear directly upon whether it was objectively reasonable for an official to believe that he was acting lawfully, these disputes must be resolved by a jury before the legal question can be addressed." (citation omitted)).

Accordingly, summary judgment is denied as to Plaintiff's failure to protect claim against Defendant Ryan.

### ii.   Defendants Hollingshead and James

Nassau County Defendants argue that Plaintiff cannot establish a failure to protect claim against Defendants Hollingshead and James because he has not introduced evidence of deliberate indifference. (ECF No. 215-4, Nassau County Defs. Mem. of Law at 17.) They assert that (1) Plaintiff's allegations that Defendant Ryan called him a snitch "cannot satisfy the objective prong"; (2) Hollingshead and James had no knowledge that Plaintiff allegedly was called a snitch prior to the assault; and (3) Plaintiff never advised either defendant that he feared for his safety prior to the incident. (*Id.* at 19.)

As with Defendant Ryan, Nassau County Defendants do not argue that the attack was provoked by Plaintiff, asserting instead that the assault was "a random incident." (ECF No. 215-4, Nassau County Defs. Mem. of Law at 19.)  Thus, as this Court determined above, the "undisputedly unprovoked attack" on Plaintiff, which led to severe injury, satisfies the objective prong of his failure to protect claim. *Gordon*, 2021 WL 5314604, at *7; *see Knowles*, 904

F. Supp. at 221 (objective prong "easily satisfie[d]" where plaintiff's face was "suddenly and unexpectedly slashed with a sharp instrument," yielding a deep cut that required stiches).

Regarding the subjective prong, however, Plaintiff has provided limited evidence to establish that Defendants Hollingshead and James knew, or should have known, that Plaintiff was facing "an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. Plaintiff asserts—and Nassau County Defendants dispute—that Defendants Hollingshead and James were in direct proximity to Plaintiff, located approximately three feet away in the plexiglass shack, when Plaintiff was assaulted in the recreation yard. Nassau County Defendants also dispute that they failed to protect Plaintiff by not responding to the slashing or beating as it was occurring, and by not providing aid after the assault until the end of the recreation period. (*See* ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶¶ 233-34; ECF No. 188-40, Ex. 51, at 80:18-80:23; ECF No. 184-1, County Defs. 56.1 at ¶¶ 33-34.) Even though a rational fact finder could find Plaintiff's assertions credible, such assertions alone do not establish that Defendants Hollingshead and James knew or should have known of an excessive risk to Plaintiff—i.e., that he was repeatedly called a snitch by Defendant Ryan in front of other inmates—*in advance* of the assault.

Plaintiff did provide additional evidence, however, regarding Defendant Hollingshead's knowledge that Plaintiff faced an excessive risk to his safety and that Defendant Hollingshead recklessly failed to act to mitigate that risk. Plaintiff testified that when Defendant Hollingshead approached him in the recreation yard after the assault, Defendant Hollingshead stated that "things come full circle." (ECF No. 188-40, Ex. 51 at 90:22-91:13.) Although this statement is disputed, rational factfinders could resolve this disputed fact in Plaintiff's favor. The jury then could reasonably find that Defendant Hollingshead's statement demonstrated that Hollingshead knew that Plaintiff was at risk for an attack based on Defendant Ryan's "snitch" comments, but that Hollingshead "recklessly failed to act with reasonable care to mitigate the risk" to Plaintiff. A jury could find that Defendant Hollingsworth's statement to Plaintiff after the attack, that "things come full circle," implies Hollingsworth's knowledge of the risk of assault prior to its occurrence. *See Darnell*, 849 F.3d at 29; *see also Meeks v. Kartan*, No. 08-CV-1037 (GLS)(DEP), 2010 WL 3909356, at *3 (N.D.N.Y. Sept. 30, 2010) (noting that a plaintiff "may satisfy the subjective requirements of a deliberate indifference claim" where staff members had "mocked" plaintiff about his injuries after assault). At the least, if Defendant Hollingshead knew that Defendant Ryan publicly called Plaintiff a snitch or that Plaintiff was reputed to be a snitch, Hollingshead

should have known that Plaintiff faced an excessive risk to his safety. *Cf. Burns*, 890 F.3d at 91 ("If a prison snitch is found out . . . [it] may well prompt life-threatening physical harm. And even if the informant is never unmasked, she must shoulder the burden of the knowledge that, if her status as a snitch ever does come to light, violence may well befall her.").

Accordingly, Plaintiff has established a genuine issue of material fact as to whether Defendant Hollingshead knew or should have known of an excessive risk to Plaintiff's health and safety. But because Plaintiff does not provide any evidence to establish that Defendant James knew or should have known that Plaintiff was called a snitch *in advance* of the assault, Plaintiff fails to establish the subjective prong of his failure to protect claim against Defendant James. Thus, Defendant James is granted summary judgment on Plaintiff's failure to protect claim.

Nassau County Defendants assert that qualified immunity bars this claim as to Defendant Hollingshead. (ECF No. 215-4, Nassau County Defs. Mem. of Law at 22.) As noted above, however, it was clearly established that corrections officers must take reasonable measures to abate a substantial risk of serious harm if the officers learn of such a risk to an inmate, *Farmer*, 511 U.S. at 832-33, 844-45, and that publicly designating an inmate as a snitch constitutes a substantial risk. As such, because a reasonable jury could find Plaintiff's version of the facts to be true, "a

reasonable officer could not have believed that his actions were lawful." *Wilson*, 526 U.S. at 617.  At this stage, the Court will not grant summary judgment to Defendant Hollingshead based on qualified immunity because of the genuine dispute as to whether Defendant Hollingshead said to Plaintiff after the assault that "things come full circle."  *See, e.g., Jefferson v. Reddish*, 718 F. App'x 94, 96 (2d Cir. 2018) (summary order) ("[G]enuine disputes of material fact preclude our determining as a matter of law whether defendants are entitled to qualified immunity."); *Newkirk v. Cnty. of Suffolk*, No. 17-CV-2960 (MKB), 2022 WL 824137, at *6 (E.D.N.Y. Mar. 18, 2022) ("In view of the conflicting evidence creating disputed issues of fact, the Court denies Defendants' motion for summary judgment based on qualified immunity.").

Therefore, summary judgment is denied as to Plaintiff's failure to protect claim against Defendant Hollingshead, but granted as to Plaintiff's failure to protect claim against Defendant James.[37]

### B. Failure to Intervene

Just as prison officials may be liable for failing to protect an inmate from an assault of which they had knowledge or should have had knowledge, they also may be liable for failing to intervene in an assault.  *Velez v. City of New York*, No. 17-CV-

---

[37] This Memorandum and Order addresses Plaintiff's supervisory liability claim against Defendant Sposato and municipal liability claim against the County below.

9871 (GHW), 2019 WL 3495642, at *3 (S.D.N.Y. Aug. 1, 2019).
"Allowing an attack on an inmate to proceed without intervening is
a constitutional violation in certain circumstances." *Rosen v.
City of New York*, 667 F. Supp. 2d 355, 359 (S.D.N.Y. 2009)
(citation omitted). "A claim that an officer failed to intervene
rises to the level of a constitutional violation where the officer
acted with deliberate indifference to a substantial risk of serious
harm to an inmate." *Velez*, 2019 WL 3495642, at *3 (internal
quotation marks and citation omitted).

Failure to intervene claims brought by pretrial detainees
arise under the Fourteenth Amendment's Due Process Clause and must
satisfy the same objective and subjective standards as a failure
to protect claim: (1) an objective showing that the challenged
conditions were sufficiently serious to constitute a due process
violation; and (2) a subjective showing that the official either
knowingly or recklessly failed to act regarding an excessive risk
to health or safety.[38] *Id.* at *3; *see also McDaniel v. City of New*

<hr>

[38] In *Darnell*, the Second Circuit established that deliberate indifference claims
brought by pretrial detainees (1) arise under the Fourteenth Amendment; (2) are
comprised of an objective and subjective standard; and (3) require the
subjective prong "or mens rea prong . . . [to be] defined objectively." 849
F.3d at 35. *Darnell* arose in the context of deliberate indifference to
conditions of confinement. Since then, the Second Circuit explicitly has
applied the *Darnell* standard to address deliberate indifference to medical
needs, *see, e.g. Charles v. Orange Cnty.*, 925 F.3d 73, 86-87 (2d Cir. 2019),
and failure to protect claims. *See Haslinger v. Westchester Cnty.*, No. 22-CV-
131, 2023 WL 219198, at *2 (2d Cir. Jan. 18, 2023). The Second Circuit has not
yet explicitly utilized the *Darnell* standard for a failure to intervene claim
where a detainee is assaulted. In *Darnell*, however, the Circuit advised in a
footnote that its "interpretation of deliberate indifference applied to any
pretrial detainee claim for deliberate indifference to serious threat to health
or safety . . . because deliberate indifference means the same thing for each

82

*York*, No. 19-CV-8735(KPF)(RWL), 2022 WL 421122, at *8-10 (S.D.N.Y. Feb. 11, 2022).  The subjective prong is met where an officer "has adequate time to assess a serious threat against an inmate and a fair opportunity to protect the inmate without risk to himself, yet fails to intervene." *McDaniel*, 2022 WL 421122, at *10; *see also Williams v. Salvucci*, No. 20-CV-5098 (CS), 2022 WL 17586326, at *8 (S.D.N.Y. Dec. 12, 2022).  Courts may ask whether a defendant "observed or had reason to know the plaintiff was involved in a physical altercation" and "had an extended opportunity to stop the attack but failed to take any action to do so."  *Blake v. Sexton*, No. 12-CV-7245 (ER), 2016 WL 1241525, at *4 (S.D.N.Y. Mar. 24, 2016) (alterations and internal quotation marks omitted). *McDaniel*, 2022 WL 421122, at *10.

As previously discussed, Plaintiff has established the objective prong of a deliberate indifference claim: his undisputed injuries establish that the conditions were "sufficiently serious." *Darnell*, 849 F.3d at 35; *see also Blake*, 2016 WL 1241525, at *4 ("[The] documented injuries suffered by Plaintiff support the inference that conditions were urgent—i.e., sufficiently serious—during the attack." (citation omitted)).

---

type of claim under the Fourteenth Amendment."  849 F.3d at 33 n.9.  Further, multiple district courts in this Circuit have applied *Darnell* in the context of failure to intervene claims.  *See Velez*, 2019 WL 3495642, at *3; *McDaniel*, 2022 WL 421122, at *8-10.  Accordingly, the Court applies the *Darnell* standard here.

Therefore, the Court addresses whether Plaintiff has established the subjective prong of a failure to intervene claim.

### i.   Defendant Ryan

Plaintiff does not submit any record evidence establishing that Defendant Ryan "observed or had reason to know" that Plaintiff was being assaulted in the recreation yard on November 17, 2018, *Blake*, 2016 WL 1241525 at *4, and thus that Defendant Ryan had "adequate time" to assess and address the "serious threat" to Plaintiff.  *McDaniel*, 2022 WL 421122, at *10.  Accordingly, Plaintiff cannot establish the subjective prong of his failure to intervene claim against Defendant Ryan, and summary judgment is granted to Defendant Ryan as to that claim.

### ii.   Defendants Hollingshead and James

Nassau County Defendants assert that Plaintiff's failure to intervene claim—alleging that Defendants Hollingshead and James, while in the plexiglass shack, observed Plaintiff being attacked in the recreation yard but did not leave the shack to assist him— is "pure baseless speculation specifically denied by the officers" and is "unsupported by any facts." (ECF No. 215-4, Nassau County Defs. Mem. of Law at 17.)  In support of their assertions, Defendants Hollingshead and James submit their deposition testimonies. (*Id.* at 18; ECF No. 188-44, Ex. 55; ECF No. 188-39, Ex. 50.)  They contend that neither defendant saw the assault nor learned of the assault until the end of the recreation period.

(*Id.*)  Plaintiff counters that the assault was "long enough and close enough" to Defendants that Defendants Hollingshead and James were "at least reckless in failing to notice" it, and also cites the Model Instructions' provision that staff must remain within "earshot" of inmates during periods of active supervision, such as when inmates are in a recreation yard. (ECF No. 215-11, Pl. Memo in Opp. at 20-21; ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶ 133; ECF No. 189-18, Ex. 64 at 6.)  Plaintiff also cites the provision of the Model Instructions that states that "[s]upervision cannot be met by staying behind an officer's work station."  (ECF No. 189-18, Ex. 64 at 6.)

Whether Defendants failed to intervene involves disputed facts that cannot be resolved by the Court at summary judgment. The parties agree that Defendants Hollingshead and James were in the shack in the recreation yard, and it is undisputed that the shack was see-through with plexiglass walls and overlooked the entire yard.  ECF No. 184-1, County Defs. 56.1 at ¶ 23; ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶ 23; County Defs. Reply 56.1 at ¶ 270.)  The parties, however, dispute (1) the extent to which Defendants Hollingshead and James could see detainees in the yard from the shack; (2) whether they saw anything about the attack; and (3) when they responded to Plaintiff. (ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶¶ 27, 232; ECF No. 188-40, Ex. 51, at 80:18-81:3, 81:25-82:12; ECF No. 184-1, County Defs. 56.1 at ¶ 27.)

Thus, there are genuine disputes of fact as to whether Defendants Hollingshead and James had "adequate time to assess a serious threat" against Plaintiff before and during the attack, and whether they had time to intervene. *McDaniel*, 2022 WL 421122, at *10; *see also Rosen*, 667 F. Supp. 2d at 360 (summary judgment denied where factual disputes existed as to "what, if anything, [defendant] saw of the fight" and "how long [defendant] was watching the fight, and whether he had a reasonable opportunity to intervene").

Nassau County Defendants assert that Plaintiff's claim "is "unsupported by any facts." (ECF No. 215-4, Nassau County Defs. Mem. of Law at 17.) However, Plaintiff testified in his deposition that, he was about three feet in front of the plexiglass shack where Defendants Hollingshead and James were on duty when he was attacked by several men, who jumped on him, slashed his face, and beat him on the ground. (ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶¶ 282-282, 290; ECF No. 188-40, Ex. 51 at 80:18-81:3, 81:25-82:12.) He testified that after getting to his feet after he was attacked, he was bleeding from his face, and looked towards the shack for several minutes. (ECF No. 188-40, Ex. 51, at 80:18-80:23; 82:17-85:17.) He testified that he believed he made eye contact with an officer in the plexiglass shack, but neither Defendant left the shack until the end of the recreation period. (*Id.*) The record evidence, including Plaintiff's deposition testimony, is sufficient for a rational juror to find that both

86

defendants had "observed or had reason to know the plaintiff was involved in a physical altercation" and had "a fair opportunity to protect [him] without risk," yet failed to intervene. *Blake*, 2016 WL 1241525, at *4.   Indeed, the parties agree that correction officers generally could intervene from the shack if they observed a threat to a detainee in the recreation yard.   (ECF No. 196, County Defs. Reply 56.1 at ¶¶ 279-80.)   Thus if a rational factfinder found Plaintiff credible, and found that Defendants Hollingshead and James observed the assault on Plaintiff from the shack while it was unfolding, but failed to intervene, the juror could find for Plaintiff.

Nassau County Defendants contend that qualified immunity bars Plaintiff's failure to intervene claim against Defendants Hollingshead and James.   It has long been "clearly established" that a constitutional violation occurs where correctional officers stand by and allow an inmate-on-inmate attack to proceed without interference. *See Davidson v. Cannon*, 474 U.S. 344, 348 (1986) (distinguishing meritless Fourteenth Amendment claim from one in which "officials simply stood by and permitted the attack to proceed" (citing *Curtis v. Everette*, 489 F.2d 516, 517-19 (3d Cir. 1973))); *Morales v. New York State Dep't of Corr.*, 842 F.2d 27, 30 (2d Cir. 1988) (holding that district court erred and that the "action clearly should be reinstated against [defendant], given [plaintiff's] claim that [defendant] stood by and permitted

87

[inmate] to attack"). Here, however, the conflicting evidence presented by the parties regarding what the Defendants observed creates disputed issues of material fact for the jury. Accordingly, the Court cannot grant summary judgment or find qualified immunity for the failure to intervene claim against Defendants Hollingshead and James. *See Glover v. City of New York*, No. 15-CV-4899, 2018 WL 4906253, at *24, 33 (E.D.N.Y. Oct. 9, 2018) (denying qualified immunity for a failure to intervene claim where "[d]efendants' argument that they [were] entitled to qualified immunity inappropriately relie[d] on disputed facts"); *Usavage v. Port Auth. of New York & New Jersey*, 932 F. Supp. 2d 575, 599 (S.D.N.Y. 2013) ("[S]ummary judgment is inappropriate when there are genuine disputes of material fact concerning what the officers who failed to intervene observed regarding the other officers' alleged violations of plaintiffs' constitutional rights." (internal quotation marks and citation omitted)).

Accordingly, summary judgment is denied as to Plaintiff's failure to intervene claim against Defendants Hollingshead and James.

### C. Supervisory Liability

Plaintiff asserts a claim of supervisory liability against Defendant Sposato based on Plaintiff's underlying failure to protect and failure to intervene claims. "It is well settled that, in order to establish a defendant's individual liability in a suit

brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). In other words, an "individual cannot be held liable for damages under Section 1983 . . . merely because he held a high position of authority." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004) (internal quotation marks omitted).

Previously, courts in the Second Circuit relied on the factors set forth in *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995), to determine personal involvement for purposes of supervisory liability.[39] The Second Circuit recently clarified in *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), that the Supreme Court's ruling in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), requires that there be no "special rule for supervisory liability." 983 F.3d at 612. A plaintiff must plead that "each Government-official defendant, through the official's own individual actions, has violated the Constitution," and thus must establish the constitutional violation against a supervisory official directly. *Id.* at 612, 616 (citation omitted).

Therefore, to establish supervisory liability for a Fourteenth Amendment deliberate indifference claim against Defendant Sposato, Plaintiff must establish Sposato's "deliberate

---

[39] Plaintiff's memorandum and Nassau County Defendants' memorandum both assess Defendant Sposato's liability under the *Colon* factors.

indifference to a substantial risk of serious harm": (1) that "challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process"; and (2) that Sposato "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. Nassau County Defendants correctly note that there is no allegation in the complaint—and no record evidence to support a claim—that Defendant Sposato knew or should have known that Defendant Ryan called Plaintiff a snitch; or that Defendant Hollingshead knew that Defendant Ryan had done so but failed to act on that knowledge; or that Defendants Hollingshead and James had watched the assault occur against Plaintiff but failed to intervene. (ECF No. 215-4, Nassau County Defs. Mem. of Law at 21.) Accordingly, Plaintiff cannot establish liability based on Sposato's supervision of those who committed the violation.

Plaintiff, however, also argues that Defendant Sposato knew or should have known of violent attacks against NCCC detainees by other detainees and corrections officers. Post-*Tangreti*, district courts in the Circuit have determined that personal involvement still may be established for a supervisory defendant if he or she "created a policy or custom under which unconstitutional practices

90

occurred, or allowed the continuance of such a policy or custom." *Stone #1 v. Annucci*, No. 20-CV-1326 (RA), 2021 WL 4463033, at *8 (S.D.N.Y. Sept. 28, 2021); *see also Brunache v. Annucci*, No. 22-CV-196 (JLS), 2023 WL 146850, at *12 (W.D.N.Y. Jan. 9, 2023); *Latimer v. Annucci*, No. 21-CV-1275 (VB), 2022 WL 1137055, at *3 (S.D.N.Y. Apr. 18, 2022); *Swinson v. City of New York*, No. 19-CV-11919 (KPF), 2022 WL 142407, at *7 (S.D.N.Y. Jan. 14, 2022). This is because an "individual who creates a policy or custom whereby the constitution is violated . . . is more directly and personally involved in the constitutional violation than someone who is only negligent in his supervision of the official committing the underlying offense." *Stone*, 2021 WL 4463033 at *8. Thus "where a plaintiff can establish that a senior official promulgated an unconstitutional policy with a culpable mental state . . . such official could be deemed to be personally involved in a constitutional violation." *Id.*

Accordingly, this Court must assess if there is a genuine issue of material fact as to whether Defendant Sposato created or continued an unconstitutional policy, practice, or custom and did so with deliberate indifference. *Darnell*, 849 F.3d at 35. In other words, the Court must examine whether Plaintiff has established genuine disputes of material fact that could create (1) an inference that Defendant Sposato knew or should have known of a serious risk of harm or injury to detainees; and (2) an

inference that Defendant Sposato intentionally or recklessly disregarded that risk by failing to enact adequate policies and practices to protect against it.  *See Myers ex rel. Myers v. Davenport*, No. 21-CV-0922 (LEK)(CFH), 2022 WL 3017367, at *7 (N.D.N.Y. July 29, 2022) (finding facts sufficient to allege supervisory liability claim for Eighth Amendment deliberate indifference on motion to dismiss).

Plaintiff has established sufficient disputed material facts to meet the forgoing standard.  Defendant Sposato testified in his deposition that he was briefed on any use of force by inmates against other inmates or corrections officers, pursuant to a policy change that *he* had implemented, because, *inter alia*, "there were always lawsuits and stuff. You get lawsuits and you want to know." (ECF No. 188-43, Ex. 54 at 81:09-81:22, 88:09-88:17, 89:20-89:25.) Record evidence also shows that there were at least 11 lawsuits filed against the County in which pretrial detainees alleged that they were assaulted while in custody at NCCC, either by other detainees or by corrections officers. (*See* ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶¶ 106-116, 118, 120, 123.)  Further, the news articles submitted by Plaintiff, although inadmissible for the truth of the matters asserted, establish that Defendant Sposato was or should have been on notice of a significant number of complaints of assaults, including slashings of detainees.  *Cf. Edwards v. City of New York*, No. 14-CV-10058 (KBF), 2015 WL

5052637, at *6 (S.D.N.Y. Aug. 27, 2015) (explaining that plaintiff's "news articles and eighteen prior lawsuits plausibly demonstrate" that policymakers had knowledge of a situation within a prison); (*see* ECF No. 21, Exhibit 24; ECF No. 22, Exhibit 25; ECF No. 34, Exhibit 46.)  Indeed, Defendant Sposato testified in his deposition that corrections officers at NCCC "very rarely" found weapons after an inmate assault, and that he knew that failing to find such weapons had "security implications for inmates." (ECF No. 188-43, Ex. 54 at 131:10-131:23, 131:24-132:06.)  Based on the evidence before the Court, a rational juror could resolve factual disputes in Plaintiff's favor and find that Defendant Sposato knew or should have known of a serious risk of harm or injury to detainees.

Additionally, there is enough evidence to support an inference that Defendant Sposato intentionally or recklessly disregarded that risk of serious harm by failing to enact adequate policies and practices to protect against it.  Defendant Sposato testified in his deposition that he had final policymaking authority at NCCC as acting Sheriff and Sheriff and that "every county has their own policies, their own rules." (ECF No. 188-43, Ex. 54 at 32:22-32:24, 43:20-43:22, 51: 51:14-52:1.)  An NCCC official, Lieutenant Arthur Krueger, confirmed in his deposition testimony that "all policies and procedures at [NCCC] have to be authorized by the Sheriff." (ECF No. 188-41, Ex. 52 at 24:02-

25:22; 35:06-35:09.)  Along with sufficient evidence in the record establishing that Defendant Sposato was aware or should have been aware of a serious risk of harm to detainees, as noted above, there is a disputed issue of material fact as to whether Defendant Sposato acted on that knowledge.  Multiple NCCC officials testified that there was no policy in place to respond to or investigate inmate assaults.  (ECF No. 188-46, Ex. 58 at 121:11-121:18; 143:16-144:1; ECF No. 188-42, Ex. 53 at 63:06-63:22, 64:08-64:10.) Indeed, NCCC officials could not recall whether the Sheriff had ever issued a policy regarding inmate assaults or slashings.  (ECF No. 188-41, Ex. 52 at 32:07-32:19.)  Defendant Sposato himself testified that he "didn't create policies very often"; that it "wasn't a regularity that [he] was putting out policies"; and that "a new policy would be very rare."  (ECF No. 188-43, Ex. 54 at 51:14-52:04;   52:14-53:19,   131:10-131:23,   131:24-132:06.) Therefore, a rational juror could conclude from the evidence in the record that Defendant Sposato at least recklessly disregarded a risk of serious harm to detainees by failing to enact adequate policies.

Accordingly, summary judgment is denied as to Plaintiff's supervisory liability claim against Defendant Sposato.

### D. Municipal Liability

To establish a municipal liability claim, a plaintiff must establish three elements: "(1) an official policy or custom that

(2) caused him to be subjected to (3) a denial of a constitutional right." *Torcivia v. Suffolk Cnty.,* 17 F.4th 342, 355 (2d Cir. 2021) (alterations omitted) (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)).  To establish an official policy or custom, a plaintiff must prove either "(1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised 'deliberate indifference' to the rights of the plaintiff and others encountering those subordinates." *McDonald v. City of New York*, No. 20-CV-4614 (MKB), 2022 WL 1469395, at *4 (E.D.N.Y. May 10, 2022) (citations omitted).  A policy "may be pronounced or tacit" and "reflected in either action or inaction." *Lucente*, 980 F.3d at 297 (internal quotation marks omitted).  Inaction rises to the level of policy "where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007).

Plaintiff argues that four policies, practices, and customs create liability for the County for the deprivation of his constitutional rights: "(i) [a widespread practice of]

'supervising' the recreation yard by having officers sit in the [recreation yard] shack; (ii) [a widespread practice of] failing to properly investigate assaults; (iii) [a widespread practice of] maintaining a secret classification system to mark disfavored detainees; and (iv) failing to supervise and discipline officers." (ECF No. 215-11, Pl. Mem. at 21.)  Nassau County Defendants counter that Plaintiff only made "bare assertions with no supportive facts" and cannot establish a "causal link" between any custom or policy and the alleged constitutional violation.  (ECF No. 215-4, Nassau County Defs. Mem. of Law at 15-16.)

### i.  Failure to Adequately Supervise Recreation Yard

"To demonstrate a *de facto* policy or custom through a widespread practice, a plaintiff must show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Rodriguez v. City of New York*, 607 F. Supp.3d 285, 292 (E.D.N.Y. 2022) (internal quotation marks and citation omitted).

There are numerous disputed facts as to whether Defendant Sposato, de facto policymaker for NCCC, was aware of and consciously ignored the practice of officers supervising the NCCC recreation yard by remaining in the plexiglass shack, amounting to a widespread practice sufficient to establish municipal liability on behalf of the County.  Defendant James testified that he generally walked around the yard "every 15 to 30 minutes,

possibly." (ECF No. 188-44, Ex. 55 at 50:17-51:08.) Other officers testified that corrections officers typically stayed in the shack while supervising the recreation yard. (*See* ECF No. 188-46, Ex. 58 at 97:08-97:18; ECF No. 188-48, Ex. 60 at 93:03-94:12). Plaintiff asserts that remaining in the shack during the entire recreation period counters New York's minimum standards, as described in the Model Instructions, requiring "active supervision" of inmates wherever inmates have "immediate access" to other inmates, such as in a recreation yard. (ECF No. 189-4, Ex. 6 at 12-13; No. 215-11, Pl. Mem. at 25). Even assuming this practice was contrary to state minimum standards, that does not necessarily make it unconstitutional.

Plaintiff, however, argues that even if the practice of sitting in the shack during recreation is not itself unconstitutional, supervisory knowledge of the lack of "active supervision" and indifference to the risk of attacks and actual attacks in the recreation yard "may be highly probative" as to municipal liability in the context of other evidence showing unconstitutional conduct. (ECF No. 215-11, Pl. Mem. at 25 (quoting *Lucente*, 980 F.3d at 305)). Plaintiff has provided evidence that a rational juror could resolve in his favor to establish that the County—through NCCC policymaker Defendant Sposato—was aware of a widespread practice of lack of "active supervision" that posed a serious risk to detainees in the recreation yard, including

97

Defendant Sposato's testimony that all inmate assaults were reported to him, and evidence of numerous lawsuits arising from alleged assaults on and by inmates at NCCC that occurred in areas of "active supervision." (ECF No. 188-43, Ex. 54 at 81:09-81:22, 88:09-88:17, 89:20-89:25). A rational juror could conclude that the County had notice of an ongoing failure to protect inmates at NCCC from the risks of serious harm resulting from a lack of policies and practices regarding active supervision, including in the recreation yard, but "consciously chose to ignore" it, given Defendant Sposato's testimony that he instituted new policies only when it was "something [he] felt we needed to do" and at least two corrections officers' testimony that they did not always engage in "active supervision" in the recreation yard. (*See* ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶¶ 106-116, 118, 120, 123; (ECF No. 188-43, Ex. 50 at 51:15-52:04, 52:14-52:19; *See* ECF No. 188-46, Ex. 58 at 97:08-97:18; ECF No. 188-48, Ex. 60 at 93:03-94:12.) Accordingly, the Court finds sufficient evidence in the record to create a genuine dispute of material fact as to whether there was a practice of failing to engage in "active supervision"—leading to a constitutional failure to protect inmates from assaults—that was sufficiently widespread, but which the County failed to act on, to establish municipal liability on behalf of the County.

## ii.  Failure to Adequately Investigate Assaults

Plaintiff also raises genuine disputes of material fact in support of the County's municipal liability based on a failure to properly investigate inmate assaults.  This claim, although framed as a municipal policy (or lack thereof), is fairly construed to articulate a claim that the County was aware of and ignored a widespread practice or custom of constitutionally inadequate investigations of inmate assaults and allowed the assaults to continue unabated.  Construing factual disputes in Plaintiff's favor, the record evidence shows that (1) after Plaintiff was assaulted, his housing unit and the recreation yard were not searched until two hours after the attack, and inmates who had been in the yard were returned to their units without being searched (ECF No. 188-46, Ex. 58 at 194:6-194:25; ECF No. 197-21, Ex. U at 49); (2) CIU, a department in the Sheriff's Office assigned to conduct the investigation, did not appear to investigate the assault (ECF NO. 46, Ex. 58 at 216:22-217:22, 219:20-221:03); and (3) an investigation into the assault against Plaintiff did not begin until over 24 hours after the attack occurred (ECF No. 46, Ex. 58 at 219:20-221:02).  Further, if factual disputes are resolved by a jury in favor of Plaintiff, the record establishes that (1) Defendant Sposato testified that an investigation should be carried out any time an inmate claimed they were assaulted or slashed, but there is no evidence that he,

99

as the County's policymaker for NCCC, implemented practices or procedures to adequately investigate assaults (ECF No. 188-43, Ex. 54 at 93:07-93:14); (2) Sergeant Bertin, the housing unit supervisor at NCCC, did not know of any formal policy that described how to investigate an inmate assault (ECF No. 188-46, Ex. 58 at 121:11-121:18; 143:16-144:1); (3) any procedure for such an investigation instead was learned on-the-job or through a supervisor's directions (ECF No. 188-46, Ex. 58 at 121:11-121:18); (4) Sergeant Bertin could not recall even one instance in which he recovered contraband, such as a weapon, after an investigation into an inmate assault, which suggests that practices and procedures were inadequate (ECF No. 188-46, Ex. 58 at 150:06-150:20); and (5) Defendant Sposato testified that corrections officers at NCCC "very rarely" found weapons after an assault, which a jury could find established constitutionally inadequate procedures to protect NCCC detainees (ECF No. 188-43, Ex. 54 at 131:10-131:23). Indeed, Defendant Sposato acknowledged in his testimony that NCCC's failure to find weapons used in an assault could have "security implications for inmates." (*Id.* at 131:24-132:6.) Finally, the record shows that assaults and slashings were required to be reported to the "State Commission of Corrections," *and* that numerous lawsuits were filed against the County regarding inmate assaults at NCCC, many of which alleged the use of contraband weapons in the assault. (*Id.* at 94:14-

100

94:19; ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶¶ 106-116, 118, 120, 123.)  Therefore, the Court finds sufficient evidence in the record to create a genuine dispute of material fact as to whether there was a practice of inadequate investigations of inmate assaults—leading to a constitutional failure to protect inmates from assaults and the use of contraband in assaults—that was "so persistent or widespread as to constitute a custom or usage with the force of law" of which the County must have been aware.  *Okin v. Vill. of Cornwall-On-Hudson Police Dep't,* 577 F.3d 415, 440 (2d Cir. 2009) (alterations, internal quotation marks, and citation omitted).

### iii. Unofficial Hash Mark Notation

The same cannot be said regarding Plaintiff's allegations about the unofficial hash mark classification system.  Although there is evidence that at least some of the corrections officers knew about the hash mark classification system, there is no evidence in the record that Defendant Sposato—or through him, the County—was aware of the unofficial hash mark classification system to identify inmates who had assaulted corrections officers.  (ECF No. 186, Pl. Resp. County Defs. 56.1 at ¶¶ 162-63; ECF No. 188-45, Ex. 57 at 24; ECF No. 188-44, Ex. 55 at 70:05-71:18.)

### iv.  Failure to Train

Plaintiff also argues for municipal liability on the basis that the corrections officers' failure to protect or intervene was

a result of a failure to train by the County.[40]   To establish municipal liability under a failure to train theory, Plaintiff must establish that the County's failure to train its employees "is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the [County] can be found deliberately indifferent to the need." *Reynolds*, 506 F.3d at 192 (citation omitted.)   To do so, Plaintiff must "identify a specific deficiency in the . . . training program and establish that [the] deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." *Tate*, 2017 WL 10186809, at *13 (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004)).

Plaintiff has met his burden for the failure to train claim. Plaintiff has established material disputed facts as to whether the training for corrections officers was deficient in preventing or responding to inmate assaults.   Multiple corrections officers testified that there was no ongoing training (other than initial training at the academy) for preventing or responding to inmate assaults, or if there was, they could not recall it.   (ECF No.

---

[40] Although Plaintiff brings a failure to train and supervise claim as one claim, "[c]ourts must analyze these [failure to train and failure to supervise] theories separately because they emphasize different facts and require different showings to establish deliberate indifference." *Rodriguez*, 607 F.Supp.3d at 285 (internal quotation marks omitted); *see also Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 127 (2d Cir. 2004)("Because these theories emphasize different facts and require different showings in order to establish deliberate indifference, they must be analyzed independently, rather than evaluated collectively.").

188-44, Ex. 55 at 23:18-21:23, 128:07-158:12; ECF No. 188-41, Ex. 52 at 49:03-49:13; ECF No. 188-39, Ex. 50 at 15:10-15:22, 59:06-59:18.)  There was no staff handbook that listed NCCC policies or procedures regarding the prevention of inmate assaults, if officers chose to seek out additional training on such policies for themselves, and policies and procedures were not posted in break areas for corrections officers.  (ECF No. 188-41, Ex. 52 at 24:16-25:03;  26:06-26:07.)   Though corrections officers could access NCCC policies on a computer, there was no search function, and they would have to read through all policies to find guidance and train themselves on the issue they sought out.  (*Id.* at 26:08-28:19.)  At least one NCCC official was "unaware" if there was anyone on staff at NCCC who could train a corrections officer who had questions about a particular policy or procedure.  (*Id.* at 27:13-27:20.)

Plaintiff also establishes sufficient disputed facts concerning causation, or whether the lack of ongoing training "actually caused" the constitutional violations of failure to protect and intervene.  *Amnesty Am.*, 361 F.3d at 129.  Plaintiff has provided more evidence than "the mere fact that the misconduct occurred in the first place"; as noted above, multiple corrections officers testified to a lack of specific ongoing training on preventing and responding to inmate assaults, and there is a disputed issue of fact as to whether anyone at NCCC could respond

to corrections officers' questions. *Id.* at 130.  Further, the specific deficiency that Plaintiff identifies—that there was no training about inmate assaults—is "closely related" to Plaintiff's ultimate injury, stemming from failing to protect inmates and failing to intervene in an inmate assault. *Tate*, 2017 WL 10186809, at *13.  A rational factfinder could conclude that the corrections' officers actions in failing to protect or intervene occurred as a result of training deficiencies.

### v.   Failure to Supervise

Plaintiff also has provided sufficient evidence establishing genuine factual disputes regarding municipal liability on the basis of failure to supervise.  A failure to supervise occurs where "the need for more or better supervision to protect against constitutional violations was obvious, but [the County] made no meaningful attempt to forestall or prevent the unconstitutional conduct." *Tate*, 2017 WL 10186809, at *13 (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)).  Such inaction "may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the [municipal] employees interact." *Wray*, 490 F.3d at 195.  Deliberate indifference occurs where "defendants knew to a moral certainty that the [County] would confront a given situation; the situation presented the [County] with a difficult choice or there was a history of its mishandling the situation; and the wrong choice by

104

the [County] would frequently cause the deprivation of plaintiffs'
rights." *Reynolds*, 506 F.3d at 192.

Plaintiff has provided sufficient evidence, from which a jury
could resolve disputes in his favor, that the County "had notice
of a potentially serious problem of unconstitutional conduct, such
that the need for corrective action or supervision was 'obvious'."
*Vann*, 72 F.3d at 1049.  One corrections officer testified that
there were "so many assaults [on inmates] throughout the week"
that he could not keep track of them, and Defendant James testified
that there were assaults at least several times a year, sometimes
as often as "weekly." (ECF No. 188-42, Ex. 53 at 96:23-96:09; ECF
No. 188-44 at 26:21-27:10.)  These assaults on inmates were
reported to Defendant Sposato, the final policymaker for the County
in his role as Acting Sheriff and Sheriff. (ECF No. 188-43, Ex.
54 at 32:22-32:24, 81:14-81:19.)  Defendant Sposato actively
changed the policy to require that "all uses of force be reported
to the Sheriff." (*Id.* at 88:09-88:17).  The County was also aware
of at least 11 lawsuits alleging assaults on inmates between
October 2006 and February 2016.  *See Vann*, 72 F.3d at 1049 (stating
that an "obvious need may be demonstrated through proof of repeated
complaints of civil rights violations").  A rational juror could
find from this evidence that the County knew to a moral certainty
of the assaults on inmates and that the "need for more or better

supervision to protect against constitutional violations was obvious." *Id.*

Similarly, a rational juror could also find that, rather than address the obvious need for closer supervision, the County failed to take meaningful action. Defendant Sposato, the County's policymaker for NCCC, testified that the creation of new policies while he was Acting Sheriff or Sheriff was "very rare" and occurred only when he got guidance from the state or it was "something [he] felt we needed to do." (ECF No. 188-43, Ex. 50 at 51:15-52:04, 52:14-52:19.) The policy changes that Defendant Sposato testified to implementing, however, pertained primarily to reducing the size of administrative staff and reducing overtime payments for staff, which a jury could find exacerbated the risk of harm at NCCC. (*Id.* at 48:19-49:17, 65:15-66:21.) A rational factfinder could resolve factual disputes for Plaintiff and could find that the County and policymaker Defendant Sposato were aware of an "obvious" problem of numerous inmate assaults but did not feel that implementing or changing NCCC policies to supervise officers and prevent assaults was something that they "needed to do," and that this demonstrated a history of mishandling the ongoing inmate assaults, which caused the violation of Plaintiff's rights. *See Jackson v. Nassau Cnty.*, 552 F. Supp. 3d 350, 379 (E.D.N.Y. 2021) ("[T]here is no requirement that complaints result in a formal finding of

misconduct for such complaints to support findings of failure to supervise.").

Plaintiff also has established genuine disputes of fact as to whether the County knew "to a moral certainty" that NCCC officers would face inmate assaults, and that there was a history of, at the least, allegations that the County had previously mishandled such situations. *Cf. Edwards*, 2015 WL 5052637, at *6 (explaining that plaintiff's "news articles and eighteen prior lawsuits plausibly demonstrate that policymakers knew to a moral certainty that DOC officers routinely confront situations in which detainees provoke them and that there is a history of DOC officers mishandling such situations by responding with excessive force"). A jury could reasonably infer that the failure to supervise corrections officers and staff would cause "frequent constitutional deprivations," *Rodriguez*, 607 F.Supp.3d at 295, especially given evidence in the record that some corrections officers at NCCC *encouraged* detainees to attack other detainees. (*See* ECF No. 188-40, Ex. 51 at 171:04–173:06.)

Accordingly, Plaintiff presents genuine issues of material fact as to whether the County is subject to municipal liability on a theory of widespread practice and custom, a theory of failure to train, and a theory of failure to supervise. Summary judgment is therefore denied as to Plaintiff's claim against the County for municipal liability.

## CONCLUSION

For the forgoing reasons, the Court ORDERS as follows:

1. Defendant Ryan's motion for summary judgment is GRANTED as to the failure to intervene claim against Defendant Ryan but is DENIED as to the failure to protect claim against Defendant Ryan.

2. Nassau County Defendants' motion for summary judgment is GRANTED as to the failure to protect claim against Defendant James, but is DENIED as to the failure to protect claim against Defendant Hollingshead.

3. Nassau County Defendants' motion for summary judgment is DENIED as to the failure to intervene claims against Defendant James and Defendant Hollingshead.

4. Nassau County Defendants' motion for summary judgment is DENIED as to the supervisory liability claim against Defendant Sposato.

5. Nassau County Defendants' motion for summary judgment is DENIED as to the municipal liability claim against the County, on theories of widespread practice or custom; failure to train; and failure to supervise.

The parties are strongly encouraged to engage in good faith settlement negotiations, and are directed to appear before Magistrate Judge Bloom for a settlement conference. If the parties do not settle, the parties are directed to file a joint status

108

report advising the Court of the failure to settle and, within sixty (60) days of such a report, the parties are directed to file a joint pretrial order according to the procedures listed in the Court's Chambers Practices.


**SO ORDERED**

Dated:      March 11, 2023
            Brooklyn, New York

_____
**HON. KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York